UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SANKO STEAMSHIP CO. LTD.,       :
                                            :
            Plaintiff,      :              07 Civ. 2401 (VM)
                                            :
     - against -          :              ECF CASE
                                            :
CHINA NATIONAL CHARTERING    :
CORP. also known as SINOCHART,    :
                                            :
           Defendant.     :
-------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO VACATE OR REDUCE MARITIME ATTACHMENT

The Defendant, China National Chartering Corp. (hereinafter "Sinochart" or "Defendant"), by and through its undersigned counsel, Tisdale & Lennon, LLC, respectfully submits this Memorandum of Law in Support of its Motion to Vacate or Reduce the Maritime Attachment issued pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). Pursuant to the Ex-Parte Order for Process of Maritime Attachment issued in this case, Plaintiff, Sanko Steamship Co. Ltd. (hereinafter "Sanko" or "Plaintiff") restrained funds in the amount of $3,752,082.05 belonging to Sinochart. The parties then negotiated a substitute security arrangement and submitted a Stipulated Order for substitute security and release of attached property on April 5, 2007, pursuant to which the parties expressly stipulated that Sinochart's right to bring this motion would be preserved.

Sinochart respectfully submits that under Rules (E)(4)(f) and (E)(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule" or "Rules"), Sanko will be unable to meet its burden of showing why the attachment

should not be vacated because under English law, which governs Plaintiff's claim against Sinochart, it has no cause of action. Recent authority from this Court confirms that absent compelling circumstances, if a claim has not accrued under English Law, then it is not a prima facie valid claim for Rule B purposes and the attachment based thereon should be vacated. *See Sonito Shipping Company Ltd. v. Sun United Maritime Ltd,* 2007 U.S. Dist. LEXIS 19531, at *10 (S.D.N.Y. 2007) (holding cargo claim unripe and vacating attachment); *J.K. Int'l Pty. Ltd. v. Agriko S.A.S.,* 2007 U.S. Dist. LEXIS 10074 (S.D.N.Y. Feb. 13, 2007)(holding indemnity claim was not mature and vacating attachment); and *Bottiglieri Di Na Vigazione Spa v. Tradeline LLC,* 472 F. Supp. 2d 588 (S.D.N.Y. Feb. 6, 2007)(confirming that absent a final adjudication of liability, indemnity claims should not serve as the basis for security in Rule B scenarios).

Further, Plaintiff's claims are also unripe under United States law. The discretionary factors employed by Courts in this context weigh in Defendant's favor, and the underlying claims which form the basis of Plaintiff's indemnity causes of action have not been adjudicated. Plaintiff's indemnity claims are premature and cannot serve as the basis of a Rule B attachment.

Finally, under Supplemental Admiralty Rule E (5) or (6) the attachment should be vacated or reduced because Sanko's claim for security is excessive and unreasonable. For the reasons stated herein, Sanko's attachment should be either vacated in its entirety, or in the alternative, reduced to an appropriate level.

## FACTS

By a charter party dated April 25, 2006, Sanko chartered the motor vessel "SANKO RALLY" (hereinafter the "Vessel") to Sinochart for one time chartered trip of about 60 days, without guarantee. *See Exhibit "1" annexed to the accompanying Declaration of Chris Howse dated April 2, 2007 (hereinafter 'Howse Decl.").* Clause 40 of the Sanko-Sinochart charter party

incorporates the Inter-Club New York Produce Exchange Agreement (1996)("Inter-Club Agreement" or "ICA") *See Howse Decl. ¶ 5; see also Inter-Club Agreement annexed to the Howse Decl. as Exhibit "2."*

The Inter-Club Agreement is a standard contractual form that provides a methodology and structure for the apportionment of liability and payment between shipowners and charterers arising from cargo claims. The Second Circuit Court of Appeals has recognized that the Inter-Club Agreement is "a well-known, long-established agreement specifically identified in the charter party as the document that would govern the settlement of any disputed cargo claims." *Siderius, Inc. v. M.V. "Amilla",* 880 F.2d 662 (2d Cir. 1989). The Second Circuit further observed that the "parties' election to incorporate the Inter-club Agreement is analogous to parties' specifying what law or procedures will govern potential disputes. The Agreement is arguably more like law. . .than it is to an adjudicative fact." *Id.* at 666.

After chartering the Vessel from Sanko, Sinochart in turn chartered the Vessel to Pactrans Air and Sea Inc. ("Pactrans"). In turn, Pactrans made an agreement with the Devon International Trading ("Devon") to import approximately 485,000 sheets of gypsum board drywall/sheetrock.

Pursuant to the Pactrans-Devon agreement, the cargo of drywall/sheetrock was loaded on board the Vessel at Guingdai, China for carriage to and discharge at Pensacloa, Florida in the United States. During the course of the voyage the cargo was allegedly damaged which resulted in alleged losses to Devon, the owner of the cargo.

Eventually, Devon arrested the Vessel to obtain security for its claim of alleged cargo damage.[1] Sanko claims in its Verified Complaint in this action that it posted security in the form of a Letter of Undertaking in the amount $1,650,281.56 in order to procure the Vessel's release. It is unclear at this time whether the provision of security in this regard was reasonable. At the same time, Devon submitted its claim for cargo damage to Pactrans, the party with which it contracted to ship the goods.

After the Vessel was released, Pactrans then arrested it again to obtain security for the *same cargo damage claim* alleged by Devon and for an indemnity demurrage claim raised against it by Sinochart under the Sinochart-Pactrans charter party. Sanko claims in its Verified Complaint in this action that it posted security in the form of a second Letter of Undertaking in the amount of $2,275,000.00 in order to procure the Vessel's release for the second time.[2]

On March 23, 2007, Sanko applied for and obtained an Ex-Parte Order of Maritime Attachment in this action pursuant to Supplemental Admiralty Rule B against Sinochart in order to obtain security for its indemnity claims arising from the claims Pactrans and Devon asserted against Sanko and the Vessel. Pursuant to Sanko's attachment, various garnishee banks restrained Sinochart's funds in the amount of $3,752,082.05.[3] Sanko's request for security against Sinochart is largely comprised of the amounts Sanko provided first to Pactrans and then to Devon *for the same cargo damage claim.* Thus, as well as objecting to the ripeness of Sanko's indemnity claims, Sinochart submits that Sanko's decision to provide <u>double</u> security for the same cargo damage claim is inherently unreasonable. Sinochart should not be required to

---

[1]     Devon brought its action to arrest the Vessel in the United States District Court of the Northern District of Florida and requested security for its cargo damage claim in the amount of $2,000,000.00.
[2]     Pactrans brought its action to arrest the Vessel in the United States District Court of the Southern District of Alabama. In the Alabama arrest action, Pactrans requested security in the amount of $1,500,000.00 for the cargo claim raised against it by Devon. It also requested security in the amount of $891,017.71 for the demurrage claim raised against it by Sinochart. *See Pactrans' Complaint annexed hereto as Exhibit "A."*
[3]     Sinochart, reserving all of its right to contest the attachment and the underlying claims, posted substitute security by means of a letter of undertaking in the amount of $3,752,082.05.

provide double security to Sanko merely because Sanko made the unreasonable decision to provide two Letters of Undertaking ("LOU") for the same claim.

Sanko's remaining claim against Sinochart arises from the demurrage claim that Sinochart itself raised against Pactrans.[4]  During the course of the Sinochart-Pactrans charter, Pactrans failed to pay Sinochart demurrage due and owing under the Sinochart-Pactrans charter party.  As a result, in a separate pending action in this district filed prior to this action, Sinochart applied for and obtained an Ex-Parte Order of Attachment against Pactrans in order to obtain security for its demurrage claim in the amount $775,300.88.[5]

In this action, Sanko sought and obtained security from Sinochart for the very same claim that Sinochart raised against Pactrans!  Thus, by Sanko's unreasonable actions, Sanko has been forced to secure its own claim.  This type of inconsistency and circularity is one of the primary reasons why courts have held that it is inappropriate to permit claimants to obtain security for indemnity claims before those claims have matured and ripened.  If Pactrans has a defense to Sinochart's demurrage claim, then that defense should be raised in arbitration.  The parties in a charter party chain should not be able to skip arbitration altogether and continue passing the buck when there *has been no adjudication of liability.*  If Sinochart were to take Sanko's tack, then Sinochart would now seek security against Pactrans, once again, for all the claims raised against it by Sanko.  Sinochart would base its claim on a theory of indemnity, rather than breach of contract, just as Sanko has done here.  Such logic results in absurd consequences, and an un-ending progression of indemnity claims.  If such a position were endorsed, all security would be essentially worthless and the purpose of Rule B would be abused.

---

[4]    Sinochart recognizes that Sanko has also claimed for the interest, attorneys fees and costs which it has incurred, or will incur in the various proceedings.  Sinochart maintains that as the primary claims are unripe, the corresponding claims for costs, attorneys fees and interest on those claims must fail as well.
[5]    Pursuant to the Ex-Parte Order issued against Pactrans on behalf of Sinochart, various garnishee banks in New York have restrained Pactrans' funds in the approximate amount of $479,715.94.

Sanko has brought the instant action against Sinochart in order to obtain security for its indemnity claims in respect of Devon's and Pactrans' cargo claims against Sanko and the Vessel. The Inter-Club Agreement, as incorporated into the Sanko-Sinochart charter party, sets forth the *exclusive* mechanism for the resolution of cargo claims between Sanko and Sinochart. And, more importantly, the relevant provisions of the Inter-Club Agreement provide that the cargo claims cannot be apportioned against one of the contracting parties unless "the claim has been properly settled or compromised of paid." *See Howse Decl.* ¶8.

A cursory review of the facts reveals that Sanko's claims for cargo damage have not accrued under the Inter-Club Agreement, which indisputable governs Sanko's claims for indemnity against Sinochart. Upon information and belief, neither Devon nor Pactrans have obtained judgment against Sanko. Furthermore, Sanko has made no payment, by award, judgment, settlement or otherwise, to Devon or Pactrans. Thus, Sanko's speculative cargo claims have not accrued under English Law, and do not therefore constitute prima facie admiralty claims as required before Supplemental Admiralty Rule B may be invoked.

For the reasons stated herein, the attachment should be vacated and Sinochart's funds should be released.

## ARGUMENT

### POINT I

### UNDER RULES B AND E, THE PLAINTIFF BEARS THE BURDEN OF <u>ESTABLISHING THAT THE ATTACHMENT SHOULD NOT BE VACATED</u>

A Rule B maritime attachment will not issue unless the plaintiff can establish that: (1) it has alleged a maritime claim against the defendant; (2) the defendant is not present in the district; (3) defendant's property can be found in the district; and (4) no other statutory bar to maritime attachment exists. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 2006 U.S. App. LEXIS

19302, *2-3, 28-30 (2d Cir. 2006). In addition, "a district court *must vacate* an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E." *Id.* (emphasis added). Rule E(4)(f) further provides that "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." *Supplemental Rule E(4)(f)*.

Thus, it is a plaintiff's burden at the post-attachment hearing to show that it has a valid maritime claim. Plaintiff's failure to do so is fatal to a Rule B attachment. *Id.* at 28-29. As will be set forth below, Sanko cannot establish that it has a prima facie valid maritime claim against Sinochart. As such, because Sanko cannot carry its burden of establishing the requirements of Rule B, this Court must vacate the attachment.

## POINT II

## ENGLIGH LAW GOVERNS SANKO'S CLAIMS

It is unequivocal that English law governs Sanko's claims based upon the contractual agreements between Sanko and Sinochart. Despite the fact that Rule B attachments are generally procedural in nature,[6] whether the plaintiff has alleged a prima facie valid maritime claim is substantive matter. *See T&O v. Lydia Mar,* 415 F. Supp. 2d 310, 314 (S.D.N.Y. 2006)(holding that "the law of the contract applies to the question of whether a claim has accrued"); *see also Trinidad Foundry and Fabricating, Ltd. v. M/V K.A.S. CAMILLA,* 966 F.2d 613, 615 (11th Cir. 1992)(recognizing that although the Rules are procedural, the existence of the lien under Rule C is not created by the procedural rule but by substantive maritime law); *see further Garcia v. M/V KUBBAR.,* 4 F. Supp. 2d 99, 103 (N.D.N.Y. 1998).

---

[6] It is well-established in this district that the attachment of funds is a procedural remedy, and federal law applies to procedural issues in admiralty cases. *See Dominion Bulk Int'l, S.A. v. Naviera Panoceanica, S.A.C.,* 2006 U.S. Dist. LEXIS 85616, * 3 (06 CV 6854 (LAP))(S.D.N.Y. Nov. 21, 2006).

In *Sonito Shipping Co.,* 2007 U.S. Dist. LEXIS 19531 at *10, a case strikingly similar to instant matter, Judge Haight confirmed that the question of whether a Plaintiff has alleged a valid maritime claim should be answered pursuant to the applicable substantive law.    Judge Haight reasoned that:

> The Supplemental Rules apply, as Rule A, states, 'to the *procedure* in admiralty and maritime claims.'  Neither Rule B nor any other of the Supplemental Rules create 'a valid prima facie admiralty claim.'  Rather the Supplemental Rules fashions procedures by which a valid maritime claim may form the basis for a writ of maritime attachment.  The existence *vel non* of a valid maritime claim for purposes of a Rule B writ of attachment turns upon the applicable substantive law, in this case the law of the contract.  And that leads to a consideration of English law because, as noted, *supra,* the parties agreed in the charter party that it "shall be governed by and construed in accordance with English law."

*Id.*

Further, it is well-settled that choice of law provisions in maritime contracts are valid unless a strong showing is made that such provisions should be set aside. *Lydia Mar,* 415 F. Supp. 2d at 314; *citing Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10-12; 92 S. Ct. 1907, 1913-1914 (1972).  Choice of law provisions are considered to be the foundation of contractual agreements; thus, exceptions to enforcement are very rare because such provisions are of "far greater strategic importance" than choice of forum provisions. *Marine Oil Trading Ltd. v. M/T Paros,* 287 F. Supp. 2d 638, 645 (E.D.Va. 2003).

Clause 17 of the Sanko-Sinochart Charter Party expressly states that any dispute arising between the parties "shall be referred to arbitration in London with English Law to apply. . ." *Howse Decl.* ¶ 5.  Similarly, Clause 9 of the Inter-Club Agreement, which is the basis of Sanko's cargo claim, directs the application of either English law or the law of the governing Charter Party, which is also English law. *See Inter-Club Agreement annexed to the Howse Decl. as Exhibit "2;" see Sanko-Sinochart charter party annexed to the Howse Decl as Exhibit "1."* Thus, based on the express choice of law provisions contained in both the charter party and the

incorporated Inter-Club Agreement, English law governs this dispute irrespective of the fact that it relates to the use of Rule B procedures.

Regarding Sanko's indemnity claims in respect of the alleged cargo damage, Sanko has failed to comply with a condition precedent (*i.e.* the accrual of an action) that is mandatory under English law before a cause of action is ripe for adjudication. As a substantive matter, the issue of whether a condition precedent has been met to warrant the attachment of Sinochart's funds must be decided under the law of the contract, not the law of the forum. *See Finch v. State Farm Fire and Cas. Co.,* 794 F.2d 685 (11th Cir. 1986) (a contractual condition precedent is a substantive issue to be decided based upon the law of the contract, not the law of the forum); *see further Rose Gehling v. St. George Univ. School of Medicine,* 698 F. Supp. 419, 425-426 (E.D.N.Y. 1988) (holding that analysis of the existence and compliance with a condition precedent is substantive, and not procedural in nature).

**POINT III**

**THE INTER-CLUB AGREEMENT IS THE EXCLUSIVE MECHANISM FOR APPORTIONING LIABILITY FOR CARGO CLAIMS BETWEEN SANKO AND SINOCHART**

An accrued, prima facie valid maritime claim under substantive English law is a prerequisite for Sanko's Rule B action. *See Sonito, supra,* at *10*. The Inter-Club Agreement provides the substantive English Law, governing Sanko's indemnity claims against Sinochart. In order to determine if Sanko has a valid maritime indemnity claim, it must be determined whether the indemnity claim is ripe under the ICA's provisions.

A short description of the Inter-Club Agreement and its purpose is instructive in determining the viability of Sanko's cargo claims. In *Sonito,* Judge Haight summarized the origin of the Inter-Club Agreement as follows:

Claims by third parties for cargo damage or loss are among the more common claims presented to P & I Clubs. Where the vessel carrying the cargo is operating under a charter party, the cargo owner may assert a claim for damages against the shipowner, the charterer, or both. The shipowner may be a member of one P&I club and the charter a member of another. The apportionment of liability for cargo damage and loss among shipowner and a charterer can be litigious, vexing, and expensive. To alleviate these problems, a number of P&I clubs entered into the ICA.

*Sonito, supra, at \*12.*

The Inter-Club Agreement is intended to bring order to the chaos of the cargo claim arena by restraining a claimant's ability to assert a cargo claim until that claim has been resolved by way of judgment or settlement. The Inter-Club Agreement prevents all the possible claimants in a cargo damage scenario from prematurely asserting their claims and unnecessarily disrupting the commercial relations. Thus, it is only logical that where the Inter-Club Agreement has been incorporated into the charter party, it provides the sole mechanism for apportioning liability for cargo claims against the contracting parties. As set forth in Point IV, *infra*, Sanko's indemnity claims have not yet accrued under the Inter-Club Agreement, and therefore do not constitute a prima facie valid maritime claims sufficient to support Sanko's use of Supplemental Rule B.

## POINT IV

### UNDER ENGLISH LAW, SANKO HAS NO CAUSE OF ACTION

Under the Second Circuit's recent decision in *Aqua Stoli v. Gardner Smith Pty. Ltd.,* and the weight of the law of this Circuit for several decades, it is a fundamental requirement of a maritime attachment that the plaintiff make a *prima facie* showing that it has a "maritime claim against the defendant." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.,* 460 F.3d 434, 2006 U.S. App. LEXIS 19302, \* 28-29 (2d Cir. 2006); *see* Rule B, Advisory Committee's Notes (1985); *see e.g. Eitzen Sealift A/AS v. Cementos Andinos Dominicanos,* No. 05 Civ. 4550 (DC),

2005 WL 2218025, at *3-4 (S.D.N.Y. Sept. 9, 2005). Thus, Sanko has the burden to demonstrate that it has such a cause of action against Sinochart.

### a.    Sanko's indemnity claim against Sinochart for demurrage is circuitous and absurd

Here, Sanko is asserting three different causes of action against Sinochart, all under an indemnity theory. The first arises from the demurrage claim that Sinochart originally asserted against Pactrans. By arresting the Vessel, Pactrans has been able to obtain security from Sanko for a future indemnity claim in respect of Sinochart's demurrage claim. Sanko now seeks security from Sinochart for a future indemnity claim in respect of the very same claim. This claim is not only completely hypothetical, but is also circuitous and abusive. Sanko is seeking security from Sinochart for Sinochart's own claim! It is the definition of premature, speculative, and circuitous, and the applicable case law confirms that such a claim should not form the basis for security in a Rule B action. *See Point IV (e).*

Sinochart's second and third causes of action are based on indemnity claims for cargo damage asserted against it by Devon and Pactrans, and are addressed immediately below. As will be shown below, Sinochart cannot meet its burden with regard to these causes of action because the underlying cargo claim(s) against Sinochart is not ripe under English law. Therefore, the attachment must be vacated.

### b.    Under English Law, cargo claims must be resolved before a cause of action under the Inter-Club Agreement accrues

The second and third of Sanko's claims arise out of a potential or future indemnity claim in respect of alleged cargo damage. These potential claims are subject to the Inter-Club Agreement agreed to and adopted as between Sanko and Sinochart. *See Howse Decl.* ¶ 7. As stated by Sinochart's English Law expert Christopher Howse in his Declaration dated April 2,

2007, an English court will conclude that a cause of action arising under the Inter-Club Agreement does not accrue unless and until the original cargo claim has been resolved. *Howse Decl.* ¶¶13, 15-16. As arbitration has not been commenced between Sanko and Sinochart and because the cargo claims Pactrans and Devon raised against Sanko have not been adjudicated by judgment, settlement, or otherwise paid by Sanko, Sanko has no valid, accrued underlying cause of action against Sinochart.

As more fully explained in accompanying Howse Declaration, the issue of when a cause of action will accrue under the Inter-Club Agreement is addressed in Clause 4(c):

> Apportionment under this Agreement shall only be applied to cargo claims where the claim has been properly settled or compromised and paid.

*See Howse Decl.* ¶ 8.

This clause makes it clear that "the apportionment process under the ICA can only take place once the underlying cargo claim has been (properly) settled or compromised and paid. *Howse Decl.* ¶ 13. Moreover, this clause imposes two conditions precedent to the accrual of a cause of action under the Inter-Club Agreement: (1) the original cargo claim must have been decided by a court order, arbitral award or settlement agreement; and (2) the original cargo claimant must have received payment of the funds so owed. *Howse Decl.* ¶8. Thus, according to Mr. Howse, until those events have occurred, there is no right to apportionment. *Id.* Clause 7 of the Inter-Club Agreement also supports this conclusion:

> The amount of any Cargo Claim to be apportioned under this Agreement shall be the amount in fact borne by the party to the Charterparty seeking apportionment.

*Howse Decl., Ex. 2.* This language, specifically the reference to the payment "in fact borne," lends additional support to the proposition that a claim must be resolved and paid prior to the accrual of any indemnity claim.

Although no English decisions have been found that directly address this issue, *dicta* in numerous cases demonstrates that, under English law, a cause of action based on the Inter-Club Agreement does not accrue until the cargo claims have been resolved. *Howse Decl. ¶15.* In addition, Mr. Howse explains two South African decisions that address this precise issue both stand for the proposition that security for future indemnity claims cannot be obtained until the cargo claims have been resolved and paid. *Id.* While these decisions are not binding on English courts, they are regarded as very persuasive authority. *Id.*

In the instant action, none of Sanko's potential indemnity claims have been concluded by a court order, arbitral proceedings, settlement or otherwise, let alone has Sanko commenced arbitration proceedings against Sinochart. Until Sanko establishes that all conditions precedent have been met, it cannot establish that its indemnity claims against Sinochart are valid, accrued claims under the Inter-Club Agreement and English law.

Importantly, this Court recently considered two cases nearly identical to the instant matter and, in applying English law, found that cargo claims must be resolved before a cause of action under an Inter-Club Agreement may accrue. *See Sonito Shiping Ltd, supra; see also T&O v. Lydia Mar*, 415 F. Supp. 2d at 315-317. In *Sonito*, Judge Haight provides a detailed analysis on the applicability of the Inter-Club Agreement to cargo indemnity claims and when such claims accrue under English law. The *Sonito* Court ultimately endorsed the position set forth by Mr. Howse and vacated the plaintiff's attachment, holding that a cause of action for indemnity under the Inter-Cub Agreement does not accrue until the cargo claim has been properly settled

and paid. Furthermore, the Court confirmed that as the plaintiff's cargo claim was unripe under applicable English law, it could not meet its burden to show a prima facie valid claim as required by Rule B, and the attachment could not stand.

Furthermore, in *T&O v. Lydia Mar*, Judge Scheindlin vacated a Rule B attachment stating that the plaintiff's claim was premature because the cargo claims presented had yet to be resolved as required under English law. *See Lydia Mar*, 415 F. Supp. 2d at 310. Sanko's cargo indemnity claims are indistinguishable from those presented in *Sonito* and *Lydia Mar*. In accordance with these precedents, Sanko has no valid, accrued cause of action against Sinochart, and the attachment should therefore be vacated.

### c.   Under English law, the Inter-Club Agreement is an exclusive code that provides the sole remedy with respect to third-party cargo claims

In its Complaint, Sanko has been intentionally vague as to whether it commenced this action exclusively on the basis of the Inter-Club Agreement. As such, it is noteworthy that under English law, a claim under the Inter-Club Agreement is exclusive and paramount to any other remedy related to third-party claims. Moreover, clause 2 of the Inter-Club Agreement contains a paramount clause which provides for the applicability of the terms of the Inter-Club Agreement to the exclusion of any contrary provision. *See Howse Decl*, Ex. 2. Both the decisions and *dicta* of the English cases demonstrate that English courts have determined that the terms of the Inter-Club Agreement are exclusive and paramount to any other remedy with respect to third-party cargo claims. *See Howse Decl*. ¶15. Thus, even if Sanko argues that this suit is brought on the basis of an alternative cause of action, an English court would find that the Inter-Club Agreement is the sole remedy with respect to its indemnity claims based on third-party cargo claims.

### d. Under English law, an accrued cause of action is a condition precedent for a pre-judgment attachment

English law is clear that there must be an accrued cause of action before any pre-judgment security can be ordered. *See Howse Decl.* ¶*13*. A claim under the Inter-Club Agreement does not accrue until the original cargo claims have been resolved. Thus, until the cargo claims against Sanko are resolved and paid (which would constitute an accrued action under the Inter-Club Agreement), Sanko's action against Sinochart is not ripe for adjudication. As Sanko's indemnity claims are premature under English law, it has not asserted prima facie valid mature claims against Sinochart, and the attachment of Sinochart's property must be vacated.

### e. Absent compelling circumstances, an indemnity claim may not serve as the basis for security in a Rule B attachment action

*All* of Sanko's indemnity claims are unripe and contingent. That is, there is a condition precedent which must occur before Sanko's indemnity actions accrue, namely the adjudication of the underlying claims. The law of this Circuit is clear that absent compelling circumstances, a contingent claim is not a proper basis for security in a Rule B action. In general, the plaintiff must wait until the underlying claim has been resolved before its may seek security for *any type* of indemnity claim under Rule B. *See Sonito, at *19* (stating that this Circuit has not been receptive to contingent indemnity claims as bases for maritime arrest for attachment) *citing Greenwich Marine, Inc. v. S.S. Alexandra*, 339 F. 2d 901 (2d Cir. 1965)(vacating attachment based on indemnity claim as premature as no judgment had been entered against the charterer for the cargo damage).

Furthermore, the compelling circumstances exception is construed very narrowly. While there is authority suggesting that district courts have discretion to grant security for some types of indemnity claims, "the scope of a district court's discretion under Rule B has been

15

significantly narrowed by *Aqua Stoli*, and it is unclear whether any such discretion is available to the Court today. In any event, the Second Circuit has made it clear that such discretion may be exercised only in very compelling circumstances." *Bottiglieri Di Na Vigazione SPA v. Tradeline LLC*, 472 F. Supp. 2d 588, 591 (S.D.N.Y. 2007).

Recent case law confirms the principal that where the underlying claim has not been resolved, indemnity claims remain premature and generally cannot serve as the basis for security in a Rule B attachment. *See Sonito Shipping Co., Ltd. v. Sun United Mar., Ltd.*, 2007 U.S. Dist. LEXIS 19531, at *21 (stating that "a number of district judges of this Court have vacated maritime attachments based upon comparable claims for contingent indemnity").

In *J.K. Int'l, Pty., Ltd. v. Agriko S.A.S.*, the Court found the plaintiff's indemnity claim was premature and vacated the attachment. The Court reasoned that absent evidence that the ship owner intended to press a demurrage claim against the plaintiff, plaintiff's claim for contingent indemnity against cargo receivers "is simply too thin a reed to rest on when Plaintiff carries the burden of defending the Attachment." *J.K. Int'l. Pty, Ltd.*, 2007 U.S. Dist. LEXIS 10074 (S.D.N.Y. 2007).

The *Bottiglieri di Navigazione SPA v. Tradeline LLC* case, *supra*, further exemplifies the law on indemnity claims in Rule B actions in this Circuit. In *Bottiglieri*, the Court found that until the underlying action is resolved, an indemnity action based thereon is premature and thus, Rule B is not an available remedy. The Court went on to find that the indemnity claim would remain unripe until the Rule B plaintiff had actually been ordered to reimburse the underlying claimant for the damages that it had paid. Thus, applying the *Bottiglieri's* court's reasoning, until Sanko actually pays, or is ordered to pay, Pactrans' and Devon's claims, its indemnity claims against Sinochart remain unripe and contingent.

16

Here, Plaintiff can show neither that the claims underlying its indemnity actions have been resolved nor that there are any compelling circumstances which would justify maintaining the attachment. Plaintiff will not even be able to show that the underlying claims will be resolved in the near future. To the contrary, it is indisputable that Plaintiff's claims are highly speculative and contingent. Thus, for the foregoing reasons, even under U.S. law, Plaintiff's claims remain unripe and the attachment should therefore be vacated in its entirety.

**f.    Sanko has admitted that the claims are unripe in another litigation, and therefore should be estopped from making arguments to the contrary in this proceeding**

"Estoppel is a bar or impediment which precludes [the]allegation or denial of a certain fact or state of facts, in commission, or in consequence of a previous allegation or denial or conduct or admission, or in consequence in adjudication of the matter in a court of law." *See Black's Law Dictionary, 648 (4ᵗʰ Ed.1968); see also Agoodash Achim of Ithaca v. Temple Beth-El,* 147 Misc. 405, 263 N.Y.S. 81 (N.Y.S. 1933). The purpose of equitable estoppel is to prevent injustice from a party's inconsistent acts, admissions and/or prior statements.

Sanko has admitted that the claims underlying its application for security against Sinochart have not accrued under English or U.S. law and are otherwise premature in another pending litigation in the Southern District of Alabama. Thus, Sanko should be prevented or estopped from arguing the contrary position to Sinochart's detriment in the present action in New York.

After Pactrans' arrested the Sanko Rally, Sanko submitted an opposition to the arrest and affirmatively argued that all claims presented therein, including both the indemnity claim with regard to cargo damage and the indemnity claim with regard to demurrage were: (1) governed by

English Law; (2) not valid, accrued claims; and (3) in all ways premature such that maritime attachment under the Supplemental Admiralty Rules was not an available remedy.

Sanko specifically contended that "English law governs [the] claims against Sanko Steamship and/or SANKO RALLY arising from or related to the shipment of the subject cargo" and that English law does not provide for a lien - the basis for the arrest of the M/V SANKO RALLY and the continued prosecution of this suit against Sanko Steamship – for inchoate or unripe indemnity and/or contribution claims. The same result is reached under U.S. maritime law. . . ." *See Sanko's Brief In Support of Motion to Quash Warrant of Arrest, Release Security and Dismiss Complaint annexed hereto as Exhibit "B," at 2.*

As well as recognizing that English Law governs, Sanko has claimed that the arrest was improper, because "there have been no findings or determinations of liability, no award or settlement paid by Pactrans, and Pactrans has not posted any security in advance of judgment." *See Exhibit "B," p.5.* Contrary to its contentions in this case, Sanko concluded, in opposition to it statements in this action, that "the arrest of the SANKO RALLY. . . was therefore premised on contingent liability." *Id.* Finally, Sanko admits that as the underlying claims are premature under English and U.S. law, they cannot form the basis for a maritime lien (or it is submitted a maritime attachment) pursuant to the Supplemental Admiralty Rules. *See Exhibit "B," at 8.*

As shown above, Sanko set forth almost the exact argument that Sinochart posits herein regarding the pre-maturity of the underlying claims. Sinochart submits that Sanko should be estopped from asserting two completely contradictory and totally inconsistent arguments on the same issue pending before two different courts. Either the underlying claims are ripe or they are not. Sanko cannot have it both ways. Thus, as Sanko has admitted that underlying claims have

not accrued under English or U.S. law in another pending action and are otherwise premature, it should be held to these admissions in this proceeding.

For the foregoing reasons, Sanko's arguments in this action should be disregarded, and the attachment vacated.

**POINT V**

**ALTERNATIVELY, PURSUANT TO SUPPLEMENTAL ADMIRALTY
RULE E(6) THE COURT SHOULD REDUCE THE AMOUNT OF THE ATTACHMENT**

Alternatively, Sinochart moves for a reduction of security provided pursuant to Rule E(6) on the basis that Sanko's alleged damages are unreasonable. To wit, the amount that Sanko prays for in its Verified Complaint is roughly double the amount of any possible judgment that could be realistically rendered against Sanko in the actions commenced against it by Devon and Pactrans. Supplemental Admiralty Rule E(6) provides that " [w]henever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security give. . . ." As set forth above, the Court "has power, pursuant to Supplemental Admiralty Rule E(6) to reduce the amount of the attachment when good cause is shown." *Sea Transp. Contractors, Ltd. v. Indus. Chemiques du Senegal*, 411 F. Supp. 2d 386, 396 (S.D.N.Y. 2006).

It is well settled that a plaintiff must reasonably estimate its damages in a Rule B action or its attachment may be reduced. *See Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235, 237 (S.D.N.Y. 1996)("[m]otions for reducing attachments are common in admiralty law. Because pre-judgment attachments are usually based upon reasonable estimates and not precise facts, parties often attach amounts which are later deemed excessive in light of changes in circumstance. See 7A James W. Moore et al., Moore's Federal Practice P E14 (2d ed. 1996)."

19

Here, Sanko has provided double security for the same cargo claim, *i.e.* it has secured both Devon and Pactrans for the very same alleged cargo damage. This is inherently unreasonable and Sinochart should not be required to post security for unreasonable damages. Under Plaintiff's logic, any time it decides to provide security to a cargo claimant, no matter how unreasonable the amount, it is entitled to obtain security for this amount pursuant to Rule B against any party who may ultimately be liable to Sanko for indemnity. This is illogical and would encourage claimants to post security without determining the reasonableness of the damages claimed, knowing they can then pass the liability on to another party via Rule B attachment by alleging a purely contingent claim.

No matter how the scenario between the interests involved plays out, Sanko could only possibly be required to pay the full extent of the cargo damages one time. It was Sanko's own folly to post security to two parties for the same claim. Sinochart should not be prejudiced by Sanko's ill-considered decision and forced to post more security than can actually be awarded in the underlying arbitration. For this reason, Sanko's attachment should be reduced to reflect the actual amount of the alleged cargo damages one time, *i.e.* $1,500,000.00.[7] Furthermore, the security awarded for the interest and costs related to this claim should be reduced as well to reflect a more reasonable estimate thereof. Sanko's security for interest should be limited to a reasonable estimate thereof, *i.e.* three years at 6% per annum, compounded quarterly. Applied to the reduced claim ($1,500,000), this equals $293,427.26. Furthermore, Sanko's security for costs should be limited to, at the most, 30% of its claim, a generally accepted percentage for the estimation of recoverable damages, which as applied to the adjusted claim equals $450,000.00. Therefore, in total Sanko's security should be reduced to **$2,243,427.20.**

---

[7] See Pactrans' Complaint at 10, annexed hereto as Exhibit "A."

In addition, Sanko's indemnity claim based on Sinochart's own demurrage claim against Pactrans is intrinsically unreasonable and the Court should reduce the attachment with regard to this claim in the full amount requested (approx. $890,071.71). Sanko's alleged indemnity claim arising from Sinochart's own demurrage claim against Pactrans is circuitous and abusive and too far removed from the actual underlying claim to support a Rule B attachment. There are two proceedings which must be completed adverse to Sanko for it to suffer any actual damages with regards to Sinochart's demurrage claim. Particularly, Pactrans must be found liable to Sinochart in arbitration, and Sanko must be found liable to Pactrans in indemnity in a subsequent litigation. Sanko has suffered no actual damages, and cannot rely on rank contingent indemnity claims to support the attachment of Sinochart's property in an amount exceeding $3.7 million. Furthermore, Sanko has even admitted that its indemnity claim based on Sinochart's claim for demurrage against Pactrans is premature. *See Exhibit "B," at 5.*

As Sanko's damages are excessive and unreasonable, the Court should reduce the attachment to reflect a more reasonable assessment of Sanko's liability.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, it is respectfully requested that this Court grant Sinochart's motion to vacate the attachment, or in the alternative, reduce the attachment to an appropriate level.

Dated: New York, NY
     May 7, 2007

                           The Defendant,
                           CHINA NATIONAL CHARTERING
                           CORP. also known as SINOCHART,

By:                    
                           Patrick F. Lennon (PL 2162)
                           Nancy R. Peterson (NP 2871)
                           TISDALE & LENNON, LLC
                           11 West 42nd Street, Suite 900
                           New York, NY 10036
                           (212) 354-0025 – phone
                           (212) 869-0067 – fax
                           plennon@tisdale-lennon.com
                           npeterson@tisdale-lennon.com

## AFFIRMATION OF SERVICE

I hereby certify that on May 7, 2007, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: _____
Nancy R. Peterson (NP 2871)

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| **PACTRANS AIR & SEA INC.,**<br>**a Corporation,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **CIVIL ACTION NO. 06 - 862** |
| **MV SANKO RALLY, her engines,** | § | **In Admiralty** |
| **tackle, appurtenances, etc., *in rem,*** | | |
| **and Sanko Steamship Co., Ltd., *in*** | § | |
| ***personam,*** | | |
| **Defendants.** | § | |

### COMPLAINT FOR CARGO LOSS AND DEMURRAGE

The Complaint of Pactrans Air & Sea, Inc. ("Pactrans") against the Defendants, MV SANKO RALLY, her engines, tackle, appurtenances, *etc., in rem,* ("the vessel"), and Sanko Steamship Co., Ltd., *in personam*, ("Sanko Steamship"), in a cause of contract and tort, civil and maritime, for damages, cargo loss and demurrage, respectfully alleges and represents, upon information and belief, as follows:

I.

This is an admiralty and maritime claim within the jurisdiction of the United States and of this Honorable Court all within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure; Jurisdiction is proper pursuant to 28 U.S.C. §1331; 28 U.S.C. §1332; and 28 U.S.C. §1333.

II.

This complaint is instituted without waiver of the rights of plaintiff, Pactrans, to arrest and or attach other assets, goods or property of the Defendant or other parties in interest, in order to fully secure its claims, including actions to obtain security in aid of arbitration, or collateral attachment.

III.

At all times material hereto, Plaintiff Pactrans Air & Sea, Inc. ("hereinafter Pactrans"), was and now is a corporation duly organized and existing under and by virtue of the laws of the State of Illinois, with its principal place of business at Chicago, Illinios, and had, at all times material hereto, entered into a GENCON Charter dated April 24, 2006 with China National Chartering Corp. for carriage of certain cargo for its disclosed principal aboard the MV SANKO RALLY, a 25,676 GT bulk cargo vessel which flies the Vanuatu flag.

IV.

At all times material hereto, China National Chartering Corp., also known as "Sinochart" (hereinafter "China National" or "Sinochart"), was and now is a corporation or other legal entity organized and existing pursuant to and by virtue of the laws of Peoples Republic of China, or other foreign state, with its offices and principal place of business at Beijing, China, and was engaged in the chartering and operation of oceangoing vessels, and was, at all times material hereto, a time charterer, broker, owner and/or disponent owner of the vessel MV SANKO RALLY.

2

V.

At all times material hereto, Defendant, Sanko Steamship Co., Ltd. (hereinafter "Sanko Steamship"), was and now is a corporation or other legal entity organized and existing pursuant to and by virtue of the laws of foreign state, with its offices and principal place of business outside of the State of Alabama, and was engaged in the chartering and operation of oceangoing vessels, and was, at all times material hereto, a time charterer, broker, owner and/or disponent owner of the vessel MV SANKO RALLY.

VI.

At all times material hereto, the Master of the vessel MV SANKO RALLY was employed by or acting for and on behalf of the Owner and/or disponent Owner of the vessel, including without limitation on behalf of the Defendant Sanko Steamship, and his actions as further described herein which resulted in loss, damage and expense  to Plaintiff, and claims incurred for alleged cargo loss, freight, demurrage and other charges, were binding on said Defendant as well as the vessel *in rem,* for and as an authorized act of said Defendants based on his actions supplanting the judgment of Charterers and assuming obligations and duties with respect to loading, stowing, caring for and securing the cargo, and for the seaworstheness of the vessel and fitness to prosecute the voyage.

VII.

At all times material hereto, Devon International Trading Inc. (hereinafter "Devon"), was and now is a corporation or other legal entity organized and existing pursuant to and by virtue of the laws of the State of Pennsylvania, with its offices and principal place of business at King of Prussia, Pennsylvania, and was engaged in the business of importing

3

and/or sourcing manufacturing products in China, for resale and distribution in the United States, and Devon was the Shipper, Receiver and Consignee of the cargo shipped aboard the SANKO RALLY, or in the alternative, was the Voyage Charterer of the vessel.

VIII.

On or about 24 April, 2006, China National entered into a Voyage Charter, on the Baltic and International Maritime Council Uniform General Charter, as revised 1922, 1976 and 1994 ("GENCON") form, with Pactrans as agent on behalf of Devon, and a true and correct copy of the charterparty is attached hereto as Exhibit "A".

IX.

At the times material, Sanko Steamship was party to a time charter for the vessel, and the charterparty terms applicable to Sanko Steamship required loading of the vessel under supervision of the Master, and Sanko Steamship authorized issuance of Bills of Lading for the cargo loaded aboard the vessel which was expressly made subject to the GENCON Charter, Exhibit "A" as aforesaid.

X.

At the time of entering into the GENCON charter, Exhibit "A" as aforesaid, Pactrans was acting for and on behalf of its disclosed principal, Devon International Trading, Inc., to arrange for transport by Devon of certain cargo from Qingdao, China to Pensacola, Florida, USA, consisting of approximately 7,133 Bundles/31,000 CBM Gypsumboard, and it was expressly understood and agreed in governing charterparties and contracts and

4

affreightment, and the Service Agreement between Pactrans and Devon, that the cargo would be loaded, stowed and discharged free of risk, liability and expense to Pactrans and/or the vessel, and it was further agreed that Pactrans would not be responsible for any damage during loading, or damage caused by improper lashing, securing or dunnage.

XI.

At the times material, Pactrans Service Contract and/or Charter Agreement with Devon required loading, stowing, blocking and bracing to be done by Shipper Devon or his agent, and a true and correct copy of the Service Contract is attached hereto as Exhibit "B."

XII.

After entering into the GENCON charter as aforesaid, the MV SANKO RALLY loaded the said cargo of 7,133 Bundles/31,000 CBM of Gypsumboard for carriage to the Port of Pensacola, Florida and a Bill of Lading was issued on behalf of the vessel, China National and/or Sanko Steamship, to Devon or its Consignee, and dated 25 April, 2006 which further incorporated by reference the provisions of the GENCON charterparty, Exhibit "A" as aforesaid, and a true and correct copy of the Bill of Lading for the Cargo is attached hereto as Exhibit "C".

XIII.

At the time of sailing of the vessel, the Bills of Lading were expressly and/or impliedly ratified by the vessel *in rem,* Sanko Steamship, and the Owners, Charterers and/or Managers of the vessel.

5

XIV.

At all times material hereto, and specifically including the negotiation and agreement for the GENCON charter, Exhibit "A" as aforesaid; and negotiation and agreement to the Service Agreement, Exhibit "B" as aforesaid, loading of the cargo, and issuance of the Bill of Lading, Exhibit "C" as aforesaid, Pactrans was acting as an agent, freight forwarder, or transport intermediary for and on behalf of Devon as its disclosed principal, and because this status was fully disclosed in its dealings with China National, Sinochart and other parties in interest, Pactrans was therefore standing in the shoes of Devon.

XV.

Pactrans relationship with the parties involved at the times material to this litigation, including the carriers of the goods, *viz:* the MV SANKO RALLY *in rem,* Sinochart, China National, Sanko Steamship and other parties in interest, were subject to and governed by standard NCBFAA terms, and a true and correct copy of the applicable NCBFAA terms is attached as Exhibit "D".

XVI.

The cargo of 7,133 Bundles/31,000 CBM of Gypsumboard was loaded at Qingdao, Cina on or about 25 April, 2006 aboard the SANKO RALLY, and the vessel thereafter arrived at the Port of Pensacola, Florida on or about June 15, 2006, where it subsequently discharged her cargo.

XVII.

At the time of loading of the cargo at Qingdao, China the parties had modified the printed terms of the GENCON Charter which had required Pactrans as Charterer to load,

6

stow and secure the cargo; and it was agreed that the cargo would be loaded, stowed, and

discharged free of risk, liability and expense to Pactrans; further agreed that Pactrans was

not responsible for any damages related to the manner of loading; and further agreed that

Devon would assume sole obligation and responsibility for loading, stowing, blocking and

bracing of the cargo as aforesaid and it was further provided in the NCBFAA terms Exhibit

"D" as aforesaid that Pactrans had no liability for acts of Third Parties, that carriers ad the

"Customer" would indemnify, defend and hold Pactrans harmless for any such acts of third

parties; and just prior to commencement of loading of the vessel Devon purported to serve

notice of cancellation of its charter with Pactrans in order to deal directly with Sanko

Steamship and/or vessel Owners for all matters with respect to performance of the

governing Charterparties, carriage of goods and/or the contract of affreightment; and a true

and correct copy of the notice of cancellation is attached hereto as Exhibit "E."

## XVIII.

Thereafter, the Master of the vessel, acting for and at the direction of Devon and/or

Sanko Steamship, became directly involved in loading of the cargo, as evidenced by the

Master's development, design and approval of a stowage plan for the cargo; the Master's

and Sanko Steamship's refusal to permit Pactrans access to the vessel, or monitoring of

loading; and by these actions, and other conduct, the Master and Defendant Sanko

Steamship thereby assumed   full and exclusive responsibility and control for proper

stowage, loading and securing of the cargo; and the Master otherwise imposed his

judgment for that of the Charterers with respect to decisions which affected both the proper

7

stowage and securing of the cargo, and the seaworthiness of the vessel to transport the same.

## XIX.

At the time of loading of the cargo at Qingdao, China, as aforesaid, Sanko Steamship and its Master, acting at the direction of Devon, assumed the responsibilities to load, stow and secure the cargo and further prevented Pactrans from monitoring or attending the vessel, or in any manner directing or supervising the manner in which the cargo was loaded, stowed or secured aboard the vessel; and Defendant Sanko Steamship by its acts, and/or its ratification of the actions of its Master, assumed exclusive custody and control of the vessel and the Cargo during loading, all without consultation or agreement of Pactrans, and Sanko Steamship, by its acts and exclusive control of the vessel and cargo during loading, and assumption of responsibilities for loading, should be held liable for damage to the cargo which occurred on the voyage from Qingdao to Pensacola as a result of negligence during loading, and for alleged failure to properly load, stow and secure the cargo, including without limitation insufficient dunnage.

## XX.

Based on the foregoing, Defendant Sanko Steamship should be held liable for additional costs of discharge for the cargo and expenses of demurrage at the Port of Pensacola, Florida, which was a direct, foreseeable and proximate result of the negligence and acts of Sanko Steamship and its Master, including the manner in which said parties assumed responsibilities for, directed and supervised the loading.

8

XXI.

During the voyage from Qingdao to Pensacola, and with direct knowledge of the deficient manner of stowage and securing of the cargo, the Master of the vessel proceeded on the voyage at an excessive rate of speed, negligently failed to reduce speed during inclement weather, failed to take advantage of safe weather routing for the vessel, and failed to take proper actions to minimize the damage to the cargo which occurred when the bracing and supports for the cargo began to collapse and break during the voyage and weather conditions encountered, and thereby aggravated the situation causing by partial collapse of the stow and damage to the cargo during the voyage.

XXII.

At all times material, the vessel, SANKO RALLY *in rem* and Sanko Steamship had a non-delegable duty imposed by the United States Carrage of Goods by Sea Act ("COGSA") including the provisions of 46 U.S.C. §1303(2), which required the vessel and Sanko Steamship to properly load, stow and trim the cargo, and exercise proper handling of the cargo during the voyage.

XXIII.

As a direct, forseeable and proximate result of the breach of duties, undertakings and obligations assumed by the Master and Defendant Sanko Steamship, or as otherwise imposed on the vessel *in rem* by the governing charterparties, imposed by contract, or otherwise imposed by operation of COGSA to exercise exclusive control of the vessel and properly load and stow the cargo, the cargo arrived at Pensacola in damaged condition,

9

and Devon has made claim against Pactrans for alleged cargo loss and damage of $1.5 Million dollars (USD $1,500,000.00), and has failed and/or refused to pay certain charges for demurrage, port charges, freight and/or charter hire which have been claimed by China National.

XXIV.

Further, as a direct, foreseeable and proximate result of the breach of duties, undertakings and obligations assumed by the Master and Defendant Sanko Steamship, or as otherwise imposed on the vessel *in rem* by the governing charterparties, imposed by contract, or otherwise imposed by operation of COGSA to exercise exclusive control of the vessel and properly load and stow the cargo as aforesaid, and the resulting damage ot the cargo, it required far more time than was provided in the GENCON charter for discharge of the damaged cargo at Pensacola, Florida, and for separation of the damaged from undamaged cargo, and China National has made claim and demanded security against Pactrans for substantial funds including demurrage charges in the amount of $543,814.74; port charges at Pensacola, Florida in the amount of $35,136.74; freight and/or charter hire in the amount of $79,580.09; estimated interest in the amount of $106,486.14; attorneys fees and arbitration costs of $125,000.00; disbursements, survey costs and other proximate damages, and certain additional sums required to be paid pursuant to the charterparty which may be identified, and the total amounts presently claimed against Pactrans to be due and owing are the principal sum of $890,017.71, which is an estimated amount which is as nearly as exact as the same can now be ascertained.

10

XXV.

Based on the foregoing, if Pactrans is deemed liable to Devon for alleged cargo loss of $1.5 Million and or to China National or other parties for demurrage, port charges, freight, charter hire, arbitration costs and attorneys fees of $890,017.21 as aforesaid, as a consequence of the breech of duties and obligations assumed by Defendant Sanko Steamship, its Master, and/or the vessel MV SANKO RALLY *in rem*, then Pactrans is entitled to full indemnity or contribution from Defendant Sanko Steamship and the MV SANKO RALLY *in rem*, or against any security which may be provided in lieu of arrest of the vessel or in order to lift an arrest or attachment of the said vessel; Pactrans is further entitled to express contractual indemnity, or implied indemnity; and Pactrans is further entitled to recovery and claim over against said Defendants Sanko Steamship and MV SANKO RALLY *in rem* for the actions of the Master, and actions of Defendant Sanko Steamship which modified the terms of written agreements, and assumed responsibility for loading of the cargo as aforesaid.

XXVI.

As a direct and proximate result of the aforesaid breaches and actions of Defendants, Plaintiff has incurred a claim for damages and losses of the cargo in the amount of $1.5 million, and has incurred claims and additional expenses for demurrage, port charges, attorneys fees and costs of arbitration in the amount of $890,017.71, estimates which are as exact as can now be calculated, none of which has been paid although duly demanded from Defendants.

11

WHEREFORE, the premises considered, the Plaintiff prays:

(a)     That Process in due form of law be issued for the arrest of said vessel, M/V SANKO RALLY, or the proceeds of sale thereof, pursuant to Supplemental Rule C of the Federal Rules of Civil Procedure.

(b) That Process in due form of law be issued against the Defendant Sanko Steamship Co., Ltd., citing it to appear and answer this Complaint;

(c)     For a judgment herein in favor of Plaintiff Pactrans Air & Sea, Inc. and against the Defendant M/V SANKO RALLY *in rem*, and against the Defendant Sanko Steamship Co., Ltd. *in personam*, in the total amount of TWO MILLION THREE HUNDRED NINETY THOUSAND SEVENTEEN AND 71/100 ($2,390,017.71) DOLLARS, plus interest, attorneys fees and costs.

(d)     That a Decree of Condemnation be issued against the property and credits of the Defendant herein, and against the proceeds of sale of said vessel, for the amount of Plaintiff's claims plus interest, attorneys' fees and costs thereon.

(e)     That Plaintiff have and receive such other, different and further relief as justice and equity may require.


Respectfully submitted,

*Gregory C. Buffalow*

GREGORY C. BUFFALOW (BUFFG 3126)
KENNETH A. WATSON (WATSK 3123)
ADAM M. MILAM (MILAA 2597)
Attorneys for Plaintiff Pactrans Air & Sea Inc.

12

OF COUNSEL:

MILLER HAMILTON SNIDER & ODOM LLC
254 State Street
P.O. Box 46
Mobile, Alabama 36603
Telephone: (251) 432-1414
Facsimile (251) 433-1001

## **VERIFICATION**

STATE OF ALABAMA )
COUNTY OF MOBILE )

BEFORE ME, the undersigned authority, a notary public commissioned and qualified, personally came and appeared:

GREGORY C. BUFFALOW

who, after being duly sworn, did depose and say:

He is an attorney at law and is a member of the firm of Miller, Hamilton, Snider & ODOM, L.L.C., counsel of record for Pactrans Air & Sea Inc;

He has read the above and foregoing Verified Complaint and knows the contents thereof, and that the same are true and correct to the best of his knowledge, information and belief, the sources of said information and the grounds for the belief being material contained in his file, and records furnished to him by PacTrans Air & Sea Inc.; and

The reason that he makes this Verification, which he is authorized to do, is that the Plaintiff is a foreign corporation, no officers of which can be found within the district.

_____
GREGORY C. BUFFALOW

13

Sworn to and subscribed before me
this 19th day of December, 2006.

NOTARY PUBLIC
[AFFIX SEAL]

My Commission expires: 7/26/08

U:\atty\GCB\Pactrans SANKO RALLY\Vessel arrest\Draft Complaint Sanko demurrage security.wpd

14

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

PACTRANS AIR & SEA, INC.,      *

        *

   Plaintiff,            *

        *

vs.                 *   CASE NO. 1:06-cv-00862-CG-C

        *

M/V SANKO RALLY, her engines, tackle,  *   IN ADMIRALTY

appurtenances, etc., *in rem*, and SANKO  *

STEAMSHIP CO., LTD. *in personam*,   *

        *

   Defendants.         *

**BRIEF IN SUPPORT OF MOTION QUASH WARRANT OF ARREST,
RELEASE SECURITY AND DISMISS COMPLAINT**

COMES NOW Defendants M/V SANKO RALLY, *in rem*, and Sanko Steamship Co.,

Ltd., *in personam*,[1] through undersigned counsel, and file this Brief in Support of their Motion to

(1) quash the Warrant of Arrest issued for the M/V SANKO RALLY (Doc. No. 11), (2) release

the security which now substitutes for said vessel, and (3) dismiss the Plaintiff's Complaint for

failure to state a claim upon which relief can be granted or, in the alternative, for failure to join

and indispensable party under Rule 19, <u>Fed. R. Civ. P.</u> <u>See</u> <u>Fed. R. Civ. P.</u> 12(b)(6) and (7).[2]

<u>SUMMARY OF ARGUMENT</u>

English law governs claims against Sanko Steamship and/or SANKO RALLY arising

from or related to the shipment of the subject cargo. English law does not provide for a lien –

---

[1] Sanko Steamship Co., Ltd., appears in a restricted and/or special capacity as permitted under Rule E(8), Supplemental Rules for Certain Admiralty and Maritime Claims.

[2] Defendants' Motion is being submitted without prejudice, and with express reservation thereof, its right to demand arbitration of the instant controversy pursuant to the applicable contracts, charter parties and agreements.

the basis for the arrest of the M/V SANKO RALLY and the continued prosecution of this suit against Sanko Steamship – for inchoate or unripe indemnity and/or contribution claims. The same result is reached under U.S. maritime law, should the Court elect to evaluate the issue using this substantive body of law.

Alternatively, the absence of a necessary and indispensable party (China National Shipping Corp., a/k/a Sincochart) requires the Court to exercise its discretion and dismiss this suit under Rule 19, Fed. R. Civ. P. Indeed, Sinochart's status as a "necessary and indispensable" party has been acknowledged by the Plaintiff.[3] Because there is a parallel proceeding initiated by this Plaintiff wherein the necessary and indispensable party has been sued, the potential harm of proceeding herein far outweighs any prejudice potentially created by dismissing the present suit.

## FACTUAL BACKGROUND/PROCEDURAL HISTORY

This lawsuit stems from the shipment of gypsum board (also referred to as drywall or sheetrock) from Qingdao, China to Pensacola, Florida. Devon International Trading, Inc. ("Devon") was the owner or consignee of the cargo. See Pactrans' "Service Contract" with Devon, attached as "Exhibit B" to Plaintiff's Complaint (Doc. No. 1). Pactrans undertook to provide transportation of this cargo from China to Pensacola. Id. In order to perform and carry out its contractual obligations, Pactrans entered into a voyage charter of the M/V SANKO

---

[3] See Pactrans' "Memorandum in Opposition to Devon International Trading [sic] Motion to Dismiss or Stay," filed in *Pactrans Air & Sea, Inc. v. China National Chartering Corp., et al.*, Civil Action No. 3:06-cv-369-RS-ENT (N. D. Fla.). For ease of reference, said pleading is attached hereto as "Exhibit A."

2

RALLY from China National Shipping Corp. (also known as "Sinochart") on April 24, 2006. See Exhibit A attached to Plaintiff's Complaint. (Doc. No. 1).[4]

Sinochart, in turn, entered into a time charter of the vessel SANKO RALLY from Defendant Sanko Steamship Lines, Inc. on April 25, 2006. See Exhibit B attached hereto.[5] Sanko Steamship was not the owner of the SANKO RALLY, but instead was itself a long-term time charterer of the vessel from its dipsonent owner, Grand Slam Enterprises.

The subject cargo was loaded aboard the M/V SANKO RALLY in Qingdao, China. A Bill of Lading was issued at Qingdao signed by "China Marine Shipping Agency, Shangdong Company Limited" in its capacity as agent for Sinochart and/or Pactrans as carrier(s) of the cargo. See Bill of Lading attached as Exhibit C to Plaintiff's Complain (Doc. No. 1); see also "Shipping Instructions" issued by Sinochart to the Master M/V SANKO RALLY (attached hereto as Exhibit C). These "Instructions" identify China Marine Shipping Agency Shangdong Company Limited, as Sinochart's agent at the load port of Qingdao. See Exhibit C, at p. 5; see also GENCON Charter Party which confirms that agents at load port will be "owner's [Sinochart's] agent." (Exhibit A to Plaintiff's Complaint).

The vessel departed the loading port on or around May 12, 2006. Sinochart provided sailing instructions to the Master of the M/V SANKO RALLY. See Exhibit C, attached hereto. The SANKO RALLY arrived in Pensacola, Florida on or about June 15, 2006. Upon opening the hatches and inspection of the cargo, significant damage was noted.

---

[4] This voyage charter party, also referred to as a "GENCON" Charter Party, is dated April 24, 2006. Sinochart is referred to therein as the "Owner" of the M/V SANKO RALLY, with Pactrans being shown as the "Charterer" of said vessel.

[5] The Sanko Steamship-Sinochart time charter is attached hereto as "Exhibit B."

3

Devon, the consignee/owner of the cargo, filed a lawsuit in the Northern District of Florida against the M/V SANKO RALLY, *in rem*, Sanko Steamship Company, Ltd, *in personam*, and Pactrans, *in personam*. See *Devon International Trading, Inc. v. M/V SANKO RALLY, et al.*, Case No. 3:06-cv-285-RV-MD (N. D. Fla.). The SANKO RALLY was arrested and released when a Letter of Undertaking was given by or on behalf of Sanko Steamship as security. Pactrans, however, has not posted any security for the claims of Devon, nor has Pactrans made any payment to Devon in resolution of cargo claims.

Pactrans – the Plaintiff herein – then filed a separate lawsuit against Devon, China National Chartering Corp. (Sinochart) and the cargo of gypsum board, *in rem*. See *Pactrans Air & Sea, Inc. v. China National Chartering Corp., et al.*, Case No. 3:06-cv-369-RS-ENT (N. D. Fla.). The claims between Devon and Pactrans have been stayed pending the outcome of arbitration between these parties. See 01/26/07 Order, in Case No. 3:06-cv-369-RS (N.D. Fla) (Doc. No. 24). Pactrans' claims against Sinochart, however, remain pending; Pactrans has recently asked for an extension of time to complete service on Sinochart under the Hague Convention. See *Pactrans Air & Sea, Inc.* Case No. 3:06-cv-369 (Doc. No. 23) (asking for extension of time up to and including 3/27/07).

ARGUMENT AND AUTHORITIES

1.    <u>Plaintiff's Demands for Contingent Indemnity or Contribution Do Not Support Lien Claim.</u>

The basis of Pactrans' arrest of the SANKO RALLY (and the *in personam* claims against Sanko Steamship) are claims for indemnity or contribution for potential damages which Pactrans might be caused to suffer in a separate lawsuit filed by Devon. *Devon International Trading, Inc. v. M/V SANKO RALLY, et al.*, Case No. 3:06-cv-285-RV-MD (N. D. Fla.). See Complaint, at

4

¶ XXV (Doc. No. 1). In this parallel suit, there have been no findings or determinations of liability, no award or settlement paid by Pactrans, and Pactrans has not posted any security in advance of judgment.[6]

Pactrans also claims a right to indemnity or contribution for potential damages sought by Sinochart. See Complaint, at ¶ XXIV (Doc. No. 1). However, Sinochart is not a party in the original suit filed by Devon. See *Devon International Trading, Inc. v. M/V SANKO RALLY, et al.*, Case No. 3:06-cv-285-RV-MD (N. D. Fla.). Sinochart has been named as a defendant in a separate suit initiated by Pactrans, but it has not appeared or filed an answer therein. See *Pactrans Air & Sea, Inc. v. China National Chartering Corp., et al.*, Civil Action No. 3:06-cv-369-RS-ENT (N. D. Fla.). Again, there have been no findings of liability adverse to Pactrans, Pactrans has paid no award or settlement to Sinochart, and Pactrans has posted no security for the benefit of Sinochart.

The arrest of the SANKO RALLY in the instant case, therefore, was premised on contingent liabilities and a demand for indemnity or contribution in case these contingent liabilities come to pass. A maritime lien against a vessel is a prerequisite to an action in rem. See Rule C, Supplemental Rules for Certain Admiralty and Maritime Claims; *Belcher Co. of Alabama, Inc. v. M/V MARTHA MARINER*, 724 F.2d 1161, 1163 (5th Cir. 1984). The plaintiff claiming the benefit of the lien has the burden of showing that it is entitled to a maritime lien; if it cannot do so, the arrest fails and must be dissolved. See Rule E(4)(f), Supplemental Rules for Certain Admiralty and Maritime Claims.

---

[6] Conversely, a Letter of Undertaking in the amount of $1,650,281.56 was posted by or on behalf of Sanko Steamship to secure the release of the SANKO RALLY.

**English Law.** Pactrans entered into a voyage charter with Sinochart for the SANKO RALLY. Sinochart, in turn, entered into a time charter dated April 25, 2006 with Sanko Steamship. See Exhibit B attached hereto. The Sanko Steamship–Sincochart contract/charter party calls for the application of English law to any disputes arising from the charter of the vessel SANKO RALLY. Id. The terms of the Sanko Steamship-Sinochart charter party are incorporated into the Bill of Lading issued for the subject cargo. See Bill of Lading attached as Exhibit C to Plaintiff's Complaint (indicating that Bill of Lading was to be used in connection with charter party dated '25 April 2006"). The Bill of Lading evinces the contract of carriage, the agreement which governs the relationships of the interested parties vis-à-vis the subject cargo. See generally Schoenbaum, Admiralty and Maritime Law, § 10-11 (3rd ed. 2001). Pursuant to English law, there is no viable claim for indemnity or contribution available to Pactrans at this juncture. See *Bottiglieri Di Na Vigazione v. Tradeline, LLC*, ___ F. Supp. 2d ___, 2007 WL 404657 (02/06/07 S.D. N.Y.).[7] Accordingly, the arrest of the SANKO RALLY must be quashed, the security provided in its stead should be released, and this suit is due to be dismissed.

First, an English court would dismiss the case because it would not recognize the claimed lien. An action *in rem* must be initiated by a writ issued by the Admiralty Registry of the High Court and must be served within the High Court's jurisdiction. See *Trinidad Foundry & Fabricating, Ltd. v. M/V K.A.S. CAMILLA*, 966 F.2d 613, 616 (11th Cir. 1992); *North End Oil, Ltd. v. M/V OCEAN CONFIDENCE*, 777 F. Supp. 12, 13-14 (C. D. Cal. 1991). Pactrans does not have a writ issued by the appropriate English authority and the vessel was not served within

---

[7] Copy of decision is attached as "Exhibit D."

6

the appropriate jurisdiction.

Even if the M/V SANKO RALLY had been served within the English Admiralty Court's jurisdiction, English law does not recognize a substantive claim for an inchoate or unripe demand for indemnity in the context of this case, i.e. claims against "upstream" time charterer where plaintiff has not suffered actual damage. The facts of *Bottiglieri* dovetail with those in the case at bar and illustrate why Pactrans' present claims against Defendants are unfounded.

The parties in *Bottiglieri* entered into a charter party whereby the Plaintiff (Bottiglieri) chartered to the Defendant (Tradeline) the vessel M/V KAVO DELFINI for the transport of corn and other cargo from Argentina to Iran. Plaintiff, in turn, had chartered the vessel from its actual owner who not a party to the subject lawsuit. Upon discharge, it was discovered that cargo was severely damaged. The vessel's owner settled the claim with the receivers for approximately $2 million and commenced arbitration against Bottiglieri to recover its losses. Id., at *1. Bottiglieri later filed suit against Tradeline and sought to attach close to $3 million, an amount that included the potential liability Bottiglieri faced in its arbitration with the vessel owner. Id. It was undisputed – like in the instant case – that Bottiglieri had not incurred any liability nor had it been forced to pay the vessel owner in the underlying arbitration. Id.

Tradeline moved the court to dismiss the lawsuit, arguing that Plaintiff's indemnity claim was unripe under English law and that the Plaintiff had failed to establish a valid *prima facie* admiralty claim. Id., at *2. The court, after a brief recitation of English law, agreed, and dismissed the attachment of Tradeline's funds. Id., at **2-3 (citing *Telfair Shipping Corp. v. Intersea Carriers, S. A.*, (the CAROLINE P.), [1984] 2 Lloyd's Rep. 466); see also *Olin Corp. v. Fisons, PLC*, 47 F.Supp.2d 151, 158 (D. Mass. 1999) ("[U]nder English law, this cause of action

7

for indemnification will not accrue until the fact and extent of [putative indemnitee's liability] is established . . . .").

The Court in *North End Oil*, *supra*, discussed the need for a substantive right under the controlling law before a procedural mechanism (e.g., arrest under Rule C) can be used:

> Third, even if English law governed only the substantive aspects of the case, NEO [plaintiff] still may not proceed in rem because it does not have the necessary underlying right to a maritime lien. NEO is attempting to use a procedural device of U.S. law, the in rem action, to create the underlying substantive right to a maritime lien. Under English law NEO has no substantive right to a maritime lien, and therefore, may not use U.S. procedural law to create such a right.

*North End Oil, Ltd.*, 777 F.Supp. at 14 (discussing lien for bunkers). An action in rem may be brought only to enforce a maritime lien or when provided for by statute. Rule C(1), Supplemental Rules for Certain Admiralty and Maritime Claims. Under English law, there is no right to indemnity for inchoate or unripe claims. Under English law, therefore, there can be no basis for the arrest of the M/V SANKO RALLY or the continued prosecution of *in personam* claims against Sanko Steamship. See *Bottiglieri*, 2007 WL 404657, at * 2; *North End Oil, Ltd. supra*.

**American Law.** Evaluating the instant claim under the guise of the U. S. general maritime leads to the same result; i.e., Pactrans has not been cast into judgment, forced to post security, etc. Therefore, its claims for indemnity or contribution have not matured and do not support the continued prosecution of this suit. It is well established that a claim for indemnity accrues not when the underlying tort is committed, but when the underlying claim, a judgment on that claim, or a settlement of that claims is paid or discharged. See *The TOLEDO*, 122 F.2d 255, 257 (2nd Cir. 1941); *In re American Export Lines, Inc.*, 568 F.Supp. 956, 962 (S.D. N.Y.

1983). "This is the prevailing rule in suits in admiralty." *In re American Export Lines, Inc.*, 568 F.Supp. at 963 (citing, *inter alia, Hercules, Inc. v. Stevens Shipping Co., Inc.*, 698 F.2d 726 (5th Cir. 1983) (*en banc*)).

Regarding contribution, the general rule is that a cause of action for contribution does not arise until the party seeking judgment has paid, or had a judgment rendered against him, for more that his proportional share of a common liability. See *Sea-Land Service, Inc. v. United States*, 874 F.2d 169, 171-72 (3rd Cir. 1989), where the Court held, as follows:

> A cause of action for contribution between private parties in admiralty cases accrues either when one party pays, or has a judgment entered against it, for more than its share of the damages. See *Erie R.R. Co. v. Erie Transportation Co.*, 204 U.S. 220, 226-227 (1907) (stating that a right to contribution in an admiralty collision case accrues when the third-party plaintiff pays the original plaintiff). This court thus observed in *Purnell v. Norned Shipping B.V.*, 801 F.2d 152, 156 (3d Cir.1986), *cert. denied*, 480 U.S. 934 (1987), a noncollision admiralty case, that "if the plaintiffs had a wrongful death claim against the City immediately following the decedents' deaths, ... the Stevedore, at that point, had an *inchoate* claim for contribution against the City under federal maritime law which would mature when it paid more than its share of the joint liability." (emphasis in original). Similarly, in the context of a collision case, we had occasion to address the issue of when a claim for contribution matures in *Stahl v. Ohio River Company*, 424 F.2d 52, 56 (3d Cir.1970) (analyzing when a claim for contribution is mature under F.R.C.P. 13 and 14, the court observed that a counter-claimant seeking contributions "could not show he was entitled to relief until there was a final adjudication of liability . . . .").
>
> These cases reflect the admiralty law as articulated by other courts. See *Petition of Bloomfield Steamship Co.*, 422 F.2d 728, 734 (2d Cir.1970) (In a collision case between private parties, "[t]he right to contribution from the joint tort-feasor can be appropriately asserted only where the other tort-feasor has paid more than half of a third party's damages."); *ITT Rayonier*, 620 F.2d 512 (In a noncollision case, the court stated that "the general rule that any limitations period in a cause of action for indemnity or contribution does not begin to run until judgment against the defendant has been entered or payment of the primary liability payment has been made should be followed.")

9

Pactrans is not without recourse if it wants to direct potential liability towards the Defendants herein. There are two lawsuits pending in the Northern District of Florida. Rules 13 and 14, Fed. R. Civ. P., permit Pactrans to use cross-claims or third-party practice to "tender" Defendants to Devon or Sinochart. These mechanisms can facilitate the prosecution of inchoate or unripe claims when used in a properly filed lawsuit. However, these procedural devises – standing alone – are not available under Rule C, Supplemental Rules for Certain Admiralty and Maritime Claims; there must be a viable claim to support a maritime lien to sustain a Rule C arrest of a vessel. Under English law or the U.S. general maritime law, Pactrans' inchoate claims for indemnity and/or contribution cannot sustain the arrest of a vessel or the continued prosecution of this suit.

2.    Failure to Join Indispensable Party.

Pactrans entered into a contract with Devon, its customer and the receiver/consignee of the cargo, for the transportation of goods from China to Pensacola. See Pactrans' "Service Contract" with Devon, attached as "Exhibit B" to Plaintiff's Complaint (Doc. No. 1). Pactrans in turn entered into another contract, a voyage charter for the SANKO RALLY, with Sinochart. See Exhibit A attached to Plaintiff's Complaint. (Doc. No. 1). Sinochart chartered the SANKO RALLY from Defendant Sanko Steamship. See Exhibit A, attached hereto.

Sinochart is the missing link in the contractual chain created by the shipment of the subject cargo. Sinochart, therefore, is a party without whom complete relief cannot be accorded or, in the alternative, is so situated that the disposition of this action will expose Defendants to a substantial risk of incurring multiple or inconsistent obligations. For proof of the latter point, the Court should simply take note of the two arrests of the SANKO RALLY which have already

10

occurred, requiring Defendants to post double security for essentially the same underlying events.

Rule 19, <u>Fed. R. Civ. P.</u>, governs joinder of parties and provides for a two-part inquiry to determine whether an action should be dismissed for failure to join an indispensable party. *Focus on the Family v. Pinellas Suncoast Transit Authority,* 344 F.3d 1263, 1279 (11th Cir.2003). First the Court must focus on whether the presence of the party to the action is necessary. Specifically, Rule 19(a) provides, in relevant part:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

If Rule 19(a)'s threshold standard is met and the party cannot be joined, the Court should next consider whether dismissal is warranted under Rule 19(b). Pursuant to this second prong, the Court must determine whether the suit can proceed "in equity and good conscience" without the necessary party, or "should be dismissed, the absent [party] being thus regarded as indispensable." Rule 19(b), <u>Fed. R. Civ. P.</u> Rule 19(b) provides lists the factors to be considered in such an evaluation:

> The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

11

In making the determination as to whether the party in question should be joined "pragmatic concerns, especially the effect on the parties and the litigation, control." *Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.,* 669 F.2d 667, 669 (11th Cir.1982) (internal citations omitted); see also *In re Torcise,* 116 F.3d 860, 865 (11th Cir.1997) ("findings of indispensability must be based on stated pragmatic considerations, especially the effect on parties and on litigation") (internal citations omitted).

**Joinder of Sinochart.** Plaintiff has acknowledged that Sinochart is a necessary party; attached hereto as "Exhibit A" is a copy of Pactrans' "Memorandum in Opposition to Devon International Trading [sic] Motion to Dismiss or Stay," filed in one of the Northern District of Florida cases. In said pleading, Pactrans cites that the need for Sinochart's participation to obtain complete resolution of the instant controversy:

> A stay of the action, or dispositive ruling on the appropriate venue for arbitration, would be premature at this stage because all of the necessary parties have not yet been served and joined in the litigation
>
> \*   \*   \*   \*
>
> While counsel for China National is aware of the captioned litigation, and has definite views concerning arbitration venue, they have not filed an appearance in the Northern District of Florida pending actual receipt by China National of the Summons and Complaint through regular service pursuant to the Hague Convention on service of documents abroad. It is anticipated that such service can be completed within the next thirty (30) days.
>
> It is important that this Court await service of China National Corp. as an additional defendant because Pactrans, Devon and China National are all parties to the GENCON Charter party on which the instant claims for demurrage and arbitrability are based. In order to avoid piecemeal resolution of arbitration issues, and enforce arbitration as to all parties in the same venue at the same time, it is submitted that this Court should await joinder of China National as a party before the Court enters a ruling on arbitration.

Exhibit A, at pp.8-9.

In further support of Sinochart's position as a necessary party, it must be recalled that there is no contract between Plaintiff and Sanko Steamship. Plaintiff's only contracts with respect to the cargo at issue were with Devon (its customer and the receiver/consignee of the cargo) and Sinochart (the time charterer of the SANKO RALLY with whom Pactrans contracted for the shipment of the cargo). Any claims premised on alleged breaches of contract necessarily require discovery, investigation and adjudication of Sinochart as the time charterer/vessel "owner" for the shipment at issue. See Exhibit A attached to Plaintiff's Complaint.[8] (Doc. No. 1).

Likewise, with respect to Plaintiff's tort-based claims, any acts or omissions regarding the loading, stowing and transporting of the cargo are attributable to Sinochart or its agents, not the Defendants herein. Sinochart's agents at the load port were responsible for the loading, stowing, etc., of the cargo. See Sinochart's "Shipping Instructions," attached hereto as Exhibit C. The Bill of Lading was executed by Sinochart's agent at the load port. See Bill of Lading attached as Exhibit C to Plaintiff's Complain (Doc. No. 1). Discovery, investigation and adjudication of the facts surrounding the loading, stowing and securing of the cargo – all done under the direction, control and supervision of Sinochart or its agents – is absolutely necessary for the resolution of these claims.

Alternatively, the risk of double, multiple or inconsistent obligations has already come to pass. As noted above, the SANKO RALLY has been arrested twice: Once in Pensacola by Devon and, more recently, by Pactrans in the connection with the instant matter. Defendants

---

[8] In this voyage charter party, Sinochart is referred to as the "Owner" of the M/V SANKO RALLY, with Pactrans being shown as the "Charterer" of said vessel.

have been forced to put up security twice (most of which is duplicative since there can only be one recovery for cargo damage). The underlying cargo claims remain unresolved, and not all of the requisite parties are present in either of the parallel proceedings. Defendants therefore remain exposed to possibly another arrest of the SANKO RALLY or other efforts to obtain pre-judgment security. Only with the participation of Sinochart will all of the necessary parties be present so that complete resolution of the claims is possible.

**Feasiblity of Joinder.** Sinochart is a Chinese corporation, possibly owned and/or controlled by the Chinese government. Pactrans named Sinochart as a defendant in its parallel suit now pending in the Northern District of Florida. *Pactrans Air & Sea, Inc. v. China National Chartering Corp., et al.*, Case No. 3:06-cv-369-RS-ENT (N. D. Fla.). The difficulty of accomplishing service over this foreign entity is depicted in Pactrans' "Second Motion for Extension of Time for Service of Complaint." (Doc. No. 23) (attached hereto as Exhibit F). Pactrans has been trying, unsuccessfully, since September of 2006 to perfect service on Sinochart. See Exhibit E. Sinochart is aware of the Florida proceedings but is unwilling to participate voluntarily. See Exhibit A, at p. 9; Exhibit E, at pp. 2-3. It is fair to assume the same delays would be faced in undertaking to join Sinochart as a party to the instant proceedings.

Further, and assuming that service could be made, this Court will not likely have personal jurisdiction over Sinochart. The events giving rise to the suit took place in Pensacola, within the Northern District of Florida. This suit was initiated in the Southern District of Alabama simply as a means to arrest the SANKO RALLY while it was in the Port of Mobile. Sinochart is not believed to regularly and systematically conduct business in this District or the State of Alabama. It is not believed to have any offices, agents or representatives present in the District or State of

14

Alabama, own or lease any real or personal property in the State, or otherwise have any of the necessary contacts with this forum so that personal jurisdiction could appropriately be exercised.

**Action Should not Proceed Absent Presence of Sinochart.** Assuming that Sinochart cannot feasibly be joined as a party, "equity and good conscience" warrants that dismissal of the action is appropriate. The first factor under Rule 19(b) considers the prejudice which would result from a judgment rendered in the absence of Sinochart. This suit is basically a breach of contract action wherein one of the contracting parties is not before the Court. Sinochart's interest in the contracts is at least equal to that of Plaintiff (for the voyage charter party of the SANKO RALLY) and Defendant Sanko Steamship (for the time charter of the vessel). See, e.g., *Alaska Freight Lines, Inc. v. Weeks*, 18 F.R.D. 64, 66 (D. D.C. 1955) (holding that, before any final decree adjudicating contract issues could be entered, all parties to the contract must be heard). The collateral effects of rulings herein on myriad issues – discovery, evidence and damages – would also prejudice both Plaintiff and Defendants if and when Sinochart is served in the parallel suit.

The second factor asks what protective measures could be fashioned to lessen or avoid the potential prejudice. The most obvious measure would be to direct Pactrans to join Sinochart as a party to this suit. Alternative consideration might be given to transfer of this suit to the Northern District of Florida *if and when* Pactrans succeeds in serving Sinochart in its suit now pending therein. Any provision which might be fashioned to reduce the risk of prejudice or exposure to multiple damage awards must involve the participation of Sinochart.

The adequacy of judgment in the absence of Sinochart and whether or not the Plaintiff (Pactrans) will have an adequate remedy are the third and fourth factors. "The court should

15

consider whether there is any assurance that the plaintiff, if dismissed, could sue effectively in another forum where better joinder would be possible." (Advisory Committee Notes, Rule 19(b)). Here, an alternative forum not only exists, Plaintiff has an active lawsuit pending therein (N.D. Florida) where it is anticipating the appearance of Sinochart. The fact that the voyage charter terminated in Pensacola will likely sustain that court's exercise of personal jurisdiction over Sinochart, as opposed to the lack of any significant contacts in this District.

Rule 19 contemplates that alternatives to dismissal should be. employee where appropriate. "Thus, courts generally will dismiss only when serious harm may result from nonjoinder and the plaintiff's interest can be protected by proceeding in another forum." Moore's Federal Practice (Third), at § 19.02[3][c]. Because of the pendency of a parallel suit in a nearby venue, with service on the missing and necessary party already underway, dismissal of this suit is appropriate. This conclusion becomes clear once weighed against the prejudice and harm faced by Defendants should this matter proceed without Sinochart's presence.

CONCLUSION

Absent a substantive basis – under English or U.S. law – for its arrest of the SANKO RALLY and the continued prosecution of its claims, Plaintiff's suit is due to be dismissed. <u>Fed. R. Civ. P.</u> 12(b)(6). Alternatively, Sinochart is a necessary and indispensable party without whom complete relief cannot be accorded under Rule 19, <u>Fed. R. Civ. P.</u> Plaintiff's suit should be dismissed for failure to join an indispensable party. <u>Fed. R. Civ. P.</u> 12(b)(7),

WHEREFORE, Defendants move the Court for the following relief:

1.    That the Warrant of Arrest issued for the M/V SANKO RALLY (Doc. No. 11) be quashed;

2.    That the security which now substitutes for said vessel be released;

16

3.    That the Plaintiff's Complaint be dismissed, with prejudice; and,

4.    For such other, further and different relief as justice may so require.

Respectfully submitted,

*s/ John P. Kavanagh, Jr.*
ABRAM L. PHILIPS, JR.    (PHILA8019)
JOHN P. KAVANAGH, JR.    (KAVAJ1011)
Attorneys for Defendants

OF COUNSEL:

BOWRON, LATTA & WASDEN, P.C.
Post Office Box 16046
Mobile, Alabama 36616
Telephone:    251-344-5151
Facsimile:    251-344-9696

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of March, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Gregory C. Buffalow, Esquire
Kenneth A. Watson, Esquire
Adam M. Milam, Esquire
Miller Hamilton Snider & Odom, LLC
P.O. Box 46
Mobile, Alabama 36603

*s/John P. Kavanagh, Jr.*