UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

SANKO STEAMSHIP CO. LTD.,    :
                 :
        Plaintiff,         :              07 Civ. 2401 (VM)
                 :
    - against -          :              ECF CASE
                 :
CHINA NATIONAL CHARTERING    :
CORP. also known as SINOCHART,    :
                 :
        Defendant.      :
------------------------------------------------------X

## DECLARATION OF CHRIS HOWSE
### IN SUPPORT OF DEFENDANT'S
### MOTION TO VACATE MARITIME ATTACHMENT

     Chris Howse declares under penalty of perjury of the laws of the United States of America as follows:

     1.      I am a partner in the Hong Kong office of Richards Butler, English counsel to the Defendant in this action, China National Chartering Corp. ("Sinochart") and I make this declaration based upon my own personal knowledge and upon documents that I believe to be true and accurate.

     2.      For the purposes of this Declaration, I have reviewed:

(A)      A time-charter contract on the NYPE Form dated 25th April 2006 between the Sanko Steamship Co. Ltd., Tokyo ("Sanko"), and Sinochart.   (*See Exhibit "1" annexed hereto*).

(B)      The Inter-Club New York Exchange Agreement dated 1st September 1996 ("The Inter-Club Agreement") and the commentary to the Inter-Club Agreement as set out in Time Charters, 5th Edition, by Michael Wilford, Terence Coghlin and John D. Kimball, pages 341 to 345. (*See Exhibit "2" annexed hereto*).

(C)      Verified Complaint filed by Sanko against Sinochart in this action.

The Facts

3.      By charter party contract dated 25th April, 2006, between Sanko and Sinochart,

Sanko, as owners, chartered the vessel "SANKO RALLY" for one time charter trip duration

about 60 days without guarantee.

4.      Pursuant to the terms of the charter, a cargo of plasterboard was loaded at

Quingdao, China for carriage to and discharge at Pensacola in the United States.

5.      For the purposes of this Declaration, the relevant clauses in the charter are as

follows:

"8.      The Captain shall prosecute his voyages with due despatch and shall render all customary
         assistance with ship's crew and boats.  The Captain (although appointed by the Owners)
         shall be under the orders and directions of the Charterers as regards employment and
         agency; and Charterers are to perform all cargo handling at their expense under the
         supervision of the Captain, who is to sign the bills of lading for cargo as presented in
         conformity with mate's or tally clerk's receipts.  However, at Charterers' option, the
         Charterers or their agents may sign bills of lading on behalf of the Captain always in
         conformity with mate's or tally clerk's receipts."

"17.     Should any dispute arise between Owners and Charterers, the matter in dispute shall be
         referred to arbitration in London, English Law to apply, in accordance with the
         Arbitration Act 1990 and any subsequent amendment.  The award of the arbitration shall
         be final and for the purpose of enforcing any award this agreement may be made a rule of
         the Court."

"40.     Liability for cargo claims shall be borne by the Owners and the Charterers in accordance
         with NYPE Inter-Club Agreement as amended September 1996 including subsequent
         amendments."

"78.     Bill of Lading Clause
         ...
         (C)     It is agreed that Charterers shall handle cargo claims in the first instance and
                 provide security to cargo interests in respect of cargo claims within a reasonable
                 time of receipt of a request to do so."

*See Exhibit "1."*

6.      I am advised, and note that this is confirmed by Sanko in the Verified Complaint,

which they have filed in this action , that it is alleged that, while on the voyage from Quingdao to

Pensacola, the vessel's cargo of plasterboard collapsed due to the improper stowage of the cargo

by agents and representatives of Sinochart. The collapse of the stowage allegedly caused loss

and damage to the owners of the cargo, Devon International Trading Inc., and Pactrans Air and

Sea Inc. who arrested the vessel in order to obtain security for their claims in Florida and

subsequently in Mobile, Alabama. Security was allegedly provided by Sanko through their

underwriter in the amounts of US$1,650,281.56 and US$2,275,000 respectively. I am advised

that Sanko has not paid the cargo claims, although it is seeking security in New York by way of a

Rule B Attachment in the amount of US$3,752,084.05 from Sinochart.

      7.    The parties to the charter had agreed, as confirmed by clause 40, that liability for

cargo claims would be apportioned in accordance with the provisions of the Inter-Club

Agreement, as amended in September 1996.

      8.    The relevant provisions of the Inter-Club Agreement provide:

"(4)    Apportionment under this Agreement shall only be applied to cargo claims where:

    (a)    The claim was made under a contract of carriage, whatever its form,

        ...

    and

    (b)    the cargo responsibility clauses in the charterparty have not been materially
        amended. A material amendment is one which makes the liability, as between
        Owners and Charterers, for Cargo Claims clear.

        ...
        (The clause goes on to identify two specific amendments which are considered
        material but as these two amendments have not been made to the charter in this
        case I will not set out these provisions)

        ...

    and

    (c)    The claim has been properly settled or compromised and paid."

*See Exhibit "2."*

9.      I understand that the cargo claims allegedly asserted against Sanko have been made under a contract of carriage.

10.     I do not consider that the charterparty has been materially amended, in particular, no amendments have been made to clause 8 or clause 26 as referred to in clause (4)(b)(i) and (ii) of the Inter-Club Agreement.

11.     I have reviewed the provisions of clause 78(C) of the charter. (See Exhibit "1"). I do no believe that the provisions of clause 78(C) affect the position under the Inter-Club Agreement as this clause does not seek to determine or apportion liability for cargo claims.

12.     I have been asked to advise, as a matter of English law, on the effect of the Inter-Club Agreement and the nature of the claim which Sanko is seeking to pursue against Sinochart.

13.     The purpose of the Inter-Club Agreement was to avoid difficulties which had arisen under the NYPE charter, in particular, clause 8, regarding the settlement of cargo claims. The Inter-Club Agreement is intended to provide a complete code for the settlement of cargo claims between the parties to an NYPE charter provided that the provisions of the Inter-Club Agreement and, in particular, clause (4) are satisfied. It is a specific requirement that, before either party can invoke the provisions of the Inter-Club Agreement, as provided by clause (4)(c), the cargo claims in respect of which indemnity is sought, have been properly settled or compromised and paid. Under English law, until such time as clause (4)(c) is satisfied, there is no right to pursue an indemnity claim by reference to the Inter-Club Agreement under an NYPE charter.

14.     In the present case, there appears to be no dispute that Sanko has not settled, compromised or paid the cargo claims. Accordingly, as a matter of English law, they have no accrued, or ripe, cause of action which they can pursue against Sinochart.

G:\Litigation\S\S110\046-001E.doc

- 4 -

15.    There has been a case in South Africa which is frequently referred to by shipping practitioners in England on this very point - <u>Wajilam Export (Singapore) Pte Ltd. -v- Transpacific Eternity S.A. (The "GALLANT II") - High Court (Durban and Coast Local Div) (Pillay MS) - 31st January 2003</u>. (*See Exhibit "3" annexed hereto*). In that case, a cargo of steel coils was carried from Mumbai in India to Ravenna in Italy. When the cargo was discharged, the cargo receiver alleged that many of the coils were damaged and they obtained an Order detaining the vessel at Ravenna pending security being provided by Owners for the cargo claim. The Owners, having provided security, contended that they had a prima facie right of recourse against the Charterers in the form of a claim for damages for breach of the charter in respect of sums which they alleged would be payable by Owners to cargo interests in a dispute which would be determined by arbitration in London. The Owners sought security for this indemnity claim by arresting the assets of the charterers, namely the bunkers on board the vessel "GALLANT II", in South Africa. The South African Court held, on the wording of the 1996 Inter-Club Agreement, that, until the cargo claims had been compromised or settled, the owners were not entitled to pursue a claim for an indemnity nor were they entitled to obtain security in respect of such a claim.

16.    I understand that the foregoing analysis was precisely the same as was adopted by the courts in *Sonito Shipping Co., Ltd. v. Sun United Mar., Ltd.*, 2007 U.S. Dist. LEXIS 19531 (S.D.N.Y. March 19, 2007) and *T & O Shipping, Ltd. v. Lydia Mar Shipping Co.*, 415 F. Supp. 2d 310 (S.D.N.Y. 2006). I have reviewed these decisions and can conceive of no reason why the analysis and outcome should not be the same with regard to Sanko's claims against Sinochart in this matter.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on April 2nd, 2007 in Hong Kong.

_____
C.G. Howse

## AFFIRMATION OF SERVICE

I hereby certify that on May 7, 2007, a copy of the foregoing Declaration was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF system.

By: _____
Nancy R. Peterson (NP 2871)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
SANKO STEAMSHIP CO. LTD.,                    :
                                             :
                    Plaintiff,               :          07 Civ. 2401 (VM)
                                             :
        - against -                          :          ECF CASE
                                             :
CHINA NATIONAL CHARTERING                    :
CORP. also known as SINOCHART,               :
                                             :
                    Defendant.               :
------------------------------------------------------X

EXHIBIT 1

# TIME CHARTER

## New York Produce Exchange Form

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946; June 12th, 1981

| | |
|---|---|
| | THIS CHARTER PARTY, made and concluded in ....Beijing......................... 1 |
| | .............25th.................. day of........April 2006.................... 19............ 2 |
| **Owners** | between ............THE SANKO STEAMSHIP CO. LTD.,TOKYO....................... 3 |
| | ......................................................................Owners of 4 |
| | ~~Steamship~~ |
| | The good ......................................Motorship ...." SANKO RALLYL".................. 5 |
| **Description** | of ........................................ of ........ ~~tons gross register, and~~ 6 |
| **of** | ~~tons net register, having engines of~~............................... 7 |
| **Vessel** | ~~horsepower and with hull, machinery and equipment in a throughly efficient~~ 8 |
| | ~~state, and classed~~........................................~~of about~~ 9 |
| | ~~cubic feet grain/bale capacity~~....................... 10 |
| | .............................................................~~and about~~ 11 |
| | ~~long/metric tons deadweight capacity (cargo and~~ 12 |
| | ~~bunkers, including fresh water and stores not exceeding~~................... 13 |
| | ~~long/metric tons) on a salt water draft of~~............................~~on summer~~ 14 |
| | ~~freeboard, inclusive of permanent bunkers, which are of the capacity of about~~ 15 |
| | ...................................................~~long/metric tons of~~ 16 |
| | ..........................~~fuel oil and~~............................ 17 |
| | ~~long/metric tons of~~.........................................~~and~~ 18 |
| | ~~capable of steaming, fully laden, under good weather conditions about~~ 19 |
| | ...................~~knots on a consumption of about~~...................... 20 |
| | ~~long/metric tons of~~  (*Description See Clause 28* ).................... 21 |
| | 22 |
| | now *trading* ...................................................... 23 |
| | ......................................................... and 24 |
| **Charterers** | CHINA NATIONAL CHARTERING CORP.,BEIJING (SINOCHART, BEIJING).......... 25 |
| | .............................Charterers of the City of ..... *seoul* .............. 26 |
| | The Owners agree to let and the Charterers agree to hire the vessel from the 27 |
| **Duration** | time of delivery for ~~about~~  *one time charter trip via safe port(s) safe berth(s) safe* ......... 28 |
| | *Anchorage(s) always afloat always within Institute Warranty Limits always ice free with* 29 |
| | *Intention cargo plasterboard from far east to U.S. Gulf duration about 60 days without guar-* |
| | *antee*.................................. within below mentioned trading limits. 30 |
| **ject** | Charterers shall have liberty to sublet the vessel for all or any part of the 31 |
| | time covered by this Charter, but Charterers shall remain responsible for the 32 |
| | Fulfillment of this Charter. 33 |
| **Delivery** | Vessel shall be placed at the disposal of the Charterers *on dropping last outward* 34 |
| | *Sea pilot one safe port,Qingdao,China any time day or night Sundays and holidays* ......... 35 |
| | *included* ................................................ 36 |
| | 37 |
| | ~~in such dock or at such berth or place (where she may safely lie, always afloat,~~ 38 |
| | ~~at all times of tide, except as otherwise provided in Clause 6) as the Charterers~~ 39 |
| | ~~may direct, if such dock, berth or place be not available, time shall count as~~ 40 |
| | ~~provided in Clause 5.~~  Vessel on her *arrival first load port* ~~delivery~~ shall be ready to receive cargo |
| | w                       i                       t                       h 41 |
| | clean-swept holds and tight, staunch, strong and in every way fitted for ordi- 42 |
| | nary cargo service, having water ballast and with sufficient power to operate all 43 |
| | cargo-handling gear simultaneously (and with full complement of officers and 44 |
| | crew for a vessel of her tonnage), to be employed in carrying lawful merchan- 45 |
| **Dangerous** | ~~dise excluding any goods of a dangerous, injurious, flammable or corrosive~~ 46 |
| **Cargo** | ~~nature unless carried in accordance with the requirements or recom-~~ 47 |
| | ~~mendations of the proper authorities of the state of the vessel's registry and of~~ 48 |
| | ~~the states of ports of shipment and discharge and of any intermediate states or~~ 49 |
| | ~~ports through whose waters the vessel must pass. Without prejudice to the~~ 50 |

| | | |
|---|---|---|
| Cargo Exclusions | ~~generality of the foregoing, in addition the following are specifically excluded; livestock of any description, arms, ammunition, explosives~~ *See Clause 29* ............... | 51 |
| | | 52 |
| | -------------------------------------------------------------------------------------- | 53 |
| | -------------------------------------------------------------------------------------- | 54 |
| | -------------------------------------------------------------------------------------- | 55 |
| | -------------------------------------------------------------------------------------- | 56 |

Trading     The vessel shall be employed in such lawful trades between safe ports and    57

places within *See Clause 29* ........................................................................................ 58

........................................ ~~excluding~~ ................................................................. 59

-------------------------------------------------------------------------------------------------- 60

-------------------------------------------------------------------------------------------------- 61

-------------------------------------------------------------------------------------------------- 62

as the Charterers or their agents shall direct, on the following conditions : 63

**Owners to Provide**

1. The Owners shall provide and pay for the insurance of the vessel and 64
for all provisions, cabin, deck, engine-room and other necessary stores, in- 65
cluding boiler water; shall pay for wages, consular shipping and discharging 66
fees of the crew and charges for port services pertaining to the crew; shall 67
maintain vessel's class and keep her in a thoroughly efficient state in hull, 68
machinery and equipment for and during the service. 69

**Charterers To Provide**

2. The Charterers, while the vessel is on hire, shall provide and pay for all 70
the fuel except as otherwise agreed, port charges, pilotages, towages, agen- 71
cies, commissions, consular charges (except those pertaining to individual 72
crew members or flag of the vessel), and all other usual expenses except those 73
stated in Clause 1, but when the vessel puts into a port for causes for which 74
vessel is responsible, then all such charges incurred shall be paid by the 75
Owners. Fumigations ordered because of illness of the crew shall be for 76
Owners' account. ~~Fumigations ordered because of cargoes carried or ports 77
visited while vessel is employed under this Charter shall be for Charterers' 78
account. All other fumigations shall be for Charterers' account after vessel has 79
been on charter~~ for a continuous period of six months or more. *Owners to keep on board a valid deratization certificate throughout the Charter Party period.* 80

    Charterers shall provide necessary dunnage and shifting boards, also 81
any extra fittings requisite for a special trade or unusual cargo, but Owners 82
shall allow them the use of any dunnage and shifting boards already aboard 83
vessel. 84

**Bunkers on Delivery and Redelivery**

3. The Charterers on delivery, and the Owners on redelivery, shall take 85
over and pay for all fuel and diesel oil remaining on board the vessel as 86
hereunder. The vessel shall be delivered ~~with~~: *Bunkers as per Clause 73* ........... 87
~~long/metric* tons of fuel oil at the price of~~ ................................................ ~~per ton~~ ; 88
...................................... ~~tons of diesel oil at the price of~~ ........................ 89
~~per ton. The vessel shall be redelivered with:~~ ........................................... 90
~~tons of fuel oil at the price of~~ ........................ ~~per ton:~~ ........................ 91
.................................. ~~tons of diesel oil at the price of~~ ........................ ~~per ton~~ 92
-------------------------------------------------------------------------------------------------- 93
-------------------------------------------------------------------------------------------------- 94
~~(*Same tons apply throughout this clause)~~ 95

**Rate of Hire**

4. The Charterers shall pay for the use and hire of the said vessel at the 96
rate of *US$24,000.00(Twenty four thousand U.S.Dollars) in* ........................ daily ~~or~~ 97
.............................................................. United States Currency 98
Per *day or pro rata including overtime payable semi-monthly in advance* ~~ton on vessel's total 99
deadweight carrying capacity, including bunkers and 100
stores, on~~ ........................ ~~summer freeboard, per calendar month,~~ commencing on and from the *time* ~~day~~ of her delivery, as aforesaid, and at and after 101
the same rate for any part of a month; hire shall continue until the hour of the 102

**Redelivery Areas and**

*time* ~~day~~ of her redelivery *based on GMT* in like good order and condition, ordinary wear and tear 103
excepted, to the Owners (unless vessel lost) ~~at~~ *on dropping last outward sea pilot one* ............... 104
*safe port, Houston/Tampa, Bangladesh any time day or night Sundays and holidays included* 105

**Notices**

*d* ............................................................................................................ 106
-------------------------------------------------------------------------------------------------- 107
........................................ *unless otherwise mutually agreed.* 107
Charterers shall give Owners not less than *30/25/20/15/12/10/7* ........... days notice 108

of vessel's expected date of redelivery and ~~probable port~~  *5/3/2/1  day(s)*  109

*notice of redelivery. Charterers are to declare redelivery port 20days prior to redelivery.*  110

5. Payment of hire shall be made *by telegraphic transfer on or before due date* so as to be  111

**Hire**     r e c e i v e d   b y   O w n e r s   o r   t h e i r  111

**Payment** designated payee ~~in New York, i.e.~~  *to Owners' designated bank account*  112

**and** .......................................................................................................................  ·113

.......................................................................................................................  114

**Commencement** .......................................................................................................................  114

........................................................ in United States Currency, in funds  115

available to the Owners on the due date, semi-monthly in advance, and for the  116

last half month or part of same the approximate amount of hire, and should  117

same not cover the actual time, hire shall be paid for the balance day by day as  118

it becomes due, if so required by Owners. Failing the punctual and regular  119

payment of the hire, or on any breach of this Charter, the Owners shall be at  120

liberty to withdraw the vessel from the service of the Charterers without pre-  121

judice to any claims they (the Owners) may otherwise have on the Charterers.  122

~~Time shall count from 7 A.M. on the working day following that on~~  123

~~which written notice of readiness has been given to Charterers or their agents~~  124

~~before 4 P.M., but if required by Charterers, they shall have the privilege of~~  125

~~using vessel at once, in which case the vessel will be on-hire from the com-~~  126

~~mencement of work.~~  127

**Cash**       Cash for vessel's ordinary disbursements at any port may be advanced,  128

**~~vances~~** as required by the Captain, by the Charterers or their agents, subject to 2.5  129

percent commission and such advances shall be deducted from the hire. The  130

Charterers, however, shall in no way be responsible for the application of such  131

advances.  132

**Berths**       6. Vessel shall be loaded and discharged in any dock or at any berth or  133

place that Charterers or their agents may direct, provided the vessel can safely  134

lie always afloat at any time of tide, ~~except at such places where it is customary~~  135

~~for similar size vessels to safely lie aground.~~  136

**Spaces**       7. The whole reach of the vessel's holds, decks, and usual places of  137

**Available** loading (not more than she can reasonably and safely stow and carry), also  138

accommodations for supercargo, if carried, shall be at the Charterers' dis-  139

posal, reserving only proper and sufficient space for ship's officers, crew,  140

tackle, apparel, furniture, provisions, stores and fuel.  141

**Prosecution**       8. The Captain shall prosecute his voyages with due despatch and shall  142

**of** render all customary assistance with ship's crew and boats. The Captain  143

**Voyages** (although appointed by the Owners) shall be under the orders and directions of  144

the Charterers as regards employment and agency; and Charterers are to  145

perform all cargo handling at their expense under the supervision of the  146

Captain, who is to sign the bills of lading for cargo as presented in conformity  147

with mate's or tally clerk's receipts. However, at Charterers' option, the Chart-  148

erers or their agents may sign bills of lading on behalf of the Captain always in  149

**Bills** conformity with mate's or tally clerk's receipts. ~~All bills of lading shall be~~  150

**of** ~~without prejudice to this Charter and the Charterers shall indemnify the Own-~~  151

**Lading** ~~ers against all consequences or liabilities which may arise from any inconsis-~~  152

~~tency between this Charter and any bills of lading or waybills signed by the~~  153

~~Charterers or their agents or by the Captain at their request.~~  154

**Conduct of**       9. If the Charterers shall have reason to be dissatisfied with the conduct of  155

**Captain** the Captain or officers, *or any of the crew members,*  the Owners on receiving particulars of  156

t             h             e  156

complaint, investigate the same, and, if necessary, make a change in the  157

appointments. *But this provision does not affect Charterers right to advance any claim or req*  157

*uire arbitration under Clause 17 on dispute regarding the conduct of the Master in prosecuti*

*on of the voyage and carrying out the orders and the direction of the Charterers.*  158

**Supercargo**       10. The Charterers are entitled to appoint a supercargo, who shall accom-  159

**and** pany the vessel and see that voyages are prosecuted with due despatch. He is  160

**Meals** to be furnished with free accommodation and same fare as provided for  161

Captain's table, Charterers paying at the rate of *US$10.00*.......................... per day.  162

~~Owners shall victual pilots and customs officers, and also, when authorized by~~  ·163

~~Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,~~  164

~~Charterers paying at the rate of ................................. per meal for all such victual-~~ 165
~~ling.~~ 166

**Sailing**      11. The Charterers shall furnish the Captain from time to time with all 167
**Orders** requisite instruction and sailing directions, in writing, and the Captain shall 168
**and Logs** keep full and correct deck and engine logs of the voyage or voyages, which are 169
to be patent to the Charterers or their agents, and furnish the Charterers, their 170
agents or supercargo, when required, with a true copy of such deck and engine 171
logs, showing the course of the vessel, distance run and the consumption of 172
fuel. 173

**Ventilation**      12. The Captain shall use diligence in caring for the ventilation of the 174
cargo. 175

**Continuation** 13. ~~The Charterers shall have the option of continuing this Charter for a~~ 176
~~further period of~~ ...................................................................................... 177
178

................................................................................................................ 179
     14. If required by Charterers, time shall not commence before ...................... 179
*0001 hours 01st May, 2006(local time)*......and should vessel not have given written 180
notice of readiness on or before*2400 hours 09th May, 2006 (local time)* 181
~~b~~...................~~u~~................~~t~~..............~~n~~............~~o~~............~~t~~ 181
~~later than 4 P.M. Charterers or their agents shall have the option of canceling~~ 182
~~this Charter at any time not later than the day of vessel's readiness.~~*See Clause 84* 183

**Off**      15. In the event of the loss of time from deficiency and/or default of officers 184
**~~Hire~~** ~~or crew or deficiency of stores, fire, breakdown of, or damages to hull,~~ 185
~~machinery or equipment, grounding, detention by average accidents to ship or~~ 186
~~cargo unless resulting from inherent vice, quality or defect of the cargo,~~ 187
~~drydocking for the purpose of examination or painting bottom, or by any other~~ 188
~~similar cause preventing the full working of the vessel, the payment of hire and~~ 189
~~overtime, if any, shall cease for the time thereby lost. Should the vessel deviate~~ 190
~~or put back during a voyage, contrary to the orders or directions of the~~ 191
~~Charterers, for any reason other than accident to the cargo, the hire is to be~~ 192
~~suspended from the time of her deviating or putting back until she is again in~~ 193
~~the same or equidistant position from the destination and the voyage resumed~~ 194
~~therefrom. All fuel used by the vessel while off-hire shall be for Owners'~~ 195
~~account. In the event of the vessel being driven into port or to anchorage~~ 196
~~through stress of weather, trading to shallow harbors or to rivers or ports with~~ 197
~~bars, any detention of the vessel and/or expenses resulting from such deten-~~ 198
~~tion shall be for the Charterers' account. If upon the voyage the speed be~~ 199
~~reduced by defect in, or breakdown of, any part of her hull, machinery or~~ 200
~~equipment, the time so lost, and the cost of any extra fuel consumed in~~ 201
~~consequence thereof, and all extra expenses shall be deducted from the hire.~~ 202

**~~Total~~**      16. Should the vessel be lost, money paid in advance and not earned 203
**~~Loss~~** (reckoning from the date of loss or being last heard of) shall be returned to the 204
Charterers at once. 205

**Exceptions**      The act of God, enemies, fire, restraint of princes, rulers and people, 206
and all dangers and accidents of the seas, rivers, machinery, boilers and steam 207
navigation, and errors of navigation throughout this Charter, always mutually 208
excepted. 209

**Liberties**      The vessel shall have the liberty to sail with or without pilots, to tow and 210
to be towed, to assist vessels in distress, and to deviate for the purpose of 211
saving life and property. 212

**Arbitration**      17. Should any dispute arise between Owners and Charterers, the 213
matter in dispute shall be referred to *arbitration in London, English Law to apply, in accordan*
*ce with the Arbitration Act 1990 and any subsequent amendment. The award of the arbitrati*
*on* ~~three persons at New York, one to be~~ 214
~~appointed by each of the parties hereto, and the third by the two so chosen;~~ 215
~~their decision, or that of any two of them,~~ shall be final and for the purpose of 216
enforcing any award this agreement may be made a rule of the Court. ~~The~~ 217
~~arbitrators shall be commercial men conversant with shipping matters.~~ 218

**Liens**      18. The Owners shall have a lien upon all cargoes and all sub-freights for 219
any amounts due under this Charter, including general average contributions, 220
and the Charterers shall have a lien on the ship for all monies paid in advance 221
and not earned, and any overpaid hire or excess deposit to be returned at once. 222

Charterers will not suffer, nor permit to be continued, any lien or encumbrance 223
incurred by them or their agents, which might have priority over the title and 224
interest of the Owners in the vessel. 225

**Salvage**   19. All derelicts and salvage shall be for Owners' and Charterers' equal 226
benefit after deducting Owners' and Charterers' expenses and crew's propor- 227
tion. 228

**General**   General average shall be adjusted, according to York-Antwerp Rules 229
**Average** *1994 as any amendments thereto in London. Hire not to be contributed to General Average.*
~~1974, at such port or place in the United States as may be selected by the~~ 230
~~Owners and as to matters not provided for by these Rules, according to the~~ 231
~~laws and usage at the port of New York. In such adjustment disbursements in~~ 232
~~foreign currencies shall be exchanged into United States money at the rate~~ 233
~~prevailing on the dates made and allowances for damage to cargo claimed in~~ 234
~~foreign currency shall be converted at the rate prevailing on the last day of~~ 235
~~discharge at the port or place of final discharge of such damaged cargo from~~ 236
~~the ship. Average agreement or bond and such additional security, as may be~~ 237
~~required by the Owners, must be furnished before delivery of the goods. Such~~ 238
~~cash deposit as the Owners or their agents may deem sufficient as additional~~ 239
~~security for the contribution of the goods and for any salvage and special~~ 240
~~charges thereon, shall, if required, be made by the goods, shippers, consign-~~ 241
~~ees or owners of the goods to the Owners before delivery. Such deposit shall,~~ 242
~~at the option of the Owners, be payable in United States money and remitted to~~ 243
~~the adjuster. When so remitted the deposit shall be held in a special account at~~ 244
~~the place of adjustment in the name of the adjuster pending settlement of the~~ 245
~~general average and refunds or credit balances, if any, shall be paid in United~~ 246
~~States money.~~ 247

**York-**   Charterers shall procure that all bills of lading issued during the cur- 248
**Antwerp** rency of the Charter will contain a provision to the effect that general average 249
shall be adjusted according to York-Antwerp Rules *1994 or any amendments thereto* ~~1974~~ and
**Rules** w i l l   i n c l u d e   t h e 250
"New Jason Clause" as per Clause 23. 251

**Drydocking** 20. ~~The vessel was last drydocked~~ .............................. ~~The~~ 252
~~Owners shall have the option to place the vessel in drydock during the cur-~~ 253
~~rency of this Charter at a convenient time and place, to be mutually agreed~~ 254
~~upon between Owners and Charterers, for bottom cleaning and painting~~ 255
~~and/or repair as required by class or dictated by circumstances. Payment of~~ 256
~~hire shall be suspended upon deviation from Charterers' service until vessel is~~ 257
~~again placed at Charterers' disposal at a point not less favorable to Charterers~~ 258
~~than when the hire was suspended~~ ................................. 259
............................................................. 260
261

**Cargo**   21. Owners shall maintain the cargo-handling gear of the ship which is as 262
**Gear** follows : ............................................................. 263
264
............................................................. 265
providing gear (for all derricks or cranes) capable of lifting capacity as de- 266
scribed. Owners shall also provide on the vessel for night work lights as on 267
board, but all additional lights over those on board shall be at Charterers' 268
expense. The Charterers shall have the use of any gear on board the vessel. If 269
required by Charterers, the vessel shall work night and day and all cargo- 270
handling gear shall be at Charterers' disposal during loading and discharging. 271
**Stevedore** In the event of disabled cargo-handling gear, or insufficient power to operate 272
the same, hire to reduce pro-rata, for the period of such insufficiency in relation to the numb
**Stand-by** er of hatch( es ) available. ~~the vessel is to be considered to be off hire to the extent that time is~~ 273
~~actually lost to the Charterers and Owners to pay stevedore stand-by charges~~ 274
~~occasioned thereby. If required by the Charterers, the Owners are to bear the~~ 275
~~cost of hiring shore gear in lieu thereof.~~ 276

**Crew**   22. ~~In lieu of any overtime payments to officers and crew for work ordered~~ 277
**Overtime** ~~by Charterers or their agents, Charterers shall pay Owners $~~ .............. 278
~~per month or pro-rata.~~ 279

**Clauses**   23. *See Clause 54* ~~The following clause is to be included in all bills of lading issued~~ 280

Paramount

~~hereunder:~~ 281

~~This bill of lading shall have effect subject to the provisions of the~~ 282
~~Carriage of Goods by Sea Act of the United States, the Hague Rules, or the~~ 283
~~Hague-Visby Rules, as applicable, or such other similar national legislation as~~ 284
~~may mandatorily apply by virtue of origin or destination of the bills of lading,~~ 285
~~which shall be deemed to be incorporated herein and nothing herein con-~~ 286
~~tained shall be deemed a surrender by the carrier of any of its rights or~~ 287
~~immunities or an increase of any of its responsibilities or liabilities under said~~ 288
~~applicable Act. If any term of this bill of lading be repugnant to said applicable~~ 289
~~Act to any extent, such term shall be void to that extent, but no further.~~ 290

This Charter is subject to the following clauses all of which are to be 291
included in all bills of lading issued hereunder: 292

New
Both-
to-
Blame
Collision
Clause

If the ship comes into collision with another ship as a result of the 293
negligence of the other ship and any act, neglect or default of the master, 294
mariner, pilot or the servants of the carrier in the navigation or in the manage- 295
ment of the ship, the owners of the goods carried hereunder will indemnify the 296
carrier against all loss or liability to the other or non-carrying ship or her 297
owners insofar as such loss or liability represents loss of, or damage to, or any 298
claim whatsoever of the owners of said goods, paid or payable by the other or 299
non-carrying ship or her owners to the owners of said goods and set off, 300
recouped or recovered by the other or non-carrying ship or her owners as part 301
of their claim against the carrying ship or carrier. 302

The foregoing provisions shall also apply where the owners, operators 303
or those in charge of any ships or objects other than, or in addition to, the 304
colliding ships or objects are at fault in respect to a collision or contact. 305

New
Jason
Clause

In the event of accident, danger, damage or disaster before or after 306
commencement of the voyage resulting from any cause whatsoever, whether 307
due to negligence or not, for which, or for the consequences of which, the 308
carrier is not responsible, by statute, contract, or otherwise, the goods, ship- 309
pers, consignees, or owners of the goods shall contribute with the carrier in 310
general average to the payment of any sacrifices, losses, or expenses of a 311
general average nature that may be made or incurred, and shall pay salvage 312
and special charges incurred in respect of the goods. 313

If a salving ship is owned or operated by the carrier, salvage shall be 314
paid for as fully as if salving ship or ships belonged to strangers. Such deposit 315
as the carrier or his agents may deem sufficient to cover the estimated con- 316
tribution of the goods and any salvage and special charges thereon shall, if 317
required, be made by the goods, shippers, consignees or owners of the goods 318
to the carrier before delivery. 319

War
Clauses

~~(a) No contraband of war shall be shipped. Vessel shall not be re-~~ 320
~~quired, without the consent of Owners, which shall not be unreasonably~~ 321
~~withheld, to enter any port or zone which is involved in a state of war, warlike~~ 322
~~operations, or hostilities, civil strife, insurrection or piracy whether there be a~~ 323
~~declaration of war or not, where vessel, cargo or crew might reasonably be~~ 324
~~expected to be subject to capture, seizure or arrest, or to a hostile act by a~~ 325
~~belligerent power(the term "power" meaning any de jure or de facto authority~~ 326
~~or any purported governmental organization maintaining naval, military or air~~ 327
~~forces).~~ 328

~~(b) If such consent is given by Owners, Charterers will pay the provable~~ 329
~~additional cost of insuring vessel against hull war risks in an amount equal to~~ 330
~~the value under her ordinary hull policy but not exceeding a valuation of~~ 331
~~.......................................... In addition, Owners may purchase and Charterers~~ 332
~~will pay for war risk insurance on ancillary risks such as loss of hire freight~~ 333
~~disbursements, total loss, blocking and trapping, etc. If such insurance is not~~ 334
~~obtainable commercially or through a government program, vessel shall not~~ 335
~~be required to enter or remain at any such port or zone.~~ 336

~~(c) In the event of the existence of the conditions described in (a)~~ 337
~~subsequent to the date of this Charter, or while vessel is on hire under this~~ 338
~~Charter, Charterers shall, in respect of voyages to any such port or zone~~ 339
~~assume the provable additional cost of wages and insurance properly incurred~~ 340
~~in connection with master, officers and crew as a consequence of such war,~~ 341

warlike operations or hostilities. 342

**Ice** 24. The vessel shall not be required to enter or remain in any icebound port 343
or area, nor any port or area where lights or lightships have been or are about 344
to be withdrawn by reason of ice, nor where there is risk that in the ordinary 345
course of things the vessel will not be able on account of ice to safely enter and 346
remain in the port or area or to get out after having completed loading or 347
discharging. 348

**Navigation** 25. Nothing herein stated in to be construed as a demise of the vessel to the 349
Time Charterers. The Owners shall remain responsible for the navigation of the 350
vessel, acts of pilots and tug boats, insurance, crew, and all other similar 351
matters, same as when trading for their own account. 352

**Commissions** 26. A commission of ........*1.25*........................ percent is payable by the vessel 353
and Owners to *Ocean Robin Shipping Holding Corp. and 1.25 percent to Yamamizu Shipping* 354
............................................................................................................................. 355
on hire earned and paid under this Charter, and also upon any continuation or 356
extension of this Charter. 357

**Address** 27. An commission of ....................*3.75*................................ percent 358
is payable to ....*Charterers*............................................................................. 359
............................................................................................................................. 360
on hire earned and paid under this Charter. 361

**Rider** Rider Cluse *28to91inclusive*..............................................................*as at-* 362
tached hereto are incorporated in this Charter. 363

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

28.    Description – details all 'about'

M.V. SANKO RALLY
   VANUATU/1994/N.K.
   OPEN-HATCH BOX-SHAPED HOLD BULKER (EXCL NO.1/NO.8)
   DWT 42,529MT ON 11.535M SSW DRAFT
   GRT 25,676 / NRT 13,991
   LOA 184.93M / BEAM 30.50M / DEPTH 16.20M
   4 SET X 30T JIB CRANE (4 GEARS SERVING ALL HATCHES BUT ONLY 4
HATCHES
   SIMULTANEOUSLY AND EACH CRANE SET SERVING ONLY IMMEDIATELY ADJACENT
   HATCHES)
   8 HOLDS / 8 HATCHES
   GRAIN/BALE CAPA. 1,802,319CFT/1,759,341CFT
   HATCH SIZE NO.1    8.80M X 12.96M
           NO.2/6/7 14.40M X 25.92M
           NO.3   13.60M X 25.92M
           NO.4/5   12.80M X 25.92M
           NO.8   8.80M X 16.20M
  - MAX 2.40M OVER HANG (HATCH WAY/FORE AND AFT ONLY)
   IS EXISTING THRU NO.2-NO.7 HOLD.
  - HATCH TYPE:
   NO.1/8 : FOLDING TYPE
   NO.2/3  4/5  6/7 : PIGGY BACK TYPE
  - SMALL SLANT (HOPPER) IS EXISTING IN NO.7 HOLD
   (AFTER PART/BOTH SIDE).
  - ALL DETAILS "ABT".

   SPEED/CONSUMPTION : (ALL FIGURE 'ABOUT')
   (AT SEA)
   (UNDER WEATHER CONDITION UP TO AND INCLUDING BEAUFORT
   SCALE FORCE 4)
   BALLAST - 14.3 KTS ON 29.5MT IFO(380CST-RMG35) + 0.1MT MDO(DMB)
   LADEN  - 13.8 KTS ON 30.0MT IFO(380CST-RMG35) + 0.1MT MDO(DMB)
   (AT PORT)
   IDLING     - 3.0MT IFO(380CST-RMG35) + 0.1MT MDO(DMB)
   GEAR WORKING - 3.5MT IFO(380CST-RMG35) + 0.1MT MDO(DMB)

   THE VSL HAS LIBERTY TO BURN GAS OIL/DIESEL OIL FOR MAIN ENGINE
   WHEN MANOEUVERING IN SHALLOW/NARROW/RESTRICTED WATER,
   CANAL RIVERS OR IN AND OUT OF PORT

  - TANK TOP STRENGTH
   24.3MT/M2 - NO.2/3/5/7/8 HOLD
   14.0MT/M2 - NO.1/4/6 HOLD
  - TANK TOP DIMENSIONS:
   NO.1 HOLD    16.00M X (F)11.50M / (A) 22.50M
   NO.2 HOLD    16.80M X (F)23.00M / (A) 25.92M
   NO.3/4/5/6 HOLD  16.80M X (F)25.92M / (A) 25.92M
   NO.7 HOLD    16.80M X (F)25.92M / (A) 19.20M
   NO.8 HOLD    15.20M X (F)18.80M / (A) 10.50M

   OWS BANK DETAILS :
       CITIBANK N.A.NEW YORK
       399 PARK AVENUE, NEW YORK, N.Y.10043
       CHIPS CODE: 0008
       A/C THE SANKO STEAMSHIP CO., LTD.
       A/C NO. 4068-6369

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

29.    Cargo/Trading Exclusions:
       Cargo Exclusions:

CHARTERERS INTENTION IS TO BE PLASTERBOARD.
CHARTERERS GUARANTEE THAT PLASTERBOARD NOT TO BE 'CARGO LISTED IN IMO/IMDG
CARGOES CLASSIFIED UNDER CATEGORIES 1-9' NOR DANGEROUS CARGO.
VSL TO BE EMPLOYED IN CARRING LAWFUL CARGOES/MARCHANDIZE,
ALWAYS EXCLUDING AMMONIA, AMMONIUM NITRATE, AMMONIUM SULFATE,
AMMUNITIONS, ARMS, BONES, BULK BORAX, BAGGED RICE,
CALCIUM HYPOCHLORITE, CEMENT, CEMENT CLINKER, CHARCOAL,
CONTAINERS, FERRO SILICON, CHROME, CHROMITE, FERROCHROME,
CHROME ORE, CHROME BEARING ORES/ALLOYS, NICKEL ORES/ALLOYS,
HAZARDOUS CARGOES, INJUROUS/INFLAMMABLE OR DANGEROUS GOODS,
MACOYA EXPELLERS, MACOYA PELLETS, METAL BORINGS AND CUTTINGS,
NAPHTHA, NUCLEAR FUEL MATERIALS AND WASTES, PETROLEUM,
PETROLEUM PRODUCTS, POND COAL, RADIOACTIVE MATERIALS AND WASTES,
TURPENTINE, WAR MATERIALS, LIVESTOCKS, NUCLEAR MATERIALS,
TAR, PITCH (INCL. PENCIL PITCH), ASPHALT, SILICAMANGANESE,
SUNFLOWER SEEDS, EXPELLERS, FISHMEAL, HIDES, CREOSOTED GOODS,
CALCIUM CARBIDE, EXPLOSIVES (BLACK POWDER, BLASTING CAPS,
DETONATORS, LOADED BOMBS, DYNAMITE AND TNT), ACIDS, MOTOR SPIRIT
AND TURNINGS, ASBESTOS, BITUMEN, SPONGE IRON, DIRECT REDUCED,IRON, HOT MOULDED
BRIQUETTES, COTTONS, SULPHUR, SALT, ANY KIND OF SCRAP
INCLUDING MOTORBLOCK/TURNING, ANY KIND OF DECK CARGO, MOTOR
BLOCK, COPRA, PETCOKE, QUEBRACHO, LOG, MAHOGANY LOGS,
AND ANY KIND OF ARMS AND AMMUNITIONS.

BULK CARGOES LISTED IN THE IMO CODE OF SAFE PRACTICE FOR SOLID
BULK CARGOES 1994 WHICH CAN NOT BE CERTIFIED BY CHTRS/SHIPPERS
AS HARMLESS AND/OR HAVING A HISTORY OF SHIPMENT WITHOUT
PROBLEMS. CHTRS UNDERTAKE TO LOAD VSL IN ACCORDANCE WITH IMO
CODE OF SAFETY PRACTICE FOR BULK CARGOES ALSO IN ACCORDANCE
WITH ANY LOCAL REGULATIONS.

ALL CARGOES (ESPECIALLY CONCENTRATE AND COAL) TO BE IN
ACCORDANCE WITH IMO REGULATIONS AND ALL CARGOES (ESPECIALLY
CONCENTRATE AND COAL) TO BE LOADED, STOWED, CARRIED, AND
DISCHARGED STRICTLY IN ACCORDANCE WITH I.M.O.'S CODE OF SAFE
PRACTICE FOR SOLID BULK CARGOES 1994 AND LOCAL REGULATIONS.

       Trading Exclusions:
WORLD WIDE TRADING ALWAYS VIA SAFE PORT(S), SAFE BERTH(S) AND
SAFE ANCHORAGE(S) AND PLACES ALWAYS AFLOAT ALWAYS WITHIN
INSTITUTE WARRANTY LIMITS, BUT EXCLUDING BALTIC SEA, IRAN, IRAQ,
YEMEN, LEBANON, ALBANIA, CUBA, ANGOLA, ISRAEL, ISRAEL CONTROLLED,
TURKISHI OCCUPIED CYPRUS, LIBERIA, CAMBODIA, NORTH KOREA, LIBYA,
RUSSIAN PACIFIC, PORT(S), LAGOS, PORTS THAT WERE PREVIOUSLY IN
YUGOSLAVIA, ETHIOPIA, ZAIRE, HAITI, SUDAN, SOMALIA, SERBIA,
PAKISTAN, MONTENEGRO, KUWAIT, SRI LANKA, ALASKA, SIERA LEONE,
ETHIOPIA, ERITREA, NIGERIA, ANY AREA(S) AND/OR COUNTRIES BANNED
AND BOYCOTTED BY THE U.N. AND ANY OTHER COUNTRIES PROHIBITED
FROM CALLING AT BY THE FLAG STATE, VESSEL SHALL NOT BE SENT
TO A PORT OR ZONE WHERE THERE IS WAR OR WARLIKE HOSTILITIES OR
TO A PORT OR ZONE WHERE DECLARED "HELD COVER" BY THE
UNDERWRITERS OF THE VESSEL, THE AREA INFESTED BY ASIAN GYPSY

30.    War Risk Insurance

Basic war risk insurance premium for worldwide trading shall be for Owners' account and additional premium for Hull and Machinery and officers/crew including blocking and trapping and war crew liability and crew war bonus, due to this one time charter trip as per the governing Charter Party, if any shall be for Charterers account.

Insurance/extra insurance not to exceed official quotation by Lloyd's underwriters, London. However if such insurance is not obtainable commercially or through a government program, the vessel shall not be required to enter or remain at any such port or zone. And Owners will have the right to refuse vessel entering into war zone as per Charter Party.

31.    Panama/Suez Canal Transit
The Owners guarantee that the vessel shall be fully fitted for Panama/Suez canal transit and in possession of valid necessary certificate during the currency of this Charter to comply with current regulations and requirements of both Canals.

32. Boycott
If the vessel to boycotted, picketed, blacklisted or if any similar incident occurs at any port or place by shore and/or port labours and/or tugboats, and/or pilots, or by government and/or any authority, by reason or manning or Ownership/ Management or terms and conditions on which members of the Officers/crew are employed, all consequences and any extra expenses incurred therefrom to be for Owners' account and the Charterers are entitled to place the vessel off-hire for any time lost by such reasons. Charterers shall not trade the vessel to any port or place where the vessel is known to be boycotted by shore and/or port labours and/or tugboats and/or pilots or by government and/or any authority, by reason of the vessel's flag/registry.

33. War Cancellation
If war breaks out between any two or more of the following countries:

United Kingdom, U.S.A., Russia, People's Republic or China, Japan, directly affecting the performance of this charter, both the Owners and the Charterers shall have the option of cancelling this charter provided that the trading of the vessel is significantly affected adversely due to the outbreak of war. The Charterers shall redeliver the vessel to the Owners, if she has cargo on board after discharge thereof at destination, or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by the Charterers. In all cases hire shall be paid until: the vessel's redelivery. Both Owners and Charterers shall act in good faith in invoking this Clause.

34.    Requisition
Should the vessel be requisitioned by the government of the vessel's flag during the period of the charter, the vessel shall be deemed to be off-hire during the period of such requisition, and any hire paid by the said government in respect, of such' requisition period shall be retained by the Owners. In the event for such requisition, the Charterers shall have the option to cancel the balance period of this Charter.

35. Deratting Certificate
The vessel shall be delivered with a valid deratting or deratting exemption certificate. If such certificate does not cover the whole period of the charter, costs of renewal of certificate and any required fumigation for obtaining of such certificate, if necessary shall be for the Owners' account. Any detention and extra expenses incurred thereby shall be also for the Owners' account.

36. Quarantine
Normal quarantine time and expenses for the vessel's entering port shall be for the Charterers' account, but any time of detention and expenses for quarantine due to pestilence, epidemics and illness of Captain, Officers and crew shall be for the Owners' account.

37.    Equipment
The vessel's equipment shall comply with the regulations and/or requirements in effect at the port

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

or ports of call, canals and countries in which the vessel will be employed. The Owners also guarantee that the vessel shall be at all times in possession or a valid and up-to-date certificate on board to comply with such regulations and/or requirements. If stevedores, longshoremen or other labours are not permitted to work by reason of any failure of the Captain, the Owners and/or their agents to comply with such regulations or by reason that the vessel is not in possession of such valid and up-to-date certificates, then the Owners shall take immediate corrective measures. The Charterers may suspend hire for time lost thereby and any extra expenses including stevedores' stand-by time shall be for Owners' account.

38.     Stevedore
Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the vessel caused by stevedores provided the master has notified the Charterers and/or their agents in writing as soon as practical but not later than 48hours after any damage is discovered. Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage.

(a) incase of any and all damage(s) affecting the vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the vessel is to remain on hire until such repairs are completed and if required passed by the vessel's classification society.

(b) Charterers are to endeavour to repair any and all damage(s) not described under point (a) above at Charterers time and expenses before redelivery. But, owners accept redelivery without Charterers repairing the damage(s) not described under point (a) above and in such a case the Charterers to pay for the costs and time immediately/promptly in order to avoid outstandings between Charterers and Owners.

39.     P. & I. Club
The Owners guarantee that the vessel shall be fully covered by P. & I. Club. The Charterers have the benefit of the Owners granted by the P. & I. Club as far as the rules permit.

40.     N.Y.P.E. Interclub Agreement
Liability for cargo claims shall be borne by the Owners and the Charterers in accordance with NYPE Interclub Agreement as amended September 1996 including subsequent amendments.

41.     Agents
Charterers will have their agents to attend Owners' minor/normal husbandry affairs without charging separate agency fees, however should there be any extra ordinary matters such as crew change, dry-dock, special survey, major repair, general average work for Owners' account. Owners shall employ Charterers' agents as Owners' husbandry agents and pay agency as per local recognized tariff or Owners at their option shall appoint their own husbandry agents at their expense.

42.     Deductions
The Charterers shall be entitled to deduct from hire payments any disbursements undisputedly for Owners' account which amounts to be supported by vouchers and any previous over-payments of hire including undisputed off-hire. The Charterers also shall be entitled to deduct from last hire payment estimated costs of bunkers on redelivery and estimated Owners' accounts but maximum US$700 per port. (but in case the last hire is not sufficient, Charterers may deduct from the second to the last hire payment) which to be settled within seven (7) days after vessel's redelivery. Any missing/outstanding vouchers to be sent to Owners soonest received by Charterers.

43.     Joint On/Off Hire Survey
Joint on/off hire survey to ascertain the vessel's condition and quantity of bunkers remaining on board shall be carried out at delivery port and at redelivery port. Joint on hire survey to be carried out by independent surveyor on delivery in owners time and joint off-hire survey by

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

independent surveyor on redelivery in Charterers time, but expenses to be equally shared between Owners and Charterers.

44. Replenishment of Bunkers

Owners to be allowed to replenish bunker before redelivery subject such bunkering does not interfere Charterers' loading/discharging operation.

45    A. Liberties

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

B. Off-Hire

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants, agents or subcontractors are responsible), or detention by average accidents to the vessel or cargo unless resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or painting bottom, or by any other similar cause preventing the full working of the vessel, the payment of hire and overtime. If any, shall cease for the time thereby lost. Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident to the cargo or where permitted clause 45-A hereunder, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom, All bunkers used by the vessel while off hire shall be for the Owners' account. In the event of the vessel being driven into port or to anchorage through stress of weather, trading to shallow harbors or to fivers or ports with bars, any detention of the vessel and/or expenses resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be deducted from the hire.

46. Capture, Seizure, Arrest

Should the vessel be captured or seizured or detained or arrested by any authority or by any legal process during the currency of this Charter Party, for any reason attributable to the Owners, the payment of hire shall be suspended until the time of her release.

Any extra expenses incurred by and/or during such capture or seizure or detention or arrest shall be for Owners' account.

47. Smuggling

Any delay, expenses and/or find incurred on account of smuggling shall be for Owners' account if caused by the Officers and/or crew, or shall be for Charterers' account if caused by the Charterers' supercargo and/or their staff or agents.

48. Return Premium

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their underwriters as and when received from the underwriters by reason of the vessel being in port for a minimum period or 30 days if on full hire for this period or pro-rata for the time actually on hire but Owners not to be held responsible for any deficiency in speed/ consumption due to foul bottom as a result of prolonged stay in port.

49. Hold Condition on Redelivery:

Charterers are to redeliver the vessel with clean holds to be same condition as on delivery. Charterers have the option to redeliver the vessel with unclean hold and to pay US$ 5,000 lumpsum excluding removal/disposal of dunnage/lashing materials/plastics which to be for Charterers' time/account before redelivery.

Charterers are to declare whether or not Charterers will use this option prior to 10 days before arrival last discharging port.

50. Gangway Watchman

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

Expenses for gangway watchmen, if ordered by the vessel to be for the Owners' account, but if ordered by the Charterers or required by a port regulation, except in the case such watchmen are necessitated due to nationality or conduct of any of the ship's members, such expenses shall be for the Charterers' account.

All crew nationality: Filipinos

51.    Additional Equipments, Fittings
The Charterers, subject to the Owners' prior approval not to be unreasonably withheld, shall be at liberty to fit/weld any additional equipment and fittings for loading, discharging and/or securing cargo. Such work shall be done at the Charterers' expense and time, and the Charterers shall remove such equipment and fitting and restore the vessel to her original conditions at their expense and time prior to redelivery.

52.    Loading on Deck - Deleted.

53.    Tax
Any dues and/or taxes on vessel's cargo and/or freight and/or charter hire to be for Charterers' account. However any taxes on charter hire levied by country of vessel's flag, registry and/or Owners' principal place or business to be for Owners' account.

54.    Paramount Clause
Clause Paramount, U.S. Clause Paramount, Canadian Clause Paramount, York Antwerp Rules 1994, U.K. Clause Paramount, wherever applicable, shall be deemed to form a part of this Charter Party and shall be contained in Bill of Lading issued hereunder. CONWARTIME 1993 as per undernoted, P. and I. Bunker Clause also form part of this Charter Party.


*CONWARTIME 1993"*

(1) For the purpose of this Clause, the words:

(a)         "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b)         "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4)

    (a)        The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

    (b)        If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:-

    (a)        to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

    (b)        to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

    (c)        to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

    (d)        to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

    (e)        to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter party.

55.    Communication & Entertainment
Charterers shall pay Owners a lumpsum of US$ 1,200 per month or pro rata payable together with hire for vessel's communication like telephone, cable, telex during charter period.

56.    I.T.F. Clause
Vessel's crew shall be converted at all times by an I.T.F. agreement or bona fide trading union agreement that is acceptable to the I.T.F. or its affiliates. Any cost or loss of time due to Owners' failure to comply with the above to be for Owners' account.

57.    Oil Pollution
Charterers shall bear no responsibility for all consequences (including fines if any imposed to Charterers) of oil and any time lost due to pollution of oil or its consequences shall be deemed off-hire.

Vessel possesses a certificate of financial responsibility meeting the requirement of U.S. Federal Water Pollution Control Act, as amended, or any statutory modification or reenactment thereof. Owners particularly further warrant that the said certificate of financial responsibility will be maintained effective throughout the duration of performance under this charter. Should the vessel be delayed or detained due to failure to comply with aforementioned, the Charterers shall place the vessel off hire for such time lost.

However notwithstanding the foregoing paragraphs, the parties are aware that the oil pollution act of 1990 (the "Act") has recently been enacted into law in the United States. Regulations under the Act, however, have not yet been issued by the United States. Under the provisions of the Act, states of .the United States have the right to pass legislation that could impose liability, sanctions or other conditions in addition to those set forth in the Act. The effect on P. & I. insurance by the foregoing is uncertain.

In view of the uncertainties. In the event of following cases are applied in futures. Owners shall not be obliged to provide additional premium or similar extra payment to obtain P. & I. cover, shall be under no obligation to obtain any documents from any other source in case Owners' P. & I. Club restrict the issuance of, revoke or refuse to issue, letters of compliance, letters of undertaking, letters of guarantee, certificates of financial responsibility or other similar documents and shall not be obliged to trade to the United States, Charterers and Owners shall mutually discuss in good faith ways and means to resolve the problem:

1) If the Owners' P. & f Club were to require an additional premium or similar extra payment for providing the Owners' and the vessel with P. & I. cover for potential liability for trading to areas in the United States.
2) If, due to laws or regulations enacted or issued by the United States or by       any of the states of the United States, the Owners' P, & I. Club refuses or is unable to provide full P. &. I. cover for pollution liability.
3) If the Owners' P. & I. Club is restricting the issuance of, revoking or refusing to issue, letters of compliance, letters of undertaking, letters of guarantee, certificates of financial responsibility or other similar
documents.

58.    Export and/or Import Permits for cargo and trade to be at Charterers' risk and expense. Taxation or levies in respect of cargo and trade to be for Charterers' account and to be paid by

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

Charterers.

59.  Grain Clause:
     Deleted.

60.  Deleted.

61.  Delivery Notice:
     Owners/Master to give Charterers daily notice of delivery of the vessel.

62.  Hold conditions on Delivery
     Hold conditions upon arrival at first loading port, the holds to be clean swept and in every respect ready to load harmless/lawful steel products as per government/local/independent inspectors.

     If vessel fails above inspection, vessel shall be off-hire from the time of rejection until all holds have passed inspection and Master/crew shall commence hold cleaning without delay in order to meet inspector's requirements.

63.  Preparation for Loading/Discharging Operation
     Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches and gangway in order to commence loading and/or discharging without any delay. Opening/closing of all hatch-covers shall be done by Officer/crew, free of cost to Charterers if allowed by shore regulations.

64.  Weather Condition
     Within the context of this charter party 'good weather conditions' are to be taken as wind speed not exceeding Beaufort Force 4 (16 knots maximum). Evidence of weather conditions to be taken from vessel's deck logs and independent weather reports. In the event of consistent discrepancy between the deck log and the weather reports, Charterers and Owners to mutually agree weather routing service and decision of this service to be taken as ruling.

65.  Master and crew shall cooperate with the Charterers, receivers or their representatives insofar as local regulations permit to facilitate loading and discharging operations.

66.  Certificates
     Owners are obliged to deliver the vessel with all necessary and valid certificates - such as (but not limited to) International Tonnage certificate, deratization certificate, safety and health certificates, cargo handling gear certificate, safety equipment certificate, all canal certificates, class certificates, untrimmed ends certificates and similar - and all such certificates to be kept in valid condition by Owners throughout the period of the charter.

67.  Australia's Regulations
     The vessel to comply with and be maintained in accordance with the requirements of the Commonwealth of Australia's loading and unloading safety measures regulations. The vessel to be fitted with hold ladders acceptable for New Zealand and Australian trade.

68.  In case of Charterers' or Owners' default, Owners or Charterers to give each other at least forty-eight (48) working hours written notice before exercising, their respective rights under this Charter Party.

     About hire payment, where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners 2 clear banking days (as recognized at the agree place of payment) written notice to rectify the failure, and when so rectified within those 2 days following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay the hire within 2 days of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw as set forth in Clause 5.

69.    Hire Calculation
Time of delivery and redelivery to be based on G.M.T. but laydays/canceling dates to be based on local time.

70.    Vessel has liberty to use diesel oil in main engine on entering/leaving ports or maneuvering in narrow/shallow restricted water, canal rivers or in and out of port.

71.    U.S. Trade - Unique Bill of Lading Identifier Clause
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill(s) of Lading Identifier as required by the U.S. Customs Regulations (19 CRF part 4 section 4. 7A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.    Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

72.    Vessel's constant including unpumpable ballast excluding fresh water is about 500 MT but without guarantee.

73.    Bunkers on delivery/redelivery
Bunkers on delivery to be as on board, about 650/700 MT IFO and about 46 MT MDO.
Bunkers on redelivery to be about same quantity as on delivery.
Bunker prices US$339 per metric ton for IFO and US$580 per metric ton for MDO at both ends.

Owners to be allowed to replenish bunker before redelivery subject such bunkering does not interfere Charterers' loading/discharging operation.

74    Original Bill(s) of Lading
In the event that the vessel arrives at the port of discharge but Original Bill(s) of Lading are not available for presentation, it is agreed that Charterers will request Owners to discharge the cargo on board without presentation of Original Bill(s) of Lading provided that Charterers will present to Owners a Letter of Indemnity in the form as required by Owners' P & I Club, signed by Charterers only.

75.    Hire Payment:
Charterers to arrange payment of first hire, ballast bonus and value of estimated bunkers on delivery upon vessels delivery. If due to delays in the banking system, funds have not actually been received by Owners within two (2) banking days after delivery of the vessel Owners to accept telex from Charterers' bank as proof that funds have been irrevocably remitted to Owners account.
Further hire to be paid semi-monthly in advance.

Bank charge on hire payment if any to be for Charterers' account.

76.    Private & Confidential
The fixture to be kept strictly Private & Confidential.

77.    Bunker Quality
Charterers to supply first class quality bunkers.    Bunkers strictly complying with ISO 8217-96(E).   In case Charterers supply off-spec bunkers then if required the sludge removal to be organized by Owners/Managers but at Charterers' costs. Fuel testing to be organized by Owners/Managers, however costs always for Charterers' account if Charterers supply off-spec bunkers.

78. Bill of Lading Clause

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

A) The Master shall sign the Bill(s) of Lading or waybills for the cargo as presented in conformity with Mate's or Tally Clerk's receipts. However, the Charterers may sign Bill(s) of Lading or waybills on behalf of the Master with the Owners prior written authority, always in conformity with Mate's or Tally Clerk's receipts and Charterers holding Owners harmless against all consequences arising out of their signing Bill(s) of Lading.

B) All Bill(s) of Lading or waybills shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter Party and any Bill(s) of Lading or waybills signed by the Charterers or by the Master at their request.

C) It is agreed that Charterers shall handle cargo claims in the first instance and provide security to cargo interests in respect of cargo claims within a reasonable time of receipt of a request to do so.

79. Extra Insurance:
Any extra insurance, blocking and trapping insurance, war risks, crew war risks/bonus, and all such additional premiums, if any, on the vessel are for the Charterers' account to be paid by Charterers. Same not to exceed min. quoted by Lloyd's of London, Charterers to pay additional premiums against receipt of underwriters invoices.

80. Pre-Loading Survey:
If steel/steel products are to be loaded, Owners have option to carry out pre-loading survey to be performed by Owners' P & I Club's appointed surveyor. Such cost to be for Charterers' account.

81. Bottom Fouling Clause:
In case of bottom fouling due to Charterers ordering the vessel to stay in port (including outer anchorage) for a minimum period of 20 days, Owners will carry out bottom cleaning (underwater cleaning by divers) at Charterers' time and cost prior to vessel sailing out of the port if such facilities are available, otherwise at the next port in which case until such cleaning is done the warranted speed/comsumption are not applicable.

82. Charterers accept that Owners paint "Hold Block-Ap" on hold bulk head before loading, which s solution for easy hold cleaning after discharging petcoke.

83. Ice Clause:
- Charterers to guarantee always ice free.
- Vessel not to force ice and not to follow ice breaker under any circumstances.
- Vessel not to be obliged to force ice. If on accounf of ice, Master considers it dangerous to remain at the loading or discharging port or place for fear of vessel being frozen in, he has the liberty to sail to a convenient, open place and await Charterers' fresh instructions. Unforeseen detention through the above to be for Charterers' account.
- Any extra insurance premium incurred by going to Charterers' intending ports to be for Charterers' account.
- Charterers have full responsibility for all consequences incurred thereby calling ice port(s) (including but not limited to hull damage and expenses of joint hull inspection to ascertain hull condition).

84. Revised Laycan:
Should it appear that the vessel may not meet the agreed laycan, Owners are to advise Charterers accordingly and at the same time advise a revised laycan within 48 hours Charterers are to confirm whether or not they can accept the vessel basis the revised laycan. Should Charterers not have replied within 48 hours, Owners can consider themselves free from any commitments under this charter and seek other employment for this vessel.

85. CONWARTIME 1993 to apply.

86. BIMCO ISM Clause to be applied.

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

87.   BIMCO ISPS/MTSA Clause for Time Charter Parties 2005 to be applied.
88.   BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005 to be applied.
89.   All pilotage to be paid by Charterers.
90.   YORK-ANTWERP RULE 1994 to be applied.
91.   Arbitration In London and English law to be applied.
92.   BIMCO U.S.CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE to be applied.

* * * * *

**BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005**

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

### BIMCO STANDARD ISM CLAUSE:

From the date of coming into force of the International Safety Management (I.S.M.) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirements of the I.S.M. Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or 'The Company' to comply with the I.S.M. Code shall be for the Owners' account.

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

## U.S.Customs Advance Notification/AMS Clause for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)  Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);
iii)  Provide the Owners with a timely confirmation of i) and ii) above; and
iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content
when ordered by the Charterers to trade within any such zone.

RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
SANKO STEAMSHIP CO. LTD.,                    :
                                             :
                    Plaintiff,               :           07 Civ. 2401 (VM)
                                             :
        - against -                          :           ECF CASE
                                             :
CHINA NATIONAL CHARTERING                    :
CORP. also known as SINOCHART,               :
                                             :
                    Defendant.               :
---------------------------------------------------------X

---

### EXHIBIT 2

---

## The Inter-Club New York Produce Exchange Agreement

**20.39** The absence of clear guidance in the New York Produce form on how liability for cargo claims is to be divided between owners and charterers led the major Protection and Indemnity Associations (who insure the cargo liabilities of both owners and time charterers) to draw up an agreement to facilitate the settlement of claims between those Associations who are parties to the Agreement.

**20.40** Owners and charterers are not bound to follow the Agreement merely because they are members of the Associations, but the Associations do undertake to recommend their members to consent to their disputes being resolved in accordance with its terms. Sometimes the Agreement is expressly incorporated into a New York Produce form charter. Where this is done, the effect is "to make the terms of an agreement between clubs applicable directly between charterer and owner": see *The Ion* [1980] 2 Lloyd's Rep. 245, at page 248. See also *The Strathnewton* [1983] 1 Lloyd's Rep. 219, and paragraph 20.42, below.

**20.41** In its current (1996) form, which incorporates a two-year time limit for notification of claims, the Agreement reads as follows:

### INTER-CLUB NEW YORK PRODUCE EXCHANGE AGREEMENT

This Agreement is made on the 1st of September 1996 between the P&I Clubs being members of The International Group of P&I Associations listed below (hereafter referred to as "the Clubs").

This Agreement replaces the Inter Club Agreement 1984 in respect of all charterparties specified in clause (1) hereof and shall continue in force until varied or terminated. Any variation to be effective must be approved in writing by all the Clubs but it is open to any Club to withdraw from the Agreement on giving to all the other Clubs not less than three months' written notice thereof, such withdrawal to take effect at the expiration of that period. After the expiry of such notice the Agreement shall nevertheless continue as between all the Clubs, other than the Club giving such notice who shall remain bound by and be entitled to the benefit of this Agreement in respect of all Cargo Claims arising out of charterparties commenced prior to the expiration of such notice.

The Clubs will recommend to their Members without qualification that their Members adopt this Agreement for the purpose of apportioning liability for claims in respect of cargo which arise under, out of or in connection with all charterparties on the New York Produce Exchange Form 1946 or 1993 or Asbatime Form 1981 (or any subsequent amendment of such Forms), whether or not this Agreement has been incorporated into such charterparties.

#### Scope of application

(1) This Agreement applies to any charterparty which is entered into after the date hereof on the New York Produce Exchange Form 1946 or 1993 or Asbatime Form 1981 (or any subsequent amendment of such Forms).

(2) The terms of this Agreement shall apply notwithstanding anything to the contrary in any other provision of the charterparty; in particular the provisions of clause (6) (time bar) shall apply notwithstanding any provision of the charterparty or rule of law to the contrary.

(3) For the purposes of this Agreement, Cargo Claim(s) mean claims for loss, damage, shortage (including slackage, ullage or pilferage), overcarriage of or delay to cargo including custom dues or fines in respect of such loss, damage, shortage, overcarriage or delay and include

    (a) any legal costs claimed by the original person making any such claim;

    (b) any interest claimed by the original person making any such claim;

    (c) all legal, Club correspondents' and experts' costs reasonably incurred in the defence of or in the settlement of the claim made by the original person, but shall not include any costs of whatsoever nature incurred in making a claim under this Agreement or in seeking an indemnity under the charterparty.

(4) Apportionment under this Agreement shall only be applied to Cargo Claims where:

    (a) the claim was made under a contract of carriage, whatever its form,

> (i) which was authorised under the charterparty;
> or
> (ii) which would have been authorised under the charterparty but for the inclusion in that contract of carriage of Through Transport or Combined Transport provisions,
>
> provided that
>
> (iii) in the case of contracts of carriage containing Through Transport or Combined Transport provisions (whether falling within (i) or (ii) above) the loss, damage, shortage, overcarriage or delay occurred after commencement of the loading of the cargo onto the chartered vessel and prior to completion of its discharge from that vessel (the burden of proof being on the Charterer to establish that the loss, damage, shortage, overcarriage or delay did or did not so occur); and
>
> (iv) the contract of carriage (or that part of the transit that comprised carriage on the chartered vessel) incorporated terms no less favourable to the carrier than the Hague or Hague Visby Rules, or, when compulsorily applicable by operation of law to the contract of carriage, the Hamburg Rules or any national law giving effect thereto;
>
> and
>
> (b) the cargo responsibility clauses in the charterparty have not been materially amended. A material amendment is one which makes the liability, as between Owners and Charterers, for Cargo Claims clear. In particular, it is agreed solely for the purposes of this Agreement:
>
> (i) that the addition of the words "and responsibility" in clause 8 of the New York Produce Exchange Form 1946 or 1993 or clause 8 of the Asbatime Form 1981, or any similar amendment of the charterparty making the Master responsible for cargo handling, is not a material amendment; and
>
> (ii) that if the words "cargo claims" are added to the second sentence of clause 26 of the New York Produce Exchange Form 1946 or 1993 or clause 25 of the Asbatime Form 1981, apportionment under this Agreement shall not be applied under any circumstances even if the charterparty is made subject to the terms of this Agreement;
>
> and
>
> (c) the claim has been properly settled or compromised and paid.
>
> (5)  This Agreement applies regardless of legal forum or place of arbitration specified in the charterparty and regardless of any incorporation of the Hague, Hague Visby Rules or Hamburg Rules therein.

### Time Bar

(6)  Recovery under this Agreement by an Owner or Charterer shall be deemed to be waived and absolutely barred unless written notification of the Cargo Claim has been given to the other party to the charterparty within 24 months of the date of delivery of the cargo or the date the cargo should have been delivered, save that, where the Hamburg Rules or any national legislation giving effect thereto are compulsorily applicable by operation of law to the contract of carriage or to that part of the transit that comprised carriage on the chartered vessel, the period shall be 36 months. Such notification shall if possible include details of the contract of carriage, the nature of the claim and the amount claimed.

### The apportionment

(7)  The amount of any Cargo Claim to be apportioned under this Agreement shall be the amount in fact borne by the party to the charterparty seeking apportionment, regardless of whether that claim may be or has been apportioned by application of this Agreement to another charterparty.

(8)  Cargo Claims shall be apportioned as follows:

> (a) Claims in fact arising out of unseaworthiness and/or error or fault in navigation or management of the vessel:
>
> 100 per cent.        Owners
>
> save where the Owner proves that the unseaworthiness was caused by the loading, stowage, lashing, discharge or other handling of the cargo, in which case the claim shall be apportioned under sub-clause (b).
>
> (b) Claims in fact arising out of the loading, stowage, lashing, discharge, storage or other handling of cargo:

342

| 100 per cent. | Charterers |

unless the words "and responsibility" are added in clause 8 or there is a similar amendment making the Master responsible for cargo handling in which case:

| 50 per cent. | Charterers |
| 50 per cent. | Owners |

save where the Charterer proves that the failure properly to load, stow, lash, discharge or handle the cargo was caused by the unseaworthiness of the vessel in which case:

| 100 per cent. | Owners |

(c) Subject to (a) and (b) above, claims for shortage or overcarriage:

| 50 per cent. | Charterers |
| 50 per cent. | Owners |

unless there is clear and irrefutable evidence that the claim arose out of pilferage or act or neglect by one or the other (including their servants or sub-contractors) in which case that party shall then bear 100 per cent. of the claim.

(d) All other cargo claims whatsoever (including claims for delay to cargo):

| 50 per cent. | Charterers |
| 50 per cent. | Owners |

unless there is clear and irrefutable evidence that the claim arose out of the act or neglect of the one or the other (including their servants or sub-contractors) in which case that party shall then bear 100 per cent. of the claim.

**Governing Law**

(9) This Agreement shall be subject to English Law and Jurisdiction, unless it is incorporated into the charterparty (or the settlement of claims in respect of cargo under the charterparty is made subject to this Agreement), in which case it shall be subject to the law and jurisdiction provisions governing the charterparty.

*Incorporation of Inter-Club Agreement and Carriage of Goods by Sea Act*

**20.42** The one-year time limit on cargo claims by charterers against owners, to which a charter on the New York Produce form is normally subject as a result of the incorporation of the United States Carriage of Goods by Sea Act (see *The Agios Lazaros* [1976] 2 Lloyd's Rep. 47), does not apply under a charter into which the parties have expressly incorporated the original (1970) version of the Inter-Club Agreement: see *The Strathnewton* [1983] 1 Lloyd's Rep. 219 (C.A.). In that case Kerr, L.J., said, at page 225, that the Agreement "cuts right across any allocation of functions and responsibilities based on the Hague Rules . . . " and "provides a more or less mechanical apportionment of financial liability which is wholly independent of these standards of obligation". See also *The Benlawers* [1989] 2 Lloyd's Rep. 51. The 1984 version of the Agreement, as set out in the fourth edition of this book, required notification of claims within two years of the date of discharge or the date when the goods should have been discharged, failing which any recovery was deemed to be waived and time barred. Under the current (1996) version, notification is required within 24 months of the date of delivery of the cargo or the date the cargo should have been delivered, extended to 36 months where the Hamburg Rules or national law giving effect to them are compulsorily applicable: see Clause 6. Where the 1984 version of the Agreement was incorporated by reference, this limit might itself be overridden by a different time limit on claims imposed by a typed clause elsewhere in the charter: see *The Mary L* (1990), an unreported decision of Evans, J. But the probability of the Agreement's limit taking precedence is increased by Clause 2 of the 1996 version.

*Other issues*

**20.43** The particular additional clause incorporating the Agreement into the charter may make it an express pre-condition of recovery thereunder that the party settling the claim with cargo shall have done so with the approval of the other party. This was the case in the charters considered in *The Holstencruiser*, below.

**20.44** The words in the 1984 version of the Agreement corresponding to the proviso in Clause 8(c) of the 1996 version included the phrase "act, neglect or default on the part of Owners' or Charterers' servants or agents". In *The Goodpal* [2000] 1 Lloyd's Rep. 638, the master of a ship chartered on the New York Produce form agreed to the demand of receivers at the first of two discharge ports to discharge more cargo there than had been ordered by the charterers. Colman, J., rejected the owners' argument that the resulting shortage at the second discharge port had been caused by an act on the part of the charterers' servants or agents. Once the ship had discharged at the first port the quantity of cargo ordered by the charterers, the receivers "were no longer the delegates of the charterers and there were no further orders that they could properly give to the master".

**20.45** For a case in which the current Agreement was applied to cargo claims arising under a charter whose Clause 8 had been amended by the addition of "and responsibility", see *The Clipper Sao Luis* [2000] 1 Lloyd's Rep. 645.

**20.46** In *The Holstencruiser* [1992] 2 Lloyd's Rep. 378, Hobhouse, J., answered a series of questions that had been put to him about the scope and interpretation of the 1984 version of the Agreement in a number of friendly actions between several owners and a charterer operating in the containerised liner trade. The Agreement in its 1984 form (set out in full in the fourth edition of this book) was expressly incorporated into the applicable charters which were on the New York Produce form. Several of the judge's conclusions, also set out in full in the fourth edition, have been overtaken by changes to the wording of the Agreement in its 1996 version, but the first and second were as follows:

1. The Agreement applies only to claims paid or settled under a bill of lading which could properly be issued under the time charter. (The 1996 version of the Agreement is more widely drawn; see Clause 4.)
2. Clause 8 of the charter restricts the bills that may be issued on behalf of the owners to bills signed by the master acknowledging receipt of cargo "in conformity with Mate's or Tally Clerk's receipts"; alternatively the charterers may exercise an implied authority to sign bills that the master might properly have signed for his owners, but that authority itself extends only to bills for cargo actually received by the owners (or their servants or authorised agents).

**20.47** But in *The Elpa* [2001] 2 Lloyd's Rep. 596, Morison, J., took the view that these first and second propositions in the judgment of Hobhouse, J., should not be extended beyond the shortage claims with which *The Holstencruiser* was mainly concerned so as to restrict unduly the claims to which the Agreement applies. Owners and charterers wanted to avoid legal complexities caused by Clause 8 by using the "rough and ready" mechanism of the Agreement to apportion between themselves the cost of claims they had to pay to cargo interests. Accordingly Morison, J., held that a claim arising from unseaworthiness was subject to the Agreement despite the bills being ante-dated and not claused in accordance with mate's receipts. The only requirements were that "there must be a cargo claim under the bill and the bill must contain the Hague-Visby Rules or their equivalent"; see [2001] 2 Lloyd's Rep. 596, at page 600. "If the goods were never shipped so that the bills never applied to the cargo then the claim

would be outwith the ICA. If the goods were shipped but the bills were not issued in accordance with the charter, provided the cargo claim was not affected, that is provided the claim was still a claim under the bill and subject to the regime of the rules, then the ICA applies." In this approach, Morison, J., accepted and extended the conclusions of Judge Diamond, Q.C., in *The Hawk* [1999] 1 Lloyd's Rep. 176, which "respect the decision of Mr Justice Hobhouse but confine it to shortage claims".

*NYPE 93*

**20.48** The 1993 revision of the New York Produce form states, in Clause 27, that cargo claims are to be settled as between the owners and the charterers in accordance with the 1984 version of the Inter-Club Agreement or any subsequent modification or replacement thereof: see Lines 285 to 287, above. The current version, set out above, is from 1996.

### Berth Standard of Average Clause

**20.49** This clause, which is referred to in the Inter-Club New York Produce Exchange Agreement and which is often incorporated in time charters for liner trading, reads as follows:

In the event of the vessel loading on the berth and/or loading general cargo the Charterers shall bear a sum equal to . . . per gross ton of the vessel's maximum register in respect of claims arising on any cargo voyage from improper handling during loading and discharging, improper stowage, short delivery (whether from pilferage or any other cause whatsoever) or over-carriage for which there may be as between Owners and Charterers responsibility on the part of the Owners and also in respect of any reconditioning expenses incurred in order to avoid or mitigate any such claims. If the Owners shall pay any such claims in the first instance they shall be indemnified by the Charterers to the foregoing extent.

**20.50** For cases in which the Berth Standard of Average Clause was considered, see *Clan Line* v. *Ove Skou* [1969] 2 Lloyd's Rep. 155 and *The Filikos* [1981] 2 Lloyd's Rep. 555 and [1983] 1 Lloyd's Rep. 9 (C.A.).

### Charterers to have benefit of owners' P. & I. cover

**20.51** For a decision on the frequently added clause providing for the charterers to have the benefit of the owners' protection and indemnity cover, see *Court Line* v. *Canadian Transport* (1940) 67 Ll.L.Rep. 161.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
SANKO STEAMSHIP CO. LTD.,                    :
                                             :
                    Plaintiff,               :            07 Civ. 2401 (VM)
                                             :
        - against -                          :            ECF CASE
                                             :
CHINA NATIONAL CHARTERING                    :
CORP. also known as SINOCHART,               :
                                             :
                    Defendant.               :
------------------------------------------------X

EXHIBIT 3



Register for 2 week free Trial
Tuesday, 18 July 2006

Home | Help                                                          Log Out

LLOYD'S MARITIME
AND COMMERCIAL LAW
QUARTERLY
International commercial
and shipping law journal

Lloyd's
Law Reports
The leading maritime and
commercial law reports

SHIPPING
AND TRADE LAW
Maritime law comment
and analysis


Fast Search


▷ Advanced Search

Archive

Bookshop
▷ Reference
▷ Newsletters
▷ Magazines
▷ Catalogue

Events
▷ Law
▷ Internet
▷ eCommerce



Article

Archive > 2003 > LMLN 0610: 03 April

### Shipowners bringing London arbitration proceedings claiming indemnity from time-charterers in respect of shipowners' liability to cargo interests - Shipowners seeking security in South Africa in respect of London arbitration proceedings - Time-charter incorporating NYPE Inter Club Agreement - Whether shipowners had made out prima facie case justifying provision of security

**Wajilam Exports (Singapore) Pte Ltd v Transpacific Eternity SA (The "Gallant II") - High Court (Durban and Coast Local Div) (Pillay MS) - 31 January 2003**

The vessel Antares III was charted on the NYPE form. Clause 36 of the charter provided:

"Liability for cargo claims, as between owners and charterers shall be apportioned as specified by the Inter Club New York Produce Exchange Agreement 1996 and its subsequent amendments."

The charterers had, as carriers, issued bills of lading for a cargo of steel coils to be carried by the Antares III from Mumbai to Ravenna, Italy. When the cargo was discharged, the receivers alleged that many of the coils were damaged, and they obtained an order detaining the vessel at Ravenna pending security being furnished for the cargo claims. Security was provided by the shipowners for the release of the vessel. The shipowners contended that they had a prima facie right of recourse against the charterers in the form of a claim for damages for breach of the charterparty in respect of sums payable by the shipowners to cargo interests. That dispute had been referred to arbitration in London.

The shipowners obtained an ex parte order from the South African Court for the arrest of bunker fuel on the Gallant II (another vessel chartered by the charterers) for the purpose of furnishing security to the shipowners for the arbitration proceedings in London. The charterers brought an application contending that the shipowners' claim did not justify any security.

Held, that in order to justify a security arrest, a claimant had to satisfy the court inter alia that he had a prima facie case in respect of such claim which was prima facie enforceable in the nominated forum of his choice (see Cargo Laden on Board the MV "Thalassini Augi" v MV "Dimitris" 1989 (3) SA 820). The charterers had contended that the shipowners had not made out a prima facie case because they had no claim against the charterers. According to the charterers, the shipowners had based their

application for the arrest largely on an advice received from a firm of London shipping solicitors in which the opinion was given that:

"In short owners have a prima facie claim against charterers in the amount of the claim asserted against owners by the cargo interests. That claim is prima facie enforceable against the charterers in London arbitration, the forum agreed in the charterparty for all such claims."

The charterers had obtained their own opinion from other London shipping solicitors which concluded:

"I do not consider that owners are entitled to rely on clause 8 of the charterparty in circumstances where they are seeking an indemnity from charterers for a cargo claim. The whole purpose of the Inter Club Agreement was to get away from the difficulties which clause 8 provided in practice ... The Inter Club Agreement is intended to be a complete code that cuts across other clauses as the courts have indicated and appears enshrined in paragraph 2 of the latest version of the agreement .... In summary, therefore, I do not consider that owners have an accrued cause of action for their liability for the damage if it was caused as they suggest by bad handling."

Clause 4(c) of the Inter Club New York Produce Exchange Agreement 1996 provided:

"Appointment under this agreement shall only be applied to Cargo Claims where ...

(c) the claim has been properly settled or compromised."

The disputes between the present parties, including that of the cargo interests, all arose in consequence of the purported damage to the cargo that arose at Ravenna. Although such claims depended on different causes of action, such cargo damage was their common source. The shipowners had referred to clause 18 of the charterparty which provided that "charterers will not suffer, nor permit to be continued any lien or encumbrance by them or their agents, which might have priority over the title and interests of the owner of the vessel." They had submitted that the claim under clause 18 was entirely untouched by the Inter Club Agreement, the purpose of which was to establish a code for determining liability as between owner and charterer. They had also submitted that the present claim of the shipowners was not a cargo claim as envisaged by the Inter Club Agreement.

Those submissions would be rejected. Apart from the Inter Club Agreement having as its purpose to cut across claims of the present nature, the present application was embedded in a claim for damage to cargo. It could not be separated artificially from the true nature of the dispute. Until that claim was "compromised or settled", the shipowners could not make a claim for an indemnity, or security in respect thereof.

Accordingly, the shipowners were not entitled to security in respect of their claim in the London arbitration.