UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SANKO STEAMSHIP CO., LTD.,

        Plaintiff,      **ECF CASE**

   - against -         07 Civ. 2401 (VM)

CHINA NATIONAL CHARTERING CORP.,
also know as SINOCHART,

        Defendant.
-------------------------------------------------------------------X

### AFFIRMATION OF MICHAEL VOLIKAS IN OPPOSITION TO MOTION TO VACATE MARITIME ATTACHMENT

  MICHAEL VOLIKAS, affirms the following under the penalties of perjury under the

laws of the United States pursuant to 28 USC § 1746:

  1.  I am a Partner in the London office of Ince & Co., English counsel to the plaintiff

SANKO STEAMSHIP CO., LTD. ("SANKO") in this matter.  This affirmation is based upon

personal knowledge and upon documents that I believe are true and accurate.

  2.  By an amended NYPE form time charter dated April 25, 2006, (the "Charter

Party"), defendant CHINA NATIONAL CHARTERING CORP., also known as SINOCHART

(hereinafter "SINOCHART") sub-chartered the M/V SANKO RALLY (the "Vessel") from

plaintiff SANKO for a single time charter trip for sixty days for the carriage of plasterboard (the

"Cargo") from Qingdao, the People's Republic of China to Pensacola, Florida and Mobile,

Alabama.  (A copy of the Charter Party is annexed hereto as Exhibit A.)

  3.  By a GENCON form dated April 24, 2006, (the "Pactrans Charter")

SINOCHART in turn, voyage chartered the Vessel to Pactrans Air & Sea, Inc. ("Pactrans").  (A

copy of the Pactrans Charter is annexed hereto as Exhibit B.)

4.      SINOCHART caused through their agents and/or representatives, China Marine Shipping Agency Shandong Company Limited, to have issued bill of lading no. CNHC02292001, dated May 6, 2006, for the transport of the Cargo from Qingdao to Pensacola, listing Pactrans as the party to be notified.  (A copy of the May 6, 2006, bill of lading is annexed hereto as Exhibit C.)

5.      Upon information and belief, during the course of loading at Qingdao, SINOCHART retained a Port Captain and the stevedore to load and stow the Cargo.  While en route from Quingdao to Pensacola, the Cargo collapsed allegedly due to the improper stowage of the Cargo by agents and representatives of SINOCHART.  The collapse of the Cargo stow allegedly caused damage to the Cargo.

6.      During the course of the discharge of the Cargo at Pensacola on or about June 16, 2006, the surveyors for cargo interests notified the Master and owners of the Vessel that security for the damaged Cargo was requested by cargo interests.  (A copy of the June 16, 2006, letter from surveyors M.H. Barrie & Associates is annexed as Exhibit D.)

7.      As a result of the security demand by cargo interests, on June 21, 2006, Odd Helgesen, a Claims Executive for Gard as agent for Assuranceforeningen Gard, the Vessel's P&I Club requested that Skuld Assuranceforeningen, SINOCHART's P&I Club, take over the handling of the cargo claims and post security, pursuant to Clause 78(c) of the Charter Party.  (A copy of Mr. Helgesen's June 21, 2006, e-mail is annexed hereto as Exhibit D.)  Over the course of June 21 and 22, 2006, Gard and Skuld exchanged correspondence in regard to Gard's request.  However, Skuld refused to take over the handling of the cargo claims and to provide security to cargo interests.  (See Exhibit D annexed).

8.      On June 23, 2006, my office sent a demand to Skuld by fax and by email requesting that they take over the handling of any cargo claims pursuant to Clause 78(c) of the Charter Party. (Copies of the fax and the email are annexed as part of Exhibit E.) My office received no response to our messages and so on June 27, we sent a further fax to Skuld requesting that they take over the handling of the cargo claim.  On June 28, Richards Butler in Hong Kong, English counsel for SINOCHART, responded to this demand to state that they were reviewing the papers and that they would revert to us.  No further message was received from Richards Butler however and so on June 30 my office sent a further fax enquiring further as to their response. (See Exhibit E annexed).

9.      On or about June 29, 2006, during discharge of the Cargo in Florida, the Vessel was arrested as security for claims brought by Devon International Trading, Inc. ("Devon").  The lawsuit was filed in United States District Court, Northern District of Florida against SANKO and the Vessel and bears Case No. 3:06-cv-00285-RV-MD ("Devon Claim").  (A copy of the Verified Complaint and Warrant of Arrest in the Devon Claim are annexed hereto as Exhibit F).

10.     In order to release the Vessel from arrest, attorneys were retained by plaintiff, who arranged for security in the form of a Letter of Undertaking to be provided in the amount of $1,650,281.56.  (A copy of the Devon Claim Letter of Undertaking dated June 30, 2006, is annexed hereto as Exhibit G.)  The Devon Claim is still on-going and plaintiff has incurred substantial attorneys' fees and costs in defending the cargo claim.  (In addition to the Devon Claim, there is a second lawsuit pending in Florida, which was filed by Pactrans against SINOCHART (bearing Case No. 3:06-cv-00369-RS-EMT)).

11.     Following the Vessel's arrest at Pensacola, on July 3, 2006, my office again contacted Richards Butler to attempt to convince SINOCHART to meet its obligations under the

Charter Party; to wit – to take over handling of the cargo claim and provide counter- security in the amount granted to Devon or replacement security to cargo interests. Richards Butler responded on July 5, to request documentation, but did not respond to the demand that SINOCHART take over the handling of the cargo claim and provide counter or replacement security. My office responded to this fax the same day to assert again that SINOCHART were under an obligation handle cargo claims and to provide security to cargo interests. In this fax it was noted that their client's silence appeared to demonstrate that they accepted that they were in breach of these obligations. In response Richards Butler sent a fax on July 6, to state that they were awaiting their clients' instructions but requesting that our clients continue to handle cargo claims and keep SINOCHART updated of all developments. My office sent two further faxes on July 11 and August 18 reminding SINOCHART of their obligations under Clause 78(c) and noting that their failure to comply with such obligations was causing our clients to incur costs in defending the cargo claims. On August 23, Richards Butler advised that they were "instructed" by their client that SINOCHART did not propose to takeover the conduct of the cargo claim. (See Exhibit E annexed).

   12.    My office sent various further messages, as below, to Richards Butler updating them with regards to the situation and requesting that SINOCHART takeover the handling of the cargo claim. On September 21, my office forwarded to Richards Butler copies of the complaint brought by cargo interests together with a draft reply to this complaint and asked if their clients had any comments. Their response on September 22, was to repeat that SINOCHART did not intend to handle the cargo claim and therefore would not comment on the draft reply. A copy of the Reply was sent to Richards Butler by fax on September 29, in a message in which it was again noted that SINOCHART were refusing to comply with their obligations to handle the

cargo claims meaning that our clients were continuing to incur the costs of doing so.  In a fax

dated October 5 Richards Butler replied to assert that their clients were not in breach of their

obligations under Clause 78(c) of the Charter Party.  They did not, however, explain why.

Following this my office responded on October 9 to ask for their reasons why SINOCHART

maintained this view.  Richards Butler did not respond to this fax.  (See Exhibit E annexed).

13.    Unfortunately, all attempts to have SINOCHART comply with their obligations

under Clause 78(c) of the Charter Party (*i.e.*, take over the handling of the cargo claim and

provide security to cargo interests) over the course of a several month period through January

2007 were futile.  (See Exhibit E annexed).

14.    On or about December 20, 2006, the Vessel was again arrested this time by

Pactrans Air & Sea, Inc., freight forwarders acting for receivers of the Cargo, in Mobile,

Alabama as security for alleged cargo loss (amounting to $1,500,000.00) and demurrage claims

including interests and costs (amounting to $890,017.71).  Pactrans' lawsuit against SANKO was

filed in United States District Court, Southern District of Alabama and bears Case No. 1:06-cv-

00862-CG-C ("Pactrans Claim").  (A copy of the Complaint and Warrant of Arrest in the

Pactrans Claim is annexed hereto as Exhibit H.)

15.    In order to release the Vessel from arrest in the Pactrans Claim, attorneys were

again retained by plaintiff, who arranged for security in the form of a Letter of Undertaking to be

provided – this time in the amount of $2,275,000.00.  (A copy of the Pactrans Claim Letter of

Undertaking dated December 21, 2006, is annexed hereto as Exhibit I.)  As with the Devon

Claim in Florida, the Pactrans Claim in Alabama remains on-going and plaintiff has incurred,

and continues to incur, substantial attorneys' fees and costs in defending the claim.  On January

11, 2007, (in a fax dated January 10) we advised Richards Butler that Pactrans had begun

proceedings and had arrested the vessel. My office notified them again that they were obliged to handle cargo claims and provide security. No response was received to this fax. My office was contacted by Richards Butler on March 9 to repeat that their clients would not takeover conduct of the cargo claim. Nonetheless they recommended that SANKO should consider settlement of any cargo claim rather than defend a claim. In response on March 20 my office asked Richards Butler and SINOCHART to explain their position and to indicate how they proposed SANKO should handle the cargo claims. On March 21 Richards Butler confirmed that they were taking their clients' instructions and that they would revert shortly. No further response was received in this regard. The next message my office received was Richards Butler's fax of April 2, 2007, in which Richards Butler objected to the Rule B attachment the subject of these proceedings. (See Exhibit E annexed).

16.     On April 3, 2007, my office on behalf of SANKO demanded arbitration against SINOCHART pursuant to Clauses 17 and 30 of the Charter Party. (A copy of SANKO's arbitration demand is annexed hereto as Exhibit J.) According to the provisions of English law my office notified SINOCHART in this fax that the parties had 28 days in which to agree to the identity of the sole arbitrator. My office suggested two candidates for their consideration and requested their response so that the identity of the arbitrator could be agreed. Having received no response to this fax, following the expiry of the 28 day period, my office sent a further fax to Richards Butler on May 2, to request that they respond to our suggestions and co-operate in nominating the sole arbitrator. In response, on May 9, Richards Butler asked us to re-send our fax of April 3, as they claimed they had not received it. I was surprised by this message as my office had a transmission record which showed that our fax of April 3 had been successfully sent to Richards Butler. On the same day we sent Richards Butler a copy of our fax of April 3,

together with the transmission record. I note that the declaration of Chris Howse is dated April 2 2006, by which date SANKO had not notified SINOCHART of the commencement of arbitration. However, by the date the motion to vacate was filed, on May 7, my office had, on behalf of the plaintiff, commenced arbitration over a month before and had sent a second fax, on May 2, concerning the commencement of arbitration. Although Richards Butler have stated that they did not receive the fax of April 3 they have acknowledged that they received my office's second fax of May 2. (See Exhibit J annexed).

17.     As of on or about March 23, 2007, SANKO had incurred the following costs in connection with the defense and handling of the lawsuits pending in Florida and Alabama and in connection with the matters handled by my firm in London:

(a)     $67,084.05 for legal fees and costs (including surveyors' fees) incurred to date in the defense of the Devon Claim and Pactrans Claim pending in Florida and Alabama, respectively;

(b)     $78,500.00 for legal fees and costs incurred to date in connection with the London arbitration; and

(c)     $27,000.00 for fees and costs incurred to date in connection with the handling of the cargo claims by Gard on behalf of SANKO.

18.     In addition, SANKO anticipates that further costs will be incurred in connection with the defense and handling of the lawsuits pending in Florida and Alabama and in connection with the matters handled by my firm in London as follows:

(a)     $300,000.00 for future legal fees and costs expected to be incurred in the defense of the Devon Claim and Pactrans Claim pending in Florida and Alabama, respectively;

(b)    $490,000.00 for future legal fees and costs expected to be incurred in connection with the London arbitration; and

(c)    $25,000.00 for future fees and costs expected to be incurred in connection with the handling of the cargo claims by Gard on behalf of SANKO.

19.    On June 30, 2006 GARD on behalf of SANKO provided a Letter of Undertaking to Devon in the amount of $1,650,281.56. On December 21, 2006 GARD on behalf of SANKO provided a Letter of Undertaking to Pactrans in the amount of $2,275,000.00. The total security provided on behalf of SANKO to Devon and Pactrans amounts to $3,925,281.56. SANKO has not sought double security for those claims. Rather, SANKO chose the greater security of $2,275,000 that was provided to Pactrans as a basis for part of their security claim against SINOCHART. Thus, there has been no double security sought from SINOCHART.

The foregoing is true and correct to the best of my knowledge under the penalties of perjury under the law of the United States pursuant to 28 USC § 1746.

Executed on:  May 22, 2007

MICHAEL VOLIKAS

EXHIBIT A



# TIME CHARTER

## New York Produce Exchange Form

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946; June 12th, 1981

|  |  |  |
|---|---|---|
| | THIS CHARTER PARTY, made and concluded in ....Beijing............................... | 1 |
| | ...................25th.................. day of ........April,2006.............. ~~19~~ .... | 2 |
| Owners | between ...................THE SANKO STEAMSHIP CO. LTD.,TOKYO.................... | 3 |
| | .........................................................................Owners of | 4 |
| | ~~Steamship~~ | |
| | The good ................................. Motorship " SANKO RALLY" | 5 |
| Description of | of ................................ of ~~tons gross register, and~~ | 6 |
| Vessel | ~~tons net register, having engines of~~ ................................. | 7 |
| | ~~horsepower and with hull, machinery and equipment in a throughly efficient~~ | 8 |
| | ~~state, and classed~~ ~~of about~~ | 9 |
| | ~~cubic feet grain/bale capacity~~ ................................. | 10 |
| | ................................. ~~and about~~ | 11 |
| | ~~long/metric tons deadweight capacity (cargo and~~ | 12 |
| | ~~bunkers, including fresh water and stores not exceeding~~ | 13 |
| | ~~long/metric tons) on a salt water draft of~~ ............... ~~on summer~~ | 14 |
| | ~~freeboard, inclusive of permanent bunkers, which are of the capacity of about~~ | 15 |
| | ~~long/metric tons of~~ | 16 |
| | ................................. ~~fuel oil and~~ ................................. | 17 |
| | ~~long/metric tons of~~ ................................. ~~and~~ | 18 |
| | ~~capable of steaming, fully laden, under good weather conditions about~~ | 19 |
| | ~~knots on a consumption of about~~ ................................. | 20 |
| | ~~long/metric tons of~~ *(Description See Clause 28.)* | 21 |
| | | 22 |
| | now *trading* | 23 |
| | ......................................................................... and | 24 |
| Charterers | .....CHINA NATIONAL CHARTERING CORP.,BEIJING (SINOCHART BEIJING)............. | 25 |
| | ...........................Charterers of the City of ......Beijing............... | 26 |
| | The Owners agree to let and the Charterers agree to hire the vessel from the | 27 |
| Duration | time of delivery for ~~about~~ *one time charter trip via safe port(s) safe berth(s) safe* | 28 |
| | *Anchorage(s) always afloat always within Institute Warranty Limits always ice free with* | 29 |
| | *Intention cargo plasterboard from far east to U.S. Gulf duration about 60 days* | |
| | within below mentioned trading limits. | 30 |
| Subject | Charterers shall have liberty to sublet the vessel for all or any part of the | 31 |
| | time covered by this Charter, but Charterers shall remain responsible for the | 32 |
| | Fulfillment of this Charter. | 33 |
| Delivery | Vessel shall be placed at the disposal of the Charterers *on dropping last outward* | 34 |
| | *Sea pilot one safe port Qingdao, China any time day or night Sundays and holidays* | 35 |
| | *included* | 36 |
| | | 37 |
| | ~~in such dock or at such berth or place (where she may safely lie, always afloat,~~ | 38 |
| | ~~at all times of tide, except as otherwise provided in Clause 6) as the Charterers~~ | 39 |
| | ~~may direct, if such dock, berth or place be not available, time shall count as~~ | 40 |
| | ~~provided in Clause 5.~~ Vessel on her *arrival first load port* ~~delivery~~ shall be ready to | |
| | r e c e i v e     c a r g o     w i t h | 41 |
| | clean-swept holds and tight, staunch, strong and in every way fitted for ordi- | 42 |
| | nary cargo service, having water ballast and with sufficient power to operate all | 43 |
| | cargo-handling gear simultaneously (and with full complement of officers and | 44 |



|  |  |  |
|---|---|---|

Dangerous
Cargo

~~crew for a vessel of her tonnage), to be employed in carrying lawful merchan-~~ 45
~~dise excluding any goods of a dangerous, injurious, flammable or corrosive~~ 46
~~nature unless carried in accordance with the requirements or recom-~~ 47
~~mendations of the proper authorities of the state of the vessel's registry and of~~ 48
~~the states of ports of shipment and discharge and of any intermediate states or~~ 49
~~ports through whose waters the vessel must pass. Without prejudice to the~~ 50

merchandise (45)

Cargo
Exclusions

~~generality of the foregoing, in addition the following are specifically excluded:~~ 51
~~livestock of any description, arms, ammunition, explosives~~  *See Clause 29* ; 52
.................................................................................................................... 53
.................................................................................................................... 54
.................................................................................................................... 55
.................................................................................................................... 56

Trading

        The vessel shall be employed in such lawful trades between safe ports and 57
places within  *See Clause 29* .................................................................................. 58
.................................................................... ~~excluding~~ ................................................ 59
.................................................................................................................... 60
.................................................................................................................... 61
.......... drinking water, garbage removal, immigration .......................................... 62
as the Charterers or their agents shall direct, on the following conditions : 63

Owners
to
Provide

        1. The Owners shall provide and pay for the insurance of the vessel and 64
for all provisions, cabin, deck, engine-room and other necessary stores, in- 65
cluding boiler water; shall pay for wages, consular shipping and discharging 66
fees of the crew and charges for port services pertaining to the crew; shall 67
maintain vessel's class and keep her in a thoroughly efficient state in hull, 68
machinery and equipment for and during the service. 69

Charterers
To
Provide

        2. The Charterers, while the vessel is on hire, shall provide and pay for all 70
the fuel except as otherwise agreed, port charges, pilotages, towages, agen- 71
cies, commissions, consular charges (except those pertaining to individual 72
crew members or flag of the vessel), and all other usual expenses except those 73
stated in Clause 1, but when the vessel puts into a port for causes for which 74
vessel is responsible, then all such charges incurred shall be paid by the 75
Owners. Fumigations ordered because of illness of the crew shall be for 76
Owners' account. ~~Fumigations ordered because of cargoes carried or ports~~ 77
~~visited while vessel is employed under this Charter shall be for Charterers'~~ 78
~~account. All other fumigations shall be for Charterers' account after vessel has~~ 79
~~been on charter for a continuous period of six months or more.~~ *Owners to keep on* b 80
*board a valid deratization certificate throughout the Charter Party period.*

        Charterers shall provide necessary dunnage and shifting boards, also 81
any extra fittings requisite for a special trade or unusual cargo, but Owners 82
shall allow them the use of any dunnage and shifting boards already aboard 83
vessel. 84

Bunkers
on
Delivery
and
Redelivery

        3. The Charterers on delivery, and the Owners on redelivery, shall take 85
over and pay for all fuel and diesel oil remaining on board the vessel as 86
hereunder. The vessel shall be delivered ~~with~~ : *Bunkers as per Clause 73* ......... 87
~~long/metric* tons of fuel oil at the price of~~ ............................................ ~~per ton~~ ; 88
............................................ ~~tons of diesel oil at the price of~~ ............................... 89
~~per ton. The vessel shall be redelivered with:~~ .................................................. 90
~~tons of fuel oil at the price of~~ .................................... ~~per ton:~~ ........................... 91
............................................ ~~tons of diesel oil at the price of~~ ................... ~~per ton~~ 92
.................................................................................................................... 93
.................................................................................................................... 94
~~(*Same tons apply throughout this clause)~~ 95

Rate of
Hire

        4. The Charterers shall pay for the use and hire of the said vessel at the 96
rate of *US$24,000.00(Twenty four thousand U.S Dollars)* ......................... daily ~~or~~ 97
.............................................................. ~~United States Currency~~ 98

Per *day or pro rata including overtime payable semi–monthly in advance* ~~ton on~~ 99
~~vessel's total deadweight carrying capacity, including bunkers and~~
~~stores, on~~ ................................................................. ~~summer freeboard, per calendar month,~~ 100
commencing on and from the *time* ~~day~~ of her delivery, as aforesaid, and at and after 101
the same rate for any part of a month; hire shall continue until the hour of the 102
*time* ~~day~~ of her redelivery *based on GMT* in like good order and condition, ordinary 103

**Redelivery** w  e  a  r  a  n  d  t  e  a  r
excepted, to the Owners (unless vessel lost) ~~at~~ *on dropping last outward sea pilot o* 104
**Areas and** *ne*....................................................................................
**Notices** *.. safe port, Houston/Tampa any time day or night Sundays and holidays included* 105
...................................................................................................................... 106
............................................................................. unless otherwise mutually agreed. 107
Charterers shall give Owners not less than *30/25/20/15/12/10/7* ................. days 108
notice
of vessel's expected date of redelivery and ~~probable port~~ *5/3/2/1 day(s)*................ 109
*.. notice of redelivery. Charterers are to declare redelivery port 20days prior to redelive* 110
*ry.*

5. Payment of hire shall be made *by telegraphic transfer on or before due date* 111
**Hire** s  o  a  s  t  o  b  e  r  e  c  e  i  v  e  d  b  y  O  w  n  e  r  s  o  r  t  h  e  i  r
**Payment** designated payee ~~in New York, i.e.~~ *to Owners' designated bank account* 112
**and** ...................................................................................................................... 113
**Commencement** ...................................................................................................................... 114
............................................................... in United States Currency, in funds 115
available to the Owners on the due date, semi–monthly in advance, and for the 116
last half month or part of same the approximate amount of hire, and should 117
same not cover the actual time, hire shall be paid for the balance day by day as 118
it becomes due, if so required by Owners. Failing the punctual and regular 119
payment of the hire, or on any breach of this Charter, the Owners shall be at 120
liberty to withdraw the vessel from the service of the Charterers without pre- 121
judice to any claims they (the Owners) may otherwise have on the Charterers. 122
~~Time shall count from 7 A.M. on the working day following that on~~ 123
~~which written notice of readiness has been given to Charterers or their agents~~ 124
~~before 4 P.M., but if required by Charterers, they shall have the privilege of~~ 125
~~using vessel at once, in which case the vessel will be on hire from the com-~~ 126
~~mencement of work.~~ 127

**Cash** Cash for vessel's ordinary disbursements at any port may be advanced, 128
**Advances** as required by the Captain, by the Charterers or their agents, subject to 2.5 129
percent commission and such advances shall be deducted from the hire. The 130
Charterers, however, shall in no way be responsible for the application of such 131
advances. 132

**Berths** 6. Vessel shall be loaded and discharged in any dock or at any berth or 133
place that Charterers or their agents may direct, provided the vessel can safely 134
lie always afloat at any time of tide, ~~except at such places where it is customary~~ 135
~~for similar size vessels to safely lie aground.~~ 136

**Spaces** 7. The whole reach of the vessel's holds, decks, and usual places of 137
**Available** loading (not more than she can reasonably and safely stow and carry), also 138
accommodations for supercargo, if carried, shall be at the Charterers' dis- 139
posal, reserving only proper and sufficient space for ship's officers, crew, 140
tackle, apparel, furniture, provisions, stores and fuel. 141

**Prosecution** 8. The Captain shall prosecute his voyages with due despatch and shall 142
**of** render all customary assistance with ship's crew and boats. The Captain 143
**Voyages** (although appointed by the Owners) shall be under the orders and directions of 144
the Charterers as regards employment and agency; and Charterers are to 145
perform all cargo handling at their expense under the supervision of the 146

Captain, who is to sign the bills of lading for cargo as presented in conformity 147
with mate's or tally clerk's receipts. However, at Charterers' option, the Chart- 148
erers or their agents may sign bills of lading on behalf of the Captain always in 149

**Bills**
**of**
**Lading**

conformity with mate's or tally clerk's receipts. All bills of lading shall be 150
without prejudice to this Charter and the Charterers shall indemnify the Own- 151
ers against all consequences or liabilities which may arise from any inconsis- 152
tency between this Charter and any bills of lading or waybills signed by the 153
Charterers or their agents or by the Captain at their request. 154

**Conduct of**
**Captain**

9. If the Charterers shall have reason to be dissatisfied with the conduct of 155
the Captain or officers, *or any of the crew members,* the Owners shall on receiving
p    a    r    t    i    c    u    l    a    r    s    o    f    t    h    e 156
complaint, investigate the same, and, if necessary, make a change in the 157
appointments. *But this provision does not affect Charterers right to advance any clai*
*m or require arbitration under Clause 17 on dispute regarding the conduct of the Ma*
*ster in prosecution of the voyage and carrying out the orders and the direction of th*
*e Charterers.* 158

**Supercargo**
**and**
**Meals**

10. The Charterers are entitled to appoint a supercargo, who shall accom- 159
pany the vessel and see that voyages are prosecuted with due despatch. He is 160
to be furnished with free accommodation and same fare as provided for 161
Captain's table, Charterers paying at the rate of *US$10.00*.......................... per day. 162
Owners shall victual pilots and customs officers, and also, when authorized by 163
Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc., 164
Charterers paying at the rate of ............................... per meal for all such victual- 165
ling. 166

**Sailing**
**Orders**
**and Logs**

11. The Charterers shall furnish the Captain from time to time with all 167
requisite instruction and sailing directions, in writing, and the Captain shall 168
keep full and correct deck and engine logs of the voyage or voyages, which are 169
to be patent to the Charterers or their agents, and furnish the Charterers, their 170
agents or supercargo, when required, with a true copy of such deck and engine 171
logs, showing the course of the vessel, distance run and the consumption of 172
fuel. 173

**Ventilation**

12. The Captain shall use diligence in caring for the ventilation of the 174
cargo. 175

**Continuation**

13. The Charterers shall have the option of continuing this Charter for a 176
further period of .......................................................................................................... 177
......................................................................................................... 178

**Laydays/**
**Cancelling**

14. If required by Charterers, time shall not commence before ........................ 179
*0001 hours 01ˢᵗ May, 2006(local time)* and should vessel not have given written 180
notice of readiness on or before *2400 hours 09ᵗʰ May, 2006 (local time)* 
b    u    t    n    o    t 181
later than 4 P.M. Charterers or their agents shall have the option of canceling 182
this Charter at any time not later than the day of vessel's readiness. *See Clause 84* 183

**Off**
**Hire**



[See Clause 45]

15. In the event of the loss of time from deficiency and/or default of officers 184
or crew or deficiency of stores, fire, breakdown of, or damages to hull, 185
machinery or equipment, grounding, detention by average accidents to ship or 186
cargo unless resulting from inherent vice, quality or defect of the cargo, 187
drydocking for the purpose of examination or painting bottom, or by any other 188
similar cause preventing the full working of the vessel, the payment of hire and 189
overtime, if any, shall cease for the time thereby lost. Should the vessel deviate 190
or put back during a voyage, contrary to the orders or directions of the 191
Charterers, for any reason other than accident to the cargo, the hire is to be 192
suspended from the time of her deviating or putting back until she is again in 193
the same or equidistant position from the destination and the voyage resumed 194
therefrom. All fuel used by the vessel while off hire shall be for Owners' 195
account. In the event of the vessel being driven into port or to anchorage 196

~~through stress of weather, trading to shallow harbors or to rivers or ports with~~ 197
~~bars, any detention of the vessel and/or expenses resulting from such deten-~~ 198
~~tion shall be for the Charterers' account. If upon the voyage the speed be~~ 199
~~reduced by defect in, or breakdown of, any part of her hull, machinery or~~ 200
~~equipment, the time so lost, and the cost of any extra fuel consumed in~~ 201
~~consequence thereof, and all extra expenses shall be deducted from the hire.~~ 202

**Total**
**Loss**

16. Should the vessel be lost, money paid in advance and not earned 203
(reckoning from the date of loss or being last heard of) shall be returned to the 204
Charterers at once. 205

**Exceptions**

The act of God, enemies, fire, restraint of princes, rulers and people, 206
and all dangers and accidents of the seas, rivers, machinery, boilers and steam 207
navigation, and errors of navigation throughout this Charter, always mutually 208
excepted. 209

**Liberties**

The vessel shall have the liberty to sail with or without pilots, to tow and 210
to be towed, to assist vessels in distress, and to deviate for the purpose of 211
saving life and property. 212

**Arbitration**

17. Should any dispute arise between Owners and Charterers, the 213
matter in dispute shall be referred to *arbitration in London and English Law to be ap*
*plied, in accordance with the Arbitration Act 1990 and any subsequent amendment.*
*The award of the arbitration* ~~three persons at New York, one to be~~ 214
~~appointed by each of the parties hereto, and the third by the two so chosen;~~ 215
~~their decision, or that of any two of them,~~ shall be final and for the purpose of 216
enforcing any award this agreement may be made a rule of the Court. ~~The~~ 217
~~arbitrators shall be commercial men conversant with shipping matters.~~ 218

**Liens**

18. The Owners shall have a lien upon all cargoes and all sub-freights for 219
any amounts due under this Charter, including general average contributions, 220
and the Charterers shall have a lien on the ship for all monies paid in advance 221
and not earned, and any overpaid hire or excess deposit to be returned at once. 222
Charterers will not suffer, nor permit to be continued, any lien or encumbrance 223
incurred by them or their agents, which might have priority over the title and 224
interest of the Owners in the vessel. 225

**Salvage**

19. All derelicts and salvage shall be for Owners' and Charterers' equal 226
benefit after deducting Owners' and Charterers' expenses and crew's propor- 227
tion. 228

**General**

General average shall be adjusted, according to York-Antwerp Rules 229
*1994 as any amendments thereto in London. Hire not to be contributed to General*
*Average.*~~1974, at such port or place in the United States as may be selected by the~~ 230

**Average**
~~Owners and as to matters not provided for by these Rules, according to the~~ 231
~~laws and usage at the port of New York. In such adjustment disbursements in~~ 232
~~foreign currencies shall be exchanged into United States money at the rate~~ 233
~~prevailing on the dates made and allowances for damage to cargo claimed in~~ 234
~~foreign currency shall be converted at the rate prevailing on the last day of~~ 235
~~discharge at the port or place of final discharge of such damaged cargo from~~ 236
~~the ship. Average agreement or bond and such additional security, as may be~~ 237
~~required by the Owners, must be furnished before delivery of the goods. Such~~ 238
~~cash deposit as the Owners or their agents may deem sufficient as additional~~ 239
~~security for the contribution of the goods and for any salvage and special~~ 240
~~charges thereon, shall, if required, be made by the goods, shippers, consign-~~ 241
~~ees or owners of the goods to the Owners before delivery. Such deposit shall,~~ 242
~~at the option of the Owners, be payable in United States money and remitted to~~ 243
~~the adjuster. When so remitted the deposit shall be held in a special account at~~ 244
~~the place of adjustment in the name of the adjuster pending settlement of the~~ 245
~~general average and refunds or credit balances, if any, shall be paid in United~~ 246
~~States money.~~ 247

**York-**

Charterers shall procure that all bills of lading issued during the cur- 248



Antwerp — rency of the Charter will contain a provision to the effect that general average 249
shall be adjusted according to York-Antwerp Rules *1994 or any amendments thereto* 250

Rules — ~~1 9 7 4~~ a n d w i l l i n c l u d e t h e 250
"New Jason Clause" as per Clause 23. 251

Drydocking — 20. ~~The vessel was last drydocked~~ ........................................ ~~The~~ 252
~~Owners shall have the option to place the vessel in drydock during the cur-~~ 253
~~rency of this Charter at a convenient time and place, to be mutually agreed~~ 254
~~upon between Owners and Charterers, for bottom cleaning and painting~~ 255
~~and/or repair as required by class or dictated by circumstances. Payment of~~ 256
~~hire shall be suspended upon deviation from Charterers' service until vessel is~~ 257
~~again placed at Charterers' disposal at a point not less favorable to Charterers~~ 258
~~than when the hire was suspended.~~ ................................................ 259
.................................................................................................... 260
.................................................................................................... 261

Cargo — 21. Owners shall maintain the cargo-handling gear of the ship which is as 262
Gear — follows : .................................................................................. 263
.................................................................................................... 264
.................................................................................................... 265
providing gear (for all derricks or cranes) capable of lifting capacity as de- 266
scribed. Owners shall also provide on the vessel for night work lights as on 267
board, but all additional lights over those on board shall be at Charterers' 268
expense. The Charterers shall have the use of any gear on board the vessel. If 269
required by Charterers, the vessel shall work night and day and all cargo- 270
handling gear shall be at Charterers' disposal during loading and discharging. 271

Stevedore — In the event of disabled cargo-handling gear, or insufficient power to operate 272
the same, hire to be reduce pro-rata, for the period of such insufficiency in relatio
n to the number of hatch( es ) available. ~~the vessel is to be considered to be off-hire~~

Stand-by — t o t h e e x t e n t t h a t t i m e i s 273
~~actually lost to the Charterers and Owners to pay stevedore stand-by charges~~ 274
~~occasioned thereby. If required by the Charterers, the Owners are to bear the~~ 275
~~cost of hiring shore gear in lieu thereof.~~ 276

Crew — 22. ~~In lieu of any overtime payments to officers and crew for work ordered~~ 277
Overtime — ~~by Charterers or their agents, Charterers shall pay Owners $~~ ......................... 278
~~per month or pro rata.~~ 279

23. *See Clause 54* ~~The following clause is to be included in all bills of lading~~ 280
Clauses — i s s u e d 280
Paramount — ~~hereunder:~~ 281
~~This bill of lading shall have effect subject to the provisions of the~~ 282
~~Carriage of Goods by Sea Act of the United States, the Hague Rules, or the~~ 283
~~Hague-Visby Rules, as applicable, or such other similar national legislation as~~ 284
~~may mandatorily apply by virtue of origin or destination of the bills of lading,~~ 285
~~which shall be deemed to be incorporated herein and nothing herein con-~~ 286
~~tained shall be deemed a surrender by the carrier of any of its rights or~~ 287
~~immunities or an increase of any of its responsibilities or liabilities under said~~ 288
~~applicable Act. If any term of this bill of lading be repugnant to said applicable~~ 289
~~Act to any extent, such term shall be void to that extent, but no further.~~ 290
This Charter is subject to the following clauses all of which are to be 291
included in all bills of lading issued hereunder: 292

New — If the ship comes into collision with another ship as a result of the 293
Both- — negligence of the other ship and any act, neglect or default of the master, 294
to- — mariner, pilot or the servants of the carrier in the navigation or in the manage- 295
Blame — ment of the ship, the owners of the goods carried hereunder will indemnify the 296
Collision — carrier against all loss or liability to the other or non-carrying ship or her 297
Clause — owners insofar as such loss or liability represents loss of, or damage to, or any 298
claim whatsoever of the owners of said goods, paid or payable by the other or 299

non-carrying ship or her owners to the owners of said goods and set off, 300
recouped or recovered by the other or non-carrying ship or her owners as part 301
of their claim against the carrying ship or carrier. 302

**New Jason Clause**

The foregoing provisions shall also apply where the owners, operators 303
or those in charge of any ships or objects other than, or in addition to, the 304
colliding ships or objects are at fault in respect to a collision or contact. 305

In the event of accident, danger, damage or disaster before or after 306
commencement of the voyage resulting from any cause whatsoever, whether 307
due to negligence or not, for which, or for the consequences of which, the 308
carrier is not responsible, by statute, contract, or otherwise, the goods, ship- 309
pers, consignees, or owners of the goods shall contribute with the carrier in 310
general average to the payment of any sacrifices, losses, or expenses of a 311
general average nature that may be made or incurred, and shall pay salvage 312
and special charges incurred in respect of the goods. 313

If a salving ship is owned or operated by the carrier, salvage shall be 314
paid for as fully as if salving ship or ships belonged to strangers. Such deposit 315
as the carrier or his agents may deem sufficient to cover the estimated con- 316
tribution of the goods and any salvage and special charges thereon shall, if 317
required, be made by the goods, shippers, consignees or owners of the goods 318
to the carrier before delivery. 319

**War Clauses**

(a) No contraband of war shall be shipped. Vessel shall not be re- 320
quired, without the consent of Owners, which shall not be unreasonably 321
withheld, to enter any port or zone which is involved in a state of war, warlike 322
operations, or hostilities, civil strife, insurrection or piracy whether there be a 323
declaration of war or not, where vessel, cargo or crew might reasonably be 324
expected to be subject to capture, seizure or arrest, or to a hostile act by a 325
belligerent power(the term "power" meaning any de jure or de facto authority 326
or any purported governmental organization maintaining naval, military or air 327
forces). 328

(b) If such consent is given by Owners, Charterers will pay the provable 329
additional cost of insuring vessel against hull war risks in an amount equal to 330
the value under her ordinary hull policy but not exceeding a valuation of 331
.................................................... In addition, Owners may purchase and Charterers 332
will pay for war risk insurance on ancillary risks such as loss of hire freight 333
disbursements, total loss, blocking and trapping, etc. If such insurance is not 334
obtainable commercially or through a government program, vessel shall not 335
be required to enter or remain at any such port or zone. 336

(c) In the event of the existence of the conditions described in (a) 337
subsequent to the date of this Charter, or while vessel is on hire under this 338
Charter, Charterers shall, in respect of voyages to any such port or zone 339
assume the provable additional cost of wages and insurance properly incurred 340
in connection with master, officers and crew as a consequence of such war, 341
warlike operations or hostilities. 342

**Ice**

24. The vessel shall not be required to enter or remain in any icebound port 343
or area, nor any port or area where lights or lightships have been or are about 344
to be withdrawn by reason of ice, nor where there is risk that in the ordinary 345
course of things the vessel will not be able on account of ice to safely enter and 346
remain in the port or area or to get out after having completed loading or 347
discharging. 348

**Navigation**

25. Nothing herein stated in to be construed as a demise of the vessel to the 349
Time Charterers. The Owners shall remain responsible for the navigation of the 350
vessel, acts of pilots and tug boats, insurance, crew, and all other similar 351
matters, same as when trading for their own account. 352

**Commissions**

26. A commission of ..........1.25.......... percent is payable by the 353

vessel
and Owners to *Ocean Robin Shipping Holding Corp. and 1.25 percent to Yamamizu* 354
*Shipping* ............................................................................................. 355

on hire earned and paid under this Charter, and also upon any continuation or 356
extension of this Charter. 357

Address        27. An commission of ................... *3.75* ........................... percent 358
is payable to ..... Charterers ........................................................................ 359

..................................................................................................................... 360
on hire earned and paid under this Charter. 361

        Rider    Cl a u s e *2 8 t o 9 1 i n c l u s i v e*
Rider    *as at–* 362
tached hereto are incorporated in this Charter. 363

**CHARTERERS:**                                            *OWNERS:*

                                       THE SANKO STEAMSHIP CO.,LTD.

                                     K.KOGA
                                     GENERAL MANAGER
                                     BOXSHAPE CARRIERS DEPT.





RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

28.  Description – details all 'about'

M.V. SANKO RALLY
   VANUATU/1994/N.K.
   OPEN-HATCH BOX-SHAPED HOLD BULKER (EXCL NO.1/NO.8)
   DWT 42,529MT ON 11.535M SSW DRAFT
   GRT 25,676 / NRT 13,991
   LOA 184.93M / BEAM 30.50M / DEPTH 16.20M
   4 SET X 30T JIB CRANE (4 GEARS SERVING ALL HATCHES BUT ONLY 4
HATCHES
   SIMULTANEOUSLY AND EACH CRANE SET SERVING ONLY IMMEDIATELY ADJACENT
   HATCHES)
   8 HOLDS / 8 HATCHES
   GRAIN/BALE CAPA. 1,802,319CFT/1,759,341CFT
   HATCH SIZE NO.1      8.80M X 12.96M
              NO.2/6/7 14.40M X 25.92M
              NO.3      13.60M X 25.92M
              NO.4/5    12.80M X 25.92M
              NO.8      8.80M X 16.20M
   - MAX 2.40M OVER HANG (HATCH WAY/FORE AND AFT ONLY)
     IS EXISTING THRU NO.2-NO.7 HOLD.
   - HATCH TYPE:
     NO.1/8 : FOLDING TYPE
     NO.2/3  4/5  6/7 : PIGGY BACK TYPE
   - SMALL SLANT (HOPPER) IS EXISTING IN NO.7 HOLD
     (AFTER PART/BOTH SIDE).
   - ALL DETAILS "ABT".

   SPEED/CONSUMPTION : (ALL FIGURE 'ABOUT')
   (AT SEA)
   (UNDER WEATHER CONDITION UP TO AND INCLUDING BEAUFORT
   SCALE FORCE 4)
   BALLAST - 14.3 KTS ON 29.5MT IFO(380CST-RMG35) + 0.1MT MDO(DMB)
   LADEN    - 13.8 KTS ON 30.0MT IFO(380CST-RMG35) + 0.1MT MDO(DMB)
   (AT PORT)
   IDLING        - 3.0MT IFO(380CST-RMG35) + 0.1MT MDO(DMB)
   GEAR WORKING - 3.5MT IFO(380CST-RMG35) + 0.1MT MDO(DMB)

   THE VSL HAS LIBERTY TO BURN GAS OIL/DIESEL OIL FOR MAIN ENGINE
   WHEN MANOEUVERING IN SHALLOW/NARROW/RESTRICTED WATER,
   CANAL RIVERS OR IN AND OUT OF PORT

   - TANK TOP STRENGTH
     24.3MT/M2 - NO.2/3/5/7/8 HOLD
     14.0MT/M2 - NO.1/4/6 HOLD
   - TANK TOP DIMENSIONS:
     NO.1 HOLD      16.00M X (F)11.50M / (A) 22.50M
     NO.2 HOLD      16.80M X (F)23.00M / (A) 25.92M
     NO.3/4/5/6 HOLD  16.80M X (F)25.92M / (A) 25.92M
     NO.7 HOLD      16.80M X (F)25.92M / (A) 19.20M
     NO.8 HOLD      15.20M X (F)18.80M / (A) 10.50M

   OWS BANK DETAILS :
          CITIBANK N.A.NEW YORK
          399 PARK AVENUE, NEW YORK, N.Y.10043
          CHIPS CODE: 0008
          A/C THE SANKO STEAMSHIP CO., LTD.
          A/C NO. 4068-6369



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

29.  Cargo/Trading Exclusions:
     Cargo Exclusions;

     CHARTERERS INTENTION IS TO BE PLASTERBOARD.
     CHARTERERS GUARANTEE THAT PLASTERBOARD NOT TO BE 'CARGO LISTED IN IMO/IMDG
     CARGOES CLASSIFIED UNDER CATEGORIES 1-9' NOR DANGEROUS CARGO.
     VSL TO BE EMPLOYED IN CARRING LAWFUL CARGOES/MARCHANDIZE,
     ALWAYS EXCLUDING AMMONIA, AMMONIUM NITRATE, AMMONIUM SULFATE,
     AMMUNITIONS, ARMS, BONES, BULK BORAX, BAGGED RICE,
     CALCIUM HYPOCHLORITE, CEMENT, CEMENT CLINKER, CHARCOAL,
     CONTAINERS, FERRO SILICON, CHROME, CHROMITE, FERROCHROME,
     CHROME ORE, CHROME BEARING ORES/ALLOYS, NICKEL ORES/ALLOYS,
     HAZARDOUS CARGOES, INJUROUS/INFLAMMABLE OR DANGEROUS GOODS,
     MACOYA EXPELLERS, MACOYA PELLETS, METAL BORINGS AND CUTTINGS,
     NAPHTHA, NUCLEAR FUEL MATERIALS AND WASTES, PETROLEUM,
     PETROLEUM PRODUCTS, POND COAL, RADIOACTIVE MATERIALS AND WASTES,
     TURPENTINE, WAR MATERIALS, LIVESTOCKS, NUCLEAR MATERIALS,
     TAR, PITCH (INCL. PENCIL PITCH), ASPHALT, SILICAMANGANESE,
     SUNFLOWER SEEDS, EXPELLERS, FISHMEAL, HIDES, CREOSOTED GOODS,
     CALCIUM CARBIDE, EXPLOSIVES (BLACK POWDER, BLASTING CAPS,
     DETONATORS, LOADED BOMBS, DYNAMITE AND TNT), ACIDS, MOTOR SPIRIT
     AND TURNINGS, ASBESTOS, BITUMEN, SPONGE IRON, DIRECT REDUCED,IRON, HOT MOULDED
     BRIQUETTES, COTTONS, SULPHUR, SALT, ANY KIND OF SCRAP
     INCLUDING MOTORBLOCK/TURNING, ANY KIND OF DECK CARGO, MOTOR
     BLOCK, COPRA, PETCOKE, QUEBRACHO, LOG, MAHOGANY LOGS,
     AND ANY KIND OF ARMS AND AMMUNITIONS.

     BULK CARGOES LISTED IN THE IMO CODE OF SAFE PRACTICE FOR SOLID
     BULK CARGOES 1994 WHICH CAN NOT BE CERTIFIED BY CHTRS/SHIPPERS
     AS HARMLESS AND/OR HAVING A HISTORY OF SHIPMENT WITHOUT
     PROBLEMS. CHTRS UNDERTAKE TO LOAD VSL IN ACCORDANCE WITH IMO
     CODE OF SAFETY PRACTICE FOR BULK CARGOES ALSO IN ACCORDANCE
     WITH ANY LOCAL REGULATIONS.

     ALL CARGOES (ESPECIALLY CONCENTRATE AND COAL) TO BE IN
     ACCORDANCE WITH IMO REGULATIONS AND ALL CARGOES (ESPECIALLY
     CONCENTRATE AND COAL) TO BE LOADED, STOWED, CARRIED, AND
     DISCHARGED STRICTLY IN ACCORDANCE WITH I.M.O.'S CODE OF SAFE
     PRACTICE FOR SOLID BULK CARGOES 1994 AND LOCAL REGULATIONS.

     Trading Exclusions;
     WORLD WIDE TRADING ALWAYS VIA SAFE PORT(S), SAFE BERTH(S) AND
     SAFE ANCHORAGE(S) AND PLACES ALWAYS AFLOAT ALWAYS WITHIN
     INSTITUTE WARRANTY LIMITS, BUT EXCLUDING BALTIC SEA, IRAN, IRAQ,
     YEMEN, LEBANON, ALBANIA, CUBA, ANGOLA, ISRAEL, ISRAEL CONTROLLED,
     TURKISHI OCCUPIED CYPRUS, LIBERIA, CAMBODIA, NORTH KOREA, LIBYA,
     RUSSIAN PACIFIC, PORT(S), LAGOS, PORTS THAT WERE PREVIOUSLY IN
     YUGOSLAVIA, ETHIOPIA, ZAIRE, HAITI, SUDAN, SOMALIA, SERBIA,
     PAKISTAN, MONTENEGRO, KUWAIT, SRI LANKA, ALASKA, SIERA LEONE,
     ETHIOPIA, ERITREA, NIGERIA, ANY AREA(S) AND/OR COUNTRIES BANNED
     AND BOYCOTTED BY THE U.N. AND ANY OTHER COUNTRIES PROHIBITED
     FROM CALLING AT BY THE FLAG STATE, VESSEL SHALL NOT BE SENT
     TO A PORT OR ZONE WHERE THERE IS WAR OR WARLIKE HOSTILITIES OR
     TO A PORT OR ZONE WHERE DECLARED "HELD COVER" BY THE
     UNDERWRITERS OF THE VESSEL, THE AREA INFESTED BY ASIAN GYPSY MOTH.

30.  War Risk Insurance



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

Basic war risk insurance premium for worldwide trading shall be for Owners' account and additional premium for Hull and Machinery and officers/crew and crew war bonus, if any, due to the vessel's trading to the restricted area shall be for Charterers' account. Insurance/extra insurance not to exceed official quotation by Lloyd's underwriters, London. However if such insurance is not obtainable commercially or through a government program, the vessel shall not be required to enter or remain at any such port or zone. However, if war situation becomes serious Owners will have the right to refuse vessel entering into war zone, and Owners and Charterers shall further discuss in good faith on alternative arrangement. However Owners shall not unreasonably refuse entering vessel if similar vessel's operated by first class companies currently trading to such area.

31. Panama/Suez Canal Transit
The Owners guarantee that the vessel shall be fully fitted for Panama/Suez canal transit and in possession of valid necessary certificate during the currency of this Charter to comply with current regulations and requirements of both Canals.

32. Boycott
If the vessel to boycotted, picketed, blacklisted or if any similar incident occurs at any port or place by shore and/or port labours and/or tugboats, and/or pilots, or by government and/or any authority, by reason or manning or Ownership/ Management or terms and conditions on which members of the Officers/crew are employed, all consequences and any extra expenses incurred therefrom to be for Owners' account and the Charterers are entitled to place the vessel off-hire for any time lost by such reasons. Charterers shall not trade the vessel to any port or place where the vessel is known to be boycotted by shore and/or port labours and/or tugboats and/or pilots or by government and/or any authority, by reason of the vessel's flag/registry.

33. War Cancellation
If war breaks out between any two or more of the following countries:

United Kingdom, U.S.A., Russia, People's Republic or China, Japan, directly affecting the performance of this charter, both the Owners and the Charterers shall have the option of cancelling this charter provided that the trading of the vessel is significantly affected adversely due to the outbreak of war. The Charterers shall redeliver the vessel to the Owners, if she has cargo on board after discharge thereof at destination, or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by the Charterers. In all cases hire shall be paid until the vessel's redelivery. Both Owners and Charterers shall act in good faith in invoking this Clause.

34. Requisition
Should the vessel be requisitioned by the government of the vessel's flag during the period of the charter, the vessel shall be deemed to be off-hire during the period of such requisition, and any hire paid by the said government in respect, of such' requisition period shall be retained by the Owners. In the event for such requisition, the Charterers shall have the option to cancel the balance period of this Charter.

35. Deratting Certificate
The vessel shall be delivered with a valid deratting or deratting exemption certificate. If such certificate does not cover the whole period of the charter, costs of renewal of certificate and any required fumigation for obtaining of such certificate, if necessary shall be for the Owners' account. Any detention and extra expenses incurred thereby shall be also for the Owners' account.

36. Quarantine
Normal quarantine time and expenses for the vessel's entering port shall be for the Charterers' account, but any time of detention and expenses for quarantine due to pestilence, epidemics and illness of Captain, Officers and crew shall be for the Owners' account.



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

37.  Equipment
The vessel's equipment shall comply with the regulations and/or requirements in effect at the port or ports of call, canals and countries in which the vessel will be employed. The Owners also guarantee that the vessel shall be at all times in possession or a valid and up-to-date certificate on board to comply with such regulations and/or requirements.  If stevedores, longshoremen or other labours are not permitted to work by reason of any failure of the Captain, the Owners and/or their agents to comply with such regulations or by reason that the vessel is not in possession of such valid and up-to-date certificates, then the Owners shall take immediate corrective measures.  The Charterers may suspend hire for time lost thereby and any extra expenses including stevedores' stand-by time shall be for Owners' account.

38.  Stevedore
Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the vessel caused by stevedores provided the master has notified the Charterers and/or their agents in writing as soon as practical but not later than 48hours after any damage is discovered.  Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage.

(a) incase of any and all damage(s) affecting the vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the vessel is to remain on hire until such repairs are completed and if required passed by the vessel's classification society.

(b) Charterers are to endeavour to repair any and all damage(s) not described under point (a) above at Charterers time and expenses before redelivery. But, owners accept redelivery without Charterers repairing the damage(s) not described under point (a) above and in such a case the Charterers to pay for the costs and time immediately/promptly in order to avoid outstandings  between Charterers and Owners.

39.  P. & I. Club
The Owners guarantee that the vessel shall be fully covered by P. & I. Club. The Charterers have the benefit of the Owners granted by the P. & I. Club as far as the rules permit.

40.  N.Y.P.E. Interclub Agreement
Liability for cargo claims shall be borne by the Owners and the Charterers in accordance with NYPE Interclub Agreement as amended September 1996 including subsequent amendments.

41.  Agents
Charterers will have their agents to attend Owners' minor/normal husbandry affairs without charging separate agency fees, however should there be any extra ordinary matters such as crew change, dry-dock, special survey, major repair, general average work for Owners' account. Owners shall employ Charterers' agents as Owners' husbandry agents and pay agency as per local recognized tariff or Owners at their option shall appoint their own husbandry agents at their expense.

42.  Deductions
The Charterers shall be entitled to deduct from hire payments any disbursements undisputely for Owners' account which amounts to be supported by vouchers and any previous over-payments of hire including undisputed off-hire.   The Charterers also shall be entitled to deduct from last hire payment estimated costs of bunkers on redelivery and estimated Owners' accounts but maximum US$700 per port.  (but in case the last hire is not sufficient, Charterers may deduct from the second to the last hire payment) which to be settled within seven (7) days after vessel's redelivery.   Any missing/outstanding vouchers to be sent to Owners soonest received by Charterers.

43.  Joint On/Off Hire Survey



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

Joint on/off hire survey to ascertain the vessel's condition and quantity of bunkers remaining on board shall be carried out at delivery port and at redelivery port. Joint on hire survey to be carried out by independent surveyor on delivery in owners time and joint off-hire survey by independent surveyor on redelivery in Charterers time, but expenses to be equally shared between Owners and Charterers.

44.   Replenishment of Bunkers
      Owners to be allowed to replenish bunker before redelivery subject such bunkering does not interfere Charterers' loading/discharging operation.

45   A. Liberties
     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

     B. Off-Hire
     In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants, agents or subcontractors are responsible), or detention by average accidents to the vessel or cargo unless resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or painting bottom, or by any other similar cause preventing the full working of the vessel, the payment of hire and overtime. If any, shall cease for the time thereby lost. Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident to the cargo or where permitted clause 45-A hereunder, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom, All bunkers used by the vessel while off hire shall be for the Owners' account. In the event of the vessel being driven into port or to anchorage through stress of weather, trading to shallow harbors or to fivers or ports with bars, any detention of the vessel and/or expenses resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be deducted from the hire.

46.   Capture, Seizure, Arrest
      Should the vessel be captured or seizured or detained or arrested by any authority or by any legal process during the currency of this Charter Party, for any reason attributable to the Owners, the payment of hire shall be suspended until the time of her release.
      Any extra expenses incurred by and/or during such capture or seizure or detention or arrest shall be for Owners' account.

47.   Smuggling
      Any delay, expenses and/or find incurred on account of smuggling shall be for Owners' account if caused by the Officers and/or crew, or shall be for Charterers' account if caused by the Charterers' supercargo and/or their staff or agents.

48.   Return Premium
      The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their underwriters as and when received from the underwriters by reason of the vessel being in port for a minimum period or 30 days if on full hire for this period or pro-rata for the time actually on hire but Owners not to be held responsible for any deficiency in speed/ consumption due to foul bottom as a result of prolonged stay in port.

49.   Hold Condition on Redelivery:
      Charterers are to redeliver the vessel with clean holds to be same condition as on delivery. Charterers have the option to redeliver the vessel with unclean hold and to pay US$ 5,000 lumpsum excluding removal/disposal of dunnage/lashing materials/plastics which to be for Charterers' time/account before redelivery.



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

Charterers are to declare whether or not Charterers will use this option prior to 10 days before arrival last discharging port.

50. Gangway Watchman
Expenses for gangway watchmen, if ordered by the vessel to be for the Owners' account, but if ordered by the Charterers or required by a port regulation, except in the case such watchmen are necessitated due to nationality or conduct of any of the ship's members, such expenses shall be for the Charterers' account.

All crew nationality: ~~Filipinos~~ India

51. Additional Equipments, Fittings
The Charterers, subject to the Owners' prior approval not to be unreasonably withheld, shall be at liberty to fit/weld any additional equipment and fittings for loading, discharging and/or securing cargo. Such work shall be done at the Charterers' expense and time, and the Charterers shall remove such equipment and fitting and restore the vessel to her original conditions at their expense and time prior to redelivery.

52. Loading on Deck - Deleted.

53. Tax
Any dues and/or taxes on vessel's cargo and/or freight and/or charter hire to be for Charterers' account. However any taxes on charter hire levied by country of vessel's flag, registry and/or Owners' principal place or business to be for Owners' account.

54. Paramount Clause
Clause Paramount, U.S. Clause Paramount, Canadian Clause Paramount, York Antwerp Rules 1994, U.K. Clause Paramount, wherever applicable, shall be deemed to form a part of this Charter Party and shall be contained in Bill of Lading issued hereunder. CONWARTIME 1993 as per undernoted, P. and I. Bunker Clause also form part of this Charter Party.

*CONWARTIME 1993"*

(1) For the purpose of this Clause, the words:

(a)      "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b)      "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4)

(a)      The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(b)      If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:-

(a)      to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b)      to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c)      to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d)      to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e)      to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter party.

55. Communication & Entertainment
Charterers shall pay Owners a lumpsum of US$ 1,200 per month or pro rata payable together with hire for vessel's communication like telephone, cable, telex during charter period.

56. I.T.F. Clause
Vessel's crew shall be converted at all times by an I.T.F. agreement or bona fide trading union agreement that is acceptable to the I.T.F. or its affiliates. Any cost or loss of time due to Owners' failure to comply with the above to be for Owners' account.

57. Oil Pollution
Charterers shall bear no responsibility for all consequences (including fines if any imposed to Charterers) of oil and any time lost due to pollution of oil or its consequences shall be deemed off-hire.

Vessel possesses a certificate of financial responsibility meeting the requirement of U.S. Federal Water Pollution Control Act, as amended, or any statutory modification or reenactment thereof. Owners particularly further warrant that the said certificate of financial responsibility will be maintained effective throughout the duration of performance under this charter. Should the vessel be delayed or detained due to failure to comply with aforementioned, the Charterers shall place the vessel off hire for such time lost.

However notwithstanding the foregoing paragraphs, the parties are aware that the oil pollution act of 1990 (the "Act") has recently been enacted into law in the United States. Regulations under the Act, however, have not yet been issued by the United States. Under the provisions of the Act, states of .the United States have the right to pass legislation that could impose liability, sanctions or other conditions in addition to those set forth in the Act. The effect on P. & I. insurance by the foregoing is uncertain.

In view of the uncertainties. In the event of following cases are applied in futures. Owners shall not be obliged to provide additional premium or similar extra payment to obtain P. & I. cover, shall be under no obligation to obtain any documents from any other source in case Owners' P. & I. Club restrict the issuance of, revoke or refuse to issue, letters of compliance, letters of undertaking, letters of guarantee, certificates of financial responsibility or other similar documents and shall not be obliged to trade to the United States, Charterers and Owners shall mutually discuss in good faith ways and means to resolve the problem:

1) If the Owners' P. & f Club were to require an additional premium or similar extra payment for providing the Owners' and the vessel with P. & I. cover for potential liability for trading to areas in the United States.
2) If, due to laws or regulations enacted or issued by the United States or by    any of the states of the United States, the Owners' P, & I. Club refuses or is unable to provide full P. &. I. cover for pollution liability.
3) If the Owners' P. & I. Club is restricting the issuance of, revoking or refusing to issue, letters of compliance, letters of undertaking, letters of guarantee, certificates of financial responsibility or other similar documents.



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

58.   Export and/or Import Permits for cargo and trade to be at Charterers' risk and expense. Taxation or levies in respect of cargo and trade to be for Charterers' account and to be paid by Charterers.

59.   Grain Clause:
       Deleted.

60.   Deleted.

61.   Delivery Notice:
       Owners/Master to give Charterers daily notice of delivery of the vessel.

62.   Hold conditions on Delivery
       Hold conditions upon arrival at first loading port, the holds to be clean swept and in every respect ready to load harmless/lawful steel products as per government/local/independent inspectors.

       If vessel fails above inspection, vessel shall be off-hire from the time of rejection until all holds have passed inspection and Master/crew shall commence hold cleaning without delay in order to meet inspector's requirements.

63.   Preparation for Loading/Discharging Operation
       Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches and gangway in order to commence loading and/or discharging without any delay. Opening/closing of all hatch-covers shall be done by Officer/crew, free of cost to Charterers if allowed by shore regulations.

64.   Weather Condition
       Within the context of this charter party 'good weather conditions' are to be taken as wind speed not exceeding Beaufort Force 4 (16 knots maximum). Evidence of weather conditions to be taken from vessel's deck logs and independent weather reports. In the event of consistent discrepancy between the deck log and the weather reports. Charterers and Owners to mutually agree weather routing service and decision of this service to be taken as ruling.

65. Master and crew shall cooperate with the Charterers, receivers or their representatives insofar as local regulations permit to facilitate loading and discharging operations.

66.   Certificates
       Owners are obliged to deliver the vessel with all necessary and valid certificates - such as (but not limited to) International Tonnage certificate, deratization certificate, safety and health certificates, cargo handling gear certificate, safety equipment certificate, all canal certificates, class certificates, untrimmed ends certificates and similar - and all such certificates to be kept in valid condition by Owners throughout the period of the charter.

67.   Australia's Regulations
       The vessel to comply with and be maintained in accordance with the requirements of the Commonwealth of Australia's loading and unloading safety measures regulations. The vessel to be fitted with hold ladders acceptable for New Zealand and Australian trade.

68.   In case of Charterers' or Owners' default, Owners or Charterers to give each other at least forty-eight (48) working hours written notice before exercising, their respective rights under this Charter Party.

       About hire payment, where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners 2 clear banking days (as recognized at the agree place of payment) written notice to rectify the failure, and when so rectified within those 2 days following the Owners' notice, the payment shall stand as regular and punctual.   Failure by the



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

Charterers to pay the hire within 2 days of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw as set forth in Clause 5.

69. Hire Calculation
Time of delivery and redelivery to be based on G.M.T. but laydays/canceling dates to be based on local time.

70. Vessel has liberty to use diesel oil in main engine on entering/leaving ports or maneuvering in narrow/shallow restricted   water, canal rivers or in and out of port.

71. U.S. Trade - Unique Bill of Lading Identifier Clause
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill(s) of Lading Identifier as required by the U.S. Customs Regulations (19 CRF part 4 section 4. 7A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.   Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

72. Vessel's constant including umpumpable ballast excluding fresh water is about 500 MT but without guarantee.

73. Bunkers on delivery/redelivery
Bunkers on delivery to be as on board, about 650/700 MT IFO and about 46 MT MDO.
Bunkers on redelivery to be about same quantity as on delivery.
Bunker prices US$339 per metric ton for IFO and US$580 per metric ton for MDO at both ends.

Owners to be allowed to replenish bunker before redelivery subject such bunkering does not interfere Charterers' loading/discharging operation.

74 Original Bill(s) of Lading
In the event that the vessel arrives at the port of discharge but Original Bill(s) of Lading are not available for presentation, it is agreed that Charterers will request Owners to discharge the cargo on board without presentation of Original Bill(s) of Lading provided that Charterers will present to Owners a Letter of Indemnity in the form as required by Owners' P & I Club, signed by Charterers only.

75. Hire Payment:
Charterers to arrange payment of first hire, ballast bonus and value of estimated bunkers on delivery upon vessels delivery. If due to delays in the banking system, funds have not actually been received by Owners within two   (2) banking days after delivery of the vessel Owners to accept telex from Charterers' bank as proof that funds have been irrevocably remitted to Owners account.
Further hire to be paid semi-monthly in advance.

Bank charge on hire payment if any to be for Charterers' account.

76. Private & Confidential
The fixture to be kept strictly Private & Confidential.

77. Bunker Quality
Charterers to supply first class quality bunkers.   Bunkers strictly complying with ISO 8217-96(E).   In case Charterers supply off-spec bunkers then if required the sludge removal to be organized by Owners/Managers but at Charterers' costs. Fuel testing to be organized by Owners/Managers, however costs always for Charterers' account if Charterers supply off-spec



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

bunkers.

78. Bill of Lading Clause
   A) The Master shall sign the Bill(s) of Lading or waybills for the cargo as presented in conformity with Mate's or Tally Clerk's receipts. However, the Charterers may sign Bill(s) of Lading or waybills on behalf of the Master with the Owners prior written authority, always in conformity with Mate's or Tally Clerk's receipts and Charterers holding Owners harmless against all consequences arising out of their signing Bill(s) of Lading.
   B) All Bill(s) of Lading or waybills shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter Party and any Bill(s) of Lading or waybills signed by the Charterers or by the Master at their request.
   C) It is agreed that Charterers shall handle cargo claims in the first instance and provide security to cargo interests in respect of cargo claims within a reasonable time of receipt of a request to do so.

79. Extra Insurance:
   Basic war risk insurance premium for worldwide trading shall be for Owners' account and additional premium for Hull and Machinery and officers/crew including blocking and trapping and war crew liability and crew war bonus, due to this one time charter trip as per the governing Charter Party, if any shall be for Charterers account.
   Insurance/extra insurance not to exceed official quotation by Lloyd's underwriters, London. However if such insurance is not obtainable commercially or through a government, the vessel shall not be required to enter or remain at any such port or zone. And Owners will have the right to refuse vessel entering into war zone as per Charter Party.

80. Pre-Loading Survey:
   If steel/steel products are to be loaded, Owners have option to carry out pre-loading survey to be performed by Owners' P & I Club's appointed surveyor. Such cost to be for Charterers' account.

81. Bottom Fouling Clause:
   In case of bottom fouling due to Charterers ordering the vessel to stay in port (including outer anchorage) for a minimum period of 20 days, Owners will carry out bottom cleaning (underwater cleaning by divers) at Charterers' time and cost prior to vessel sailing out of the port if such facilities are available, otherwise at the next port in which case until such cleaning is done the warranted speed/comsumption are not applicable.

82. Charterers accept that Owners paint "Hold Block-Ap" on hold bulk head before loading, which s solution for easy hold cleaning after discharging petcoke.

83. Ice Clause:
   - Charterers to guarantee always ice free.
   - Vessel not to force ice and not to follow ice breaker under any circumstances.
   - Vessel not to be obliged to force ice. If on accouint of ice, Master considers it dangerous to remain at the loading or discharging port or place for fear of vessel being frozen in, he has the liberty to sail to a convenient, open place and await Charterers' fresh instructions. Unforeseen detention through the above to be for Charterers' account.
   - Any extra insurance premium incurred by going to Charterers' intending ports to be for Charterers' account.
   - Charterers have full responsibility for all consequences incurred thereby calling ice port(s) (including but not limited to hull damage and expenses of joint hull inspection to ascertain hull condition).

84. Revised Laycan:
   Should it appear that the vessel may not meet the agreed laycan, Owners are to advise Charterers accordingly and at the same time advise a revised laycan within 48 hours Charterers



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

are to confirm whether or not they can accept the vessel basis the revised laycan. Should Charterers not have replied within 48 hours, Owners can consider themselves free from any commitments under this charter and seek other employment for this vessel.

85.  CONWARTIME 1993 to apply.

86.  BIMCO ISM Clause to be applied.

87.  BIMCO ISPS/MTSA Clause for Time Charter Parties 2005 to be applied.

88.  BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005 to be applied.

89.  All pilotage to be paid by Charterers.

90.  BIMCO U.S.CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE to be applied.

91.  YORK-ANTWEP RULE 1994 TO BE APPLIED

* * * * *



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

## BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## BIMCO STANDARD ISM CLAUSE:

From the date of coming into force of the International Safety Management (I.S.M.) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirements of the I.S.M. Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers.
Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or 'The Company' to comply with the I.S.M. Code shall be for the Owners' account.



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

**U.S.Customs Advance Notification/AMS Clause for Time Charter Parties**

(a)  If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)   Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);
iii)  Provide the Owners with a timely confirmation of i) and ii) above; and
iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d)  The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005**

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content
when ordered by the Charterers to trade within any such zone.



RIDER TO M.V. "SANKO RALLY" CHARTER PARTY DATED 25TH APR.,2006

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.



EXHIBIT B

| 1. Shipbroker | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME: "GENCON"                                    Part I |
|---|---|
| | 2 Place and date<br>**Beijing, 24th April, 2006** |
| 3 Owners/Place of business (Cl 1)<br><br>**China National Chartering Corp., Beijing (Sinochart)** | 4 Charterers/Place of business (Cl 1)<br><br>**Pactrans Air & Sea. Inc. ( Chicago, IL)**<br><br>**PACTRANS AIR & SEA, INC.** |
| 5 Vessel's name (Cl 1)<br>**M/V "SANKO RALLY"** | 6 GT/NT (Cl 1)<br>**25,676/13,991**<br>**950 THORDALE AVE.** |
| 7 DWT all told on summer load line in metric tons (abt ) (Cl 1)<br>**42,529MT** | 8 Present position (Cl 1)<br><br>**NOW IN HONGKONG**<br>**ELK GROVE VILLAGE,**<br>**ILLINOIS 60007 U.S.A.**<br>**TEL: (847) 766-9988**<br>**FAX: (847) 766-9025** |
| 9 Expected ready to load (abt ) (Cl. 1)<br>**Laydays: April 30th / May 8th, 2006** | |
| 10 Loading port or place (Cl 1)<br><br>**1 safe berth port Qingdao, China** | 11 Discharging port or place (Cl 1)<br><br>**1 safe berth port Pensacola, USA** |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl 1)<br>**31000 CBM Gypsumboard 10% MOLOO      Gypsumboard in packages on pallets**<br>**68 sheets per bundle , 1.24M/4'  -W x 3.68M/12'-L x 12.7mm/plus pallet height/0.989M - H = 4.513cbm per bundle) weight is 3-3.1MT**<br>                 **Stowage: 12 tier restriction in hatch (about 12 M).** | | |
| 13 Freight rate (also state whether freight prepaid or payable on delivery) (Cl 4)<br><br>**US$55.50 W/M FIOS L/S/D BASIS 1/1**<br>**FREIGHT PAYALBE** | 14 Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl 4)<br>*60% freight payment less commission to be paid in US DOLLAR within 5 banking days after sr/bsl marked "freight payable as per c/p", 40% freight payment less commission to be paid before the ship's arrival discharging port.* |
| 15 State if vessel's cargo handling gear shall not be used (Cl 5) | 16 Laytime (if separate laytime for load and disch  is agreed, fill in a) and b), if total laytime for load  and disch , fill in c) only) (Cl 6) |
| 17 Shippers/Place of business (Cl 6) | (a) Laytime for loading |
| 18 Agents (loading) (Cl 6)<br>**Owner's agent** | (b) Laytime for discharging |
| 19 Agents (discharging) (Cl 6)<br>**Owner's agent** | (c) Total laytime for loading and discharging |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl 7)<br>**US$24,500.00 PDPR/DHDWTS BE**<br>DEM/DES TB SETTLED W/I 20 DAYS AFTER COMPLETION OF DISCHARGE AND SUBMISSION OF RELEVANT DOCS I E.<br>SOF/NOR/TIME SHEET DULY SIGNED/STAMPED BY MASTER/AGENTS BENDS | 21 Canceling date (Cl 9)<br>**8ᵗʰ May, 2006** |
| | 22 General Average to be adjusted at (Cl 12)<br>**Beijing, China** |
| 23 Freight Tax (state if for the Owners' account (Cl 13 (c)) | 24 Brokerage commission and to whom payable (Cl 15) |
| 25 Law and Arbitration (state 19 (a)  19 (b) or 19 (c) of Cl 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl 19)<br><br>**Arbitration in Beijing, China** | *Commission address 2.50% total to be deductible from ocean freight* |
| (a) State maximum amount for small claims/shortened arbitration (Cl 19) | 26 Additional clauses covering special provision, if agreed |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers)<br>*Kitty Pon - Vice President*<br>Remark:<br>*Charterers will pay the dead freight to Owners if Cargo only can be loaded in 10 tiers on the request of the receivers.* |
|---|---|

Printed and sold by Fr. G Knudtzon Ltd. 55 Toldbodgade. DK-1253 Copenhagen K. Telefax + 45 33 93 11 84<br>by authority of The Baltic and international Maritime Council (BIMCO)  Copenhagen

Copyright, published by The Baltic<br>and International Maritime<br>Council (BIMCO), Copenhagen

**EXHIBIT**
**A**

# PART II
## "Gencon" Charter (As Revised 1922 and 1994)

| 1 | It is agreed between the party mentioned in Box 3 as Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that: | 1 2 3 4 5 6 |
|---|---|---|

The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat and there deliver the cargo.  — 7 8 9 10 11 12 13 14

**2 Owners' Responsibility Clause** — 15 16

The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager.  — 17 18 19 20 21 22

And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.  — 23 24 25 26 27

**3 Deviation Clause** — 28

The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations and also to deviate for the purpose of saving life and/or property.  — 29 30 31

**4 Payment of Freight** — 32

(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.  — 33 34

(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost. Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actual been paid.  — 35 36 37 38 39

(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine .......  — 40 41 42 43 44 45

Cash for vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.  — 47 48 49

**5 Loading/Discharging** — 50

(a) Costs/Risks — 51

The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.  — 52 53 54 55 56 57 58 59

(b) Cargo Handling Gear — 60

Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores time lost by breakdown of the Vessel's cargo handling gear or motive power – pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party – shall not count as laytime or time on demurrage. On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.  — 61 62 63 64 65 66 67 68 69 70 71 72 73 74 75

(c) Stevedore Damage — 76

The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores written acknowledgement of liability.  — 77 78 79 80 81 82

The Charterers are obliged to repair stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account and shall be paid to the Owners by the Charterers at the demurrage rate.  — 83 84 85 86 87 88

**6 Laytime** — 89

(a) Separate laytime for loading and discharging — 90

The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting Sundays and holidays excepted unless used, in which event time used shall count.  — 91 92 93

The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting Sundays and holidays excepted unless used, in which event time used shall count.  — 94 95 96

(b) Total laytime for loading and discharging — 97

The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting Sundays and holidays excepted, unless used, in which event time used shall count.  — 98 99 100

(c) Commencement of laytime (loading and discharging) — 101

Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next Working day if notice given during office hours after 12.00 hours.  Notice of  — 102 103 104

---

readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or if not known to the Charterers or their agents named on Box 19.  — 105 106 107 108

If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/ discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/ discharging berth shall not count as laytime.  — 109 110 111 112 113 114 115 116

If after inspection, the Vessel is found not to be ready in all respects to load/ discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.  — 117 118 119

Time used before commencement of laytime shall count.  — 120

*Indicate alternative (a) or (b) as agreed, in Box 16.  — 121

**7 Demurrage** — 122

Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.  — 123 124 125 126

In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.  — 127 128 129 130 131

**8 Lien Clause** — 132

The Owners shall have a lien on the cargo and on all sub-freight payable in respect of the cargo, for freight deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.  — 133 134 135 136

**9 Cancelling Clause** — 137

(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21. The Charterers shall have the option of cancelling this Charter Party.  — 138 139 140

(b) Should the Owners anticipate that despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.  — 141 142 143 144 145

Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification .......  — 146 147 148 149

The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause  — 151 152 153

**10 Bills of Lading** — 154

Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.  — 155 156 157 158 159 160 161 162 163

**11 Both-to-Blame Collision Clause** — 164

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the Owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact  — 165 166 167 168 169 170 171 172 173 174 175 176 177

**12 General Average and New Jason Clause** — 178

General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2)  — 179 180 181 182 183

If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers Such deposit as the Owners, or their agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery"  — 184 185 186 187 188 189 190 191 192 193 194 195 196 197 198

**13 Taxes and Dues Clause** — 199

(a) On Vessel – The Owners shall pay all dues, charges and taxes customarily levied on the Vessel howsoever the amount thereof may be assessed.  — 200 201

(b) On Cargo – The Charterers shall pay all dues, charges, dulies and taxes customarily levied on the cargo howsoever the amount thereof may be assessed.  — 202 203 204

(c) On freight – Unless otherwise agreed in Box 23. Taxes levied on the freight shall be for the Charterers account.  — 205 206

# Gencon 1994 Charterparty

## PART II

"Gencon" Charter (As Revised 1922 and 1994)

**14  Agency** — 207
In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge. — 208, 209

**15  Brokerage** — 210
A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24. — 211, 212
In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses and work in case of more voyages the amount of indemnity to be agreed — 213, 214, 215, 216

**16  General Strike Clause** — 217
(a) If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account. — 218–227
(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion. — 228–243
(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo. — 244, 245, 246

**17  War Risks ("Voywar 1993")** — 247
(1) For the purpose of this Clause, the words: — 248
   (a) The "Owners" Shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the Vessel and the Master; and — 249, 250, 251
   (b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported) acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel. — 252–262
(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risk; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed or may be likely to be exposed to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement. — 263–278
(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for, any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfillment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and in the event that the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight. — 279–301
(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled. if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route — 302–313

(5) The Vessel shall have liberty: - — 314
   (a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy. ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions; — 315–321
   (b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance; — 322, 323, 324
   (c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement; — 325–330
   (d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier; — 331, 332
   (e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions; — 333, 334, 335
   (f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route. — 336–340
(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation. but shall be considered as due fulfilment of the Contract of Carriage — 341, 342, 343, 344

**18  General Ice Clause** — 345
*Port of loading* — 346
(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo and this Charter Party shall be null and void. — 347–351
(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be there by caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum). all other conditions as per this Charter Party — 352–361
(c) In case of more than one loading port, and if one or more of the ports are closed by ice the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port. — 362–366
*Port of discharge* — 366
(a) Should ice prevent the Vessel from reaching the port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination. — 367–373
(b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge. — 374, 375, 376
(c) On delivery of the cargo at such port. all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion. — 377–381

**19  Law and Arbitration** — 382
(a) This Charter Party shall be governed b and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days (ailing which the decision on the single arbitrator appointed shall be final. — 383–393
For disputes where the total amount claimed by either party does not exceed the amount stated in box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association. — 394, 395, 396, 397
(b) This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party. the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto and the third py the two so chosen; their decision or that of any two of them shall be final and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceeding shall be conducted in accordance with the rules of the Society of Maritime Arbitrators Inc. — 398–406
For disputes where the total amount claimed by either party does not exceed the amount state in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators. Inc, — 407, 408, 409, 410
(c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in box 25. subject to the procedures applicable there The laws of the place indicated in box 25 shall govern this Charter Party — 411, 412, 413
(d) If Box 25 in Part I is not filled in, sub-clause(a) of this Clause shall apply — 414
(a), (b) and (c) are alternatives; indicate alternative agreed in box 25 — 415
* Where no figure is supplied in box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect. — 416, 417

07/07/2006 14:20 FAX  2513449696          Bowron, Latta & Wasden          ☑002/008
07/06/2006 10:51 FAX 90435672l            CRAIG/1s Ltd.                    ☑002/008

# PACTRANS AIR & SEA, INC

# DEVON INTERNATIONAL TRADING

# SERVICE CONTRACT

## OCEAN IMPORT

## APRIL 10, 2006

### CHARTER

**PURPOSE**

1. These operating costs briefly explain the charges of inbound cargo from Qingdao to Mobile, AL.

2. The agreement for the service and payment between Pactrans Air & Sea, Inc and Devon International Trading.

3. The agreement for the all other conditions and terms between Pactrans Air & Sea, Inc. and Devon International Trading.

1

07/07/2006 14:20 FAX 2513448696        Bowron, Latta & Wasden        ☑003/008
07/06/2006 10:51 FAX 904356728        CRAIG/is Ltd.                      ☑003/008

## OPERATING COSTS

**PRODUCT :**

**GYPSUM BOARD**
485,00 (+/- 3%) sheets

## SHIPMENT INFORMATION:

- **Per Sheet**
  4" (W) x 12' (L) x 12.7mm ( thickness) per sheet
  75.6lbs (the less the better)·per sheet

- **Per Bundle**
  68 sheets per bundle, 1.24m (W) x 3.66m (L) x 0.989m (H) , 4.51cbm per bundle
  Total: 71.35 bundles, 3.21 Metric Tons / bundle, 3.579 sheet nett/ bundle

## QINGDAO PORT SURCHARGE

1. Local pick up and delivery fee - ex factory to Qindao port.
   - RMB68.00 / per metric ton or US\$0.50 / per sheet and max. load is 30 to 40 tons per truck.
   - The conversion rate is 1= 8.0699 as of 5/20/06.
   - US\$ 0.50 / per sheet only apply on the 1st vessel & 2nd vessel should apply in RMB 68.00/per metric ton.

2. Terminal receiving charge / Port loading fee at Qingdao port.
   - RMB 82.00 / 4.05 X 4.51cbm / 68 sheets = US\$0.27 / sheet.
   - The conversion rate is 1=8.0025 as of 5/20/06.
   - Will apply the rate level in USD on the 1st vessel then follow by in RMB on the 2nd vessel.

3. Special Note:
   The above item # 1 & #2 only for reference.
   Factram will assist Davion to arrange the Trucking / Port / Fixing service based on the Service fee as per agreed upon.

## OCEAN FREIGHT COST

- Orig: Qingdao port
  Dest: Mobile, AL or Port of Pensacola, Fl

2

07/07/2006 14:21 FAX 251344969R    Bowron, Latta & Wasden    ☒004/008
07/06/2006 10:51 FAX 904356729    CRAIG/1s Ltd.    ☒004/008

485,844 (+/-3%) sheets of Drywalls X USD3.93/sheet (USD54.08/cbm or mt which ever is

Remarks:
- The above rate only Port to Port & subject to the origin & destination port Surcharge if applicable.
- If Steel Deck is required then there is additional charge.

- The above rate are only apply for the vessling in May. 2006 & will subject to change by the charter due to fuel increase.

## DESTINATION PORT SURCHARGE:

### Port of Pensacola, Fl.

1) Vessel's dockage, harbor fees and vessel security charges 5% of the total dockage bill (all vessel related charges) will be paid by the charter.

2) Standard port surcharge
   $1.40 per short ton wharfage
   $0.10 per short ton cargo security fee

3) Terminal service providers & costs by the stevedores
   - 1st option
     US08.75/ mt for unload from vessel then transfer to warehouse (rate predicated on use of vessel gear / 25 t revolving vessel). Fork lift going in to the warehouse. US$3.00 p/ mt ton (2,000lbs) to load out trucks.
   - 2nd option
     US06.50/ mt for unload from vessel on to truck directly.
     It is up to the availability of the trucks & depending on how long can dock the vessel, Demurrage might be occurred.

4) Hours
   Straight time : 0700-1900hrs, 1400-1900hrs, Monday through Friday.
   Overtime: after 1900hrs, Monday thru Friday. Sat, Sun and holidays are full overtime.
   OTD: $ 200.00 per gang hr.

   Detention: US$ 410.00 per gang hr.
   Extra Labor: US$ 550.00 per hr.

5) Free time:
   Free time at the Port of Pensacola is 30days only for each vessel's cargo beginning on the date vessel discharge is completed. Storage rates after expiration of free time are : $0.05 per ton per day for days 31-45, $0.10 per ton per day for days 46-60, $0.15 per ton per day for days 61-75, and $0.20 per ton per day thereafter. Free time and storage fees are not negotiable and are strictly enforced.

3

## OTHER CHARGES

1. Custom Entry fee - $300/bl
2. Pier Pass fee - n/a
3. Duty - at cost
4. Exam fee (If applicable) - n/a
5. Maintenance fee (If applicable) - n/a

## FIRMING FEE

To be advised.

Shipper/cnee shal dprovide all dunnage, lashing, securing, stowing jobs. If the cargo is not firm enough, shipper/cnee might arrange to separate the cargo with plywood sheet or other materials to avoid damage. The ship owner will not be responsible for the damages because of the cargo quality, wrapping or any defects of the cargo itself. All the cargo have suitable wrapping to be fitted for the ocean transportation. Setup the steel deck is optional, subject to request & under shipper/cnee own account.

# CONDITIONS AND TERMS

Vessel: Sinochart TBN, Box shaped vessel or subject to availability of the vessel.

4

07/07/2008 14:21 FAX  2513449696        Bowron, Latta & Wasden        ☑006/008
07/08/2008 10:52 FAX 904356729          CRAIG/1s Ltd.                  ☑006/008

Loading port 1 SBSP Qingdao, China

Nomination Clause and Lay can: Charterers to advise each lay can of 12 days spread 25 days prior commencement of each lay can. Owners to nominate performing vessel or substitute 14 days after receipt of charterer's notice, declaring cargo quantity with 10 pct. Margin and ETA at loading port. 14

days prior to the first day of lay can as above, the owners shall nominate the definitive performing vessel and advice stowage plan. After nomination of definitive performing vessel and receipt of fully

completed item sheet, charterers to have 12 working hours in order to obtain loading/discharge terminal arrivals.

Dunnage, lashing, securing are for charterer's account.
Any taxes and duty on the cargo bar to be charterer's account.
Any taxes and duty on vessel, flag, freight, and ownership have to be owner's account.
Owner's not responsible for any damages during loading/discharging or any damage because of the cargo's quality/characters.

Payment term: deposit on 30% of total payment in xdying once the contract is completed and another 30% of its total payment to be made on the 3 working days after the vessel departed in Qingdao. Last 40% of payment to be paid in full prior to vessel arrival at Mobile port in Alabama or Port of Pensacola, Fl.
All other term as per GENCON 1994.

Banking information:
Royal American Bank
1604 Colonial Parkway, Inverness, IL 60067-4725
- Routing No: 071925237
- Credit to: Partrans Air & Sea, Inc.
- 950 Thorndale Ave. Elk Grove Village,IL 60007
- Account No: 500-801-5

The consignee signing this service contract warrants Partrans Air & Sea, Inc. and consignee identified by its legal name and business address, Devon International Trading, Inc. is authorized to bind itself. The consignee, which is an owner of the cargo certifies it has a service contract and bond

or other surety as required by law, a copy of such service agreement with its internet website address and bond or other surety has been given to Partrans Air & Sea, Inc., and it will fully comply with all applicable laws.

5

Pactura's Air & Sea, Inc.                          Deyon International Trading, Inc.

By _____         By _____
Kitty Fon/ Vice President             Robert Schari/ President

950 Thorndale Ave.                    Deyon Building Products
Elk Grove Village, IL 60007           1900 Hurst Ave., Suite 100
Tel: 847.766.7966                     King of Prussia, PA 19406
Fax: 847.766.7025                     Tel: 800-251-7466
                                      Fax: 610.930.4035

                                      516-359-6012 Cell

TOTAL P.01

6

07/07/2006 14:22 FAX  2513449696          Bowron, Latta & Wasden                    ☑008/008
07/06/2006 10:52 FAX  904356725          CRAIG/is Ltd.                                        ☑008/008

# BILL OF LADING

TO BE USED WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL"
EDITION 1994
ADOPTED BY
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)

Page 1

## Conditions of Carriage

(1) All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) General paramount Clause.

(a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this Bill of Lading. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

(b) Trades where Hague–Visby Rules apply.
In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 – the Hague–Visby Rules – apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

(c) The Carrier shall be in no case be responsible for loss of or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average.
General Average shall be adjusted, stated and settled according to York–Antwerp Rules 1994, or any subsequent modification thereof, in London unless another place is agreed in the Charter Party.
Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) New Jason Clause.
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier, or his agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Carrier before delivery.

(5) Both-to-Blame Collision Clause.
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

OWNERS ARE NOT RESPONSIBLE FOR ANY DAMAGES DURING
LOADING/DISCHARGING OR ANY DAMAGE BECAUSE OF THE CARGO'S
QUALITY/CHARACTERS/PACKAGING OR IMPROPER LASHING/SECURING/DUNNAGE

For particulars of cargo, freight, destination, etc., see overleaf.

EXHIBIT C

CODE NAME

Shipper
SHANGHAI YU YUAN IMP& EXP CO.,LTD

Page 2

**BILL OF LADING**

B/L No.

TO BE USED WITH CHARTER-PARTIES  CNHC02292001

DATED:25 APR 2006    Reference No.

Consignee
DEVON INTERNATIONAL TRADING INC.

Notify address
PACTRANS AIR & SEA INC.
950THORNDALE  AVE.ELK  GROVE VILLAGE ,IL
60007 ATTN:KITTY PON
T:847 766 9988  F:847 766 9020

ORIGINAL

| Vessel | Port of loading |
|---|---|
| SANKO RALLY V.080 | QINGDAO,CHINA |

Port of discharge
PENSACOLA,FL

Shipper's description of goods

L/G-022006          7133PACKAGES
GYPSUM BOARD
SIZE:1220X3660X12.7MM/PIECE
SIZE:1240X3680X989MM/PACKAGE

SHIPPER'S LOAD & COUNT
SAID TO CONTAIN:
DRY WALL

3660X1220X12.7MM
485044PCS

Gross weight

21256340KGS/32191.23CBM

ATTACHMENTS TO MATES RECEIPTS:
1.SHIPPERS WEIGHT AND QUALITY UNKNOWN.
2.QUANTITY AS PER COSTACO QINGDAO BRANCH.
3.5% COVER TORN/DAMAGES
4.50% OUTER COVER DIRTY

SAY:SEVEN THOUSAND ONE HUNDRED AND THIRTY THREE PACKAGES ONLY.

(of which                on deck at Shipper's risk;the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER-PARTY dated  25 APR 2006

FREIGHT ADVANCE.
Received on account of freight:

Time used for loading _ _ _ _ _ _ _ days _ _ _ _ _ _ _ hours.

SHIPPED at the Port of Loading in apparent good order and
condition on board the Vessel for carriage to the Port of
Discharge or so near thereto as she may safely get the goods specified
above.
Weight, measure, quality, quantity, condition, contents and value
unknown.
IN WITNESS whereof the Master or Agent of the said Vessel has signed the
number of Bills of Lading indicated below all of this tenor and date, any one
of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at CHICAGO,USA | Place and date of issue QINGDAO,CHINA  06/05/12 |
|---|---|
| Number of original B&/L THREE(3) | Signature CHINA MARINE SHIPPING AGENCY SHANDONG COMPANY LIMITED |

1 2 MAY 2006

AS AGENT FOR THE CARRIER OF
B/L TITLE SHOWED(1)

C.15  printed and sold by
Witherby & Company Limited, 32/38 Aylesbury Street,
London EC1R 0ET.
Tel.No.0171-2251 6311  Fax No.0171 251 1296
by Authority of The Baltic and International Maritime Council.
(BIMCO) Copenhagen

100

# BILL OF LADING
TO BE USED WITH CHARTER-PARTIES
CODE NAME:"CONGENBILL"
EDITION 1994
ADOPTED BY
THE BALTIC AND INTERNATIONAL MARITIME COUNCIL(BIMCO)

## Conditions of Carriage

(1) All terms and conditions,liberties and exceptions of the Charter Party,dated as overleaf,including the Law and Arbitration Clause,are herewith incorporated.

(2) **Genral paramount Clause.**

  (a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading,dated Brussels the 25th August 1924 as enacted in the country of shipment,shall apply to this Bill of Lading.When no such enactment is in force in the country of shipment,the corresponding legislation of the country of destination shall apply,but in respect of shipments to which no such enactments are compulsorily applicable,the terms of the said Convention shall apply.

  (b) Trades where Hague-Visby Rules apply.

    In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968-the Hague-Visby Rules-apply compulsorily,the provisions of the respective legislation shall apply to this Bill of Lading.

  (c) The Carrier shall in no case be responsible for loss of or damage to the cargo,howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in the charge of another Carrier,nor in respect of deck cargo or live animals.

(3) **General Average.**

General Average shall be adjusted,stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof,in London unless another place is agreed in the Charter Party.

Cago's contribution to General Average shall by paid to the Carrier even when such average is the result of a fault,neglect or error of the Master,Pilot or Crew.The Charterers,Shippers and Consignees expressly renounce the Belgian Commercial Code,Part II,Art.148.

(4) **New Jason Clause.**

In the event of accident, danger,damage or disaster before or after the commencement of the voyage,resulting from any cause whatsoever,whether due to negligence or not,for which,or for the consequence of which,the Carrier is not responsible,by statute,contract or otherwise,the cargo,shippers, consignees or the owners of the cargo shall contribute with the Carrier in General Average to the payment of any sacrifices,losses or expenses of a General Average nature,that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.If a salving vessel is owned or operated by the Carrier,salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers,Such deposit as the Carrier, or his agents,may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall,if required, be made by the cargo,shippers,consignees or owners of the goods to the Carrier before delivery.

(5) **Both-to-Blame Collision Clause.**

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act,neglect or default of the Master, Mariner,Pilot or the servants of the Carrier in the navigation or in the management of the Vessel,the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of,or damage to,or any claim whatsoever of the owners of said cargo,paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off,recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Carrier.

The foregoing provisions shall also apply where the owners,operators or those in charge of any vessel or vessels or objects other than,or in addition to,the colliding vessels or objects are at fault in respect of a collision or contact.

OWNERS ARE NOT RESPONSIBLE FOR ANY DAMAGES DURING LOADING/DISCHARGINGOR ANY DAMAGE BECAUSE OF THE CARGO'S QUALITY/CHARACTERS/PACKAGING,OR IMPROPER LASHING/SECURING/DUNNAGE

For particulars of cargo,freight,
destination,etc ,see overleaf.

# EXHIBIT D

**M. H. BARRIE & ASSOCIATES**
MARINE SURVEYORS, INCORPORATED
P. O. Box 1164
Mobile, AL 36633-1164

Mobile:  Tel. (251) 433-8122
Fax (251) 433-9122

Great Lakes:  Tel. (312) 362-0110
Fax: (312) 362-0111

New Orleans:  Tel. (504) 833-8124
Fax: (504) 833-9708

June 16, 2006

MASTER AND OWNERS
M.V. SANKO RALLY
Port of Pensacola
Pensacola, Florida

Dear Sir:

Please be advised that the consignee is requesting a Letter of Undertaking for the damage sustained to his cargo. We will advise you in due course of the amount required.

We invite you or your surveyor to attend any surveys ashore on cargo which sustained damage onboard the vessel.

Yours truly,

Doug Peel
Attending Surveyor

_____

Master

By signing this document neither the Surveyor nor his employer makes any warranty, expressed or implied, concerning any inaccuracy in any document issued. Furthermore, neither the Surveyor nor his employer shall be liable in any manner for any personal injury or property damage, or loss of any kind, arising from or connected with this survey.

## Jon Werner

| | |
|---|---|
| **From:** | Helgesen, Odd [odd.helgesen@gard.no] |
| **Sent:** | Wednesday, June 21, 2006 5:42 AM |
| **To:** | hkg@skuld.com |
| **Cc:** | Fehily, Donna; Fleureton, Edward C.; Imamura, Katsumi; Teramachi, Hideo |
| **Subject:** | URGENT New Matter M/V " SANKO RALLY" Shifting in stow/ Physical damage en-route from Qingdao to Pensacola.Cargo Gypsum Board. |
| **Attachments:** | Scan from a Xerox WorkCentre Pro (1.75 MB); Scan from a Xerox WorkCentre Pro (19.1 KB) |

To: Assuranceforeningen Skuld, Hong Kong. Your ref: NEW
Fm: GARD As, Arendal. Our ref: 1492/06/HELODD

Dear Sirs,

This is our first contact with you regarding the above mentioned incident.

The above named vessel encountered bad weather en-route from Qingdao, China to Pensacola USA, causing shifting to cargo of gypsum board.
On arrival Pensacola it was established by the attending surveyors that most of the cargo on the top tiers of holds 2,3,4,5,6 & and 7 were severely damaged. The stevedores have indicated that they want extra compensation to discharge the cargo. Further, today we have received a letter             ( attached hereto) from cargo receivers surveyor informing that they are demanding a LOU for the damage sustained to the cargo.

Attached hereto you will also find a copy of the applicable charterparty/recap between our member (owners) and your member (time charterer).
From the charterparty you will note that the InterClub Agreement has been incorporated ( clause 40) and clause 8 appear to be unamended
Further, you will note from clause 78 , (C) that it has been agreed that charterers shall handle cargo claims in the first instance and provide security to cargo interests in respect of cargo claims.

Hence, we, on behalf of Sanko Steamship Co. hold charterers China National Chartering Corp., Beijing fully liable for all cargo damage incurred in this case and all extra costs that may incur regarding discharging/disposal of the cargo in question.
We strongly recommend that you soonest possible contact the stevedore company and cargo receivers in order to comply with their requirements.
Any delay  whatsoever related to the consignees/stevedores requirements shall be on charterers own account.

We look forward to hearing from you soonest possible.

Kind regards

Odd Helgesen
Claims Executive

GARD As
As agents only for Assuranceforeningen Gard -gjensidig-
Servicebox 600 , 4809 Arendal, Norway

Tel. + 47 37 01 91 00
Fax + 47 37 02 48 10

Direct tel + 47 37 01 92 02
Mobile tel. + 47 97 55 92 02

**CONFIDENTIALITY NOTICE**

*This message is confidential and may be protected by legal privilege. Access to this message by any person other than the addressee is unauthorised and any disclosure or copying of or reliance upon the information contained in this message is prohibited. If you receive this message in error please contact the sender and delete the material from your computer.*

http://www.gard.no

**Sarah George**

| | |
|---|---|
| **From:** | Christian Ott [christian.ott@skuld.com] |
| **Sent:** | 22 June 2006 03:09 |
| **To:** | Helgesen, Odd |
| **Cc:** | BM HKG Claims |
| **Subject:** | RE: Sanko Rally |

Dear Odd,

at this time we have not been shown any evidence to support your allegation that this matter is our Members' responsibility. Until such time, when clear evidence is produced, we and our Members do not accept that they have any liability. Therefore I do not agree with your comments below.

In the meantime you will of course appreciate that your Members are not in a position where they can simply let matters lie unattended to. As actual carrier, it will be for your Members to deal with the discharge of the cargo and the cargo interests in the first instance. Failure to do so will unquestionably constitute a failure to take reasonable action in mitigation. That means delay, expense and other consequences would fall upon your Members.

Best Regards
SKULD

Christian Ott

---

**From:** Helgesen, Odd [mailto:odd.helgesen@gard.no]
**Sent:** Wed 21-Jun-06 6:48 PM
**To:** Christian Ott
**Cc:** BM HKG Claims
**Subject:** RE: Sanko Rally

Dear Christian,

We refer to and thank you for your below email.

It is disappointing to see your views in this case. Firstly, the ICA Article 8 (b) clearly states that charterers shall be 100 % liable for claims arising out of the loading, stowage, lashing, discharge, storage or other handling of cargo ( unamended clause 8 of the c/p)
The ICA is not stating which party to handle any claims. No doubt you clearly try to overlook clause 78 which refer to this matter and also the security issue.

We strongly recommend that you soonest possible get in direct contact with the cargo receivers and stevedore company. If no immediate initiative being taken from your side, we see no other way than contacting our lawyers for further assistance, which no doubt will incur extra costs to you/your members.

We look forward to hearing from you.

Kind regards

Odd Helgesen
Claims Executive

GARD As
As agents only for Assuranceforeningen Gard -gjensidig-
Servicebox 600 , 4809 Arendal, Norway

10/05/2007

Tel. + 47 37 01 91 00
Fax + 47 37 02 48 10

Direct tel + 47 37 01 92 02
Mobile tel. + 47 97 55 92 02

**CONFIDENTIALITY NOTICE**

*This message is confidential and may be protected by legal privilege. Access to this message by any person other than the addressee is unauthorised and any disclosure or copying of or reliance upon the information contained in this message is prohibited. If you receive this message in error please contact the sender and delete the material from your computer.*

http://www.gard.no

**From:** Christian Ott [mailto:christian.ott@skuld.com]
**Sent:** 21. juni 2006 12:12
**To:** Helgesen, Odd
**Cc:** BM HKG Claims
**Subject:** RE: Sanko Rally


Dear Odd,

thank you for your email.

We are investigating the matter, but at this time there can be no admission on behalf of our Members. At this stage there are mere allegations as to the damage and no evidence has been produced to show that our Members may be responsible.

In the circumstances, and given the clear incorporation of the Interclub Agreement (which provides an overriding and comprehensive code for cargo claims), it will be up to the Owners to deal with the matter in the first instance.

Should there be delay because the Owners are not dealing with the matter then the consequences of such a delay will of course be the Owners' responsibility.

Best Regards

SKULD

Christian Ott


-----------------------------------

Message has been virus checked at : Wed, 21 Jun 2006 12:48:15 +0200 GMT

-----------------------------------

10/05/2007

# EXHIBIT E

# Fax



**INTERNATIONAL
LAW FIRM**

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1UN
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 23 June 2006 |

| To | Attention | Your Ref |
|---|---|---|
| Skuld | Christian Ott | |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| 4 | Hong Kong | 00 852 2836 3219 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We are instructed by Sanko in connection with the charter dated 25 April 2005 of the *Sanko Rally* and the above matter.

As you are aware, the cargo aboard the *Sanko Rally* shifted during the course of the voyage from Qingdao to Pensacola and has caused substantial damage to the cargo of gypsum boards on board. Current indications are that the cargo shift resulted from your members' breach of their obligations to properly stow the cargo pursuant to Clause 8 of the relevant Charterparty dated 25 April 2006 (the "Charterparty"). For the avoidance of doubt, our clients hold your Members fully responsible in respect of all and any losses and costs howsoever arising out of and/or in connection with the cargo shift and under the Charterparty and fully reserve their rights in this regard.

As you know, the stevedores at the discharge port have demanded additional costs associated with the discharge of the subject cargo. These costs are for your Members' account in any event pursuant to clause 8 of the charter as it is your Member's obligation to discharge the cargo at their nominated discharge port of Penscola. We therefore request that you confirm by return that your Members will pay these costs directly to the stevedores in order that discharge can commence. We await your urgent positive response in this regard failing which our clients will have no option but to hold your Members in further breach of the Charterparty.

Without prejudice to the position with regard to liability, it is plain pursuant to clause 78 (c) of the Charterparty that your Member is under an absolute obligation to handle cargo claims in the first instance and provide security to cargo interests in respect of cargo claims within a reasonable time of receipt of a request to do so. We note that you have made certain unparticularised allegations with regard to your Member's liability in respect of this matter but this is entirely irrelevant to your



INTERNATIONAL
LAW FIRM

23 June 2006

obligations under clause 78(c) of the charter as issues in respect of liability are designed under the Charterparty to be determined at a later stage. Your Member's present obligation remains to handle any cargo claims and to put up security if required.

In this regard, our clients have received the attached demand for security from cargo interests and we hereby demand that you now take over handling of this cargo claim and also take steps to provide the necessary security immediately in order to avoid an arrest of the vessel. We need not remind you that your Members will be in breach of the terms of the Charterparty if they refuse to comply with their obligations and our clients will hold them fully responsible for any and all losses howsoever arising from your breach. We would therefore be grateful if you would confirm by return that your Members will proceed in accordance with their obligations clause 78(c) of the Charterparty.

We await hearing from you.

Regards,

**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

6091618

2

# Email



**INCE & CO**

INTERNATIONAL
LAW FIRM

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by
the Law Society. A list of partners is open to inspection at the office shown.

Please contact us immediately if any part of this email is incorrectly received.

International House
1 St Katharine's Way
London E1W 1UN
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/ Christian Dwyer | MV/CD/8272/8610 | 23 June 2006 |
| To | Attention | Your Ref |
| Skuld | Christian Ott | |
| Total number of pages | | Email address |
| 2 | | christian.ott@skuld.com |
| Copies to | | Email address |

**Matter**

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We are instructed by Sanko in connection with the charter dated 25 April 2005 of the *Sanko Rally* and the above matter.

As you are aware, the cargo aboard the *Sanko Rally* shifted during the course of the voyage from Qingdao to Pensacola and has caused substantial damage to the cargo of gypsum boards on board. Current indications are that the cargo shift resulted from your members' breach of their obligations to properly stow the cargo pursuant to Clause 8 of the relevant Charterparty dated 25 April 2006 (the "Charterparty"). For the avoidance of doubt, our clients hold your Members fully responsible in respect of all and any losses and costs howsoever arising out of and/or in connection with the cargo shift and under the Charterparty and fully reserve their rights in this regard.

As you know, the stevedores at the discharge port have demanded additional costs associated with the discharge of the subject cargo. These costs are for your Members' account in any event pursuant to clause 8 of the charter as it is your Member's obligation to discharge the cargo at their nominated discharge port of Pensacola. We therefore request that you confirm by return that your Members will pay these costs directly to the stevedores in order that discharge can commence. We await your urgent positive response in this regard failing which our clients will have no option but to hold your Members in further breach of the Charterparty.

Without prejudice to the position with regard to liability, it is plain pursuant to clause 78 (c) of the Charterparty that your Member is under an absolute obligation to handle cargo claims in the first instance and provide security to cargo interests in respect of cargo claims within a reasonable time of receipt of a request to do so. We note that you have made certain unparticularised allegations with regard to your Member's liability in respect of this matter but this is entirely irrelevant to your

EUGENERAL 4058932



23 June 2006

obligations under clause 78(c) of the charter as issues in respect of liability are designed under the Charterparty to be determined at a later stage. Your Member's present obligation remains to handle any cargo claims and to put up security if required.

In this regard, our clients have received the attached demand for security from cargo interests and we hereby demand that you now take over handling of this cargo claim and also take steps to provide the necessary security immediately in order to avoid an arrest of the vessel. We need not remind you that your Members will be in breach of the terms of the Charterparty if they refuse to comply with their obligations and our clients will hold them fully responsible for any and all losses howsoever arising from your breach. We would therefore be grateful if you would confirm by return that your Members will proceed in accordance with their obligations clause 78(c) of the Charterparty.

We await hearing from you.

Regards,

**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

# Fax



## INTERNATIONAL LAW FIRM

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1UN
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 27 June 2006 |

| To | Attention | Your Ref |
|---|---|---|
| Skuld | Christian Ott | |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| 1 | Hong Kong | 00 852 2836 3219 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|
| | | |

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to our fax and email of 23 June 2006 and note that we have received no response from you whatsoever. We would therefore be grateful if you would please provide us with your confirmation by return that your Member will (a) pay for the additional stevedoring costs, and (b) take over the handling of the cargo claims and provide security to cargo interests as requested. In the meantime, our clients' position remains fully reserved.

We await hearing from you.

Regards

**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

1.06.5751.00 6095311

# RICHARDS BUTLER 8272,8610

### INTERNATIONAL LAW FIRM

齊 伯 禮 律 師 行

# FAX

No. of pages (including this page): |

to:      Ince & Co
att:     Michael Volikas / Christian Dwyer
fax:     4420-7481-4968
your ref:  MV/CD/8272/8610

from:    Chris Howse
our ref:   CGH/jf/S110-046

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

telephone   (852) 2810 8008
facsimile   (852) 2810 0664 (Corporate)
            (852) 2810 8713 (Finance)
            (852) 2810 1607 (Litigation/Shipping)
            (852) 2810 9635 (Property)
            (852) 2810 1648 (Intellectual Property)

direct line   2507-9888

direct e-mail
chrishowse@richardsbutler.com.hk

website   www.richardsbutler.com.hk

28 June 2006

"SANKO RALLY"

We have just been instructed by Sinochart in connection with the above matter. Your fax of 27th June 2006 has been forwarded to us. We are currently reviewing the papers and we will write to you very shortly regarding this matter. We would be grateful if you would address all further correspondence to the writer.

Kind regards.

Chris Howse
Richards Butler, Hong Kong
H:\CGH\cgh-36236.doc

PARTNERS:
| C G Howse | A K Brown | M R D Pepper | D G Harrington | K C Mok | W J G Barber | D Kan |
| D M Norman | G F Winter | Nanette Kwong | S J Birt | Janet Cheung | L J Li | Linda Fung |
| A D Morrison | Denise Jong | Asha Sharma | Alice Huschens | Ivy Lui | C S K Tang | K R Bowers |
| C J Williams | J N Green | Delpha Ho | A D Horton | A P Apostolis | A W M Kaung | Doreen Kong |

BEIJING   •   LONDON   •   PARIS   •   BRUSSELS   •   ABU DHABI   •   MUSCAT   •   SÃO PAULO   •   PIRAEUS

Beijing office address: Room 703B Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1  facsimile (86) 10 6580 2701  e-mail rb@ht.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.

This fax is confidential and may be protected by legal privilege. If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

# Fax



## INTERNATIONAL LAW FIRM

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1UN
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 30 June 2006 |

| To | Attention | Your Ref |
|---|---|---|
| Richards Butler | Chris Howse | CGH/jf/S110-046 |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| 1 | Hong Kong | 00852 281 01607 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|

| Matter |
|---|
| **SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola** |

We refer to our fax of 27 June 2006 and note that we have not received any response from you to date whatsoever. We would therefore be grateful to hear from you by return.

Regards

Ince & Co

*[This is a computer generated fax and is therefore unsigned]*

# Fax



**INTERNATIONAL LAW FIRM**

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1UN
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | Michael Volikas/Christian Dwyer | 03 July 2006 |
| To | Attention | Your Ref |
| Richards Butler | Chris Howse | CGH/jf/S110-046 |
| Total number of pages | Town/Country | Fax Number |
| 1 | Hong Kong | 00852 281 01607 |
| Copies to | Attention/Ref | Town/Country/Fax Number |

Matter

## SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola

We refer to previous correspondence and note that we have still to hear from you substantively on the points raised.

As, however, you may be aware the vessel was arrested by cargo interests and our clients have been in contact with yours through their respective Club Correspondents in New York. Pursuant to those exchanges your clients have refused to provide security to lift the arrest. In those circumstances, our clients were left with no choice but to provide security to lift the arrest and minimise losses/damage suffered.

Your clients' refusal to put up security as they are obliged to under the charter and, furthermore, to deal with the subject cargo claim in the first instance is a clear breach of charter and our clients continue fully to reserve their position.

In these circumstances, please confirm by return that your clients will provide our clients with counter-security or alternatively whether your clients will take steps to replace the security our clients have been forced to provide (which is in the total, all inclusive, sum of US$1,650,281.56). Failure to do so on your clients' part will leave our clients with no option but take, without further notice, such steps against your clients as may be available to enforce their rights and obtain security. We trust that escalation of this matter (which will only be to your clients ultimate detriment) can be avoided by your clients now complying with their obligations.

We look forward to your response by return.

Regards

1.06.5751.00.6094616



03 July 2006

Ince & Co

*[This is a computer generated fax and is therefore unsigned]*

# RICHARDS BUTLER

### 8272,8610

INTERNATIONAL LAW FIRM

齊 伯 禮 律 師 行

# FAX

No. of pages (including this page): 2

| | |
|---|---|
| to: | Ince & Co |
| att: | Michael Volikas / Christian Dwyer |
| fax: | 4420-7481-4968 |
| your ref: | MV/CD/8272/8610 |
| from: | Chris Howse |
| our ref: | CGH/jf/S110-046 |

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

telephone  (852) 2810 8008
facsimile   (852) 2810 0664 (Corporate)
            (852) 2810 8713 (Finance)
            (852) 2810 1607 (Litigation/Shipping)
            (852) 2810 9635 (Property)
            (852) 2810 1648 (Intellectual Property)

direct line   2507-9888

direct e-mail
chrishowse@richardsbutler.com.hk

website    www.richardsbutler.com.hk

5 July 2006

---

<u>"SANKO RALLY"</u>

We refer to your fax of 3rd July.

We note that your clients have provided security in the amount of US$1,650,281.56 in respect of the cargo claims.

Our clients are still investigating the circumstances in which the damage arose.   To assist in their investigations we would be grateful if you could provide the following information:

1.  Our understanding is that the Chief Officer approved and signed off on the cargo securing arrangements.  If the cargo securing / lashing was defective, why did the Chief Officer approve it?

2.  Did owners or the Master make any complaint about the lashing or stowage arrangements at the time of loading?

3.  The Master has alleged that the vessel encountered bad weather during the voyage.  Clearly this may have caused or contributed to the damage.  Could we please have a copy of the deck and engine logs which cover the period of bad weather.

4.  What steps did the Master take to avoid the bad weather?

---

PARTNERS:
C G Howse        A K Brown        M R D Pepper     D G Harrington    K C Mok          W J G Barber      D Kan
D M Norman       G P Winter       Nanette Kwong    S J Birt          Janet Cheung      L J Li            Linda Fung
A D Morrison     Denise Jong      Asha Sharma      Alice Hutchens    Ivy Lai           C S K Yong        K R Bowers
C J Williams     J N Green        Delpha Ho        A D Horton        A P Apostolis     A W M Kaung       Doreen Kong

BEIJING  •  LONDON  •  PARIS  •  BRUSSELS  •  ABU DHABI  •  MUSCAT  •  SÃO PAULO  •  PIRAEUS

Beijing office address: Room 703D Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1  facsimile (86) 10 6580 2701  e-mail rb@hr.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.

This fax is confidential and may be protected by legal privilege.  If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

NO.435  P.1                    RICHARDS BUTLER (D)              5.JUL.2006  12:47

5.    What checks did the crew undertake to check the securing and lashing arrangements in view of the bad weather.

We look forward to hearing from you.

Kind regards,

Chris Howse
Richards Butler, Hong Kong
H:\CGH\cgh-36236.doc

# Fax



## INCE & CO

INTERNATIONAL
LAW FIRM

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1UN
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|------|---------|------|
| Michael Volikas/Christian Dwyer | Michael Volikas/Christian Dwyer | 05 July 2006 |

| To | Attention | Your Ref |
|------|-----------|----------|
| Richards Butler | Chris Howse | CGH/jf/S110-046 |

| Total number of pages | Town/Country | Fax Number |
|------|-----------|----------|
| 2 | Hong Kong | 00852 281 01607 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|------|-----------|----------|
| | | |

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to your fax and our subsequent telephone conversation of today.

Your requests for documentation and information are noted. We will consider these with our clients and revert.

As discussed, our clients are very concerned that your clients have not made any attempt whatsoever to comply with their obligations under Clause 78(c) of the Charterparty. As you know your clients remain under an absolute obligation to handle cargo claims in the first instance and to provide security to cargo interests in respect of cargo claims within a reasonable time of receipt of a request to do so. Your clients have failed to do so and in the circumstances our clients were left with no option but to put up security in the sum of US$1,650,281.56 in order to lift an arrest of the vessel by cargo interests.

Despite both our and our clients' repeated requests that your clients comply with their obligations, your clients have taken no steps to remedy the situation and have given no indication that they intend to do so. Our concerns in this regard have been increased by your advice today that you still have no instructions from your clients in respect of this issue. Given your clients' current silence, we take it that they agree that they are in breach of Clause 78(c) and we request your immediate response as to what your clients are proposing to do in order to avoid an unnecessary and costly escalation of this matter. In the meantime, you will understand that our clients' position must remain fully reserved.

1 06 575 L00-S110-046

DUBAI I HAMBURG I HONG KONG I LE HAVRE I LONDON I PARIS I PIRAEUS I SHANGHAI I SINGAPORE



05 July 2006

We await hearing from you.

Regards


**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

# RICHARDS BUTLER  8272,8610
### INTERNATIONAL LAW FIRM
### 齊 伯 禮 律 師 行

## FAX

No. of pages (including this page): 1

to:       Ince & Co
att:      Michael Volikas / Christian Dwyer
fax:      4420-7481-4968
your ref:  MV/CD/8272/8610

from:     Chris Howse
our ref:  CGH/jf/S110-046

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

telephone  (852) 2810 8008
facsimile  (852) 2810 0664 (Corporate)
           (852) 2810 8713 (Finance)
           (852) 2810 1607 (Litigation/Shipping)
           (852) 2810 9635 (Property)
           (852) 2810 1648 (Intellectual Property)

direct line   2507-9888

direct e-mail
**chrishowse@richardsbutler.com.hk**

website   www.richardsbutler.com.hk

6 July 2006

<u>"SANKO RALLY"</u>

We refer to your fax of 5th July.  Your comments are noted. We are awaiting our client's instructions.

In the meantime, we trust that owners will continue to handle the cargo claim with a view to resolving this on the best terms that can be negotiated.  In the event that owners intend to pursue an indemnity claim against our clients in respect of any liability that owners may have for the cargo claims, we would be grateful if you would keep us advised of all developments in respect of the cargo claims and, in particular, in respect of any settlement of those claims.

Kind regards,

Chris Howse
Richards Butler, Hong Kong
H:\CGH\cgh-36357.doc

PARTNERS:
C G Howse        A K Brown       M R D Pepper      D G Harrington    K C Mok        W J G Barber    D Kan
D M Norman       G P Winter      Nanette Kwong     S J Birt          Janet Cheung   L J Li          Linda Fung
A D Morrison     Denise Jong     Asha Sharma       Alice Hutchens    Ivy Lai        C S K Tang      K R Bowers
C J Williams     J N Green       Delphis Ho        A D Horton        A P Apostolis  A W M Kaung     Doreen Kong

BEIJING   •   LONDON   •   PARIS   •   BRUSSELS   •   ABU DHABI   •   MUSCAT   •   SÃO PAULO   •   PIRAEUS

Beijing office address: Room 703B Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1  facsimile (86) 10 6580 2701  e-mail rb@ht.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.

This fax is confidential and may be protected by legal privilege.  If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

# Fax



## INCE & CO

### INTERNATIONAL LAW FIRM

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1UN
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 11 July 2006 |
| To | Attention | Your Ref |
| Richards Butler | Chris Howse | CGH/jf/S110-046 |
| Total number of pages | Town/Country | Fax Number |
| 1 | Hong Kong | 00852 281 01607 |
| Copies to | Attention/Ref | Town/Country/Fax Number |

| Matter |
|---|
| SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola |

We refer to your fax of 6 July 2006. We note your response that you are still awaiting your client's instructions as to whether they intend to comply with their obligations under clause 78(c) and indication within your fax that they appear to have no intention to comply with their obligations at all. Your response given the present circumstances is unacceptable and we therefore request that you confirm by return whether your clients intend to comply with their obligations under clause 78(c) or not.

In the meantime our client's position remains fully reserved.

Regards

Ince & Co

*[This is a computer generated fax and is therefore unsigned]*

# Fax



INTERNATIONAL
LAW FIRM

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated
by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended
recipient and may be privileged. If you are not the intended recipient we request
that you contact us and not make any use of them pending arrangements for their
return or destruction.

Please contact us immediately if any part of this transmission
is incorrectly received. This document has been generated
electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1UN
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 18 August 2006 |

| To | Attention | Your Ref |
|---|---|---|
| Richards Butler | Chris Howse | CGH/jf/S110-046 |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| 17 | Hong Kong | 00852 281 01607 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to the above matter and note that your client's have still given no indication whatsoever as to whether they intend to comply with their obligations under clause 78(c). Your silence in this regard is unacceptable and in this regard we should remind you that your clients will be liable for all any costs and expenses incurred by our clients which have been occasioned by your clients' failure to act in accordance with their obligations under the charter. In this regard, we attach a copy of the claim documentation filed with the US Court by cargo interests. Given your clients failure to comply with their obligations under clause 78(c), you have left our clients with little option but to mitigate your clients breach and prepare an answer to the Complaint. As you will appreciate, unless your clients will comply with their obligations under the charter, the further costs of responding to the Complaint will be for your clients' account.

We therefore request that you confirm by return whether your clients intend to comply with their obligations under clause 78(c) or not.

In the meantime, our client's position remains fully reserved.

Regards

Ince & Co

*[This is a computer generated fax and is therefore unsigned]*

1.06.5751.00-8134170

DUBAI  I  HAMBURG  I  HONGKONG  I  LE HAVRE  I  LONDON  I  PARIS  I  PIRAEUS  I  SHANGHAI  I  SINGAPORE

# RICHARDS BUTLER

### INTERNATIONAL LAW FIRM

齊 伯 禮 律 師 行          8272,8610

# FAX

No. of pages (including this page):

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

| | |
|---|---|
| to: | Ince & Co |
| att: | Michael Volikas / Christian Dwyer |
| fax: | 4420-7481-4968 |
| your ref: | MV/CD/8272/8610 |
| | |
| from: | Chris Howse |
| our ref: | CGH/jf/S110-046 |

telephone    (852) 2810 8008
facsimile    (852) 2810 0664 (Corporate)
             (852) 2810 8713 (Finance)
             (852) 2810 1607 (Litigation/Shipping)
             (852) 2810 9635 (Property)
             (852) 2810 1648 (Intellectual Property)

direct line    **2507 9888**

direct e-mail
**chrishowse@richardsbutler.com.hk**

website    www.richardsbutler.com.hk

22 August 2006

"SANKO RALLY"

Thank you for your fax of 18th August. We are seeking our clients' instructions.

Yours faithfully,

RICHARDS BUTLER

H:\CGH\egh-36640.doc

**PARTNERS:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| C G Howse | A K Brown | M R D Pepper | D G Harrington | K C Mok | W J G Barber | D Kan | Emma Casdagli |
| D M Norman | G P Winter | Nanette Kwong | S J Birt | Janet Cheung | L J Li | Linda Fung | |
| A D Morrison | Denise Jong | Asha Sharma | Alice Hinchens | Ivy Lai | C S K Tang | K R Bowers | |
| C I Williams | J N Green | Delpha Ho | A D Horton | A P Apostolis | A W M Kaung | Doreen Kong | |

BEIJING    •    LONDON    •    PARIS    •    BRUSSELS    •    ABU DHABI    •    MUSCAT    •    SÃO PAULO    •    PIRAEUS

Beijing office address: Room 703B Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1  facsimile (86) 10 6580 2701  e-mail rb@ht.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.

This fax is confidential and may be protected by legal privilege.  If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

# RICHARDS BUTLER
### INTERNATIONAL LAW FIRM

8272,8610

齊 伯 禮 律 師 行

# FAX

No. of pages (including this page): 1

| | |
|---|---|
| to: | Ince & Co |
| att: | Michael Volikas / Christian Dwyer |
| fax: | 4420-7481-4968 |
| your ref: | MV/CD/8272/8610 |
| | |
| from: | Chris Howse |
| our ref: | CGH/jf/S110-046 |

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

telephone  (852) 2810 8008
facsimile   (852) 2810 0664 (Corporate)
               (852) 2810 8713 (Finance)
               (852) 2810 1607 (Litigation/Shipping)
               (852) 2810 9635 (Property)
               (852) 2810 1648 (Intellectual Property)

direct line   **2507 9888**

direct e-mail
**chrishowse@richardsbutler.com.hk**

website      www.richardsbutler.com.hk

23 August 2006

---

"SANKO RALLY"

We refer to your fax of 18th August. We are instructed that our clients do not propose to takeover the conduct of the cargo claim.

Yours faithfully,

RICHARDS BUTLER

H:\CGH\cgh-36640.doc

PARTNERS:
| C G Howse | A K Brown | M R D Pepper | D G Harrington | K C Mok | W J G Barber | D Kan | Emma Casdaghi |
| D M Norman | G P Winter | Nanette Kwong | S J Birt | Janet Cheung | L J Li | Linda Fung | |
| A D Morrison | Denise Jung | Asha Sharma | Alice Hutchens | Ivy Lai | C S K Tang | K R Bowers | |
| C J Williams | J N Green | Delpha Ho | A D Horton | A P Apostolis | A W M Kaung | Dorothea Kong | |

BEIJING    •    LONDON    •    PARIS    •    BRUSSELS    •    ABU DHABI    •    MUSCAT    •    SÃO PAULO    •    PIRAEUS

Beijing office address: Room 703B Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1  facsimile (86) 10 6580 2701  e-mail rb@ht.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.

This fax is confidential and may be protected by legal privilege. If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

# Fax



**INCE & CO**

INTERNATIONAL
LAW FIRM

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

| From | Our Ref | Date |
|------|---------|------|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 30 August 2006 |

| To | Attention | Your Ref |
|----|-----------|----------|
| Richards Butler | Chris Howse | CGH/jf/S110-046 |

| Total number of pages | Town/Country | Fax Number |
|-----------------------|--------------|------------|
| 1 | Hong Kong | 00852 281 01607 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|-----------|---------------|-------------------------|
| | | |

**Matter**

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to your fax of 23 August.

Your clients' position is noted. Given that it is now plain that your clients have no intention to comply with their obligations under clause 78(c) of the charter, you will appreciate that our clients must hold your clients fully liable for all any costs and/or expenses whatsoever and howsoever arising out of or in connection with your clients' breach of the aforesaid clause.

In the meantime, our clients continue to fully reserve their position.

Regards,

Ince & Co

*[This is a computer generated fax and is therefore unsigned]*

1 06.5751 00 6145850

# Fax



## INCE & CO

### INTERNATIONAL LAW FIRM

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 21 September 2006 |

| To | Attention | Your Ref |
|---|---|---|
| Richards Butler | Chris Howse | CGH/jf/S110-046 |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| | Hong Kong | 00852 281 01607 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|

**Matter**

## SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola

We refer to the above matter.

We attach copies of the Complaint brought by cargo interests in respect of the above matter and our clients' proposed draft Answer thereto. Our clients are required to serve and file the Answer by Monday 25 September and we would therefore be grateful if you would please advise whether your clients have any difficulties with the draft Answer and if so provide us with their proposed amendments for our consideration by close of business (London time) on Friday this week. If we do not hear from you we shall assume that you have no issue with the draft and that your clients are happy that the proposed draft puts forward Owners' best case and we shall instruct the US lawyers to serve and file it with the US Court.

In the meantime, our clients continue to fully reserve their position.

Regards,

Ince & Co

*[This is a computer generated fax and is therefore unsigned]*

22.SEP.2006  14:40      RICHARDS BUTLER                    NO.209   P.1

8272,8610

# RICHARDS BUTLER

### INTERNATIONAL LAW FIRM

齊 伯 禮 律 師 行

## FAX

No. of pages (including this page):

| | |
|---|---|
| to: | Ince & Co |
| attn: | Michael Volikas / Christian Dwyer |
| your ref: | MV/CD/8272/8610 |
| fax: | 44 207 4814968 |
| from: | Nanette Kwong |
| our ref: | NFLK/ac/S110-046  [H:\NFLK\0309E] |

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

telephone  (852) 2810 8008
facsimile   (852) 2810 0664 (Corporate)
                (852) 2810 8713 (Finance)
                (852) 2810 1607 (Litigation/Shipping)
                (852) 2810 9635 (Property)
                (852) 2810 1648 (Intellectual Property)

direct line  (852) 2507 9825
direct e-mail:
nanettekwong@richardsbutler.com.hk

website      www.richardsbutler.com.hk

22nd September 2006

**"SANKO RALLY"**

We refer to your fax dated 21st September, which was received by us this morning.

Please note that we have only received a copy of your draft answer, and not a copy of the complaint brought by cargo interests. Please send us a copy for our record.

As we have previously informed you, our clients do not propose to take over the conduct of the cargo claim. As such, they also do not propose to comment on your draft answer. In any event, our clients are certainly not in a position to do so as they have neither been provided with sufficient information nor time to do so.

All our clients' rights are fully reserved.

Regards,

RICHARDS BUTLER

PARTNERS:
C G Howse        A K Brown        M R D Pepper      D G Farrington   K C Mok          W J G Barber     D Kan            Emma Castiagli
D M Norman       G F Winter       Nanette Kwong     S J Birt         Janet Cheung     L J Li           Linda Fung
A B Morrison     Denise Jong      Asha Sharma       Alice Hutcheon   Ivy Lai          C S K Tang       K R Bowers
C J Williams     J N Green        Delpha Ho         A D Horton       A P Apostolis    A W M Kang       Doreen Kong

BEIJING    •    LONDON    •    PARIS    •    BRUSSELS    •    ABU DHABI    •    MUSCAT    •    SÃO PAULO    •    PIRAEUS

Beijing office address: Room 703B Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1 facsimile (86) 10 6580 2701 e-mail rb@ht.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.

This fax is confidential and may be protected by legal privilege. If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

# Fax



Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

**INTERNATIONAL
LAW FIRM**

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 22 September 2006 |
| To | Attention | Your Ref |
| Richards Butler | Chris Howse | CGH/jf/S110-046 |
| Total number of pages | Town/Country | Fax Number |
| | Hong Kong | 00852 281 01607 |
| Copies to | Attention/Ref | Town/Country/Fax Number |

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to your fax of today.

We attach a copy of the Complaint brought by cargo interests in respect of the above matter as requested. As you are fully aware, your clients have had every opportunity to be involved with this claim to obtain the relevant information but have chosen not to do so in breach of the terms of the charterparty. Your clients have already made their position quite clear in this regard and as you know, our clients have fully reserved their position given your clients' conduct. In the present circumstances, given that our clients are required to submit the Answer to the US Court on Monday, 25 September, we would be grateful if you would please advise whether your clients have any comments by our opening on Monday.

In the meantime, our clients continue to fully reserve their position.

Regards,

**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

# Fax



Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

**INTERNATIONAL LAW FIRM**

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 29 September 2006 |
| To | Attention | Your Ref |
| Richards Butler | Chris Howse | CGH/jf/S110-046 |
| Total number of pages | Town/Country | Fax Number |
| 12 | Hong Kong | 00852 281 01607 |
| Copies to | Attention/Ref | Town/Country/Fax Number |

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to the above matter and attach a copy of the Answer as filed with the US Court in response to the Complaint brought by cargo interests. In this regard, and for good order, we should remind you that we originally sent you a copy of the Complaint on 18 August 2006 and your clients chose not to comment on the Complaint or comply with their responsibilities under clause 78(c) of the Charterparty. Your clients have chosen to remain in breach of clause 78(c) of the Charterparty and our clients have incurred and will continue to incur significant costs as a result in responding to the Complaint brought by cargo interests. These costs are obviously for your clients' account and our clients' position remains fully reserved in regards.

Regards

Ince & Co

*[This is a computer generated fax and is therefore unsigned]*

1 06 5751 00 01 002/5

# RICHARDS BUTLER

### INTERNATIONAL LAW FIRM
### 齊 伯 禮 律 師 行

8272,8610

# FAX

No. of pages (including this page):  1

| | |
|---|---|
| to: | Ince & Co |
| attn: | Michael Volikas / Christian Dwyer |
| fax: | 44 207 481 4968 |
| your ref: | MV/CD/8272/8610 |

| | |
|---|---|
| from: | Beverly Kwong |
| our ref: | NFLK/BCLK/S110-046 |

H:\BCLK\BCLK-3714E.doc

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

telephone    (852) 2810 8008
facsimile    (852) 2810 0664 (Corporate)
              (852) 2810 8713 (Finance)
              **(852) 2810 1607 (Litigation/Shipping)**
              (852) 2810 9635 (Property)
              (852) 2810 1648 (Intellectual Property)

direct line    **(852) 2507 9894**
direct e-mail:  beverlykwong@richardsbutler.com.hk

website    www.richardsbutler.com.hk

5th October 2006

---

## "SANKO RALLY"

We refer to your fax dated 29th September 2006 which was received by us on 4th October 2006.

Our clients deny your allegations that they have been or are in breach of clause 78(c) of the charterparty. Our clients' rights are hereby fully reserved.

Yours faithfully,

RICHARDS BUTLER

---

PARTNERS:
C G Howse        A K Brown        M R D Pepper      D G Harrington    K C Mok        W J G Barber     D Kan          Emma Casdagli
D M Norman       G P Winter       Nanette Kwong     S J Birt          Janet Cheung    L J Li          Linda Pang
A D Morrison     Denise Jong      Asha Sharma       Alice Hutchent    Ivy Lai         C S K Tang      K R Bowers
C J Williams     J N Green        Delpha Ho         A D Horton        A P Apostolis   A W M Kaung     Doreen Kong

BEIJING    •    LONDON    •    PARIS    •    BRUSSELS    •    ABU DHABI    •    MUSCAT    •    SÃO PAULO    •    PIRAEUS

Beijing office address: Room 703B Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1  facsimile (86) 10 6580 2701  e-mail rb@ht.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.
This fax is confidential and may be protected by legal privilege.  If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

# Fax



**INTERNATIONAL
LAW FIRM**

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 09 October 2006 |

| To | Attention | Your Ref |
|---|---|---|
| Richards Butler | Chris Howse | CGH/jf/S110-046 |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| 1 | Hong Kong | 00852 281 01607 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|
| | | |

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We thank you for your fax of 5 October 2006.

Your client's obligations under clause 78(c) of the Charterparty are plain and in the circumstances you should not be surprised that we find your client's denial that they are in breach of clause 78(c) extraordinary. If your clients are intent upon adopting this position please kindly explain why they do not consider themselves to be in breach of clause 78(c) in order that we may properly understand their position from the outset in order to avoid unnecessary costs being incurred in discussing this matter at a later date.

In the meantime our client maintain their position that your clients are in breach of the charter and continue to fully reserve their position against your clients.

We await hearing from you.

Regards

Ince & Co

*[This is a computer generated fax and is therefore unsigned]*

DUBAI I HAMBURG I HONG KONG I LE HAVRE I LONDON I PARIS I PIRAEUS I SHANGHAI I SINGAPORE

# Fax



Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

**INTERNATIONAL LAW FIRM**

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|------|---------|------|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 16 October 2006 |

| To | Attention | Your Ref |
|----|-----------|----------|
| Richards Butler | Chris Howse | CGH/jf/S110-046 |

| Total number of pages | Town/Country | Fax Number |
|-----------------------|--------------|------------|
| 6 | Hong Kong | 00852 281 01607 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|-----------|---------------|-------------------------|

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to the above matter and attach for your information details of the salvage sale of the damaged cargo by cargo interests which have been received by our clients. Please let us know whether your clients have any comments on the salvage sale obtained.

In the meantime, our clients continue to fully reserve their position.

Kind regards

Ince & Co

*[This is a computer generated fax and is therefore unsigned]*

DUBAI | HAMBURG | HONG KONG | LE HAVRE | LONDON | PARIS | PIRAEUS | SHANGHAI | SINGAPORE

# Fax



**INTERNATIONAL
LAW FIRM**

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated
by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended
recipient and may be privileged. If you are not the intended recipient we request
that you contact us and not make any use of them pending arrangements for their
return or destruction.

Please contact us immediately if any part of this transmission
is incorrectly received. This document has been generated
electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 10 January 2007 |

| To | Attention | Your Ref |
|---|---|---|
| Richards Butler | Chris Howse | CGH/jf/S110-046 |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| | Hong Kong | 00852 281 01607 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to the above matter.

We write to advise you that further proceedings have been commenced against our clients by sub-Charterers, Pactrans, in the Southern District Court of Alabama, USA in respect of alleged losses suffered by Pactrans arising from the above incident. Pactrans further arrested the vessel at Houston to obtain security for their alleged claims. Copies of the complaint and arrest documentation are attached for your file.

As you will appreciate, our clients have incurred substantial costs in both lifting the arrest and the provision of security and will incur further costs in defending this new Complaint. Your clients have chosen to remain in breach of clause 78(c) of the Charterparty and in the circumstances these costs are obviously for your clients' account and our clients' position remains fully reserved in this regard as well as generally.

Regards,

**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

1 06 5751 00 6290491

DUBAI  I  HAMBURG  I  HONG KONG  I  LE HAVRE  I  LONDON  I  PARIS  I  PIRAEUS  I  SHANGHAI  I  SINGAPORE

# RICHARDS BUTLER

## 齊 伯 禮 律 師 行

# FAX

No. of pages (including this page): /

to: **Ince & Co**
attn: **Michael Volikas / Christian Dwyer**
fax: **MV/CD/8272/8610**

from: **Chris Howse**
our ref: **CGH/ S110-046**
H:\Mats\2892E.doc

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

telephone (852) 2810 8008
facsimile (852) 2810 0664 (Corporate)
(852) 2810 8713 (Finance)
**(852) 2810 1607 (Litigation/Shipping)**
(852) 2810 9635 (Property)
(852) 2810 1648 (Intellectual Property)

direct line (852) 2507 9888 / 2507 9805
direct e-mail:
chrishowse@richardsbutler.com.hk
mariasit@richardsbutler.com.hk

website www.richardsbutler.com.hk

9 March 2007

Dear Sirs,

**"SANKO RALLY"**

We have been passed with a copy of an email from your client to Sinochart requesting the Charterers to take over the conduct of the cargo claims. Our client's view remains as set out in our fax of 23rd August 2006 in which we advised that our client does not propose to take over the conduct of the claim. That said, irrespective of the position between the Owners and the Charterers, if Owners have no good defence to the cargo claim, Owners should consider settlement rather than defend the matter. We reserve our client's position in relation to the Owners' failure to take reasonable steps to mitigate in handling the cargo claim.

Yours faithfully,

RICHARDS BUTLER

PARTNERS:
C G Howse A K Brown M R D Pepper D G Harrington K C Mok L J Li Linda Fung
D M Norman G P Winter Nanette Kwong S J Birt Janet Cheung C S K Tang K R Bowers
A D Morrison Denise Jong Asha Sharma Alice Hutchens Ivy Lai A W M Kaung Doreen Kong
C J Williams J N Green Delpha Ho A D Horton W J G Barber D Kan Emma Casdagli

BEIJING • LONDON • PARIS • BRUSSELS • ABU DHABI • MUSCAT • SÃO PAULO • PIRAEUS
Beijing office address: Room 703B Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1 facsimile (86) 10 6580 2701 e-mail rb@ht.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.

This fax is confidential and may be protected by legal privilege. If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

# Fax



**INTERNATIONAL
LAW FIRM**

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated
by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended
recipient and may be privileged. If you are not the intended recipient we request
that you contact us and not make any use of them pending arrangements for their
return or destruction.

Please contact us immediately if any part of this transmission
is incorrectly received. This document has been generated
electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 20 March 2007 |
| To | Attention | Your Ref |
| Richards Butler | Chris Howse | CGH/jf/S110-046 |
| Total number of pages | Town/Country | Fax Number |
| 2 | Hong Kong | 00852 281 01607 |
| Copies to | Attention/Ref | Town/Country/Fax Number |

Matter

## SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola

We refer to your fax of 9 March 2007.

We note your clients' continued refusal to comply with their obligations under clause 78(c) of the
charter. We also note with great surprise your comments in respect of "settlement" and "defence" of
the cargo claim. Your clients have deliberately decided to breach the charter and if your clients have
anything to say with regard to how they consider the defence of the cargo claim should proceed then
they should say so now.

In particular, if you or your clients consider that, in order to mitigate their position, our clients have a
defence to the incoming claims that they should exercise or that they should conduct themselves in
any particular way, for example in relation to settlement, please advise by return. If you fail to
indicate now how you suggest our clients should act in order to mitigate their position but later assert
a case in this regard we shall draw the tribunal's/Court's attention to your/your clients failure to raise
the case at this point (or earlier) and invite the tribunal/Court to find that it is then not open for you to
contend that our clients have failed to mitigate.

Accordingly, we request that if your clients have anything constructive to say in respect of the
conduct of the cargo defence they say so now. If you fail to do so the only assumption to be drawn is
that you have nothing to say in this regard and we and our clients shall proceed on the that you/your
clients agree with that assumption. In the meantime, we need not remind you that our clients'
position remains fully reserved against your clients both in respect of your clients' continued breach
of clause 78(c) of the charter and generally.

1.06.5751.00 6364049



20 March 2007

We await hearing from you.

Regards,

**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

# RICHARDS BUTLER

齊 伯 禮 律 師 行     **8272,8610**

# FAX

No. of pages (including this page):  |

to:     Ince & Co
att:    Michael Volikas / Christian Dwyer
fax:    4420-7481-4968
your ref:  MV/CD/8272/8610

from:   Chris Howse
our ref:  CGH/jf/S110-049

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

telephone   (852) 2810 8008
facsimile   (852) 2810 0664 (Corporate)
            (852) 2810 8713 (Finance)
            (852) 2810 1607 (Litigation/Shipping)
            (852) 2810 9635 (Property)
            (852) 2810 1648 (Intellectual Property)

direct line

direct e-mail

website    www.richardsbutler.com.hk

21 March 2007

---

**"SANKO RALLY"** - Cargo shift en-route from Qingdao to Pensacola

We refer to your fax of 20th March. We are seeking instructions from our clients. We will write to you again shortly.

Regards,

Chris Howse
Richards Butler, Hong Kong

H:\CGH\egb-37009.doc

---

PARTNERS:
C G Howse          A K Brown          M R D Pepper       D G Harrington     K C Mok           L J Li            K R Bowers
D M Norttan        G F Winter         Nanette Kwong      S J Birt           Janet Cheung      C S K Tang        Doreen Kong
A D Morrison       Denise Jong        Asha Sharma        Alice Hutchens     Ivy Lai           A W M Kaung       Emma Casdagli
C J Williams       J N Green          Delpha Ho          A D Horton         W J G Barber      D Kan

BEIJING   •   LONDON   •   PARIS   •   BRUSSELS   •   ABU DHABI   •   MUSCAT   •   SÃO PAULO   •   PIRAEUS

Beijing office address: Room 703B Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1  facsimile (86) 10 6580 2701  e-mail rb@hr.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.

This fax is confidential and may be protected by legal privilege. If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

# RICHARDS BUTLER

齊 伯 禮 律 師 行

8272,8610

# FAX

No. of pages (including this page):  (

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

| | |
|---|---|
| to: | Ince & Co |
| att: | Michael Volikas / Christian Dwyer |
| fax: | 4420-7481-4968 |
| your ref: | MV/CD/8272/8610 |

telephone  (852) 2810 8008
facsimile   (852) 2810 0664 (Corporate)
               (852) 2810 8713 (Finance)
               (852) 2810 1607 (Litigation/Shipping)
               (852) 2810 9635 (Property)
               (852) 2810 1648 (Intellectual Property)

| | |
|---|---|
| from: | Chris Howse |
| our ref: | CGH/jf/S110-046 |

direct line

direct e-mail

website     www.richardsbutler.com.hk

2 April 2007

---

**"SANKO RALLY"**

We refer to our previous correspondence regarding the above matter and, in particular, to the action which your clients have taken by way of Rule B Attachment against our client's assets in New York.

We have consulted New York lawyers who have advised us that this action is wrongful and that our clients would be entitled to apply to set aside the Attachment of their assets. Accordingly, we are instructed to put you on notice that our clients reserve the right to take action against your clients as a result of any loss or damage which they suffer as a result of your clients' wrongful action in New York.

With regard to the claims in respect of which your clients have commenced this action, the only information on quantum we have at present is as set out in the Verified Complaint. We would be grateful if you would write to us by return with a full breakdown of the claims that have been made against owners.

Regards,

Chris Howse
Richards Butler, Hong Kong
H:\CGH\cgh-37084.doc

---

PARTNERS:
C G Howse        A K Brown        M R D Pepper      D G Harrington     K C Mok         L J Li           K R Bowers
D M Norman       Q P Winter       Nanette Kwong     S J Birt           Janet Cheung    C S K Tang       Doreen Kong
A D Morrison     Denise Jong      Asha Sharma       Alice Hutchens     Ivy Kai         A W M Kaung      Emma Casdagil
C J Williams     J N Green        Delpha Ho         A D Horton         W T G Barber    D Ken

BEIJING    •    LONDON    •    PARIS    •    BRUSSELS    •    ABU DHABI    •    MUSCAT    •    SÃO PAULO    •    PIRAEUS

Beijing office address: Room 703B Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1   facsimile (86) 10 6580 2701   e-mail rb@ht.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.

This fax is confidential and may be protected by legal privilege. If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

# EXHIBIT F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
IN ADMIRALTY

DEVON INTERNATIONAL TRADING, INC.,

      Plaintiff,

vs.

CASE NO. *3:06 cv 285 RV/mc*

M/V *SANKO RALLY*, her engines, tackle,
appurtenances, etc., *in rem*, and SANKO
STEAMSHIP CO., LTD. and PACTRANS
AIR & SEA, INC., *in personam,*

      Defendants.
_____/

## VERIFIED COMPLAINT UNDER RULE 9(h)

      COMES NOW the Plaintiff, DEVON INTERNATIONAL TRADING, INC.,

("DEVON"), by and through its undersigned counsel, and sues the Defendants, M/V *SANKO*

*RALLY*, her engines, tackle, appurtenances, etc., *in rem*, and SANKO STEAMSHIP CO.,

LTD. ("SANKO") and PACTRANS AIR & SEA, INC. ("PACTRANS"), *in personam*, and

alleges that:

      1.     This is a case of admiralty and maritime jurisdiction under 28 U.S.C. §1333

as hereinafter more fully appears and is an admiralty and maritime claim within the meaning

of Rule 9(h).

      2.     Plaintiff is a Pennsylvania corporation doing business, *inter alia*, as an

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
PENSACOLA. FLA.

06 JUN 29 PM 3: 25

FILED

importer of building materials, including drywall.

3.    The vessel M/V *SANKO RALLY* is now, or will be, during the pendency of this action, within this District and within the jurisdiction of this Court.

4.    SANKO is an alien corporation which at all times material hereto did business as a common carrier by water for hire within this District, and was the time charterer of the SANKO RALLY.

5.    PACTRANS is a foreign corporation which at all times material hereto did business in this District, and executed a Service Contract with Plaintiff for delivery of drywall cargo to Pensacola, Florida.

6.    On or about April 10, 2006, DEVON entered into a Service Contract with PACTRANS for the import of approximately 485,000 sheets of gypsum board drywall/sheetrock.

7.    On or about May 12, 2006, said cargo was loaded aboard the M/V *SANKO RALLY*, pursuant to Bill of Lading No. CNHC02292001 for shipment from Qingdao, China, to Pensacola, Florida.  On or about June 15, 2006, said vessel arrived at the Port of Pensacola, Florida.  Upon examination of the cargo, much of the cargo was found to be damaged and/or destroyed during the course of transport.

8.    The cargo was delivered to Defendants and the vessel in good order and condition, but was not redelivered in the same good order and condition as received.

## COUNT I

9.    Plaintiff readopts each and every allegation in paragraphs 1 through 8 as if

fully set forth.

10.     As a result of the foregoing, Plaintiff has a maritime lien on the vessel, for breach of the contract of affreightment as a result of damage to the cargo, in an amount of or an amount in excess of $1,500,000.00.

11.     Said lien is valid and has not been satisfied, and is entitled to priority over any and all other liens, if any.

## COUNT II

12.     Plaintiff readopts each and every allegation in paragraphs 1 through 8 as if fully set forth.

13.     Defendants contracted to transport the cargo as set forth herein.

14.     Defendants breached their duty to transport the cargo by failing to redeliver the cargo in the same good order and condition as received.

15.     As a result of Defendants' breach, Plaintiff has suffered damages in an amount of or in excess of $1,500,000.00.

## COUNT III

16.     Plaintiff readopts each and every allegation in paragraphs 1 through 8 as if fully set forth.

17.     Defendants, while in possession of the cargo at issue, owed a duty of reasonable care to Plaintiff to care for and to protect the aforesaid cargo from loss.

18.     Defendants breached said duty by failing to exercise reasonable care as a result of their negligent acts and/or omissions, including but not limited to:

        A.     Failure to deliver the goods in the same order and condition as received;

        B.     By other acts and omissions.

    19.    Defendant's breach of duty was a proximate cause of damage to Plaintiff, and Plaintiff has suffered damages in an amount of or in excess of $1,500,000.00.

## COUNT IV

    20.    Plaintiff readopts each and every allegation in paragraphs 1 through 8 as if fully set forth.

    21.    Defendants, as bailees in possession of the cargo at issue, owed a duty of reasonable care to Plaintiff to care for and to protect the aforesaid cargo from loss.

    22.    Defendants breached said duty by failing to exercise reasonable care, including but not limited to:

        A.     Failure to deliver the goods in the same order and condition as received;

        B.     By other acts and omissions.

    23.    Defendant's breach of duty was a proximate cause of damage to Plaintiff, and Plaintiff has suffered damages in an amount of or in excess of $1,500,000.00.

    WHEREFORE, the Plaintiff prays that:

    A.     A Warrant of Arrest may issue against the vessel M/V *SANKO RALLY*, her engines, tackle, appurtenances, etc., and that the vessel be sold at judicial sale and the proceeds of such sale may go to pay the amount due and owing the Plaintiff, plus costs,

interest, attorneys fees, and such other relief this Court deems just and equitable; and

     B.    That judgment be entered against the Defendants and in favor of Plaintiff for

damages to said cargo.

     Dated on this 28th day of JUNE , 2006.

> HAYDEN AND MILLIKEN, P.A.
> 5915 Ponce de Leon Boulevard
> Suite 63
> Miami, Florida 33146-2435
> Telephone:   (305) 662-1523
> Facsimile:   (305) 663-1358
>
> By: *Christopher R. Koehler*
>     Christopher R. Koehler, Esq.
>     Florida Bar No. 715131

**STATE OF FLORIDA** Florida    )
                      : SS:
**COUNTY OF** Hillsborough    )

## VERIFICATION

     **BEFORE ME** personally appeared Christopher R. Koehler, who after being first duly

sworn, deposes and says:

     1.    That he is attorney for the Plaintiff in this case and, to the best of his

*Page No. 6*

knowledge, information and belief, as well as the information provided to him by the

Plaintiff, the facts set forth in this Complaint are true and correct.

    2.    Affiant further states that he has executed this verification on behalf of the

Plaintiff because there is no officer or director of the Plaintiff within the jurisdiction of this

Court.

    FURTHER AFFIANT SAYETH NOT.

                            Christopher R. Koehler, Esq.

    SWORN TO and SUBSCRIBED before me, this 28th day of June,

2006.

NOTARY PUBLIC
Eugene Merritt

My commission expires:



EUGENE MERRITT
Comm# DD0523615
Expires 2/28/2010
Bonded thru (800)432-4254
Florida Notary Assn., Inc.

State of Florida
County of Hillsborough

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
IN ADMIRALTY

DEVON INTERNATIONAL TRADING, INC.,

    Plaintiff,

vs.

                              CASE NO. *3:06 cv 285 RV/MS*

M/V *SANKO RALLY*, her engines, tackle,
appurtenances, etc., *in rem* and SANKO
STEAMSHIP CO., LTD. and PACTRANS
AIR & SEA, INC., *in personam*,

    Defendants.

————————————————————/

### WARRANT OF ARREST

TO:   THE MARSHAL OF THE UNITED STATES FOR THE
       NORTHERN DISTRICT OF FLORIDA:

    WHEREAS, on the 29th day of June, 2006, DEVON INTERNATIONAL

TRADING, INC., filed a Verified Complaint against the M/V *SANKO RALLY*, in rem, for

the reasons in said Complaint mentioned;

    NOW THEREFORE, in accordance with Supplemental Rule C and Local Admiralty

Rule C, you are hereby commanded to arrest and take into your possession the above named

M/V *SANKO RALLY*, and to detain the same in your custody, at any time or day, until further

Order of this Court.

    YOU ARE HEREBY further commanded forthwith to give notice of the arrest to all

07/20/2006 16:14 FAX 2513448698        Bowron, Latta & Wasden                    ☑016/018

*Page No 3*

persons required by the appropriate Supplemental Rules, Local Admiralty Rules, and the

practices of your office.

ORDERED this 29th day of June, 2006.

Clerk, United States District Court
Northern District of Florida

By: _____
Deputy Clerk

Christopher R. Koehler, Esq.
HAYDEN AND MILLIKEN, P.A.
Fla. Bar No. 715131
5915 Ponce de Leon Boulevard
Suite 63
Miami, Florida 33146-2435
(305) 662-1523

## SPECIAL NOTICE

In accordance with Local Admiralty Rule C (6) any person claiming an interest in the vessel and/or property shall be required to file a claim within (10) days after process has been executed, and shall also be required to file an answer within twenty (20) days after filing his claim.

Any persons claiming an interest in the vessel and/or property may also pursue the post-arrest remedies set forth in Local Admiralty Rule C (7).

H:\1816\Pleadings\Arrest Warrant.wpd

EXHIBIT G

# BOWRON LATTA
## & WASDEN, P.C.
### ATTORNEYS AT LAW

30 June 2006

**VIA OVERNIGHT MAIL AND**
    **FACSIMILE: 904/807-2625**
Devon International Trading, Inc.
c/o CRAIG/IS, Ltd.
225 Water St. # 1700
Jacksonville, Florida 32202

        M/V "SANKO RALLY"
        Alleged Shifting in Stow/Alleged Physical Damage to Gypsum Boards en-route
        from Qingdao, China to Pensacola, Florida –  B/L: CNHC02292001 - May/June
        2006
        Your Ref: Unknown
        Our Ref: 01492/06/FLEEDW/FEHDON

Gentlemen:

    In consideration of your immediately releasing from arrest, the M/V "SANKO RALLY" ("Vessel") and refraining from arresting, attaching or otherwise detaining the Vessel or any other vessel or property of her Owner or any other vessel or property of any company in the same or associated ownership, management or control in connection with the referenced cargo claim, the undersigned Association hereby undertakes:

1. To file or cause to be filed, upon your demand, a Statement of Right or Interest in the Vessel in one suit you may commence against the Vessel *in rem* in the U.S. District Court for the Northern District of Florida, seeking damages allegedly arising out of the referenced claim ("Cargo Suit") irrespective of the Vessel not being in the jurisdiction of the Court at the time (and without raising any defenses as to her absence from said jurisdiction).

2. In the event a final judgment (after final appeal, if any) be entered in your favor against the M/V SANKO RALLY *in rem* in the Cargo Suit as referenced in paragraph 1 above then the undersigned Association agrees to pay and satisfy one said final judgment up to and not exceeding US$1,650,281.56 (One Million Six Hundred Fifty Thousand Two Hundred Eighty One and Fifty Six/ One Hundreth U.S. Dollars), inclusive of interest and costs, or any lesser amount decreed by the Court or settled between the parties without final judgment being rendered.

3. Upon demand to cause to be filed a Bond in form and sufficiency of surety satisfactory to you or to the Court in the above amount securing your claim against the said Vessel in one said action mentioned in paragraph 1.

4. In the event the Bond referred to in paragraph 3 is filed then the undersigned Association shall have no further obligation under this undertaking.

Devon International Trading, Inc.
c/o CRAIG/IS, Ltd.
June 30, 2006
Page 2 of 2

It is agreed that the amount of the Letter of Undertaking shall be promptly reduced if the amount of your claim, presently said by you to be US$1,650,281.56, is reduced voluntarily or by the Court, and it is further agreed that this Undertaking is without prejudice to Owner's right to make an appropriate application to the Court to reduce the amount of security provided herein.

It is understood and agreed that the signing of this letter by Bowron, Latta & Wasden, P.C. is not to be construed as binding Bowron, Latta & Wasden, P.C. but is to be binding only upon Assuranceforeningen Gard -gjensidig-.    Neither this agreement nor obligations under it may be assigned without written agreement of Assuranceforeningen Gard -gjensidig-.

In the event the proceedings referred to in paragraph 1 are terminated or dismissed without judgment being rendered in your favor, or in the event that payment of your claim or of an agreed settlement of your claim is made to you, this letter of undertaking shall be returned to the undersigned Association.

This letter is written entirely without prejudice to any rights or defenses which the said Vessel and/or Owner of the said Vessel may have, none of which is to be regarded as waived.

Very truly yours,

Assuranceforeningen GARD
-gjensidig-

By BOWRON, LATTA & WASDEN, P.C.

By: _____
ABE L. PHILIPS, JR.

(As Attorney-in-Fact for the above limited purpose only,
as per authority received from Assuranceforeningen GARD –gjensidig - 30 June 2006)

EXHIBIT H

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| **PACTRANS AIR & SEA INC.,**<br>**a Corporation,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **CIVIL ACTION NO. 06 - 862** |
| **MV SANKO RALLY, her engines,** | § | **In Admiralty** |
| **tackle, appurtenances, etc.,** *in rem,* | | |
| **and Sanko Steamship Co., Ltd.,** *in* | § | |
| *personam,* | | |
| **Defendants.** | § | |

## COMPLAINT FOR CARGO LOSS AND DEMURRAGE

The Complaint of Pactrans Air & Sea, Inc. ("Pactrans") against the Defendants, MV SANKO RALLY, her engines, tackle, appurtenances, *etc.*, *in rem,* ("the vessel"), and Sanko Steamship Co., Ltd., *in personam*, ("Sanko Steamship"), in a cause of contract and tort, civil and maritime, for damages, cargo loss and demurrage, respectfully alleges and represents, upon information and belief, as follows:

I.

This is an admiralty and maritime claim within the jurisdiction of the United States and of this Honorable Court all within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure; Jurisdiction is proper pursuant to 28 U.S.C. §1331; 28 U.S.C. §1332; and 28 U.S.C. §1333.

II.

This complaint is instituted without waiver of the rights of plaintiff, Pactrans, to arrest and or attach other assets, goods or property of the Defendant or other parties in interest, in order to fully secure its claims, including actions to obtain security in aid of arbitration, or collateral attachment.

III.

At all times material hereto, Plaintiff Pactrans Air & Sea, Inc. ("hereinafter Pactrans"), was and now is a corporation duly organized and existing under and by virtue of the laws of the State of Illinois, with its principal place of business at Chicago, Illinios, and had, at all times material hereto, entered into a GENCON Charter dated April 24, 2006 with China National Chartering Corp. for carriage of certain cargo for its disclosed principal aboard the MV SANKO RALLY, a 25,676 GT bulk cargo vessel which flies the Vanuatu flag.

IV.

At all times material hereto, China National Chartering Corp., also known as "Sinochart" (hereinafter "China National" or "Sinochart"), was and now is a corporation or other legal entity organized and existing pursuant to and by virtue of the laws of Peoples Republic of China, or other foreign state, with its offices and principal place of business at Beijing, China, and was engaged in the chartering and operation of oceangoing vessels, and was, at all times material hereto, a time charterer, broker, owner and/or disponent owner of the vessel MV SANKO RALLY.

2

V.

At all times material hereto, Defendant, Sanko Steamship Co., Ltd. (hereinafter "Sanko Steamship"), was and now is a corporation or other legal entity organized and existing pursuant to and by virtue of the laws of foreign state, with its offices and principal place of business outside of the State of Alabama, and was engaged in the chartering and operation of oceangoing vessels, and was, at all times material hereto, a time charterer, broker, owner and/or disponent owner of the vessel MV SANKO RALLY.

VI.

At all times material hereto, the Master of the vessel MV SANKO RALLY was employed by or acting for and on behalf of the Owner and/or disponent Owner of the vessel, including without limitation on behalf of the Defendant Sanko Steamship, and his actions as further described herein which resulted in loss, damage and expense  to Plaintiff, and claims incurred for alleged cargo loss, freight, demurrage and other charges, were binding on said Defendant as well as the vessel *in rem,* for and as an authorized act of said Defendants based on his actions supplanting the judgment of Charterers and assuming obligations and duties with respect to loading, stowing, caring for and securing the cargo, and for the seaworthiness of the vessel and fitness to prosecute the voyage.

VII.

At all times material hereto, Devon International Trading Inc. (hereinafter "Devon"), was and now is a corporation or other legal entity organized and existing pursuant to and by virtue of the laws of the State of Pennsylvania, with its offices and principal place of business at King of Prussia, Pennsylvania, and was engaged in the business of importing

3

and/or sourcing manufacturing products in China, for resale and distribution in the United States, and Devon was the Shipper, Receiver and Consignee of the cargo shipped aboard the SANKO RALLY, or in the alternative, was the Voyage Charterer of the vessel.

VIII.

On or about 24 April, 2006, China National entered into a Voyage Charter, on the Baltic and International Maritime Council Uniform General Charter, as revised 1922, 1976 and 1994 ("GENCON") form, with Pactrans as agent on behalf of Devon, and a true and correct copy of the charterparty is attached hereto as Exhibit "A".

IX.

At the times material, Sanko Steamship was party to a time charter for the vessel, and the charterparty terms applicable to Sanko Steamship required loading of the vessel under supervision of the Master, and Sanko Steamship authorized issuance of Bills of Lading for the cargo loaded aboard the vessel which was expressly made subject to the GENCON Charter, Exhibit "A" as aforesaid.

X.

At the time of entering into the GENCON charter, Exhibit "A" as aforesaid, Pactrans was acting for and on behalf of its disclosed principal, Devon International Trading, Inc., to arrange for transport by Devon of certain cargo from Qingdao, China to Pensacola, Florida, USA, consisting of approximately 7,133 Bundles/31,000 CBM Gypsumboard, and it was expressly understood and agreed in governing charterparties and contracts and

4

affreightment, and the Service Agreement between Pactrans and Devon, that the cargo would be loaded, stowed and discharged free of risk, liability and expense to Pactrans and/or the vessel, and it was further agreed that Pactrans would not be responsible for any damage during loading, or damage caused by improper lashing, securing or dunnage.

XI.

At the times material, Pactrans Service Contract and/or Charter Agreement with Devon required loading, stowing, blocking and bracing to be done by Shipper Devon or his agent, and a true and correct copy of the Service Contract is attached hereto as Exhibit "B."

XII.

After entering into the GENCON charter as aforesaid, the MV SANKO RALLY loaded the said cargo of 7,133 Bundles/31,000 CBM of Gypsumboard for carriage to the Port of Pensacola, Florida and a Bill of Lading was issued on behalf of the vessel,  China National and/or Sanko Steamship, to Devon or its Consignee, and dated 25 April, 2006 which further incorporated by reference the provisions of the GENCON charterparty, Exhibit "A" as aforesaid, and a true and correct copy of the Bill of Lading for the Cargo is attached hereto as Exhibit "C".

XIII.

At the time of sailing of the vessel, the Bills of Lading were expressly and/or impliedly ratified by the vessel *in rem,* Sanko Steamship, and the Owners, Charterers and/or Managers of the vessel.

5

XIV.

At all times material hereto, and specifically including the negotiation and agreement for the GENCON charter, Exhibit "A" as aforesaid; and negotiation and agreement to the Service Agreement, Exhibit "B" as aforesaid, loading of the cargo, and issuance of the Bill of Lading, Exhibit "C" as aforesaid, Pactrans was acting as an agent, freight forwarder, or transport intermediary for and on behalf of Devon as its disclosed principal, and because this status was fully disclosed in its dealings with China National, Sinochart and other parties in interest, Pactrans was therefore standing in the shoes of Devon.

XV.

Pactrans relationship with the parties involved at the times material to this litigation, including the carriers of the goods, *viz:* the MV SANKO RALLY *in rem,* Sinochart, China National, Sanko Steamship and other parties in interest, were subject to and governed by standard NCBFAA terms, and a true and correct copy of the applicable NCBFAA terms is attached as Exhibit "D".

XVI.

The cargo of 7,133 Bundles/31,000 CBM of Gypsumboard was loaded at Qingdao, Cina on or about 25 April, 2006 aboard the SANKO RALLY, and the vessel thereafter arrived at the Port of Pensacola, Florida on or about June 15, 2006, where it subsequently discharged her cargo.

XVII.

At the time of loading of the cargo at Qingdao, China the parties had modified the printed terms of the GENCON Charter which had required Pactrans as Charterer to load,

6

stow and secure the cargo; and it was agreed that the cargo would be loaded, stowed, and discharged free of risk, liability and expense to Pactrans; further agreed that Pactrans was not responsible for any damages related to the manner of loading; and further agreed that Devon would assume sole obligation and responsibility for loading, stowing, blocking and bracing of the cargo as aforesaid and it was further provided in the NCBFAA terms Exhibit "D" as aforesaid that Pactrans had no liability for acts of Third Parties, that carriers ad the "Customer" would indemnify, defend and hold Pactrans harmless for any such acts of third parties; and just prior to commencement of loading of the vessel Devon purported to serve notice of cancellation of its charter with Pactrans in order to deal directly with Sanko Steamship and/or vessel Owners for all matters with respect to performance of the governing Charterparties, carriage of goods and/or the contract of affreightment; and a true and correct copy of the notice of cancellation is attached hereto as Exhibit "E."

## XVIII.

Thereafter, the Master of the vessel, acting for and at the direction of Devon and/or Sanko Steamship, became directly involved in loading of the cargo, as evidenced by the Master's development, design and approval of a stowage plan for the cargo; the Master's and Sanko Steamship's refusal to permit Pactrans access to the vessel, or monitoring of loading; and by these actions, and other conduct, the Master and Defendant Sanko Steamship thereby assumed  full and exclusive responsibility and control for proper stowage, loading and securing of the cargo; and the Master otherwise imposed his judgment for that of the Charterers with respect to decisions which affected both the proper

7

stowage and securing of the cargo, and the seaworthiness of the vessel to transport the same.

XIX.

At the time of loading of the cargo at Qingdao, China, as aforesaid, Sanko Steamship and its Master, acting at the direction of Devon, assumed the responsibilities to load, stow and secure the cargo and further prevented Pactrans from monitoring or attending the vessel, or in any manner directing or supervising the manner in which the cargo was loaded, stowed or secured aboard the vessel; and Defendant Sanko Steamship by its acts, and/or its ratification of the actions of its Master, assumed exclusive custody and control of the vessel and the Cargo during loading, all without consultation or agreement of Pactrans, and Sanko Steamship, by its acts and exclusive control of the vessel and cargo during loading, and assumption of responsibilities for loading, should be held liable for damage to the cargo which occurred on the voyage from Qingdao to Pensacola as a result of negligence during loading, and for alleged failure to properly load, stow and secure the cargo, including without limitation insufficient dunnage.

XX.

Based on the foregoing, Defendant Sanko Steamship should be held liable for additional costs of discharge for the cargo and expenses of demurrage at the Port of Pensacola, Florida, which was a direct, foreseeable and proximate result of the negligence and acts of Sanko Steamship and its Master, including the manner in which said parties assumed responsibilities for, directed and supervised the loading.

8

XXI.

During the voyage from Qingdao to Pensacola, and with direct knowledge of the deficient manner of stowage and securing of the cargo, the Master of the vessel proceeded on the voyage at an excessive rate of speed, negligently failed to reduce speed during inclement weather, failed to take advantage of safe weather routing for the vessel, and failed to take proper actions to minimize the damage to the cargo which occurred when the bracing and supports for the cargo began to collapse and break during the voyage and weather conditions encountered, and thereby aggravated the situation causing by partial collapse of the stow and damage to the cargo during the voyage.

XXII.

At all times material, the vessel, SANKO RALLY *in rem* and Sanko Steamship had a non-delegable duty imposed by the United States Carrage of Goods by Sea Act ("COGSA") including the provisions of 46 U.S.C. §1303(2), which required the vessel and Sanko Steamship to properly load, stow and trim the cargo, and exercise proper handling of the cargo during the voyage.

XXIII.

As a direct, forseeable and proximate result of the breach of duties, undertakings and obligations assumed by the Master and Defendant Sanko Steamship, or as otherwise imposed on the vessel *in rem* by the governing charterparties, imposed by contract, or otherwise imposed by operation of COGSA to exercise exclusive control of the vessel and properly load and stow the cargo, the cargo arrived at Pensacola in damaged condition,

9

and Devon has made claim against Pactrans for alleged cargo loss and damage of $1.5 Million dollars (USD $1,500,000.00), and has failed and/or refused to pay certain charges for demurrage, port charges, freight and/or charter hire which have been claimed by China National.

XXIV.

Further, as a direct, foreseeable and proximate result of the breach of duties, undertakings and obligations assumed by the Master and Defendant Sanko Steamship, or as otherwise imposed on the vessel *in rem* by the governing charterparties, imposed by contract, or otherwise imposed by operation of COGSA to exercise exclusive control of the vessel and properly load and stow the cargo as aforesaid, and the resulting damage ot the cargo, it required far more time than was provided in the GENCON charter for discharge of the damaged cargo at Pensacola, Florida, and for separation of the damaged from undamaged cargo, and China National has made claim  and demanded security against Pactrans for substantial funds including demurrage charges in the amount of $543,814.74; port charges at Pensacola, Florida in the amount of $35,136.74; freight and/or charter hire in the amount of $79,580.09; estimated interest in the amount of $106,486.14; attorneys fees and arbitration costs of $125,000.00; disbursements, survey costs and other proximate damages, and certain additional sums required to be paid pursuant to the charterparty which may be identified, and the total amounts presently claimed against Pactrans to be due and owing are the principal sum of $890,017.71, which is an estimated amount which is as nearly as exact as the same can now be ascertained.

10

XXV.

Based on the foregoing, if Pactrans is deemed liable to Devon for alleged cargo loss of $1.5 Million and or to China National or other parties for demurrage, port charges, freight, charter hire, arbitration costs and attorneys fees of $890,017.21 as aforesaid, as a consequence of the breach of duties and obligations assumed by Defendant Sanko Steamship, its Master, and/or the vessel MV SANKO RALLY *in rem*, then Pactrans is entitled to full indemnity or contribution from Defendant Sanko Steamship and the MV SANKO RALLY *in rem,* or against any security which may be provided in lieu of arrest of the vessel or in order to lift an arrest or attachment of the said vessel; Pactrans is further entitled to express contractual indemnity, or implied indemnity; and Pactrans is further entitled to recovery and claim over against said Defendants Sanko Steamship and MV SANKO RALLY *in rem* for the actions of the Master, and actions of Defendant Sanko Steamship which modified the terms of written agreements, and assumed responsibility for loading of the cargo as aforesaid.

XXVI.

As a direct and proximate result of the aforesaid breaches and actions of Defendants, Plaintiff has incurred a claim for damages and losses of the cargo in the amount of $1.5 million, and has incurred claims and additional expenses for demurrage, port charges, attorneys fees and costs of arbitration in the amount of $890,017.71, estimates which are as exact as can now be calculated, none of which has been paid although duly demanded from Defendants.

11

WHEREFORE, the premises considered, the Plaintiff prays:

(a)     That Process in due form of law be issued for the arrest of said vessel, M/V SANKO RALLY, or the proceeds of sale thereof, pursuant to Supplemental Rule C of the Federal Rules of Civil Procedure.

(b) That Process in due form of law be issued against the Defendant Sanko Steamship Co., Ltd., citing it to appear and answer this Complaint;

(c)     For a judgment herein in favor of Plaintiff Pactrans Air & Sea, Inc. and against the Defendant M/V SANKO RALLY *in rem*, and against the Defendant Sanko Steamship Co., Ltd. *in personam*, in the total amount of TWO MILLION THREE HUNDRED NINETY THOUSAND SEVENTEEN AND 71/100 ($2,390,017.71) DOLLARS, plus interest, attorneys fees and costs.

(d)     That a Decree of Condemnation be issued against the property and credits of the Defendant herein, and against the proceeds of sale of said vessel, for the amount of Plaintiff's claims plus interest, attorneys' fees and costs thereon.

(e)     That Plaintiff have and receive such other, different and further relief as justice and equity may require.


Respectfully submitted,

GREGORY C. BUFFALOW (BUFFG 3126)
KENNETH A. WATSON (WATSK 3123)
ADAM M. MILAM (MILAA 2597)
Attorneys for Plaintiff Pactrans Air & Sea Inc.

12

OF COUNSEL:

MILLER HAMILTON SNIDER & ODOM LLC
254 State Street
P.O. Box 46
Mobile, Alabama 36603
Telephone: (251) 432-1414
Facsimile (251) 433-1001

## **VERIFICATION**

STATE OF ALABAMA )
COUNTY OF MOBILE )

BEFORE ME, the undersigned authority, a notary public commissioned and qualified, personally came and appeared:

GREGORY C. BUFFALOW

who, after being duly sworn, did depose and say:

He is an attorney at law and is a member of the firm of Miller, Hamilton, Snider & ODOM, L.L.C., counsel of record for Pactrans Air & Sea Inc;

He has read the above and foregoing Verified Complaint and knows the contents thereof, and that the same are true and correct to the best of his knowledge, information and belief, the sources of said information and the grounds for the belief being material contained in his file, and records furnished to him by PacTrans Air & Sea Inc.; and

The reason that he makes this Verification, which he is authorized to do, is that the Plaintiff is a foreign corporation, no officers of which can be found within the district.

_____
GREGORY C. BUFFALOW

13

Sworn to and subscribed before me
this 19th day of December, 2006.

NOTARY PUBLIC
[AFFIX SEAL]

My Commission expires: 7/26/08

U:\atty\GCB\Pactrans SANKO RALLY\Vessel arrest\Draft Complaint Sanko demurrage security.wpd

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| PACTRANS AIR & SEA INC.,<br>a Corporation, | § | |
| | § | |
| Plaintiff, | | |
| | § | |
| vs. | | |
| | § | CIVIL ACTION NO. 06 - 862 |
| MV SANKO RALLY, her engines, | § | In Admiralty |
| tackle, appurtenances, etc., *in rem*, | | |
| and Sanko Steamship Co., Ltd., *in* | § | |
| *personam*, | | |
| Defendants. | § | |

### ORDER GRANTING MOTION FOR
### APPOINTMENT OF SUBSTITUTE CUSTODIAN

Plaintiff having appeared and made the following recital:

1.    A complaint has been filed requesting that a warrant of arrest issue for the MV SANKO RALLY (hereinafter, the "Vessel").    The Clerk of this Court has been requested to issue the warrant, commanding the United States Marshal for this District to arrest and take into the custody the Vessel until further Order of this Court respecting the same.

2.    It is contemplated that the United States Marshal will be able to seize the Vessel. Custody of the Vessel will require the services of one or more keepers.

### Custodian for the Vessel

3.    The Vessel will be berthed in this District.  In the interest of allowing the Vessel to remain in the hands of a competent person and to save unnecessary expenses, plaintiff wishes to have Lott Ship Agency Inc., an experienced substitute custodian approved by the Marshal of this District, appointed as substitute custodian of said Vessel.

4.      Plaintiff, in consideration of the Marshal's consent to the substitution of custody of the Vessel, agrees to release the United States and the Marshal from any and all liability and responsibility arising out of the care and custody of the Vessel, her engines, tackle, apparel, furniture, equipment and all other necessaries thereunto pertaining and belonging, from the time the Marshal transfers custody of said Vessel over to the substitute custodian, and plaintiff further agrees to hold harmless and indemnify the United States and the Marshal from any and all claims whatsoever arising out of the substitute custodian's possession and safekeeping of the Vessel.

5.      **THEREFORE, IT IS HEREBY ORDERED** that the United States Marshal be authorized and directed to surrender the possession and custody of the Vessel to Lott Ship Agency Inc. as substitute custodian for such Vessel, and that upon such surrender, the Marshal shall be discharged from his duties and responsibilities for the safekeeping of the Vessel and held harmless by Plaintiff and the Substitute Custodian for any and all claims arising whatever out of said substituted possession and safekeeping of the Vessel.

6.      **IT IS FURTHER ORDERED** that all Marshal's costs and fees, including costs and fees of the substitute custodian, shall be paid as a matter of priority to all other claimants against the Vessel or attached or garnished property, prior to release of said Vessel or property.

7.      **IT IS FURTHER ORDERED** that the Substitute Custodian is further authorized to shift the said vessel from its present location to one or more lay berths within the Port of Mobile, and within the confines of the Port of Mobile, Alabama and within the jurisdiction of this Court, including one or more lay berths at Alabama State Port Authority

2

provided the U.S. Marshall may serve process at such lay berth on foot; and that the arrest of the said vessel shall not interfere with any ongoing repairs to the vessel, cargo operations, loading, discharging or taking on supplies, bumpers which may be allowed without further order of this Court.

**SO ORDERED** December 20th, 2006

UNITED STATES MAGISTRATE JUDGE

**Agreement of Substitute Custodian**

The undersigned has read the foregoing
Motion, and the Proposed Order appointing
Substitute Custodian herein, and agrees
to the terms thereof and to provide documentation
of insurance coverage.

Lott Ship Agency Inc.

BY: _____
As its: President
Dated: Dec. 18Th, 2006

3

# EXHIBIT I



BOWRON LATTA
& WASDEN, P.C.
ATTORNEYS AT LAW

Abe L. Philips, Jr.
Writer's Direct Dial:
(251) 345-8213
alp@bowronlatta.com

December 21, 2006

Pactrans Air & Sea, Inc.
c/o Gregory E. Buffalow, Esquire
Miller, Hamilton, Snider & Odom, L.L.C.
P.O. Box 46
Mobile, Alabama 36601

> Re:  Pactrans Air & Sea, Inc. vs. M/V SANKO RALLY, et al.
>      Civil Action No. 06-862
>      United States District Court, Southern District of Alabama

Gentlemen:

In consideration of you immediately releasing the M/V SANKO RALLY from arrest in this cause and not arresting or attaching any other vessel, property or funds of her Owner or of any company in the same ownership, management or control to assert *in rem* jurisdiction or to obtain security for any claim you may have arising from the matters and things made the basis of the Complaint you have filed in the referenced cause or for any other reason relating to the matters and things referred to in your Complaint in the referenced cause, including claims for cargo loss and demurrage, the undersigned, Assuranceforeningen Gard - gjensidig -, agrees, the said vessel lost or not lost, and whether in or out of the jurisdiction:

1.    Upon your demand, to cause to be filed an Appearance and Claim of Owner of the Vessel in the referenced cause which you have filed in the United States District Court for the Southern District of Alabama; and

2.    In the event a final decree (after all appeals, if any) be entered in your favor against the M/V SANKO RALLY, *in rem*, in said cause, or against the M/V SANKO RALLY, *in rem*, or in arbitration of the claims asserted against the M/V SANKO RALLY, *in rem*, in said cause, or if there be a settlement thereof with or without final decree, then the undersigned Insurer agrees to pay and satisfy the said final decree or amount decreed by said Court, or settled between the parties with the consent of the undersigned, without final decree being rendered, up to but not exceeding $2,275,000.00, inclusive of interests and costs; and,

3.    Upon your demand, to cause to be filed in said cause a bond in form and sufficiency of surety satisfactory to you or to the Court, in the above amount, or in such lesser amount as the Court may approve or require, securing your claim in said cause; and

Re: Pactrans Air & Sea vs. M/V SANKO RALLY, et al.
December 21, 2006
Page 2 of 2

4.    In the event the bond referred to in paragraph three (3) above is filed, the undersigned shall have no further obligation under paragraph two (2) above.

It is agreed that the amount of this Letter of Undertaking shall be promptly reduced if the amount of your claim, presently said by you to be $2,390,017.71 (US Dollars) is reduced voluntarily or by the Court, and it is further agreed that this Undertaking is without prejudice to the right to make an appropriate application to the Court to reduce the amount of the security provided herein.

Security has been given in Case No. 3:06-cv-00285 pending in the United States District Court, Northern District of Florida, Pensacola Division, which involves some of the same claims and damages as the referenced cause. The right of Sanko Steamship Co., Ltd., Owner and the undersigned to contest your right to bring the referenced cause against the M/V SANKO RALLY or to arrest the M/V SANKO RALLY or to demand or require this security, is not waived, but is specifically reserved.

This letter is given without prejudice to rights of Pactrans, or its counsel, to seek transfer of *in rem* security herein to the Northern District of Florida to consolidate with Case 3:06-cv-00285, which is preserved.

In the event the referenced cause is terminated or dismissed without judgment being rendered in your favor against the M/V SANKO RALLY *in rem*, after appeal, if any, or in the event that payment of your claim or of an agreed settlement of your claim is made to you, this Letter of Undertaking shall be void and of no further force or effect and will be returned immediately to the undersigned.

It is understood and agreed that the execution of this Letter of Undertaking by Bowron, Latta & Wasden, P.C. and/or Abe L. Philips, Jr. on behalf of Assuranceforeningen Gard shall not be construed as binding upon either the law firm or Abe L. Philips, Jr., personally, but is binding only upon Assuranceforeningen Gard.

Very truly yours,

ASSURANCEFORENINGEN GARD
-gjensidig-

BY:    BOWRON, LATTA & WASDEN, P.C.

BY:    _____
       Abe L. Philips, Jr.*

*As Attorney-in-Fact for the above listed purpose only as per written authority received from Assuranceforeningen Gard on December  21 , 2006.

# EXHIBIT J

# Fax



**INTERNATIONAL LAW FIRM**

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 03 April 2007 |
| To | Attention | Your Ref |
| Richards Butler | Chris Howse | CGH/jf/S110-046 |
| Total number of pages | Town/Country | Fax Number |
| 2 | Hong Kong | 00852 281 01607 |
| Copies to | Attention/Ref | Town/Country/Fax Number |

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to the above matter.

We write to notify your clients, China National Chartering Corp ("Sinochart"), that our clients hereby commence arbitration against them in respect of all and any disputes howsoever arising out of and/or in connection with the  charterparty evidenced by the fixture recap dated 25 April 2006 and/or the above incident.

Pursuant to Clause 30 of the recap all disputes are to be referred to arbitration in London with English law to apply.  Clause 35 of the recap states that the terms of the *Sanko Eternal* charterparty dated 13 December 2005 are to apply.  Clause 23 of the *Sanko Eternal* charterparty further provides as follows:

> *"Should any dispute arise between Owners and Charterers, the matter is dispute shall be referred to arbitration in London, English law to apply, in accordance with the Arbitration Act 1990 and any subsequent amendment.  The award of the arbitration shall be final and for the purpose of enforcing any award this agreement may be made a rule of the Court."*

As you know, in circumstances where the number of arbitrators is not fixed Section 15(3) of the Arbitration Act 1996 is applicable and requires that the tribunal is to consist of a sole arbitrator. Accordingly pursuant to Section 16(3) of the Arbitration Act 1996 we request that your clients agree to the appointment of the sole arbitrator within 28 days of the date of this fax.  In this regard we propose that the following are appointed as the sole arbitrator in the reference:

1.06.5751.00 6390195



03 April 2007

1.     Robert Gaisford

2.     Michael Baker-Harber

We look forward to receiving your response.

Regards

**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

# Fax



**INTERNATIONAL LAW FIRM**

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 02 May 2007 |
| To | Attention | Your Ref |
| Richards Butler | Chris Howse | CGH/jf/S110-046 |
| Total number of pages | Town/Country | Fax Number |
| 2 | Hong Kong | 00852 281 01607 |
| Copies to | Attention/Ref | Town/Country/Fax Number |

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to our fax of 03 April 2007, notifying you that our clients were commencing arbitration against your clients.

As we noted in that message, pursuant to Section 16(3) of the Arbitration Act 1996, where a tribunal is to consist of a sole arbitrator, the parties should attempt to agree on the identity of that sole arbitrator within 28 days. We have not had any response to our fax.

Now that the 28 day period specified under the Arbitration Act has expired it is open to our clients to apply to court for the appointment of the sole arbitrator. You will appreciate that this would be an expensive process, which will be unnecessary should your clients cooperate with us in appointing an arbitrator. Nevertheless, if we do not receive a response from your clients soon we shall have no option but to make an application to court, the costs of such an application would fall to your client's account.

We should be grateful if you would consider the two potential candidates we suggested to you in our previous fax:

1.    Robert Gaisford

2.    Michael Baker-Harber

1.06.5751.00 6424847

DUBAI  I  HAMBURG  I  HONG KONG  I  LE HAVRE  I  LONDON  I  PARIS  I  PIRAEUS  I  SHANGHAI  I  SINGAPORE



02 May 2007

We look forward to receiving your response.

Regards

**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

8272,8610

# RICHARDS BUTLER

齊 伯 禮 律 師 行

## FAX

No. of pages (including this page): 1

| | | |
|---|---|---|
| to: | Ince & Co | |
| att: | Michael Volikas / Christian Dwyer | |
| fax: | 4420-7481-4968 | |
| your ref: | MV/CD/8272/8610 | |
| | | |
| from: | Chris Howse | |
| our ref: | CGH/jf/S110-046 | |

20th Floor
Alexandra House
16-20 Chater Road
Hong Kong

| telephone | (852) 2810 8008 | |
| facsimile | (852) 2810 0664 | (Corporate) |
| | (852) 2810 8713 | (Finance) |
| | (852) 2810 1607 | (Litigation/Shipping) |
| | (852) 2810 9635 | (Property) |
| | (852) 2810 1648 | (Intellectual Property) |

direct line

direct e-mail

website        www.richardsbutler.com.hk

9 May 2007

---

## "SANKO RALLY" - Cargo shift en-route from Qingdao to Pensacola

We refer to your fax of 2nd May. We would be grateful if you would forward a further copy of your fax of 3rd April which we cannot trace having received. We will then take prompt instructions from our clients.

Regards,

Chris Howse
Richards Butler, Hong Kong

H:\Bjm\cgh-37528.doc

---

**PARTNERS:**

| | | | | | | |
|---|---|---|---|---|---|---|
| C G Howse | A K Brown | M R D Pepper | D G Harrington | K C Mok | L J Li | K R Bowers |
| D M Norman | G P Winter | Navette Kwong | S J Birt | Janet Cheung | C S K Tang | Doreen Kong |
| A D Morrison | Denise Jong | Asha Sharma | Alice Hutchens | Ivy Lai | A W M Kaung | Emma Casdagli |
| C J Williams | J N Green | Delpha Ho | A D Horton | W J G Barber | D Kan | R W K Choy |

BEIJING    •    LONDON    •    PARIS    •    BRUSSELS    •    ABU DHABI    •    MUSCAT    •    SÃO PAULO    •    PIRAEUS

Beijing office address: Room 703B Huapu International Plaza, 19 Chaowai Avenue, Chaoyang District, Beijing 100020, PRC
telephone (86) 10 6580 2690/1  facsimile (86) 10 6580 2701  e-mail rb@ht.rol.cn.net

In the event of TRANSMISSION DIFFICULTIES, please telephone (852) 2810 8008.

This fax is confidential and may be protected by legal privilege. If you are not the intended recipient, you should not copy or use it or disclose its contents, but should contact the sender immediately.

# Fax



## INCE & CO

### INTERNATIONAL LAW FIRM

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged.  If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received.  This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/ Christian Dwyer/ David Richards | MV/CD/DR/8272/8610/8735 | 09 May 2007 |

| To | Attention | Your Ref |
|---|---|---|
| Richards Butler | Chris Howse | CGH/jf/S110-046 |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| 4 | Hong Kong | 00852 281 01607 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|

| Matter |
|---|
| **SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola** |

We refer to your fax of 09 May 2007.

As requested we attach a copy of our fax to you of 03 April 2007.  We were surprised by your message, stating that you did not receive this fax.  Our transmission record shows that it was successfully sent to your offices.

We should be grateful if you would acknowledge safe receipt of the copy.

Regards

**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

1.06.5751.00 6434711

COPY

User ID: 8715
== ========  :===============================================================
TO: Name: Chris Howse
    Company: Richards Butler
    Fax Phone Number: 00852 281 01607
    Contact Phone Number:
    Info Code 1: Sanko Rally          Info Code 2: 8272/8610

Sent to remote ID:
Sent at:Tue Apr 03 11:20:29 2007
Sent on channel 6
Elapsed Time:  1 minute,  4 seconds
Transmission Status (0/339;0/0): Successful Send
Page Record: 1 - 2.
-----------------------------------------------------------------------------
Sent to remote ID:
Sent at:Tue Apr 03 11:14:59 2007
Sent on channel 4
Elapsed Time:  0 minutes, 28 seconds
Transmission Status (0/302;0/0): Busy signal detected
Page Record: NONE SENT.
-----------------------------------------------------------------------------

Sent 04/03/2007 11:20AM 01:04 on RightFAX line 6 for 8715 WORKSRV6 printed 87146123711052E on 04/03/2007  11:21AM * Pg 1/2

# Fax



**INCE & CO**

INTERNATIONAL
LAW FIRM

Ince & Co is a partnership of solicitors and registered foreign lawyers and is regulated by the Law Society. A list of partners is open to inspection at the office shown.

This message and any attachments are confidential to the intended recipient and may be privileged. If you are not the intended recipient we request that you contact us and not make any use of them pending arrangements for their return or destruction.

Please contact us immediately if any part of this transmission is incorrectly received. This document has been generated electronically and therefore may not include a signature.

International House
1 St Katharine's Way
London E1W 1AY
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Michael Volikas/Christian Dwyer | MV/CD/8272/8610 | 03 April 2007 |
| To | Attention | Your Ref |
| Richards Butler | Chris Howse | CGH/jf/S110-046 |
| Total number of pages | Town/Country | Fax Number |
| 2 | Hong Kong | 00852 281 01607 |
| Copies to | Attention/Ref | Town/Country/Fax Number |

Matter

**SANKO RALLY - Cargo Shift en-route from Qingdao to Pensacola**

We refer to the above matter.

We write to notify your clients, China National Chartering Corp ("Sinochart"), that our clients hereby commence arbitration against them in respect of all and any disputes howsoever arising out of and/or in connection with the  charterparty evidenced by the fixture recap dated 25 April 2006 and/or the above incident.

Pursuant to Clause 30 of the recap all disputes are to be referred to arbitration in London with English law to apply.  Clause 35 of the recap states that the terms of the *Sanko Eternal* charterparty dated 13 December 2005 are to apply.  Clause 23 of the *Sanko Eternal* charterparty further provides as follows:

> "*Should any dispute arise between Owners and Charterers, the matter is dispute shall be referred to arbitration in London, English law to apply, in accordance with the Arbitration Act 1990 and any subsequent amendment.  The award of the arbitration shall be final and for the purpose of enforcing any award this agreement may be made a rule of the Court.*"

As you know, in circumstances where the number of arbitrators is not fixed Section 15(3) of the Arbitration Act 1996 is applicable and requires that the tribunal is to consist of a sole arbitrator. Accordingly pursuant to Section 16(3) of the Arbitration Act 1996 we request that your clients agree to the appointment of the sole arbitrator within 28 days of the date of this fax. In this regard we propose that the following are appointed as the sole arbitrator in the reference:

1.08 5751 00 6392/195

Sent.04/03/2007 11:20AM 01:04 on RightFAX line 6 for 8715 WORKSRV6 printed 87146123711052E on 04/03/2007 11:21AM * Pg 2/2



03 April 2007

1.    Robert Gaisford

2.    Michael Baker-Harber

We look forward to receiving your response.

Regards

**Ince & Co**

*[This is a computer generated fax and is therefore unsigned]*

1 06 5751 00 6390195

2