UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SANKO STEAMSHIP CO., LTD.

                                              Plaintiff,        **ECF CASE**

     - against –                                  07 Civ. 2401 (VM)

CHINA NATIONAL CHARTERING CORP.,
also known as SINOCHART,

                                            Defendant.
-----------------------------------------------------------------X

## AFFIRMATION OF SIMON P. N. RAINEY

SIMON PIERS NICHOLAS RAINEY affirms the following under penalties of perjury under the laws of the United States under 28 USC § 1746:

1. I have been asked by counsel in New York acting for Sanko Steamship Company Limited for my opinion on questions of English law arising out of an application made by China National Chartering Corp (Sinochart) to vacate or reduce an attachment made by Sanko in proceedings before the U.S. District Court, Southern District of New York, to which I refer below.

<u>Curriculum Vitae, Experience and Expert's Declaration</u>

2. I am a barrister and Queen's Counsel practising from Quadrant Chambers at 10 Fleet Street, London EC4Y 1AU (previously 4 Essex Court and, before that, 2 Essex Court, Temple: chambers has moved addresses due to expansion). I have been joint Head of Chambers since 2006.

1

3. I practise in the field of international trade and shipping law in particular; I practise before arbitral panels and before all levels of the courts in England. I have been thus in practice as a barrister since 1983, having been called to the Bar of England and Wales in 1982 as a member of Lincoln's Inn. I was appointed Queen's Counsel in 2000.

4. Prior to my call to the Bar, I took a first class honours degree in Law at the University of Cambridge in 1980 (I was awarded an Exhibition at Corpus Christi College and passed in the first and third of my three years as first class and in my second year with an upper second). I subsequently attended the Université Libre de Bruxelles with a Weiner-Anspach scholarship to read for a postgraduate degree in European law where I was awarded a Licence en Droit Européen, with a "plus grande distinction", completing the two year course in one year and being placed first. Thereafter I read for my Bar Finals, which I took in 1982, coming second in the year and being awarded both the Denning and Scarman scholarships of Lincoln's Inn. While I was studying for my Bar Finals and in my early years of practice, namely from 1981 to 1985, I was a visiting tutor at Christ's, Selwyn and Jesus colleges, Cambridge where I taught undergraduates Roman Law.

5. As to my work outside practice at the Bar, I was the author, after a lengthy research project for the United Nations Committee on Trade and Development, of "The Maritime Laws of West Africa" (1985); I was a contributor, writing the chapter on shipbuilding contracts, to the second and third editions of "The Law of Ship Sale and Purchase", published by Lloyd's of London Press; I am the author of "The Law of Tug and Tow and allied contracts", also published by Lloyd's of London Press, now called Informa plc, now in its second edition (2002) and the leading English law work on these forms of maritime contract.

6. I am a member of the London Maritime Arbitrators Association (LMAA) and have undertaken appointments as arbitrator under the Association's rules and also

in arbitrations conducted by or under the rules of the International Chamber of Commerce (ICC) and the London Court of International Arbitration (LCIA).

7. In 2000 I was appointed a Recorder of the Crown Court, sitting as a judge in criminal cases; in 2004 I was appointed as a Recorder of the County Court, sitting as a judge in civil cases of all disciplines in the County Court.

8. I have previously given expert evidence of English law in other jurisdictions (including jurisdictions within the United States) by written opinion and, in one case, orally.

9. Expert's Declaration: (1) I confirm my understanding that my first duty is to assist the Court on those matters within my expertise as an English lawyer and that this duty overrides any obligation to those from whom I have received my instructions and by whom I am being paid. I have prepared this report solely on that basis. (2) The views and evidence contained in this Opinion are the independent product of my own researches and the independent consideration of materials provided to me as I have specified. Any opinions given are my own and have been reached objectively and without bias. The contents of this Opinion have not been influenced by the fact that I have been instructed on behalf of the Sanko or otherwise by the exigencies of the litigation in which it is being given in evidence.

<u>Documents Seen and Considered for the purposes of this Affirmation</u>

10. I have been provided with copies of the following documents: (i) a time charterparty on the New York Produce Exchange form (1981 revision) dated 25th April 2006 at Beijing ("the charterparty") concluded between Sanko Steamship Co Ltd, Tokyo, as owners of the vessel "SANKO RALLY" and China National Chartering Corp, Beijing (Sinochart Beijing): I shall refer to the parties to the charterparty as "the owners" and "the charterers" respectively; (ii) a Verified Complaint filed in the present case on behalf of the owners ("the complaint"); (iii) a Memorandum of Law in support of a Motion to Vacate or Reduce Maritime

Attachment filed on behalf of the charterers ("the memorandum to vacate"); (iv) a Declaration of Chris Howse in support of Defendant's motion to vacate Maritime Attachment ("Howse").

Summary of Relevant Background Facts

11. The relevant background facts appear from the complaint and are recited concisely in Howse, paragraph 6.

12. The vessel while on passage from Qingdao to Pensacola experienced a collapse of cargoes of plasterboard. The owners allege that this was due to the improper stowage of the cargoes in the hold by the charterers or by those for whom the charterers are responsible. The collapse of the stow is alleged to have caused loss and damage to those claiming to be interested in the cargoes and as a result cargo claims have been brought against the vessel by Devon International Trading Inc ("Devon") and by Pactrans Air and Sea Inc. ("Pactrans"). I shall refer to the claims made by Devon and Pactrans as "the cargo claims".

The Legal Issues to which English Law relates and the Subject of this Affirmation

13. I note from the complaint that the owners' cause of action against the charterers is one founded on an alleged breach by the charterers of clause 78(c) of the charterparty: see paragraph 10. Clause 78(c) provides: *"It is agreed that Charterers shall handle cargo claims in the first instance and provide security to cargo interests in respect of cargo claims within a reasonable time of receipt of a request to do so."*

14. It is further alleged by the owners that *"Defendant SINOCHART has wrongfully, and in breach of the Charter Party, refused to handle the cargo claims or provide security for such claims"*: paragraph 12.

15. I assume for the purposes of this Opinion that the factual allegation made in paragraph 12 of the complaint is correct and that the charterers have refused or

4

declined to handle the cargo claims or to provide security in respect of such claims when requested to do so by the owners and that as a result and in order to obtain the vessel's release from arrest by Devon and Pactrans, the owners put up security in the amounts of US$ 1,650,281.56 and US$ 2,275,000.

16. I note from the charterers' memorandum to vacate that the principal ground upon which the charterers' motion to vacate is based is the contention that the owners' cause of action against the charterers (by which I take it to be meant: the cause of action on which the owners' claim as contained in the complaint is founded and to which I have referred above) has not accrued at English law and, for this reason, the owners' claim against the charterers is not therefore a valid claim for Rule B attachment purposes under the relevant principles of U.S. law.

17. Clause 17 of the charterparty provides in so far as relevant: *"Should any dispute arise between Owners and Charterers, the matter in dispute shall be referred to arbitration in London, English law to apply, in accordance with the Arbitration Act 1990 [sic] and any subsequent amendment. [....]"*. (The reference to the Arbitration Act 1990 is incorrect and is, presumably, a typographical error of the Arbitration Act 1996.)

18. Accordingly, the question as to whether or not the owners' cause of action against the charterers has accrued or become "ripe" is a question of English law.

19. I do not agree with the charterers' contention and do not consider that it correctly represents English law as it would be applied by English Court (or a London arbitration tribunal) to an alleged breach of clause 78(c) of the charterparty where the owners have established the factual matters set out in paragraph 12 of the complaint.

## The Distinction between the Scope and Purpose of Clauses 78(c) and 40

*The Distinction between Cargo Claims and Liability for Cargo Claims*

20. It is necessary at the outset to distinguish between two discrete and different situations and how they are dealt with under the charterparty.

21. The first is where a cargo claimant makes a claim against either the owners or the charterers for cargo damage and, in respect of that claim, seeks security. The cargo claim will require to be answered and defended and it will be necessary to provide security, certainly in the ordinary case where the carrying vessel is arrested by the cargo claimant (as in the present case). In this situation there is a responsibility to handle and defend the claim and to provide security in respect of it. The issue arises: which of the owners or charterers is to bear this responsibility for handling the claim when made?

22. The second situation is where the cargo claimant has proceeded with its cargo claim to judgment or award against either the owners or the charterers or where the cargo claim has been the subject of a settlement or compromise by either owners or charterers. In this situation, a liability of either the owners or the charterers to pay money to the cargo claimant in respect of the cargo claim has been established, either by judgment or by settlement. The issue which arises in this situation is which of the owners or charterers is to bear the liability as adjudged or determined by settlement and how that liability is to be allocated between the parties.

23. As a matter of ordinary construction, Clause 78(c) deals with the first situation and the handling and management of cargo claims and the provision of security for such claims. Clause 40 and the Interclub Agreement deal with the second situation and how liabilities for cargo claims are to be apportioned or borne between the parties.

*English Law Principles of Construction*

24. It is helpful at this point briefly to set out what principles of contractual construction are applied in English law. The modern starting point in English law in relation to the relevant principles of construction is to be found in the speech of Lord Hoffmann in <u>Investors Compensation Scheme v West Bromwich Building Society</u> [1998] 1 WLR 896, as further qualified by him in <u>BCCI v Ali</u> [2001] AC 251 in relation to a narrower reading of relevant factual matrix evidence. The cardinal principle is that the contract words are to be given their ordinary meaning but in the context in which the contract words are used. The objective of the exercise is an objective ascertainment of what a reasonable person would understand the parties to be providing.

25. A useful and succinct recent restatement of the relevant objective in construing a contract term was given by the House of Lords in <u>Sirius International Insurance v FAI General Insurance</u> [2004] 1 WLR 3251 per Lord Steyn at paragraph 20 who stated that the question of the construction of a contract is one of the ascertainment of the objective intention of the parties, by an independent observer focussing on the words which they have used in any relevant context. As Lord Steyn put it in <u>Sirius v FAI</u> at paragraph 18: *"The aim of the inquiry is not to probe the real intentions of the parties but to ascertain the contextual meaning of the relevant contractual language. The inquiry is objective: the question is what a reasonable person, circumstanced as the actual parties were, would have understood the parties to have meant by the use of specific language. The answer to that question is to be gathered from the text under consideration and its relevant contextual scene."*

*Clause 78(c)*

26. In terms of its contractual context, clause 78(c) forms part of a wider provision headed *"Bill of Lading Clause"* which provides for the issuance by the owners of bills of lading and the granting of permission to the charterers to issue bills on behalf of the master without prejudice to the charterparty and with the charterers

7

responsible for the consequences of issuing bills in certain circumstances. In this context, clause 78(c) can plainly be seen to be intended to allocate to the charterers, as part of whose commercial operations the bills of lading are being issued, the responsibility for handling cargo claims as and when they are made and for dealing with any security aspects which may arise in respect of such cargo claims.

27. Clause 78(c) construed in accordance with ordinary principles of English law in this context and in the well-known context of cargo claims under bills of lading on chartered vessels provides for two separate obligations upon the charterers.

28. Accordingly, clause 78(c) provides first that *"It is agreed that Charterers shall handle cargo claims in the first instance"*: this is a free-standing obligation which requires charterers to "handle" cargo claims as and when they are made, including when made against the owners. Given that by clause 78(a) the bills of lading are to be issued by or on behalf of the owners and will therefore be 'owners' bills', in the sense that the carrier under the bill of lading for contractual purposes will be the owner rather than the charterer by agreement between the parties and is thus much more likely to be the party against whom a cargo claim under the bills of lading is made, clause 78(c) makes it clear that the charterers are to handle all cargo claims as and when made (*"in the first instance"*). The *"handling"* of the cargo claims is provided for in wide terms: *"to handle"* would be given its ordinary English meaning by an English Court or arbitral tribunal. The Oxford English Dictionary (Compact Edition, page 1250-1251) gives as the meaning of *"to handle"*, inter alia, *"to manage, conduct, direct, control"* and *"to deal with"*. The clause will therefore impose responsibility on the charterers for all aspects of handling any cargo claim made, in particular, the defence of such claim and the instruction of lawyers to handle and defend the cargo claim.

29. Further, clause 78(c) provides secondly that *"It is agreed that Charterers shall .... provide security to cargo interest in respect of cargo claims within a reasonable*

*time of receipt of a request to do so.*" This is also a free-standing obligation which requires the charterers to put up security in respect of all cargo claims which may be made by cargo interests, including, necessarily, given the context of 'owners' bills' as provided for by clause 78(a) and the presence of clause 78(c) in and as part of the regime of bills of lading and cargo claims dealt with by clause 78 as the "*Bill of Lading Clause*", security in respect of cargo claims made by cargo interests against the owners. The reference to the obligation on the charterers to provide security "*within a reasonable time of receipt of a request to do so*" is a reference, in my view, to the obvious situation where the owners are faced with a cargo claim against them coupled with a demand for security by cargo interests and where the owners request the charterers to provide security: upon request by the owners and within a reasonable time thereof, the charterers must provide directly to the cargo interests (see the words "*Charterers shall ... provide security to cargo interests*") the security demanded by them "*in respect of cargo claims*".

### *Clause 40*

30. Clause 40 of the charterparty deals with the second situation: that which arises where a liability to cargo interests in respect of a cargo claim has been established by judgment or by settlement or compromise.

31. The clause is a standard type of clause applying the Inter-Club Agreement to the apportionment of liability for cargo claims as between owners and charterers as follows: "*NYPE Interclub Agreement. Liability for cargo claims shall be borne by the Owners and the Charterers in accordance with the NYPE Interclub Agreement as amended September 1996 including subsequent amendments.*"

32. It is plain, in my view, as a matter of ordinary construction that the clause is dealing only with the apportionment of liability for cargo claims where such liability has been established.

*The Interclub Agreement*

33. This is made further plain by the text of the Interclub Agreement, a copy of which is exhibited to Howse (Exhibit 2). Paragraph (4) of the Interclub Agreement provides "*Apportionment under this Agreement shall only be applied to cargo claims where .... (a) The claim was made under a contract of carriage, whatever its form, and (b) [....] (c) The claim has been properly settled or compromised and paid.*" The basis of apportionment depends on the true identification of the cause of the loss and damage claimed for by the cargo interests as set out in the Interclub Agreement.

34. Applying ordinary principles of construction, it can be seen that neither clause 40 nor the Interclub Agreement which it incorporates or to which it gives contractual effect touch upon either (a) who is to handle a cargo claim when it is first made or (b) who is to provide security for such a cargo claim pending its determination or its settlement or compromise.

35. Clause 40 deals only with "*liability for cargo claims*". The Interclub Agreement deals only with the apportionment of claims which have been settled and paid.

36. Neither deal with nor make any provision for the antecedent stages in the life of a cargo claim and prior to settlement and payment of the claim and the determination of liability in respect of it, such as the stages of handling and defence of the cargo claim after it has been brought and of the putting up of security for such claim when this is sought by the cargo interests making the claim. The definition of "cargo claim" dealt with by the apportionment mechanism under the Interclub Agreement and which is given by the Interclub Agreement in paragraph (3) includes defined "costs ... incurred in the defence or or in the settlement of the claim". This underlines that such costs are to be brought into account by the paying party and apportioned in the same way as the settlement payment. Nothing is said as to who is to defend or who is to bear such

costs. The Interclub Agreement is silent on such matters which are outside its purview and purpose.

## Do the Owners have an Accrued Cause of Action for Breach of Clause 78(c)?

37. As I understand the claim brought by the owners it is for breach of clause 78(c) in two separate respects: first, the owners have called on the charterers to handle the Devon and Pactrans cargo claims but the charterers have refused or failed to do so and the owners have had to instruct lawyers and defend the claims; secondly, the owners have called on the charterers to provide security to Devon and Pactrans in respect of the cargo claims as demanded by Devon and Pactrans and the charterers have refused or failed to do so, thereby necessitating the owners putting up security to obtain the release of the vessel from arrest.

38. If these two factual allegations are good, then the owners have an accrued cause of action for breach of contract, namely for breach of clause 78(c).

## The Irrelevance of Clause 40 and the Interclub Agreement

39. I do not consider that clause 40 or the provisions of the Interclub Agreement have any bearing upon or relevance to this conclusion.

*The Owners' Cause of Action is not one under the Interclub Agreement*

40. This is because the owners are not claiming an indemnity pursuant to the apportionment provisions of the Interclub Agreement in respect of what they have had to pay to Devon and Pactrans, having settled their claims. No such settlement has taken place and no payments have been made to Devon and Pactrans. The owners are claiming for a breach by the charterers of their antecedent obligations under clause 78(c) as to cargo claim handling and security provision. Neither Clause 40 nor the Interclub Agreement have anything to do with these separate antecedent obligations expressly laid down by clause 78(c).

41. I would agree with the opinion set out in Howse that, *if* the owners were seeking to claim under the Interclub Agreement, then any such claim would be premature because the liability of the parties under the Interclub Agreement only arises and can only arise once the cargo claim has been settled and paid: see paragraph 4(c) of the Interclub Agreement; the owners would have no cause of action against the charterers under the Interclub Agreement; such a cause of action would only accrue or "ripen" upon settlement and payment of the cargo claim.

42. A claim by the owners for a contractual or other indemnity by charterers in respect of a liability incurred and discharged by the owners can only arise as a matter of analysis once the liability has been incurred and discharged: see the general statement of principle in *The "CAROLINE P"* [1984] 2 Ll. Rep. 466. The express terms of the Interclub Agreement make this clear. While there is no English authority in point (perhaps because the point is so obvious from the wording of the Agreement), as Howse points out, the issue has been determined by decisions of courts in South Africa, to which an English Court or tribunal would have regard in forming its view (although they would not be in any sense binding). In addition to the decision cited in Howse at paragraph 15 (*Wajilam*) on the 1996 Interclub Agreement, there is the earlier South African decision on the 1984 revision in *Primegates Maritime v Bunkers on board "CARGO EXPLORER"* (1995) CLD 617(D) which was followed in *Wajilam*.

43. However, this conclusion reached in Howse and with which I agree and the authorities in support of it, are, for the reasons which I have given, wholly irrelevant to the cause of action on which the owners in fact rely as set out in the complaint. That cause of action is founded on breach of clause 78(c) and a claim for damages for such breach and is not a cause of action or claim for an indemnity under the Interclub Agreement. If the charterers have refused or failed to handle the cargo claims and have similarly refused or failed to put up security in respect of those cargo claims when asked to do so by the owners, then the owners in

English law have two accrued causes of action for two separate breaches of clause 78(c).

*Clause 78(c) is unaffected by the "Exclusive Code" in the Interclub Agreement*

44. For completeness I should comment upon a submission made in the memorandum to vacate at page 14 which asserts an apparent conclusion of English law which is not addressed in, still less substantiated by, Howse.

45. Howse refers to clause 78(c) in paragraph 11 and concludes (only) that clause 78(c) does not affect when the cause of action for an indemnity arises under the Interclub Agreement. With that limited conclusion I agree. The reason is that clause 78(c) has nothing to do with the apportionment of liability under the Interclub Agreement and does not touch upon the scheme and basis of apportionment for which the Agreement provides. As considered above, clause 78(c) is dealing with matters falling wholly outside the Interclub Agreement: those of responsibilities for claim handling and security provision when a cargo claim is first made.

46. However, at page 14 of the memorandum to vacate, it is asserted that *"the decisions and dicta of the English cases demonstrate that English Courts have determined that the terms of the Inter-Club Agreement are exclusive and paramount to any other remedy with respect to third party cargo claims. See Howse Decl. §15. Thus, even if Sanko argues that this suit is brought on the basis of an alternative cause of action, an English Court would find that the Inter-Club Agreement is the sole remedy with respect to its indemnity claims based on third party cargo claims."*

47. If, by this statement, it is being submitted that the incorporation or giving effect to of the Interclub Agreement by Clause 40 has the result that all aspects of cargo claims are exclusively dealt with under the Interclub Agreement so that a provision like clause 78(c) which makes provision for who is to handle claims and

13

put up security for claims is in some way struck down in English law because of some paramountcy of the Interclub Agreement, then I do not agree with it. That submission as a matter of English law is wrong and confuses a number of separate questions.

48. It is certainly the case that parties who have agreed to apportion liability for settled and paid cargo claims under the Interclub Agreement will be held in English law to have agreed to an exclusive code for the apportionment of such liability in accordance with the rules and terms of the Interclub Agreement.

49. Thus the Interclub Agreement by paragraph (2) provides that *"The terms of this Agreement shall apply notwithstanding anything to the contrary in any other provision of the charterparty; [....]"*. Given that clause 78(c) does not in any way contradict or provide for anything inconsistent with the terms of the Interclub Agreement, paragraph (2) does not operate to strike down clause 78(c). Paragraph (2) is expressly dealing only with charter terms which are inconsistent with the Interclub Agreement. Since clause 78(c), in dealing with who is to defend and who is to put up security when a cargo claim is made, is dealing with two aspects of cargo claims which arise <u>before</u> and <u>independently of</u> the event which the Interclub Agreement is alone dealing with, namely settlement and payment of the cargo claim, there is no inconsistency between clause 78(c) and the Interclub Agreement.

50. On the contrary, clause 78(c) is dealing with matters which are outside the scope and purpose of the Interclub Agreement. This can be seen by testing what would occur if the charterers honoured their undertaking in clause 78(c) and handled the claim and put up security. Their doing so would not affect in any way the operation of the Interclub Agreement and the apportionment of liability. The charterers settle the claim which they are handling: if the cause of loss or damage is one for which owners are 100% responsible under the Agreement, the paid sum, together with all costs of handling the claim and its defence are passed on to

owners; if it is 100% charterers' responsibility, they bear the loss: but they bear it in just the same way as if owners had had to handle the claim and had settled it. Clause 78(c) is entirely neutral on eventual apportionment and is simply allocating the handling responsibilities *"in the first instance"*.

51. While a number of English decisions contain *dicta* stressing the exclusive code nature of the Interclub Agreement, it is important to have in mind that these statements are made on the premise that the Agreement acts as a complete code only <u>for claims falling within the scope</u> of the Interclub Agreement.

52. In <u>*The "STRATHNEWTON"*</u> [1983] 1 Ll. Rep. 219, Kerr J recognised that the effect of incorporating the Agreement *"may relieve either of the parties from liability in whole or in part from what would - or might – be their liability under the terms of the charterparty or the Hague Rules"* (at 225), in other words acting paramount to other clauses which might result in a different apportionment of liability from that set out in the Interclub Agreement.

53. In <u>*The "BENLAWERS"*</u> [1989] 2 Ll. Rep. 51 this was made clear by Hobhouse J. who stated at 57: *"Insofar as any cargo claim might fall outside the scope of the Interclub Agreement the question of indemnity would have to be dealt with under the ordinary law and the other provisions of the charterparty if applicable"* there recognising that the relevant question was whether the charterparty provision was one which dealt with the subject matter covered by the Interclub Agreement; if it did, then the Agreement would override it, if it did not then the provision regulated the parties' respective rights and duties.

54. In the South African decision of <u>*Wajilam Exports v Transpacific Eternity SA (The "GALLANT II")*</u> (2003), appended as exhibit 3 to Howse, the shipowner had received the cargo claim which had been enforced by an arrest of the ship in Italy, even though the bill of lading made the time charterer liable in personam. The shipowner sought to arrest the time charterer's assets, asserting a breach of a

clause under which the charterer was not suffer an encumbrance to be incurred by the vessel. In a short and somewhat compressed judgment, the court held that the owner's claim was essentially in respect of a cargo claim or *"embedded in a claim for damage to cargo"* (at 10) and the Interclub Agreement was meant to apply to such liability. The *ratio* of this decision appears to be that the owner's claim was effectively one seeking to make the charterer liable for the cargo damage on a basis and in a way different from that provided for in the Interclub Agreement scheme of apportionment and therefore fell foul of the paramountcy of the Interclub Agreement as the sole basis on which liabilities for cargo claims were to be borne. While the reasoning is not of the clearest, the decision offers an example of the sort of conflict which would need to exist before a separate head of claim could be regarded as overridden because it fell within the scope of the Interclub Agreement apportionment.

55. In my view, none of these decisions support the argument advanced in the memorandum to vacate.

Accrued Causes of Action

56. Accordingly, I conclude that in English law the owners have accrued causes of action for breaches of clause 78(c) if the charterers have refused or failed to handle the cargo claims and to put up security in respect of them.

Declaration

57. The foregoing is true and correct to the best of my knowledge and belief under the penalties of perjury under the law of the United States under 28 USC § 1746.

*[signature]*
SIMON RAINEY Q.C.

Executed on 22nd May 2007