UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------  X
                                                  :
SANKO STEAMSHIP CO. LTD.,                         :
                                                  :
                     Plaintiff,                   :
                                                  :              07 Civ. 2401 (VM)
        against                                   :                 ECF CASE
                                                  :
                                                  :
CHINA NATIONAL CHARTERING                         :
CORP. also known as SINOCHART,                    :
                                                  :
                     Defendant.                   :
------------------------------------------------  X
```

DECLARATION OF TIMOTHY NICHOLAS YOUNG
IN ACCORDANCE WITH
28 UNITED STATES CODE SECTION 1746

I, TIMOTHY NICHOLAS YOUNG, of 20 Essex Street, London WC2R 3AL hereby declare as follows.

1.      I have been asked by counsel in New York acting for the defendant for my opinion on a point of English law, to which I refer below, and I am told that certain information is required as a matter of the procedural rules of the Federal Courts of the United States governing expert reports. I will therefore begin by setting out that information as briefly as I can. I am a Queen's Counsel practising from my chambers at the above address (previously 3 Essex Court, Temple) in the field of international trade and shipping law in particular, before arbitral and all levels of the courts in England. I have been thus in practice as a barrister since 1978, having been called to the Bar of England and Wales in 1977; I was appointed Queen's Counsel in 1996 and I was elected a Master of the Bench of the Honourable Society of Gray's Inn in January 2004. Prior to my call to the Bar, I took a first class honours degree in Jurisprudence at the University of Oxford (Magdalen College, where I was an exhibitioner) in 1975 and, in the

1

following year, I took a first class honours degree in the Bachelor of Civil Law (still at Magdalen College, where I was an honorary Senior Mackinnon Scholar); thereafter, I read for my Bar Finals, which I took in 1977, coming eighth in the year and receiving the Birkenhead Scholarship of Gray's Inn.    While I was studying for my Bar finals and in my early years of practice, namely from 1976 to 1980, I was a visiting lecturer-in-law in St. Edmund Hall, Oxford, where I taught both undergraduates and graduates.

2.    As to my work outside practice at the Bar, my principal academic writing is as one of a team of authors of "Voyage Charters" published by Informa (now in its 3rd Edition, 2007), which work endeavours to set out the law on the subject of the title under English and United States law.    I am a member of the London Maritime Arbitrators Association and also of the panel of arbitrators of the Financial Services Authority (recently replaced by the Financial Ombudsman Service); I publish on average about 10 awards per annum on a variety of topics.

3.    I act as an advocate before English tribunals (judicial and arbitral) rather than as an expert witness, but I would reckon that I produce on average two or three opinions per annum on matters of English law which opinions are placed before overseas tribunals where English law is relevant; my oral testimony has never yet been called upon.

4.    I understand that my prime duty is to assist the court on such matters as are within my expertise and that this duty overrides my duty to those by whom I am to be paid.    Accordingly this Declaration is my own true and unbiased opinion based on my knowledge of English law and my own researched and independent consideration of the materials provided to me.

5.    I have been provided with and read copies of the Memorandum of Law in Opposition to Defendant's Motion to Vacate or Reduce Maritime Attachment dated May 23, 2007, together with attachments, including the Affirmation of Michael Volikas in Opposition to Motion to Vacate Maritime Attachment dated

22nd May 2007 and Exhibits A to J as well as the Affirmation of Simon P. N. Rainey also dated 22nd May 2007 in response to the Declaration of Chris Howse dated April 2nd, 2007, with Exhibits 1 to 3, which I have also seen and read.

6.     Since many of the factual assumptions seem to be relatively uncontentious, at least for present purposes as I understand it, I will not spend much time rehearsing them, but there are some which do require to be set out since they have not featured in the Affirmation of Mr. Rainey QC and I consider that they may have some considerable importance.   I ought therefore to set them out so as to inform the court of my understanding of those facts and therefore of the basis on which I make this declaration.

7.     Plaintiff "Sanko" has made a Rule B attachment of US$3,750,082.05 of funds in accounts belonging to defendant "Sinochart" in respect of claims arising out of the time-charterparty of M/V SANKO RALLY ("the vessel") concluded between them and dated 25th April 2006, which charterparty incorporates by clause 40 the New York Produce Exchange Inter-Club Agreement on the apportionment of cargo claims.   That clause 40 provides:

> "Liability for cargo claims shall be borne by the Owners and the Charterers in accordance with the NYPE Interclub Agreement as amended September 1996 including subsequent amendments."

The Charterparty does not define "cargo claims", but clause (3) of the Interclub Agreement does:

> "…Cargo Claim(s) mean claims for loss, damage, shortage …overcarriage of or delay to cargo including custom dues or fines in respect of such loss, damage, shortage or overcarriage or delay and include
>
> (a) any legal costs claimed by the original person making any such claim;
>
> (b) any interest claimed  by the original person making any such claim;
>
> (c) all legal, Club correspondents' and experts' costs reasonably incurred in the defence of or in the settlement of the claim made by the original person, but shall not include any costs of whatsoever nature incurred in making a claim under this Agreement or in seeking an indemnity under the charterparty."

3

Consistently with this, the Charterparty also provides, by clause 39, that the Owners guarantee that the vessel would be fully covered by a P.& I. Club and the clause continues:

> "The Charterers have the benefit of the Owners [] granted by the P.& I. Club as far as the Rules permit."

There is a word missing where I have inserted square brackets, but it would appear that the Owners granted the Charterers the benefit of their own P & I cover as far as the Rules of the Owners' Club (Gard) permitted.

7. The Charterparty also contains, at clause 78, a "Bill of Lading Clause" which is split into three sub-clauses. The first, sub-clause (a) concerns the duty of the master to sign bills of lading or waybills as presented and the right of the charterers also to do so, with prior written authority and it makes it plain that only Owners' Bills would be issued; by that term I mean bills lf lading under which the shipowners, and not the charterers, were the contracting "carrier". The second, sub-clause (b), provides that any inconsistency between the bills as presented and the charterparty shall give rise to a right of indemnity as against the charterers. The third, sub-clause (c) provides:

> "It is agreed that Charterers shall handle cargo claims in the first instance and provide security to cargo interests in respect of cargo claims within a reasonable time of receipt of a request to do so."

8. It is that sub-clause which lies at the heart of the present case since the vessel carried a cargo of gypsum board under the time charter and under Owners' bills duly issued consistently with the charterparty. There was cargo damage; the cause does not matter for the moment, but the cargo claimants seem to allege bad stowage and bad handling on the voyage.    There were and are two cargo claimants; I will refer to them as "Devon" and "Pactrans" respectively, although Pactrans seem to assert that they were agents of Devon. Each of them caused the vessel to be arrested, Devon did so in Florida and Pactrans in Alabama. The Owners asked the Charterers to provide security to cargo interests, but the Charterers declined to do so and therefore the Owners' P.& I. Club

correspondents provided Club Letters of Undertaking ("LOU"). The LOU granted to Devon was for a maximum sum of US$1,650,281.56, to include principal, interest and costs; the LOU granted to Pactrans was for a maximum sum of US$2,275,000.00 to include principal, interest and costs. I have not seen the relevant Club Rules of the Owners' Club, ("Gard") nor have I seen any correspondence between the Owners and Gard concerning the question whether Gard required counter-security for these LOUs. Bearing in mind how big Sanko are and how important their fleet entry would be to Gard, I think it not unlikely that no such counter-security was sought. However on any view there is no evidence of such being sought.

9.     The Devon claim and demand for security was entirely conventional as a cargo claim, but the Pactrans claim was a little less conventional. Their claim was split into two halves, US$1,500,000 for alleged cargo loss/damage (as to which I am unclear whether this is the same as or in addition to Devon's claim, but for the moment this does not matter) and US$890,017.71 in respect of "demurrage". The "demurrage" claim was made (as I understand it) on the basis that Pactrans, who had voyage chartered the vessel from Sinochart, thought that Sinochart might recover demurrage from them for the period of delay caused by cargo handling difficulties and so wanted security for that possible demurrage liability (US$543,814.14) plus associated port charges at Pensacola, Florida, and "freight/charterhire" in the amount of US$79,580.09 and estimated interest and attorneys' fees. All of these claims were put under the rubric of "demurrage", however inaccurately.

10.    The Rule B attachment by the Owners, Sanko, was in respect of the sum of US$3,750,082.05 described above which is of course slightly less than the value of the two LOUs, but in addition as I read the Affirmation of Mr. Volikas, it is also said that various heads of costs in London are also to be treated as added to the accrued claims. They fall into three classes of accrued and yet-to-be incurred

5

claims, namely the costs of defending the cargo claims, the costs of Gard and the costs of the London arbitration proceedings contemplated under the charterparty.

11.   Against this factual background, I turn to the Declaration of Mr. Howse and the Affirmation of Mr. Rainey QC. As I read them, they do not actually disagree; they merely address different points. Mr. Howse addresses the effect of the Interclub Agreement, as incorporated into the Charterparty, and says that the cause of action for recovery under that Agreement has not yet accrued, or become "ripe". As to that he is correct and Mr. Rainey QC agrees; at paragraph 42 of his Affirmation he says that the claim for an indemnity such as under the Interclub Agreement "...can only arise as a matter of analysis once the liability has been incurred and discharged...". The important words are "...and discharged..." by which is meant payment of the claim. That is entirely consistent with the substance of the Interclub Agreement which provides that the right of apportioned indemnity in respect of Cargo Claims arises when the claim "...has been properly settled or compromised and paid...." (Paragraph (4)(c)). The important words in this context are of course "...and paid...". This is wholly consistent with Mr. Rainey's description of the general English law of indemnities for liabilities arising when "...discharged...".

12.   The difference between Messrs. Howse and Rainey QC (if it is really a difference) is that Mr. Rainey QC approaches the matter from a different perspective, namely that specifically of clause 78(c) of the Charterparty. He says that the failure to handle cargo claims in the first instance and the failure to provide security for cargo claims when requested was a breach of charter by the Charterers and that that cause of action has accrued and is "ripe" already. As to that, he is plainly right in my opinion. Clause 78 as a whole persistently uses the word "shall" to indicate an obligation and sub-clause (c) therefore plainly imposes an obligation on Charterers which, on the facts as I assume them to be, the Charterers have breached. I agree with Mr. Rainey's analysis and exposition but with three qualifications.

6

13.    Those qualifications are (i) he does not analyse the precise relationship presumed by clause 78(c) and clause 39; (ii) more importantly, he does not analyse the issues of quantum as they relate to the relevant "ripe" breach; he does not ask "*For what are the Charterers liable as a result of their breach of charter?*" and (iii) part of the sums secured is not a "cargo claim" and does not fall within clause 78(c) at all.

14.    As to qualification (i) it is important to see clause 78(c) in the context of the clause and indeed of the charterparty as a whole.    I am sure Mr Rainey QC would agree with that proposition.    The point is that it is plain that "Owners' bills" (as I have defined this term) were contemplated as being issued. Thus the Charterers would be expected to incur no primary liability as carriers to cargo claimants. The liability, if established, would be that of the shipowners alone.    On this basis, the principals on whose behalf the cargo claims would be "handled" would have to be the shipowners.    It would not be possible for the charterers to "handle" the claims without the authority of the shipowners; to do otherwise would expose them to a liability for breach of warranty of authority and that would not be within the Interclub Agreement.    Thus it is plain that the Charterers must be "handling" the claims as Owners' agents. This is inevitable on the arrangement of clause 78.

15.    The arrangement is therefore that the Charterers agreed to act "in the first instance" and subject to apportionment, *as the shipowners' agents* in handling claims made against the shipowners.    In the capacity of agents, they would be entitled as a matter of general law to the right to be indemnified for costs incurred unless the contract specifies otherwise: see Article 62 of *Bowstead & Reynolds on Agency 18th Ed.(2006)*, the leading authority on the law of Agency.    Thus the question is whether the contract does specify otherwise.

16.    The Charterparty does not, however do so.    Indeed, looking at the charterparty as a whole, it is clear that what I might call *function allocation* obligations are distinct from *payment* obligations; i.e. who has to perform a given duty and who

7

has to pay for it. This is a distinction particularly familiar to Mr. Rainey QC since he and I had a case which went to the House of Lords on (inter alia) this issue: The Jordan II [2005] 1 Lloyd's Rep. 57. Thus clauses 1 and 2 stipulate what the owners or charterers are to "provide and pay for", clause 8 states that "Charterers are to perform all cargo handling at their expense", clause 41 provides "Charterers will have their agents attend Owners' minor/normal husbandry affairs without charging separate agency fees, however should there be any extra ordinary matters...for Owners' account...", clause 53 specifies what taxes are for charterers' and owners' "account" respectively.    The parties have said nothing about the cost of claims handling when done in the first instance by the charterers.

17.    The inexorable inference is that the Charterers are to do the claims handling, but *in the capacity of the Owners' agents* and therefore the Owners are to pay for the function thus performed even though in the final account under the Interclub Agreement, it may be brought into the ultimate account.    This may be seen as in line with the benefit of P & I Club cover "as far as the Rules permit" as granted by clause 39. Such clauses are enforceable although in particular cases club rules may not so allow: see Court Line v Canadian Transport [1940] A.C. 934. I know nothing of the relevant Gard Rules, which have not, so far as I am aware, been put in evidence in this case.

18.    This produces the result in English law that the failure of the Charterers to do the cargo claim handling in the first instance does not in fact generate a recoverable head of loss or damage in the Owners, so far as the costs of the claims handling are concerned, until the time comes for apportionment under the Interclub Agreement.    It may be thought that this diminishes the impact of clause 78(c), and to an extent that is plainly true, but it is analytically inevitable in my view and it is consistent with clause 39. Also, although this falls under the heading of the second qualification which I discuss below, I add one note of caution. I have no knowledge of the arrangement as to the costs of claims handling which has in fact been put in place. It is said that the Owners have incurred the costs and of course

8

I accept that assumption, but it must be borne in mind that P. & I. clubs usually organize, undertake and pay for defence of claims otherwise falling within club cover and some rules specify that they do so specifically as agents for the members and they indemnify the members for such costs as a matter of strict analysis, whereas other clubs do it directly. An example may be found in the Nordisk rules, so I believe, and one very eminent London arbitrator has recently refused to award a successful party costs incurred by Nordisk since, under the rules, Nordisk does not act as agent for the member of indemnify the member for incurred costs. As I have said, I have no knowledge of the relevant Gard Rules which have not been provided to me. The importance is that it may be that the costs, as incurred, may have been analytically incurred *by the Owners* (with a right of indemnity from Gard) or they might have been incurred *directly by Gard* without recourse to the Owners. If Gard has suffered the loss rather than the Owners themselves on this analysis, then the Owners have suffered no loss or damage and have no accrued cause of action for such loss even though it may find its origins in the Charterers' breach of clause 78(c) of the Charterparty.

19.    Furthermore, I should note what is already obvious, namely that the costs of London arbitration proceedings fall outside the Interclub Agreement. There is simply no cause of action for such costs. The only right to recover such costs arises in the event that an arbitral tribunal exercises its right under s.49 of the Arbitration Act 1996 to award that one or other party bears the costs of an arbitration reference. Until such an award is made, which is in the entire discretion of the tribunal, there is no cause of action. By definition none is "ripe" so far as those accrued and anticipated costs are concerned.

20.    I now turn to qualification (ii).    As adumbrated above, it is important to discern the precise heads of loss and damage for which the Owners are seeking Rule B attachment and in respect of which they assert a "ripe" cause of action in English law.    Mr. Rainey QC does not consider this question at all, assuming implicitly that once there is a cause of action then that is the end of the matter.    I do not

believe that this is correct or quite so simple, although I cannot blame him since he seems not to have been provided with Mr. Volikas' Affirmation in which the precise heads of claim are enumerated.

21.    If one ignores (as Mr. Rainey QC says one must) the impact of the Interclub Agreement, one is necessarily looking specifically for those heads of loss and damage which the Owners have suffered as a result of the Charterers' breach of their obligations under clause 78(c) and not for the ultimate payout to the cargo claimants; that ultimate allocation of loss and damage is to be effected under the Interclub Agreement and Mr. Rainey QC accepts that there is no current "ripe" cause of action under that Agreement.    Thus one is concerned only with an "in the first instance" allocation of cashflow as being recoverable loss and damage resulting from a breach of clause 78(c). I will call this "the financing cost".    The cause of action is "ripe" only for that financing cost as material loss and damage. By definition, the amounts secured by the LOUs are not actually lost to the Owners since they are not paid to the cargo claimants but merely unavailable for use by the Owners, even if one assumes that the Owners have actually provided a designated sum as counter-security for the Club LOU's, as to which see below. The only recoverable loss and damage to the Owners resulting from the breach of clause 78(c) at this "first instance" stage is thus the financing cost of maintaining the security, if any and often this is only a nominal 1% per annum although this will vary.    I have seen no evidence on this.

22.    Therefore, it is quite clear to me that the amounts secured by the LOUs are not recoverable as damages for breach of clause 78(c), but only the financing cost of maintaining that security, if any.    I have seen no evidence showing what those costs are.

23.    This brings me to a point which is similar to one raised above, namely the relationship of the Owners to Gard as stipulated in the Gard Rules and the correspondence between the Owners and Gard in relation to these two LOUs.

The point is that, as already noted, unless there is specific provision in the Gard Rules to a different effect, it is Gard who have established the LOUs, not the Owners and thus, in the absence of rights of indemnity of Gard against the Owners, the security would not have cost the Owners anything and therefore the Owners would have suffered no loss and damage as a result of the Charterers' breach of clause 78(c) at all. Of course it may be that Gard have indeed required counter-security to be provided by Sanko and the cost of that counter-security (and the losses attributable to its loss if use) would then be a loss to the Owners and recoverable as damages for the Charterers' breach of clause 78(c). If, as may well be the case, Gard have made no demands on the Owners at all as a condition of providing the LOUs, then there is no loss to the Owners. Until the LOU is claimed upon, there is in truth little or no loss to anyone and as soon as it is claimed upon it falls under clause 40 and the Interclub Agreement. For obvious reasons, I am unable to comment further upon this since I have no factual or evidential material, but I hope my various assumptions are and their consequences are reasonably clear.

24.     Therefore, the important question which Mr. Rainey QC has, understandably, not addressed is in my view the critical one and it undermines the effect for present purposes of his otherwise perfectly correct analysis. The full nominal amounts of the LOU maximum figures are not, on what I have seen, recoverable as damages for the Charterers' breach of clause 78(c). At most, the recoverable loss is the cost of the LOUs as incurred by or on behalf of the Owners. That is not the full amount of the LOUs and that full amount is recoverable only upon payment under them, but that must falls within clause 40, for which there is no "ripe" cause of action.

25.     I turn finally to qualification (iii), and it is really no more than a point of detail, although not without its financial impact. It will be noted that US$890,017.71 of the Pactrans claim is in respect of "demurrage" which has not yet been paid by Pactrans to Sinochart. The definition of "cargo claims" as it appears in the

11

Interclub Agreement (quoted above) and would unquestionably be adopted as the meaning of the same term in clause 78(c) (albeit that there are no capital letters) does not appear to embrace "demurrage" claims, however the Pactrans claim may be worked out.    It does not fall within any of the wide terms stipulated in the definition of "cargo claims".    This is significant since it would seem to show that the Pactrans claim at least for that sum is not a "cargo claim" at all for the purposes of clause 78(c) at all.    The Charterers did not, by clause 78(c), undertake to handle or secure claims which were not "cargo claims".    I quite accept that the Pactrans "demurrage" claim may in some sense be tracked back to the cargo damage, but that does not mean that it is or becomes a "cargo claim" for the purposes of the Charterparty and clauses 40 and 78(c) in particular.

26.    In conclusion, therefore, I agree with the Affirmation of Mr. Rainey QC that there is an accrued "ripe" cause of action vested in the Owners for the Charterers' breach of clause 78(c) of the Charterparty, but that cause of action does not, as a matter of English law in my opinion, extend to the amounts stipulated in the Owners' claims to Rule B attachment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of July, 2007 at London, England.

TIMOTHY YOUNG Q.C

12

## **AFFIRMATION OF SERVICE**

I hereby certify that on July 6, 2007, a copy of the foregoing Declaration of Timothy Nicholas Young was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By:  _____
Patrick F. Lennon (PL 2162)