```
                                    ┌─────────────────────────┐
                                    │ USDS SDNY               │
                                    │ DOCUMENT                │
                                    │ ELECTRONICALLY FILED    │
                                    │ DOC #: _____ │
                                    │ DATE FILED: 2-22-08     │
                                    └─────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------- X
SANKO STEAMSHIP CO., LTD.,              :
                                        :        07 Civ. 2401 (VM)
                     Plaintiff,         :
                                        :
     - against -                        :        **DECISION AND ORDER**
                                        :
CHINA NATIONAL CHARTERING CORP.,        :
                                        :
                     Defendant.         :
--------------------------------X

**VICTOR MARRERO, United States District Judge.**

On March 23, 2007, plaintiff Sanko Steamship Co. Ltd.
("Sanko") applied ex parte for an order for process of a
maritime attachment against defendant China National
Chartering Corp., also known as Sinochart ("Sinochart"),
pursuant to Rule B of the Supplemental Admiralty Rules for
Certain Admiralty and Maritime Claims ("Rule B"). See Fed. R.
Civ. P. Supp. R. B(1).    The Court granted the order.
Sinochart now moves to vacate the attachment, or in the
alternative, to reduce its amount.    For the reasons stated
below, the motion to vacate the order of attachment is DENIED,
and the motion to reduce the amount of the attachment is
GRANTED.

## I. BACKGROUND[1]

---

[1] The factual recitation set forth below is drawn from the Amended Verified
Complaint, dated Sept. 14, 2007 (the "Complaint") and the Memorandum of
Law in Opposition to Defendant's Motion to Vacate or Reduce Maritime
Attachment, dated 4, 2007, as well as the Affirmation of Michael Volikas,
dated May 22, 2007 ("Volikas Decl.").   Except as quoted or otherwise
cited, no other specific reference to these documents will be made.

On 25, 2006, Sanko time chartered a vessel to Sinochart for sixty days for the carriage of plasterboard ("the Cargo") from Qingdao, the People's Republic of China to Pensacola, Florida and Mobile, Alabama. (See Time Charter ("Charter Party"), attached as Ex. A to Volikas Decl.) Sinochart in turn chartered the vessel to Pactrans Air and Sea Inc. ("Pactrans"), which entered into an agreement with Devon International Trading ("Devon") to import the Cargo. During the course of loading at Qingdao, Sinochart retained a Port Captain and stevedore to load and store the Cargo. While en route from Qingdao to Pensacola, the Cargo collapsed and was allegedly damaged due to improper stowage.

On or about June 16, 2006, during the discharge of the Cargo at Pensacola, Devon, surveyors for cargo interests, notified Sanko that security for the damaged Cargo was requested by the cargo interests. In response to the security demand, Assuranceforeningen Gard ("Gard"), Sanko's P&I Club[2] requested that Skuld Assuranceforeningen ("Skuld"), Sinochart's P&I Club, take over the handling of the cargo claims and post security pursuant to Clause 78(c) of the Charter Party ("Clause 78(c)"). Clause 78(c) states:

It is agreed that Charterers shall handle cargo claims in

---

[2] P&I Clubs are insurers of maritime risk. The "P" stands for protection and the "I" stands for indemnity. For a description of the purpose and operation of P&I Clubs, see Sonito Shipping Co., Ltd. v. Sun United Maritime Ltd., 478 F. Supp. 2d 532, 537-538 (S.D.N.Y. 2007).

the first instance and provide security to cargo
interests in respect of cargo claims within reasonable
time of receipt of request to do so.

Skuld refused to take over the handling of the cargo claim or
to provide security to the cargo interests. Subsequently,
Ince & Co., London solicitors for Sanko, contacted Skuld
regarding the handling of the cargo claim and the security to
cargo interests, but Skuld provided no substantive response to
the request.

On or about June 29, 2006, during discharge of the Cargo
in Florida, the vessel was arrested as security for the claim
brought by Devon. A lawsuit was filed in the United States
District Court for the Northern District of Florida against
Sanko and the vessel. In order to release the vessel from
arrest, Sanko arranged for security in the form of a Letter of
Undertaking in the amount of $1,650,281.56. Sanko is
currently defending a lawsuit in Florida for alleged Cargo
damage. Beginning July 3, 2006, Ince & Co. repeatedly
contacted Sinochart to take over the handling of the cargo
claim and to provide counter-security in the amount granted to
Devon or replacement security. Ince & Co.'s efforts were not
successful.

On or about December 20, 2006, the vessel was arrested
for the second time in Mobile, Alabama by Pactrans, freight
forwarders acting for receivers of the cargo, as security for

3

alleged cargo loss and demurrage claims.  In order to release the vessel from arrest, Sanko arranged for security in the form of a Letter of Undertaking in the amount of $2,275,000. Sanko is currently defending a lawsuit in Alabama for alleged Cargo damage.  Beginning on January 11, 2007, Ince & Co. contacted Sinochart through Richards Butler, their English solicitor, and advised Sinochart that Pactrans had brought a lawsuit and arrested the vessel for security.  Sanko received no meaningful response as to whether Sinochart would take over the handling of the Pactrans cargo claim and provide security for the cargo claim under Clause 78(c).

On April 3, 2007, Sanko demanded arbitration in London pursuant to Clause 17 of the Charter Party. On September 14, 2007, Sanko filed an Amended Verified Complaint in this case alleging violations of Clause 78(c) and Clause 40 of the Charter Party ("Clause 40").  Clause 40 incorporates the Inter-Club New York Produce Exchange Agreement which determines apportionment of liability for cargo claims. (See Inter-Club New York Produce Exchange Agreement ("ICA"), attached as Ex. 2 to Decl. of Chris Howse, dated Apr. 2, 2007 ("Howse Decl.")  Under the ICA, apportionment for cargo claims is to be made when (1) the claim was made under contract of carriage; (2) the responsibility clauses in the charter party have not been materially amended; and (3) the claim has been

4

properly settled or compromised and paid.

In the Amended Complaint, Sanko requested an order for process of maritime attachment against Sinochart in the amount of $3,752,084.05. This sum was derived from (1) Sanko's payment of $2,275,000 as security, which represents the greater of the two attachments for the claims pending in Florida and Alabama; (2) Sanko's payment of $490,000 to cover interest on the security; (3) $568,000 for legal fees in connection with the London arbitration ($78,500 incurred and $490,000 estimated); (4) $367,084.05 for legal fees in connection with the defense of the cargo claims in Florida and Alabama ($67,084.05 incurred and $300,000 estimated); and (5) $52,000 to cover the fees of Gard ($27,000 incurred and $25,000 estimated).

Sinochart argues that the attachment should be vacated, as Sanko has failed to state a valid prima facie admiralty claim, or in the alternative, the attachment should be reduced pursuant to Rule E of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims ("Rule E"). See Fed. R. Civ. P. Supp. R. E(6).

## II. **DISCUSSION**

A.   SANKO'S CLAIM UNDER CLAUSE 40 OF THE CHARTER PARTY

Sinochart contends that Sanko does not have a valid prima facie admiralty claim under Clause 40, because the action is

5

a premature indemnity claim that is unripe and not accrued, and as such, it is not a valid prima facie admiralty claim under Rule B.

### 1.   Legal Standard

In <u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.</u>, the Second Circuit laid out a plaintiff's burden in overcoming a motion to vacate a Rule B attachment.  <u>See</u> 460 F.3d 434, 445 (2d Cir. 2006).   Under <u>Aqua Stoli</u>, a plaintiff must demonstrate that:

> 1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment.

<u>Id.</u> The issue of whether Sanko's claim has accrued is to be determined by English law, as that is the law of the Charter Party.   <u>See</u> <u>T & O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A.</u>, 415 F. Supp. 2d 310, 314 (S.D.N.Y. 2006) ("[T]he law of the contract applies to the question of whether a claim has accrued, but federal law governs the determination of whether an attachment is reasonable.")

### 2.   Prima Facie Admiralty Claim Under Clause 40

Sinochart argues that because the cargo claim has not been "properly settled or compromised and paid" as required for apportionment under the ICA, Sanko's indemnity claim is not yet ripe.  In support of its argument, Sinochart relies

primarily on <u>Sonito Shipping Co. Ltd. v. Sun United Maritime Ltd.</u>, 478 F. Supp. 2d. 532 (S.D.N.Y. 2007). The plaintiff in <u>Sonito Shipping</u> attached the defendant's property following commencement of arbitration in London to resolve the underlying cargo claim, and the defendant moved to vacate the attachment on the grounds that the plaintiff's maritime claim had not yet accrued, because the cargo claim had not yet been determined and paid. Similar to the instant case, the charter party at issue in <u>Sonito Shipping</u> provided that it would be governed by English law, and also incorporated the ICA with regard to the apportionment of cargo claims. The <u>Sonito Shipping</u> Court vacated the attachment, holding that, under English law, the plaintiff did not have a valid maritime claim against the defendant at the time the complaint was filed, because payment of the cargo claim was a condition precedent for apportionment and indemnification under the ICA. <u>See id.</u> at 543. Sinochart argues that, as no cargo claim has been paid, under <u>Sonito Shipping</u>, Sanko has not stated a valid maritime claim justifying the Rule B attachment.

Sanko, on the other hand, relies on <u>Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.</u> to support its contention that, under the facts of the instant case, it has stated a valid maritime claim properly justifying an attachment under Rule B. <u>See</u> 485 F. Supp. 2d 399 (S.D.N.Y.

7

2007).  The <u>Navalmar</u> Court was also faced with the issue of whether a maritime claim had accrued, and therefore was valid under Rule B, where the charter party incorporated the ICA. The <u>Navalmar</u> Court upheld the attachment, and differentiated the case from <u>Sonito Shipping</u> on several grounds.  First, in <u>Navalmar</u>, the plaintiff had been required to post security, and thus had to "prepay a debt owed to it," whereas in <u>Sonito Shipping</u> there had been no ship arrests or equivalent provisional remedy to secure payment by the vessel owner for a cargo claim.  <u>Id.</u> at 405.  And second, the plaintiff secured an interim award in an arbitration hearing that made findings of fact favorable to its case.   The <u>Navalmar</u> Court stated that, by posting security, the plaintiff had a direct interest in securing its claim of indemnity against the defendant, and should have the right to do so just as the cargo claimant had gained security against it by arresting the vessel.  <u>See id.</u> The <u>Navalmar</u> court further noted that "the entire point of an attachment, as a provisional remedy before trial, is to secure a plaintiff's claim before it can be adjudicated."  <u>Id.</u>  In concluding, the <u>Navalmar</u> Court held:

> The parties have cited no precedent to suggest that [the relevant clause] of the ICA should apply where a vessel owner has had to prepay an obligation potentially owed by the charterer for goods damaged in an ocean voyage arranged by the charterer.

<u>Id.</u>

The facts of the instant case lie somewhere in between those of _Sonito Shipping_ and _Navalmar_. Unlike in _Sonito Shipping_, in this case, Sanko has had to post security, and in effect, "prepay" for the cargo claim. However, unlike the case in _Navalmar_, no interim determination favorable to Sanko regarding the cargo claim has been made. The _Navalmar_ Court appears to have focused on the equity of the situation before it, _i.e._, the plaintiff had been required to post security and had obtained a favorable interim award, and therefore, should have the benefit of attaching the defendant's funds because "[i]n a world of shifting assets, numerous thinly-capitalized subsidiaries, flags of convenience, and flows of currencies, maritime attachments have particular importance." 485 F. Supp. 2d at 404. On the other hand, the _Sonito Shipping_ Court focused more on the language of the ICA, and on plaintiff's having willingly entered an agreement with these terms, stating that, "Sonito was not required to agree to the incorporation of the ICA in the charter party, but having done so, it is bound by it." 478 F. Supp. 2d at 543.

Given the clear language of the ICA, that Sanko voluntarily entered into this agreement with Sinochart, and the precedent in both this District and elsewhere holding that an indemnity claim under the ICA is not ripe until the underlying cargo claim has been paid, the Court finds that

9

Sanko's claim under Clause 40 is indeed not ripe, and is therefore not a valid prima facie maritime claim within the meaning of Rule B.   While the <u>Navalmar</u> Court noted that neither party had cited precedent suggesting that the ICA should apply where a ship arrest has occurred, the Court takes into account that no precedent, except for <u>Navalmar</u>, has been brought to its attention to support the contention that the ICA should not apply in this situation, and indeed, nothing in the ICA or Charter Party suggests otherwise.

B.    <u>SANKO'S CLAIM UNDER CLAUSE 78(C) OF THE CHARTER PARTY</u>

Sinochart's motion with respect to Sanko's claim under Clause 78(c) contends that even if Sinochart breached that provision of the Charter Party, Sanko has suffered no damages, and therefore, such a claim cannot be the basis of the Rule B attachment.   Alternatively, Sinochart moves to reduce the amount of the attachment pursuant to Rule E.

1.    <u>Legal Standard</u>

Rule E states, "[w]henever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given." While a "plaintiff need not prove its damages with exactitude," the court must find that the plaintiff's damages estimate is "not frivolous." <u>Dongbu Express Co. Ltd. v. Navois Corp.</u>, 944 F.Supp. 235, 237 (S.D.N.Y. 1996).    Courts have released funds where the

10

plaintiff has failed to provide sufficient evidence to support its claim.  See Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd., No. 05 Civ. 7173, 2005 WL 2446236, at *2 (S.D.N.Y. Oct. 3, 2005).

### 2.    The Amount of Attachment Must Be Reduced

Sinochart has admitted that Sanko has a ripe, accrued claim under Clause 78(c) of the Charter Party, but contends that Sanko has suffered no damages due to Sinochart's breach of Clause 78(c), and therefore, the claim cannot justify the Rule B attachment.    (See Sinochart's Reply Memorandum of Law in Further Support of Motion to Vacate or Reduce Maritime Attachment, dated July 6, 2007, at 7-9; Declaration of Timothy Nicholas Young, dated 5, 2007, at ¶¶ 12, 13 ("Young Decl."))  The thrust of Sinochart's argument is that Clause 78(a) of the Charter Party required the use of Sanko's bills of lading, and therefore, Sinochart would be expected to incur no primary liability as carriers to cargo claimants, but rather, would handle the cargo claims only as Sanko's agents. (See Young Decl. at  ¶¶ 7, 14.)  In acting as Sanko's agents in handling the claims, Sinochart contends that it would be entitled, as a matter of general law, to the right to be indemnified for costs incurred unless the contract specifies otherwise.  (See id. at ¶ 15.) Sinochart further argues that, because it would have handled the claims as the agent of

Sanko, there is no recoverable loss or damage to Sanko for the costs of the claims handling. Additionally, because the funds posted as security have not been lost by Sanko, but merely made unavailable, the only recoverable loss to Sanko for Sinochart's breach of Clause 78(c) is the financing cost associated with maintaining the security.   Accordingly, Sinochart contends that the attachment must be vacated or reduced, as Sanko has failed to justify the attachment of Sinochart's property in the sum of $3,750,082.05.

Sanko, on the other hand, counters that the Clause 78(c) should be read exactly as written, i.e., that Sinochart has the obligation to provide security for cargo claims and to pay the costs of defending those claims in the first instance. Sanko essentially argues that because Sinochart had the obligation to post security and pay costs for defending the cargo claims, Sanko should be entitled to an attachment of Sinochart's property in those amounts.

The issues of the interpretation of Clause 78(c) and the determination of any attendant damages are for the London arbitrators to decide, not this Court.   Given the clear language of Clause 78(c) and with the information currently available, the Court cannot rule with certainty that Sinochart's obligations under the clause exist as agents for Sanko, and Sanko therefore has a valid claim against

Sinochart.   For the purposes of the attachment, it is
sufficient that Sanko have a prima facie martitime claim
against Sinochart, and as previously noted, the exact damages
for that claim are not questions to be decided by this Court.
The Court need only be satisfied that Sanko's claims are not
frivolous.

The Court disagrees with Sinochart's argument that the
only potential loss to Sanko is the financing cost of
maintaining the security, because it fails to take into
consideration the risk borne by Sanko in posting security and
paying legal fees for the defense of the actions in Florida
and Alabama.  If Sanko prevails on its theory regarding Clause
78(c), then the associated costs constitute a risk that should
have been borne by Sinochart.  Be that as it may, the Court is
persuaded that the amount of the attachment must be reduced as
Sanko has overreached in the amount it attached based on this
claim.   The Court agrees with Sinochart that the attachment
should be reduced.  Sanko is not entitled to the $890,071.71
security based on Sinochart's own demurrage claim, and
therefore Sanko is entitled only to the security for the cargo
claim in the amount of $1,500,000.  Additionally, given the
lack of documentary evidence regarding fees and costs, the
Court accepts Sinochart's estimation of thirty percent of
Sanko's claim as sufficient security for costs, which amounts

to $450,000. Accordingly, the Court concludes that the amount of the attachment should be reduced, however the exact amount of the attachment is to be determined pending submissions regarding the calculation of interest on the $1,500,000 security.

### III. ORDER

ORDERED that the motion of (Docket No. 6) defendant China National Chartering Corp. also known as Sinochart ("Sinochart") to vacate the Order of Attachment, dated March 23, 2007 ("the Order") herein is DENIED; and it is further

ORDERED that Sinochart's alternative request that the Order be modified to reduce the permissible amount of attachment is GRANTED.

Plaintiff Sanko Steamship Co. Ltd. ("Sanko") is directed to submit its calculation regarding interest within seven days of the filing of this Decision and Order. Sinochart may respond within five days of the filing of Sanko's response to this Order should it disagree with Sanko's calculation.

SO ORDERED.

Dated:    New York, New York
          22 February 2008

VICTOR MARRERO
U.S.D.J.

14